**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ROBERT SAMPSON, | : | |
| | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. 22-cv-05120 |
| v. | : | |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

## I.      INTRODUCTION

Stony Brook University School of Medicine (Stony Brook) has determined that Robert Sampson is an individual with disabilities who needs double extended time (100%) on examinations and provides these accommodations on medical school examinations. Sampson needs to take and pass the Step 1 of the United States Medical Licensing Examination (USMLE) in order to continue onto his last 40 weeks of medical school, but the National Board of Medical Examiners (NBME) which administers Step 1of the USMLE has refused to provide him with the extended testing time accommodations that he needs and Stony Brook provides. Sampson must take the USMLE Step 1 without delay because Stony Brook has asserted that he is to be dismissed for failing to complete medical school within seven years.[1] Therefore, unless Sampson takes and passes the USMLE Step 1, he will be dismissed from medical school. Once dismissed from medical school, he will no longer be eligible to take the USMLE at all, and despite years of work and sacrifice, his medical career will be over before it began.

---

[1] Plaintiff has filed a separate but related action captioned *Sampson v. Stony Brook University*, No. 22-cv-4490. A separate Motion for Preliminary Injunction is pending in which Sampson seeks to enjoin Stony Brook from dismissing him from medical school before he has had an opportunity to take Step 1 with accommodations.

It is not in the public interest to destroy the careers of promising medical students with disabilities. In 2008, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et. seq.,* was amended to prevent this exact harm and to underscore the point that whether a person has a disability "should not demand extensive analysis." ADA Amendments Act ("ADAAA"), Pub.L.No. 110-325, §2(b)(5); *see also* 28 C.F.R. § 36.105(d)(1)(ii). Extended time is a routine testing accommodation provided to students with learning disabilities and/or ADHD on standardized examinations, including medical licensing examinations, and is required by the ADA. ADA regulations require testing entities to administer tests "to *best ensure* that, when the examination is administered to an individual with a disability," the examination results "accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure," rather than reflecting the extent of the individual's disability. 28 C.F.R. § 36.309(b)(1)(i) (emphasis added).

Sampson will be able to prove that he is an individual with a disability based on his neuropsychological evaluations, history of receiving accommodations, and testimony of those who have seen first-hand his struggles with reading, thinking and concentrating. If Sampson is not given extended time, he will suffer irreparable harm because he will not be able to demonstrate his skill and knowledge on the examination and runs the risk of failing the exam and being expelled from his medical school.  The harm to the public will be that a talented and compassionate medical student will be permanently sidelined on the basis of disability contrary to the principles enshrined in the ADA.  For these reasons, a preliminary injunction should be granted so that Sampson has a fair opportunity to demonstrate that he has learned the material expected of him, without the test also measuring the extent of his disabilities.

## II.    FACTUAL BACKGROUND

Sampson is a student in his final year of a joint MD/MBA program. He has completed nearly all the required coursework and several clinical rotations. In order for Sampson to graduate from medical school, he is required to pass the USMLE Step 1 and USMLE Step 2 Clinical Knowledge (CK) exams. Sampson has attempted to take the USMLE Step 1 without accommodations because of NBME's unlawful denial of accommodations, but he has failed due to not having enough time to read the questions.

Sampson is affected by a Specific Learning Disorder with impairments in reading and written expression and Attention Deficit Hyperactivity Disorder (ADHD), which substantially impair the major life activities of reading, spelling, cognitive processing speed, attention concentration and taking standardized exams. On lengthy academic tasks and/or examinations, which are strictly timed, he requires extra time in order to read the questions asked and the possible answers. The USMLE Step 1 contains lengthy reading passages, often referred to as "vignettes", which are longer and more complex reading passages than are found on any other standardized exam that Sampson has previously taken. Exhibit 1, Declaration of Robert Sampson (Samson Decl.) ¶ 42.

NBME has on multiple occasions denied Sampson's requests for additional time (100% extended time) contrary to the extensive documentation submitted in support of his request for accommodations. This documentation included evaluations conducted by qualified professionals, educational records, and approval of accommodations by his medical school. In denying Sampson's requests, the NBME has second-guessed the conclusions of highly respected professionals who have evaluated Sampson's disability firsthand.

A.     <u>**Sampson's History of Disability**</u>

Robert Sampson, despite enormous talent and dogged determination, has struggled with reading, learning, and concentration since his early childhood. Unlike the general population for whom reading and learning occurs with fluency and automaticity, for Sampson he has struggled throughout his education.

At the age of 4, Sampson exhibited difficulty with speech articulation and subsequently received speech and language therapy. Exhibit 1, Declaration of Robert Sampson (Sampson Decl.) ¶ 6; Exhibit 2, Declaration of Jeanette Wasserstein, Ph.D. (Wasserstein Decl.) ¶ 7; Exhibit 2-B, Neuropsychological Evaluation of Robert Sampson dated December 6, 2020 (Neuropsychological Evaluation). Throughout his elementary education he had difficulty reading aloud, reading fluently and reading for comprehension. Additionally, he exhibited difficulty maintaining his focus and attention.

Sampson's elementary educational records reflect that his teachers recognized that his impairments impacted him at school. For example, his first-grade teacher wrote in a grade report, "We are presently working on making sure Robert listens to and follows directions the first time they are given. We will also be working on having Robert stay more focused on a task, so he may complete the task faster and stay more organized." Ex. 2-B, Neuropsychological Evaluation p. 4. His second-grade teacher commented that Sampson lacked focus and "Robert will have difficulty with comprehension especially inferential material." *Id*. Later in elementary school, his fifth-grade teacher wrote, "He frequently fails to listen to directions the first time and needs them to be repeated. Robert can also act impulsively on occasions, drawing attention to himself in ways that are not positive. Among the areas to work on this year are his organizational skills and his writing skills." *Id*. Similarly, his sixth-grade teacher reported, "He is easily distracted often does not begin his work promptly." *Id.*

In middle school and high school, Sampson continued to encounter difficulties due to his reading impairment and ADHD. Sampson was not able to complete assigned books because it took him too long to read and comprehend. Ex.1, Sampson Decl. ¶ 8. Moreover, his impairment in sustained attention caused significant fatigue which further impeded reading comprehension. Accordingly, Sampson relied upon summaries, Spark Notes and significant intervention by subject matter tutors throughout his middle and high school education. Ex. 1, Sampson Decl. ¶ 9. At times Sampson met with as many as three tutors a day in order to learn the material his classmates learned during the school day. Ex. 1, Sampson Decl. ¶ 8. Tutors would verbally engage with Sampson discussing materials with him interactively in order for him to gain meaning from print or lectures. Ex. 1, Sampson Decl. ¶ 8. Because reading was so difficult and time consuming for Sampson, he never read for pleasure. Ex. 1, Sampson Decl. ¶ 8, 44. Sampson relies on voice-to-text applications for texts and emails. Ex. 1, Sampson Decl. ¶ 12.

During Sampson's undergraduate years, he continued to encounter challenges and barriers due to his disabilities. In college, due to his reading impairment and impaired focus and concentration, he avoided classes with heavy reading and large lecture-hall style classes that had timed multiple-choice formatted exams. Ex. 1, Sampson Decl. ¶ 9. When required to take such multiple-choice exams, he routinely ran out of time and scored poorly. As throughout his education, Sampson was typically the last one finished when taking a test. *Id.* Whenever possible, Sampson opted for classes that assessed performance based on projects and essays, rather than timed assessments, even if it meant taking an African dance class that was totally out of his comfort zone but did not have heavy written requirements to fulfill a non-Western perspectives requirement. *Id.* On projects and essays, his grades were typically better than on multiple-choice exams. Accordingly, during college, his grades varied widely because of the impact of his disability. *Id.* Beginning in college, Sampson relied on a live scribe pen to record

lectures and sync them to his notes so that he could listen over and over to lectures rather than utilize text. Sampson Decl. ¶ 10.

While in college, Sampson continued to work extensively with tutors. One of the tutors with whom Sampson worked closely, recommended a neuropsychological assessment due to the evident learning challenges that he exhibited. Sampson Decl. ¶ 10.

Suzanne E. Michels, Ph.D. conducted a comprehensive psychological evaluation of Sampson on August  26, 2013. Dr. Michels summarized the results, diagnosis and recommendations in a written report. Exhibit 3, Suzanne E. Michels, Ph.D. Psychological Evaluation (Michels Evaluation). Based on Sampson's history, assessment results and her own observations, Dr. Michels diagnosed Sampson with Learning Disorder, Not Otherwise Specified. She noted that his reading speed was clearly a liability. Dr. Michels recommended several academic and testing accommodations including extended time on exams. *Id.*

Sampson underwent additional psychological testing to evaluate his attention and concentration impairments. Allison Anderson, Ph.D. evaluated Sampson on December 16, 2013, and prepared a report that summarized the results, findings, and recommendation. Exhibit 4, Allison Anderson, Ph.D. Psychological Evaluation (Anderson Evaluation). Dr. Anderson administered the Woodcock Johnson Test of Cognitive Abilities, 3rd Edition (WJ Cog III). She reported that on Picture Recognition subtest, he scored in the 16th percentile, which reflected below average ability to recall visual images after brief exposure. Deficits in visual spatial thinking were further reflected in the results of the Rey-Complex Figure Test (RCFT). On each of the subtests of the RCFT, he scored below the 16th percentile. Dr. Anderson reported that Sampson's ability to retrieve visuospatial material when given a cue was impaired as he scored in the 4th percentile on the Recognition Total Correct assessment of the RCFT. The results of the RCFT indicate problems with visuospatial storage (memory). *Id*.

Dr. Anderson also administered an assessment of reading achievement, the Scholastic Achievement Test for Adults (SATA). Dr. Anderson diagnosed Sampson with Unspecified Neurodevelopmental Disorder,[2] visuospatial memory, visuospatial processing and Specific Learning Disorder, with impairment in reading. Dr. Anderson recommended accommodations, which included extended time on standardized testing and in classes. *Id.*

Sampson began medical school in August 2015 at Stony Brook University's Renaissance School of Medicine (Stony Brook). Ex. 1, Sampson Decl. ¶ 16. At orientation, Sampson and his classmates were told that they only needed to pass their classes to progress. Ex. 1, Sampson Decl. ¶ 17. He hoped that the mitigating measures including reliance on a live scribe pen, audio review of lectures, reliance on multimodal supports, extensive hours of study, completion of practice tests beyond those completed by his peers, and one-on-one didactic review of material, that he utilized and relied upon throughout his education would be sufficient to overcome the challenges from his impairment. Ex. 1, Sampson Decl. ¶¶ 11 – 12, 16. However, these compensatory strategies did not ameliorate the impact of his various impairments. Ex. 1, Sampson Decl. ¶19. While Sampson passed all his classes, his grades did not fully reflect his knowledge because without the extended time he needs to because of his disabilities, he did not have enough time to read all the questions on exams. Ex. 1, Sampson Decl. ¶19; Exhibit 4, Unofficial Transcript; Exhibit 5, Course History.

During Sampson's second year, he applied for accommodations including testing accommodations with Stony Brook's Student Accessibility Support Center (SASC). After

---

[2] Unspecified Neurodevelopment Disorder is an updated change in terminology from Learning Disorder, Not Otherwise Specified. The change of diagnostic terminology over the course of Sampson's evaluations reflects a change in terminology in the revised version (Fifth Edition) of the Diagnostic and Statistical Manual of Mental Disorders (DSM-V), which was published in May 2013.

completing the required paperwork, furnishing Dr. Anderson's and Dr. Michel's evaluation

reports, and submitting to an interview with a SASC disability resource professional, Sampson

was approved for accommodations including 50% extended time on exams. Ex. 1, Sampson

Decl. ¶ 22; Exhibit 7, Christopher Heedles, LMSW, March 27, 2017 letter. In addition to

receiving accommodations, Sampson at the start of his second year worked with Stony Brook's

Learning Specialist, Linda De Motta, to develop strategies to compensate for his learning

differences. Upon receiving extended time coupled with his learned strategies, Sampson was able

to complete more of the examination questions, though he still did not have enough time to read

all of the questions. Since he was able to read and answer more of the questions, the scores that

he received on exams after the implementation of accommodations vastly improved. Ex. 1,

Sampson Decl. ¶ 24; Exhibit 8, Linda De Motta, Learning Specialist, March 29, 2017 letter;

Exhibit 9, Linda De Motta, Learning Specialist, February 15, 2018 letter. The examinations

administered by Stony Brook to its students included NBME Subject Examinations (also known

as Shelf Exams), which are standardized examinations prepared by the NBME. Sampson

received extended time on the NBME Subject Examinations, which are substantively similar to

the actual NBME examinations for which he seeks accommodations from the NBME.[3] With

accommodations, he was able to read and answer more of the questions on these shelf exams,

and therefore demonstrate more of his actual knowledge of medicine. Exhibit 8

In August 2020, Sampson underwent a more recent evaluation to furnish updated

information to both Stony Brook and the NBME about his disabilities. Jeanette Wasserstein,

Ph.D., ABPP, who conducted the evaluation, has been a clinical psychologist for more than

---

[3] The NBME Shelf Exam are questions taken from retired USMLE exams, which are no longer part of the active circulation of questions utilized on the USMLEs and are therefore put on the "shelf". However, these retired questions are utilized in subject exams to assess a student's knowledge at the conclusion of a rotation such as in internal medicine.

thirty years and is also an Assistant Clinical Professor at Icahn School of Medicine at Mount

Sinai notably observed:

> Of note, the testing lasted about 15 hours, which is almost twice as
> long as usual for this type of evaluation. This extra time demand
> resulted from Mr. Sampson's extremely slow rate of reading and
> his deliberate and slow work style. On untimed tasks, he also was
> prone to rumination over his responses. Such observations
> illustrate real world impact of his disabilities.

Exhibit 2, Wasserstein Decl. ¶ 12.

Several assessments and normed rating scales support the prior diagnoses and

determinations that Sampson is a person with disabilities. On the Nelson Denny Reading Test, he

was able to answer only 12 of the 38 questions (answering all 12 questions correctly) in the

standard administration (20 minutes), which placed his score in the 1st percentile or at a 7th grade

level. Ex. 2, Wasserstein Decl. ¶ 24; Ex. 2-B, Wasserstein Evaluation p. 16. However, when give

extended time, Sampson was able to complete the 38 questions in more than double the amount

of time (54:30 minutes) and he was able to answer correctly 37 of 38 questions. *Id*. Additionally,

on the California Verbal Learning Test, several of his subtest scores were in the single digits

(i.e., 7th percentile). Ex. 2-B, Wasserstein Evaluation p. 10. Furthermore, on normed behavior

rating scales, many of his scores were in the clinically significant range for ADHD. Ex. 2,

Wasserstein Decl. ¶ 24.

Dr. Wasserstein provided diagnoses, which included Specific Learning Disorder, with

impairment in reading and ADHD. Ex. 2, Wasserstein Decl. ¶¶ 13-15. She concluded Sampson

needs double (100%) extended time for the NBME examinations, administered over two days

with additional breaks. Ex. 2, Wasserstein Decl. ¶ 28. After discussing the findings with Dr.

Wasserstein, Stony Brook agreed Sampson needed more than time and a half and approved

100% extended time for medical school evaluations. Ex. 2, Wasserstein Decl. ¶ 28; Ex. 1, Sampson Decl. ¶ 39.

### B.        The United States Medical Licensing Exam

The USMLE is a three-step (Step 1, Step 2 CK, and Step 3) examination, the successful completion of which is required for medical licensure in the United States. (see https://usmle.org/). The USMLE Step 1 examination is a computerized examination, which consists of questions presented in multiple choice formats. The USMLE Step 1 has approximately 280 multiple choice test items, divided into seven 60-minute blocks, administered in one eight-hour testing session. (see, https://www.usmle.org/step-exams/step-1)

Sampson must pass the USMLE Step 1 in order to maintain his eligibility to remain in medical school.  Furthermore, passing the USMLE 1 and USMLE Step 2 CK is required to graduate from Stony Brook, to enter into a residency program and to ultimately obtain medical licensure. Ex. 1, Sampson Decl. ¶ 21. The USMLE Step 1 examination requires candidates to read lengthy passages, as well as multiple answer options.  Ex. 1, Sampson Decl. ¶ 42. As a result, candidates cannot pass without reading the questions and the multiple-choice answer options.  As a result, test-taking strategies that work on the SAT or MCAT—such as reading only the questions and then searching for the relevant language in a passage in order to answer the question—do not work on the Step 1 examination. Ex. 1, Sampson Decl. ¶ 42.

Consequently, without testing accommodations, Sampson is not able to read all of the questions and multiple-answer choice options, much less have an opportunity to demonstrate what he actually knows about medicine. Sampson's efforts to take and pass Step 1 without accommodations were nothing short of Herculean. He studied as many as 16 hours a day, to the point that he developed back and wrist pain and neuropathy requiring medical devices and treatment. Ex. 1, Sampson Decl. ¶ 32. He described the months studying as if he was in a

different world from his friends, classmates, and family, as if he were a zombie. *Id*. Despite these extraordinary efforts and his knowledge of the materials, he failed the exam on his first attempt without the necessary accommodations for him to demonstrate his knowledge of medicine based on having read all of the test questions and answer choices. Ex. 1, Sampson Decl. ¶ 33.

    **C.**    **NBME's Denials of Sampson's Requests for Accommodations**

Since April 2017, Sampson has presented seven requests for accommodations to the NBME seeking extended time. Sampson, over the course of each accommodations submission, provided NBME with hundreds of pages of documents, including psychoeducational evaluation reports, a medical letter, letters from education and disability resource professionals, and educational records. Sampson Decl. ¶¶ 26-27, 31, and  40

Each time that Sampson registered for the USMLE Step 1, he provided thorough documentation of his disability and requested extended time. *Id*. Each time, NBME denied his requests despite having never met him, much less evaluated his disability. NBME did not conduct any testing of its own to measure Sampson's disabilities.

The most recent request for accommodations was submitted by Sampson in April 2022. Ex. 1, Sampson Decl. ¶ 40. In support of multiple applications for accommodations submitted between 2017 and 2022, Sampson submitted extensive documentation, including, psychological and psychiatric evaluations, personal statements, proof of prior accommodations, educational records, and learning specialist's letters. *Id*. Despite this extensive documentation showing that Sampson has disabilities and has received testing accommodations in medical school, including on the NBME shelf examinations, NBME has repeatedly refused to provide him with these accommodations. By letter dated June 1, 2022, NBME denied Sampson's request for appropriate accommodations for the seventh time. Exhibit 11, NBME June 1, 2022 denial letter. Sampson now stands on the precipice of losing everything.  Stony Brook requires students to pass Step 1

in order to begin the fourth year of medical school.  Despite having struggled with extraordinary mitigation and with sheer grit and determination, having succeeded in medical school despite all of the barriers he faced, and despite the promise his clinical supervisors saw in his committed, creative, and empathetic patient care, his medical career will be over before it began if he does not have the opportunity to demonstrate on the USMLE Step 1 exam the medical knowledge that he has worked hard to master.

## III.    LEGAL ARGUMENT

A party seeking a preliminary injunction in the Second Circuit must establish: "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest."  *Green Haven Prison Preparative Mtg. of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021).  These elements are taken up in turn.

### A.    Sampson Is Likely To Prevail on the Merits of His ADA Claim

Title III of the ADA requires that testing entities such as NBME "offer such examinations . . . in a place and *manner* accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."  42 U.S.C. § 12189 (emphasis added).  The U.S. Department of Justice (DOJ) regulations interpret this provision of the ADA to require that

> The examination is selected and administered so as to *best ensure* that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

28 C.F.R. §36.309(b)(1)(i) (emphasis added); *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1162 (9th Cir. 2011) (quoting 28 C.F.R. § 36.309).[4]  DOJ's regulations state explicitly that "[r]equired modifications to an examination may include changes *in the length of time permitted for completion of the examination* and adaptation of the manner in which the examination is given."  28 C.F.R. § 36.309(b)(2) (emphasis added).

An individual has a disability if he or she has "a physical or mental impairment that substantially limits one or more major life activities of such an individual."  42 U.S.C. § 12102(1)(A).  DOJ regulations make clear that that the term "physical or mental impairment" includes ADHD and "dyslexia and other specific learning disabilities."  28 C.F.R. § 36.105(b)(2); *see also, e.g.*, *Ramsay v. Nat'l Bd. of Medical Exam'rs*, 968 F.3d 251, 257 (3d Cir. 2020) *cert. denied,* 141 S. Ct. 1517 (2021); *Vinson v. Thomas*, 288 F.3d 1145, 1153-54 (9th Cir. 2002).  Major life activities include reading, concentrating, and thinking.  42 U.S.C. § 12102(2)(A).

An impairment "will meet the definition of disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  28 C.F.R. § 36.105(d); *Ramsay*, 968 F.3d at 257 (quoting *J.D. v. Colonial Williamsburg Found.*, 925 F.3d 663, 670 (4th Cir. 2019)) (quotation marks and brackets omitted).  The regulations state that in determining whether an individual has a disability, "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve" despite the disability.  *Id.* § 36.105(d)(3)(iii).

The test whether an individual has a disability "should not demand extensive analysis."  *E.g.*, *Ramsay*, 968 F.3d at 258 (citing 28 C.F.R. § 36.105(d)(1)(ii)).  Congress has explained that

---

[4] This "best ensures" standard is distinct from the "reasonable accommodation" standard used in the employment discrimination context.  *E.g.*, Enyart, 630 F.3d at 1162.

"the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."  ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, § 2(b)(5); *see also* 28 C.F.R. § 36.105(d)(1)(ii); *see also, e.g.*, *Alexiadis v. New York College of Health Professions*, 891 F. Supp. 2d 418, 428 (E.D.N.Y. 2012) (Bianco, J.) (quoting this language).[5]  Accordingly, the definition of disability is "construed in favor of broad coverage" and "to the maximum extent permitted."  42 U.S.C. § 12102(4)(A); 28 C.F.R. § 36.101(b); 28 C.F.R. § 36.105(a)(2)(i).  The term "substantially limits" is "not meant to be a demanding standard," 28 C.F.R. § 36.105(d)(1)(i), and "usually will not require scientific, medical, or statistical evidence." *id.* § 36.105(d)(1)(vii).

To this effect, the DOJ has explained that in determining what accommodations will "best ensure" the test scores fairly reflect the individual's skills and knowledge, the testing entity must give "considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations. . . ." 28 C.F.R. §36.309(b)(1)(v); *Ramsay*, 968 F.3d at 259 (discussing regulatory guidance).  As the Third Circuit recently explained in the testing context,

---

[5] Prior to the ADAAA's enactment in 2008, courts had imposed an exacting standard of disability that resulted in many cases being dismissed on the ground that the plaintiff was insufficiently disabled, without reaching the question whether there had actually been discrimination.  Congress specifically rejected Supreme Court decisions requiring that the ADA be "interpreted strictly to create a demanding standard for qualifying as disabled" and creating an "inappropriately high level of limitation necessary to obtain coverage under the ADA."  Pub. L. No. 110-325, § 2(b)(4), (5).  Congress further rejected the assertion that an individual with a disability "must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  *Id.* § 2(b)(4); *see also* 28 C.F.R. § 36.101(b) (stating that the definition of disability "shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA").

the regulations mandate that "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 28 C.F.R. § 36.105(d)(1)(vi).  Such assessments benefit from the reports of professionals who know or have personally examined the individual.  Because such examinations allow the professional to evaluate the individual's behavior, effort, and candor, DOJ understandably has stated that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from . . . reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment." Nondiscrimination on the Basis of Disability, 75 Fed. Reg. at 56,297.  As a result, DOJ has directed that testing entities "shall generally accept" "documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation, or aid requested . . . and provide the accommodation." *Id.*

*Ramsay*, 968 F.3d at 260; *see also, e.g. Berger v. National Bd. of Med. Exam'rs,* 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666 at *74 (S.D. Ohio Aug. 27, 2019) (finding the strong weight of the evidence support plaintiff's evaluator who personally administered multiple assessments and clinically observed performance and effort on assessments); *Agranoff v. Law Sch. Admission Council, Inc.*, 97 F. Supp. 2d 86, 87 (D. Mass. 1999) (noting the importance of direct medical examination of the plaintiff); *D'Amico v. New York State Board of Law Exam'rs*, 813 F. Supp. 217, 222-23 (W.D.N.Y. 1993) (according great weight to the conclusions of the plaintiff's physician and that the absence of a medical expert reviewing on behalf of the testing agency left it in "no position to countermand . . . as to what is the appropriate accommodation").

In the context of learning disabilities and other cognitive impairments, the ADA makes clear that in the determination whether a person has a disability should be made "without regard to the ameliorative effects of mitigating measures" such as "learned behavioral or adaptive neurological modifications."  42 U.S.C. §12102(4)(E)(i)(IV).  As noted in the Congressional Record:

> Historically, certain individuals with learning disabilities seeking accommodations in higher education – including high stakes exams-have seen their access to testing accommodations severely undercut by testing companies

15

> not willing to consider and support that learning disabilities are neurologically based, lifelong disabilities that may exist in students with high academic achievement because the individual has been able to cope and mitigate the negative impact while simultaneously being substantially limited in one or more life activities.

2 Cong. Rec. 8296 (Sept. 17, 2008).  The DOJ has accordingly noted that

> Someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities including, but not limited to, reading, writing speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people.

28 C.F.R. § 36.105(d)(3)(iii); *Ramsay*, 968 F.3d at 260 (quoting 28 C.F.R. § 36.105(d)); *see also, e.g.*, *Girard v. Lincoln College of New England*, 27 F. Supp. 3d 289, 295 (D. Conn. 2014) (plaintiff's status as a person with a disability was not refuted by evidence that she used adaptive strategies, or by evidence that she succeeded in some courses without accommodations).

The case of *Ramsay v. Nat'l Board of Law Examiners* is directly on point.  In that case, Ramsay, a medical student, had a history of informal accommodations growing up to compensate for her learning disabilities, and was not diagnosed with dyslexia or ADHD until she was already in college.  968 F.3d at 254, 262 & nn.7, 14.  Due to her belated diagnosis, she did not receive testing accommodations on standardized examinations growing up or on the MCAT.  *Id*. at 254.  In medical school, she received double time on exams on the basis of neuropsychological evaluations that she submitted to the school.  *Ramsay v. Nat'l Bd. of Med. Exam'rs*, No. 19-CV-2002, 2019 U.S. Dist. LEXIS 222782, at *4 (E.D. Pa. Dec. 30, 2019).  NBME refused to grant Ramsay extended time based on the reports of external reviewers who had never met Ramsay.  *Ramsay*, 968 F.3d at 259**.**  Ramsay failed the Step 1 examination without accommodations and faced imminent dismissal from medical school if she did not pass the exam on her next try.  968 F.3d at 254-55 & 262 n.15.  The District Court granted a preliminary injunction ordering the testing entity to grant double time, giving greater weight to

the evaluations of experts who had personally met and evaluated Ramsay. 968 F.3d at 262. The Third Circuit affirmed, noting the regulatory guidance calling for testing entities to generally defer to the findings of evaluators who have personally met testing candidates and observing that these neuropsychological evaluations showed Ramsay's reading abilities were in the single digit percentiles when compared to the general population. 968 F.3d at 255.

Just like the medical student in *Ramsay*, Sampson has a wealth of evidence showing that he is a person with a disability. Sampson's neuropsychological evaluations conducted by three different experts who personally evaluated him show that he is impaired in his reading abilities, including reading fluency. Furthermore, his evaluator and medical doctor demonstrate that his ADHD-based symptoms cause substantial impairment to his thinking concentration and focus, which impact his ability to complete an exam within the standard time administration. Furthermore, he has been under the psychiatric care of Thomas A. Aronson, M.D. since November 2015, from whom he is receiving treatment for his ADHD symptoms. Exhibit 10, Thomas A. Aronson, MD, September 6, 2017 medical letter. Each evaluation that Sampson had found that he has learning disabilities and cognitive impairments and that he requires extended time to ensure that tests measure what he actually knows, rather than how quickly he can read. Moreover, Dr. Aronson reported:

> My diagnosis was developed through direct clinical assessment over several visits. I am an MD and I specialize in the treatment of individuals with ADHD. ADHD is a clinical diagnosis made over several visits triangulating patient self-reported symptoms and impact the key data points from a multitude of sources.
>
> * * *
>
> It is my professional opinion that my patient, Mr. Sampson is currently and profoundly disabled in that [he] cannot concentrate and read efficiently. Mr. Sampson meets the requirements of a person with a disability covered [under] the ADA and Section 504 of the Rehabilitation Act. The only way to mitigate the barriers of

> your exam is to provide extended time and extra breaks over two
> days.

Ex. 10.

NBME, like it did in *Ramsay*, disregarded comprehensive neuropsychological and medical evaluations without having so much as even met with Sampson or conducted independent testing of its own. NBME chose to disregard these comprehensive evaluations and medical reports of Sampson and his history of accommodations on medical school exams, including NBME's own subject exams.  As described, DOJ has stated, and courts have held, that testing entities should defer to the findings of experts who have actually met and evaluated the testing candidate.  NBME failed to defer to the findings of the evaluators and medical doctor who personally assessed and clinically observed Sampson and dismissed entirely their comprehensive findings.  NBME's refusal to provide testing accommodations despite the extensive documentation demonstrating his need for such accommodations is the type of conduct that Congress targeted and sought to end when it passed the ADA Amendments Act.

Also like in *Ramsay*, Sampson is asking for the same accommodation on the board exams—extended testing time—that his medical school determined he needs in order to have an equal opportunity to demonstrate his knowledge of the material learned in medical school. ADA regulations expressly provide the entities should give "considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations." 28 C.F.R. §36.309(b)(1)(v); *see also Ramsay,* 968 F.3d at 259 (noting a recent history of past accommodations critical to understanding disability and appropriateness of accommodations; *Berger,* 2019 U.S. Dist. LEXIS 145666, at *76 (giving "considerable weight" to Plaintiff's past history of accommodations).

Although Sampson has relied on mitigating measures such as reliance on audio and visual learning, extensive one-on-one didactic tutoring, and significant test preparation, these learned behavioral modifications are precisely what the ADA, as amended, says that the NBME must not consider.  42 U.S.C. § 12102(4)(E)(i); *Ramsay*, 968 F.3d at 260-61 & n.7; *see also, e.g.*, *Girard*, 27 F. Supp. 3d at 295 (that a plaintiff had employed adaptive strategies was irrelevant to the disability determination).  Moreover, even when Sampson employed ameliorative strategies on examinations in which he was not given the extended time he needs to read all of the questions, he struggled to answer all of the questions. However, once his medical school implemented extended time, he passed his examinations. Ex. 1, Sampson Decl. ¶ 24; Ex. 8, Linda De Motta, Learning Specialist, March 29, 2017 letter. Similarly, when he took the USMLE Step 1 he did not pass, not because of a lack of subject knowledge but because he did not have sufficient time to answer questions. Accordingly, without accommodations, he was unable to demonstrate the extent of his knowledge and his score reflected the impairing nature of his disabilities. Ex. 1, Sampson Decl. ¶ 33.  In recognition of this, Sampson's medical school has provided extended time for Sampson to take shelf exams in medical school that NBME itself developed.

The ADA has made clear that determining whether a person has a disability should not require extensive analysis.  Congress did not contemplate fine hairsplitting when it declared that the focus of the ADA should not be on whether a person has a disability, but whether covered entities such as NBME engaged in discrimination by refusing to provide necessary accommodations for individuals with a disability.  Pub. L. No. 110-325, § 2(b)(5); *see also* 28 C.F.R. § 36.105(d)(3)(iii); *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 888 (7th Cir. 2019). Sampson's comprehensive neuropsychological examinations, medical reports, and history of

receiving extended time on medical school exams, including NBME's exams in medical school, is sufficient to demonstrate his need for extended time for the USMLE Step 1.

**B.      Sampson Will Suffer Irreparable Harm If Not Permitted To Take the Exam With Necessary Accommodations**

Courts view as irreparable injury a person's psychological harm in not being able to pursue his chosen profession.  In *Enyart v. Nat'l Conference of Bar Examiners*, *supra,* the Ninth Circuit affirmed the grant of a preliminary injunction requiring bar exam administrators to provide accommodations for a blind test-taker, explaining that she had "demonstrated irreparable harm in the form of the loss of opportunity to pursue her chosen profession." 630 F.3d at 1165; *see also, e.g.*, *Featherstone v. Pacific Northwest U. of Health Sciences,* 2014 U.S. Dist. Lexis 102713, 2014 WL 3640803 (E.D. Wash. 2014) (holding that a medical student would suffer irreparable harm if he continued to suffer delays in his education as a result of disability discrimination).

*Ramsay* is again instructive.  In that case, the Third Circuit noted that given Ramsay's disability and previous failures on the USMLE Step 1exam, "she likely would fail again and be forced to leave medical school" which "could not later be redressed by a legal or an equitable remedy."  968 F.3d at 262.  The Third Circuit concluded that "an examiner's refusal to provide accommodations can cause the exam-taker irreparable harm because doing so jeopardizes her 'opportunity to pursue her chosen profession.'"  *Id.* (quoting *Enyart*, 630 F.3d at 1166).

Sampson has already been delayed, at a minimum, in obtaining his medical degree. He has already failed the USMLE Step 1 due to NBME's unlawful refusal to implement appropriate accommodations. NBME's repeated refusal to approve appropriate accommodations has been a barrier to Sampson progress in medical school. If he has to take the USMLE Step 1 again without extended time, given his clear disabilities and the barriers these disabilities presented in

past performance, there is a likelihood that he will fail again. Should he fail the USMLE Step 1, he will be terminated from medical school.  Sampson's medical education, graduation, profession, and financial wellbeing—his entire future—hang in the balance of this motion.  He cannot move forward without successfully completing the medical board exams, and for that he requires appropriate accommodations.

Failure to provide Sampson with accommodations for the USMLE Step 1, will effectively become the ultimate barrier to the medical profession because the resulting score will not "best ensure" that the exam results will reflect his true ability or achievement level.  Rather, his score will reflect the substantial impact of his disability. *See* 28 C.F.R. §36.309(b)(1)(i); *Jones v. National Conference of Bar Examiners,* 801 F.Supp.2d 270, 286-288 (D. Vt. 2011). This immediate harm cannot be repaired absent preliminary relief.

Each day that Sampson has to defer his dream is a day that he suffers the sort of emotional and dignitary harm that the ADA was enacted to prevent.  *See Ramsay*, 968 F.3d at 262; *Enyart*, 630 F.3d at 1166.  He stands on the precipice of expulsion from medical school and losing the chance to take the USMLE Step 1 altogether, as it requires being enrolled as a medical student. In other words, Sampson must take the exam now or his dream of becoming a doctor will be lost forever.  Since Title III of the ADA does not provide for damages, he will be left without a remedy at all.  *See* 42 U.S.C. §12188(a).  Since this is precisely the sort of injury that courts have held to be irreparable harm, Sampson readily satisfies the requirement for irreparable harm.

Courts have granted preliminary injunctive relief against testing agencies under similar circumstances. See e.g., *Jones v. National Conference of Bar Examiners,* 801 F.Supp.2d 270, 286-288 (finding irreparable harm if Plaintiff is required to take a "high stakes" exam in discriminatory circumstances);  *Enyart v. Nat'l Conf. of Bar Exam., Inc.*, 630 F.3d 1153, 1165

(9th Cir. 2011) (finding irreparable harm in the form of loss of pursuing chosen profession); *Bonnette v. District of Columbia Court of Appeals*, 796 F.Supp.2d 164, 186-187 (D.D.C. 2011) (irreparable harm found for delay in practicing profession); *Agranoff v. Law School Admission Council, Inc.*, 97 F. Supp. 2d 86 (Mass. 1999); *Rush v. National BD. Of Medical Examiners,* 268 F. Supp. 2d 673 (N.D. Tx. 2003).

### C.     The Balance of Hardships Favors Granting a Preliminary Injunction

The balance of hardships strongly weighs in favor of granting a preliminary injunction requiring NBME to grant Sampson the same testing accommodations he has had in medical school. The NBME's denials of Sampson's accommodation request denies him the opportunity to take the USMLE Step 1 in a non-discriminatory manner and on equal footing with non-disabled test-takers.

NBME will not be harmed.  Extended testing time is not logistically difficult to provide in general and even less so in this specific case.  In the *Ramsay* case, the Third Circuit affirmed the grant of a preliminary injunction requiring the testing entity to grant double time.  968 F.3d at 263; *see also Berger,* 2019 U.S. Dist. LEXIS 145666, at *89-90 (granting preliminary injunction requiring testing entity to provide double extended time)*.* Testing entities such as the NBME grant extended time as an accommodation, and it will cost NBME nothing to grant this accommodation to Sampson so that he has a fair opportunity to demonstrate his knowledge of medicine.  *See Ramsay*, 968 F.3d at 263.

**D.     The Public Interest Favors Enforcing the ADA and Making It Possible for Qualified Individuals with Disabilities To Pursue Careers in Medicine**

The enforcement of the ADA is in the public interest.  Many areas of the United States are under-served by physicians, and so increasing the number of physicians is in the public interest.  *Ramsay*, 968 F.3d at 263.  It is also in the interest of people with disabilities – estimated to number almost 13 percent of the total population of the United States– to have the opportunity to be treated by people with life experiences that are more similar to their own experiences, *i.e.,* by people with disabilities.  *See generally* L. Meeks and N. Jain, *Accessibility, Inclusion and Action in Medical Education* (Association of American Medical Colleges 2018) at 8.[6]

In the context of testing accommodations, Congress explained that it enacted 42 U.S.C. § 12189 "to assure that persons with disabilities are not foreclosed from educational, professional or trade opportunities because an examination or course is conducted in an inaccessible site or without an accommodation." *Rawdin v. American Bd. of Pediatrics*, 582 F. App'x 114, 118 (quoting H.R. Rep. No. 101-485(III), at 68-69 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 491-92). For these reasons, granting a preliminary injunction would further the public interest in eradicating discrimination against individuals with a disability. Accordingly, granting the injunctive relief requested is consistent with the anti-discrimination mandate of the ADA and therefore serves the public interest.

Sampson's career now hinges not on his intellect, extraordinary hard work, and commitment he has demonstrated in the course of medical school, but on the outcome of this motion seeking accommodations that NBME can and does provide to other students. For this reason, he seeks an order requiring the NBME to immediately cease its denial of necessary

---

[6] Available at the Association of American Medical Colleges website, https://store.aamc.org/accessibility-inclusion-and-action-in-medical-education-lived-experiences-of-learners-and-physicians-with-disabilities.html.

accommodations and allow him to proceed to demonstrate his knowledge and skill under fair testing conditions.

## IV.    CONCLUSION

The public interest demands not that barriers be placed in front of gifted students with disabilities but that tests be administered so that students can demonstrate knowledge and competence. Sampson is likely to prevail on the merits, has demonstrated that he is on the brink of irreparable harm, and the balance of hardships and public interest strongly favors granting a preliminary injunction. Sampson accordingly requests that the Court grant preliminary injunctive relief so that he can take the USMLE Step 1 with necessary testing accommodations and finally have an opportunity equal to that of individuals without disabilities to prove that he has mastered the medical knowledge learned in medical school.

Respectfully submitted,

s/Charles Weiner
Charles Weiner
LAW OFFICE OF CHARLES WEINER
Cambria Corporate Center
501 Cambria Avenue
Bensalem, PA 19020
Tel. (267) 685-6311
Fax (215) 604-1507
charles@charlesweinerlaw.com

Mary C. Vargas
mary.vargas@steinvargas.com
STEIN & VARGAS LLP
10 G Street NE, Suite 600
Washington, DC  20002
Tel. (240) 793-3185
Fax (888) 778-4620

*Attorneys for Plaintiff*