**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ROBERT SAMPSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 2:22-CV-05120-JMA-AYS** |
| **v.** ) | |
| ) | |
| **NATIONAL BOARD OF MEDICAL EX-** ) | |
| **AMINERS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**DEFENDANT NBME'S OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    I.      NBME and the USMLE ....................................................................2

    II.     Mr. Sampson's Requests for Accommodation .......................................2

    III.    Mr. Sampson's Background.........................................................................3

          A.     Mr. Sampson's History Before Medical School .........................................3

          B.     Mr. Sampson's Evaluations .................................................................4

          C.     Mr. Sampson's History and Status in Medical School and Business School ....................................................................................5

ARGUMENT ...................................................................................................... 6

    I.      Mr. Sampson Has Not Satisfied the Demanding Standard for A Mandatory Preliminary Injunction ................................................................6

    II.     Mr. Sampson Has Not Satisfied His Burden of Showing Irreparable Harm ..........7

    III.    Mr. Sampson Has Not Satisfied His Burden of Showing a Clear Likelihood of Success on the Merits.......................................................11

          A.     Disability Under the ADA:  Substantial Limitation in a Major Life Activity Compared to Most People in the General Population..................11

          B.     Major Life Activities Under the ADA ......................................................13

          C.     Mr. Sampson Is Not Disabled Within the Meaning of the ADA...............14

    IV.    NBME and Other Examinees Would Be Harmed by the Preliminary Injunction ...................................................................................24

    V.     The Public Interest Does Not Support Mr. Sampson's Motion ............................24

CONCLUSION.................................................................................................. 25

## <u>INTRODUCTION</u>

Plaintiff Robert Sampson is seeking a mandatory preliminary injunction that would require defendant National Board of Medical Examiners ("NBME") to provide him with double testing time and extra breaks on Step 1 of the United States Medical Licensing Examination ("USMLE"). He is seeking such emergency relief, he says, because without it, he will be dismissed from medical school. But Mr. Sampson is facing dismissal because he has not completed medical school in seven years, and he provides no evidence that all he needs to do is pass the Step 1 exam (with or without accommodations) in order to stay enrolled. Stony Brook's filings in Mr. Sampson's other lawsuit make clear that he is past that point with his school. His situation is unfortunate, but he has not made the showing necessary to meet the demanding standard that governs his request for a mandatory injunction.

Mr. Sampson has not established that he faces non-speculative irreparable harm if he does not immediately take Step 1 with twice the amount of testing time that other candidates receive. Nor has he shown a clear likelihood of success on the merits.  Although no discovery has yet occurred, the record evidence shows that Mr. Sampson is not substantially limited in any major life activity that is relevant to taking the Step 1 exam. His diagnostic evaluations, academic record, and history of performance on standardized tests show that Mr. Sampson consistently performs as well as, if not better, than most people in the general population. Nor do the other relevant factors support his requested preliminary injunction.

No one disputes that Mr. Sampson is an impressive, accomplished, and hard-working individual, whose desire to become a doctor is both commendable and compelling. But he is not entitled to the relief he seeks from NBME. For the reasons in this brief and the supporting declarations from numerous well-qualified professionals, his motion for a preliminary injunction should be denied.

# BACKGROUND

## I. NBME and the USMLE

NBME is a non-profit organization whose mission is to help protect the public health through the development and administration of high-quality examinations, including the United States Medical Licensing Examination ("USMLE"). Decl. of Lucia McGeehan ("McGeehan Decl.") ¶¶ 3-4. The USMLE assesses an examinee's ability to apply the knowledge and demonstrate the skills that constitute the basis of safe and effective patient care. *Id.* ¶ 4. Licensing authorities rely upon the USMLE to help evaluate the qualifications of individuals seeking an initial medical license. *Id.* ¶ 5. Three "Step" exams make up the USMLE: Step 1, Step 2 Clinical Knowledge (Step 2 CK), and Step 3. *Id.* ¶ 6. Step 1, the examination currently at issue, assesses whether the examinee can understand and apply basic science concepts that are important to the practice of medicine. *Id.*

Examinees take the USMLE under uniform conditions, including standard testing time. *Id.* ¶ 7. NBME provides accommodations, however, to individuals who have a disability within the meaning of the ADA and need accommodations. *Id.* ¶¶ 7-8. In all instances, NBME's objective is to ensure that "individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage…. As administrator of the national exam used by ... states for licensing medical doctors, [NBME] has a duty to ensure that its examination is fairly administered to all those taking it." *Powell v. NBME*, 364 F.3d 79, 88-89 (2d Cir. 2004).

## II. Mr. Sampson's Requests for Accommodation

Mr. Sampson first requested accommodations from NBME in April 2017, seeking 50% extra time on Step 1. McGeehan Decl. ¶ 11 and Ex. 1. After thoroughly reviewing his request and supporting documentation and seeking the recommendation of an external expert, NBME

- 2 -

denied the request. *Id.* ¶¶ 13-14 and Exs. 2-3. Between June 2017 and November 2018, Mr. Sampson sent multiple reconsideration requests, each time seeking 50% extra time on Step 1. *Id.* ¶¶ 15-28. NBME thoroughly reviewed each request and again obtained recommendations from independent, external experts. *Id.* ¶¶ 15-30. NBME denied the requests by letters dated August 1, 2017, January 12, 2018, March 6, 2018, September 7, 2018, and January 4, 2019. *Id.* Exs. 5, 7, 8, 11, 14.

More than three years later, in April 2022, Mr. Sampson sent a new accommodation request, this time seeking 100% additional testing time (double time) and extra breaks. He submitted a December 2020 neuropsychological evaluation in support of this request. *Id.* ¶ 32 and Ex. 16. NBME thoroughly reviewed Mr. Sampson's file and sought the recommendation of an external expert. *Id.* ¶ 33. By letter dated June 1, 2022, NBME denied the request. *Id.* ¶ 34 and Ex. 18.

## III.    Mr. Sampson's Background

### A.    Mr. Sampson's History Before Medical School

The limited records that Mr. Sampson provided to NBME show that he was a successful student in elementary school with no issues acquiring reading or other academic skills, and had no academic skill weaknesses or unusual behavioral issues. McGeehan Decl. Exs. 35-43.

Mr. Sampson's his first evaluation in 2013 reflects that he "excell[ed] in math and science, but worked hard to obtain B+/A- grades in language arts." Pl. Br. Ex. 3 at 2. His "high school was extremely competitive, leading to widespread use of tutoring," and he "[made] use of a math tutor … to keep up with the accelerated pace of his classes." *Id.* His "high school transcript indicates that he earned A's in most classes but math, in which he earned mostly B's. Classes were typically honors or AP level." *Id.*

According to behavioral questionnaires, Mr. Sampson saw "himself as significantly inattentive in his early years," Pl. Br. Ex. 4 at 5, but "neither his mother nor father saw him as having

significant levels of difficult in any of these areas," *id.* His father "occasionally" saw him as having more difficulty focusing "compared to other students his age (and especially more forgetful), but did not rate him as having the level of problems either at school or home that are typical of students with ADHD." *Id.*

Mr. Sampson attended the University of Virginia, "an academically competitive university," Pl. Br. Ex. 3 at 1, and "he flourished socially and intellectually" with a 3.43 GPA. *Id.* at 2.

Mr. Sampson did not receive any accommodations in elementary, middle, or high school, or in college. *See, e.g.,* McGeehan Decl. Ex. 16 at 5. He "had no formal interventions for academic difficulties, no special services, grade retentions, or behavior problems." Pl. Br. Ex. 4 at 1.

Mr. Sampson took the Medical College Admission Test ("MCAT") twice, achieving total scores in the 67th and 73rd percentiles and a Verbal Reasoning in the 84th percentile--meaning that his Verbal Reasoning performance was in the top 16% percent of all the extremely capable individuals who took the MCAT when he did. *See* McGeehan Decl. Ex 21.

Mr. Sampson also did extremely well on the SAT and ACT exams.  He took the SAT three times and received scores on the Critical Reading section that were in the 74th, 84th, and 93rd percentiles, meaning that, with his best performance, he "scored higher than 93% of [the prior] year's group of college bound seniors" from across the United States. *Id.* Exs. 23-26.

**B.    Mr. Sampson's Evaluations**

In August 2013, after he graduated from college, Mr. Sampson sought out a psychological examination from Suzanne Michels, Ph.D. ("Dr. Michels"). Pl. Br. Ex. 3. Dr. Michels diagnosed Mr. Sampson with a Learning Disorder, Not Otherwise Specified, based on a "disparity" between his measured verbal abilities and his visual/spatial reasoning abilities. *Id.*

Mr. Sampson obtained a "Supplemental" report from Allison Anderson, Ph.D., in December 2013. Pl. Br. Ex. 4. She diagnosed him with a Neurodevelopmental Disorder and with

Specific Learning Disorder with impairment in reading. *Id.* at 7. At Mr. Sampson's request, Dr. Anderson evaluated him for ADHD but concluded that "his testing results and history supply little evidence" that he meets the diagnostic criteria for ADHD; no ADHD diagnosis was provided.

Mr. Sampson obtained another evaluation report in 2020, from Jeannette Wasserstein, Ph.D. Pl. Br. Ex. 2-B. This evaluation resulted in diagnoses of Specific Learning Disorder with impairment in reading (reading fluency and reading comprehension) and written expression (spelling and handwriting) and ADHD, Combined presentation. *Id.* at 24.

### C.    Mr. Sampson's History and Status in Medical School and Business School

Mr. Sampson began medical school in August 2015. Pl. Br. Ex. 1 ¶ 16. In late 2016, he was informed that he had exhibited "academic marginality," even though he had passed his classes. 22-4490 Dkt. 3-2 ¶ 29.[1] He took a leave of absence in December 2016. Pl. Br. Ex. 2-B at 7.

Mr. Sampson took the USMLE Step 1 exam under standard conditions on January 23, 2020. McGeehan Decl. ¶ 31. At that time, he had been on leave of absence from medical school for over three years. He did not pass the test. McGeehan Decl. ¶ 31.

Mr. Sampson completed his third-year clinical rotations in July 2021. Pl. Br. Ex. 1 ¶ 2. According to various preceptor comments, Mr. Sampson:

- "[R]eadily and frequently reads up on his patients, looks up medical literature and shares new knowledge with the team."

- "[S]howed up on time and … pays attention to detail…."

- "[T]ook the initiative to look up information on interesting cases."

- "[U]ses scientific literature effectively to enhance his medical knowledge."

Pl. Br. Ex. 1-A. There is no indication that he received accommodations in his clinical rotations.

---

[1] Cites to filings in the *Sampson v. Stony Brook* matter are referenced by the case (22-4490) and docket number.

Mr. Sampson is also enrolled in Stony Brook's College of Business, where he has a 4.0 GPA. Pl. Br. Ex. 1 ¶ 3. It appears he has been on another leave of absence from medical school (since July 2021) and has been taking classes in the MBA program since Fall 2021. *Id.* Ex. 6.

## **ARGUMENT**

**I.**   **Mr. Sampson Has Not Satisfied the Demanding Standard for a Mandatory Preliminary Injunction**

Preliminary injunctive relief "'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22 (2008).

Mr. Sampson's brief does not accurately state the standards that govern his motion. *See* Pl. Br. 12. If a requested injunction is prohibitory and intended to preserve the status quo, the movant "must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League v. U.S. Soccer Fed'n,* 883 F.3d 32, 37 (2d Cir. 2018) (internal citation omitted). A more demanding standard applies, however, when a party seeks *mandatory* relief. "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits[.]" *Id.* (internal quotation marks and citation omitted); *Raia v. Pompeo*, 455 F. Supp. 3d 7, 11-12 (E.D.N.Y. 2020).

A heightened burden also applies if the injunction would give the plaintiff the "final relief he seeks without requiring him to prove the merits of his case at trial," because this "is not the appropriate purpose of a preliminary injunction." *Demirayak v. City of New York*, No. 17-5205, 2017 WL 6729355, *2 (E.D.N.Y. Oct. 31, 2017), *aff'd*, 746 F. App'x 49 (2d Cir. 2018); *Warn-*

*erVision Entm't v. Empire of Carolina, Inc.*, 101 F.3d 259, 261-62 (2d Cir. 1996). If the injunction would provide a plaintiff with all or substantially all the relief requested on the merits and it would be difficult "to render a meaningful remedy" to the defendant if it prevails at trial, the movant must meet "the higher standard of substantial, or clear showing of likelihood of success to obtain preliminary relief." *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34-35 (2d Cir. 1995). The movant must also make a "strong showing" of irreparable harm, and demonstrate that "the preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).

In accordance with this Circuit's well-settled legal standard for mandatory preliminary injunctive relief, Mr. Sampson's requested preliminary injunction should be denied.

## II.    Mr. Sampson Has Not Satisfied His Burden of Showing Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citations omitted). "In the absence of evidentiary support of irreparable harm," there is no basis to enter a preliminary injunction. *Id.* at 120.

At first blush, Mr. Sampson would seem to have a reasonable argument for irreparable harm, given his assertion that his "medical education, graduation, profession, and financial well-being—his entire future—hang in the balance of this motion." Pl. Br. 21. But this is not actually the case. Although Mr. Sampson "stands on the precipice of expulsion from medical school," taking the Step 1 exam will not alter the fact that he is subject to dismissal by Stony Brook because he failed to complete his medical degree within seven years. 22-4490 Dkt. 13 at 1-3, 10 ("Plaintiff was required to complete all the requirements for his MD degree by August 12, 2022."). Stony Brook has not agreed that Mr. Sampson could move forward in medical school if he simply takes and passes Step 1.

- 7 -

Mr. Sampson has also sued Stony Brook and seeks a preliminary injunction in that case to block his dismissal. That motion is fully briefed. If Stony Brook is not enjoined from dismissing Mr. Sampson, his dispute with NBME will be moot. Mr. Sampson agrees that he is not eligible to take Step 1 if he is not enrolled in medical school. *See* Pl. Br. 21; McGeehan Decl. ¶ 34. If Stony Brook is enjoined from dismissing Mr. Sampson, then the claimed irreparable harm motivating the present expedited motion—dismissal from medical school—will no longer exist.

Even if passing the Step 1 exam *now* would allow Mr. Sampson to remain enrolled in medical school (and there is no indication it would), and even if Mr. Sampson needs his requested accommodations to pass the test (which is at best highly speculative, as explained below), his extraordinary delay in pursuing relief "defeats any possible showing of irreparable harm." *Monowise Ltd. Corp. v. Ozy Media, Inc.*, 2018 WL 2089342, *2 (S.D.N.Y. 2018); *see also Tom Doherty Assocs., Inc.*, 60 F.3d at 39. NBME first denied Mr. Sampson's request for accommodations in 2017—more than five years ago. McGeehan Decl. Ex. 3. Mr. Sampson returned with numerous requests for reconsideration in 2017 and 2018, and each time NBME unequivocally denied his requests. *Id.* ¶¶ 15-30 and Exs. 5, 7, 8, 11, 14. As early as 2018, he was represented by counsel who accused NBME of discriminatory conduct. *Id.* ¶¶ 24, 28. At that time, Mr. Sampson knew he had to take and pass Step 1, believed that he could not pass without accommodations, knew that NBME had repeatedly denied his accommodation requests, and was represented by counsel, yet he did not seek court relief until he was "on the precipice of expulsion," Pl. Br. 21. Those facts weigh strongly against a finding of irreparable harm. *See Pazer v. N.Y. State Bd. of Law Exam'rs*, 849 F. Supp. 284, 287 (S.D.N.Y. 1994) ("[A]ny so-called irreparable injury here is largely the result of Pazer's decision not to seek judicial relief sooner."); *Wright v. NBME*, 2021 WL 5028463, *9 (D. Colo. 2021) ("Another problem is that the emergency nature of this litiga-

tion is at least in part due to Mr. Wright's own choices. He has taken the USMLE Step 3 three times since 2017 and requested accommodations twice but did not bring this case until August 27, 2021."); *Bach v. Law Sch. Admission Council*, 2014 U.S. Dist. LEXIS 124632, *7 (M.D.N.C. 2014); *cf. Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (holding in trade dress case that if delay is not explainable by lack of knowledge or good faith efforts to investigate infringement, "'delay alone may justify denial of a preliminary injunction'") (citation omitted).

Mr. Sampson may argue that he chose to submit a new accommodation request with a new evaluation report rather than pursue litigation. But even there, he delayed. He was tested in August 2020 and received an updated evaluation from Dr. Wasserstein in ***December 2020***. Pl. Br. Ex. 2-B. He did not send a new request to NBME, however, until ***April 2022***. This delay is particularly perplexing because he finished his third year of medical school in ***July 2021***, 22-4490 Dkt. 3-2 ¶ 2, and he has argued that is the best time to take Step 1, *id.* ¶¶ 23, 35. But Mr. Sampson did not pursue accommodations at that time, nor did he attempt the test under standard conditions. Instead, he waited until ***June 2022*** to submit a new request for accommodations based on the ***December 2020*** evaluation report.[2] Even now—facing dismissal from medical school and claiming that he needs to pass Step 1 exam in order to continue his studies—Mr. Sampson ***has not even registered to take the test***. McGeehan Decl. ¶ 36.

Mr. Sampson's other arguments of irreparable harm are also insufficient to justify mandatory preliminary injunctive relief. He claims irreparable harm based on psychological injury

---

[2] In the Stony Brook litigation, Mr. Sampson represents that he had to take a leave of absence after completing his third year of medical school (*i.e.*, after July 2021) to obtain updated diagnostic testing and pursue accommodations from NBME. 22-4490 at 8-9. But he had already obtained an updated evaluation report at that time, and he did not submit a new accommodation request to NBME until April 2022. It does not appear that Mr. Sampson used his second leave of absence to pursue taking the Step 1 exam; rather, he used this time to take business school classes. *See* Pl. Br. Ex. 5 (showing MBA classes taken in summer and fall of 2021 and spring and fall of 2022); Ex. 6 (same).

from "not being able to pursue his chosen profession," Pl. Br. 20, but this argument rings hollow in light of his own actions (and inaction). Mr. Sampson is not in the same position as the plaintiffs in *Enyart v. NCBE*, *Jones v. NCBE*, and *Bonnette v. D.C. Ct. of Appeals*. *See* Pl. Br. at 20-22. There, the plaintiffs had either graduated from school or were on track to graduate and the only remaining step was passing the licensure exam. There also was no dispute that they were disabled (they were all legally blind); the only issue was appropriate accommodations on the bar exam. In contrast, Mr. Sampson is not in good standing at his medical school, the Step 1 exam is not the only remaining requirement for him to complete medical school, and his disability status is a vigorously disputed issue. Mr. Sampson also cites *Agranoff v. LSAC* and *Rush v. NBOME*, but the cursory irreparable harm analysis in those cases is inapt here.

Mr. Sampson's irreparable harm argument also fails because the alleged harm is speculative. He does not need a preliminary injunction to register for and take the Step 1 exam right now (subject to meeting standard eligibility requirements), and he might well pass. It is true that he did not pass when tested under standard conditions in January 2020, but at that time he had been on leave of absence from medical school for three years. 22-4490 Dkt. 3-2 ¶¶ 34-40; Ex. D. He also tested earlier than his classmates, who were not required to take Step 1 until after they completed their third year of medical school. 22-4490 Dkt. 3-2 ¶ 35. Any assumption that Mr. Sampson would fail if he tested again under standard conditions is entirely speculative. *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (threatened harm must be "actual and imminent, not remote or speculative"); *Bach v. LSAC*, 2014 U.S. Dist. LEXIS 124632, *5 (noting that plaintiff might successfully test without accommodations) (collecting similar cases).

Thus, Mr. Sampson has not shown, and cannot, show that he is likely to suffer irreparable harm, attributable to NBME, if he does not immediately take Step 1 with accommodations.

### III.   Mr. Sampson Has Not Satisfied His Burden of Showing a Clear Likelihood of Success on the Merits

Mr. Sampson also is not entitled to mandatory preliminary injunctive relief because he has not shown a clear likelihood of success on the merits.

Mr. Sampson has been diagnosed with a learning disability (LD) and ADHD, but these diagnoses are not supported by the data or objective evidence. One, and perhaps two, of his own professionals concluded that he does not have ADHD. In addition, four independent, well-qualified professionals have concluded that he does not meet the appliable diagnostic criteria for ADHD and/or a learning disorder. *See* Decl. of B. Lovett; Decl. of K. Murphy; Decl. of S. Ortiz; Decl. of J. Bernier; *see also* Decl. of D. Flanagan. And even if one or the other of the diagnoses were warranted, Mr. Sampson is not substantially limited in any relevant major life activities as compared to most people in the general population, as discussed below. *See id*.

### A.   Disability Under the ADA:  Substantial Limitation in a Major Life Activity Compared to Most People in the General Population.

Pursuant to 42 U.S.C. § 12189, persons who qualify as disabled under the ADA are entitled to accommodations if needed to take an exam such as the USMLE in an accessible manner.

While learning disabilities and ADHD are impairments that can be disabilities under the ADA, each is a disability only if it substantially limits a person's ability to perform major life activities as compared to most people. "[N]ot every impairment will constitute a disability[.]" 28 C.F.R. § 36.105(d)(1)(v); *see also, e.g., B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 160 (2d Cir. 2016) (noting that "'[n]ot every impairment that affects an individual's major life activities is a *substantially* limiting impairment,'" and that a court must be "careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities") (citations omitted); *Black v. NBME*, 281 F. Supp. 3d 1247, 1249-50 (S.D. Fla. 2017) (finding that medical school student with ADHD was not disabled under the ADA); *Wright v. NBME*,

2021 WL 5028463, at *8; *Glueck v. Nat'l Conf. of Bar Exam'rs*, No. 17-451, 2018 WL 3977891, *4-6 (W.D. Tex. 2018) (finding law school graduate with ADHD and LD diagnoses was not disabled under the ADA); *Montgomery v. Chertoff*, No. 03-CV-5387-ENV-JMA, 2007 WL 1233551, *7-8 (E.D.N.Y. April 25, 2007) (concluding that plaintiff had an impairment (ADHD) but was not disabled under the ADA because she was not substantially limited in her ability to learn or interact with others as compared to the average person).

Mr. Sampson emphasizes regulatory and legislative history language stating that the determination whether an individual has a disability "should not demand extensive analysis." Pl. Br. 13-14, 19. But the notion that the substantial limitation inquiry "should not demand extensive analysis" does not expand the ADA's scope beyond the "terms of [the statute]." 42 U.S.C. § 12102(4)(A). And the terms of the statute require a showing of substantial limitation, even after enactment of the ADA Amendments Act ("ADAAA"):

> By retaining the essential elements of the definition of disability including **the key term 'substantially limits'** we reaffirm that not every individual with a physical or mental impairment is covered by the … definition of disability in the ADA.  An impairment that does not substantially limit a major life activity is not a disability[.]  That will not change after enactment of the ADA Amendments Act[.]

Statement of the Managers, 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008) (emphasis added); *see* 42 U.S.C. § 12102(1)(A). As recognized by the Second Circuit in a post-ADAAA case, the substantial limitation requirement "serv[es] to focus the statute on the class of persons Congress aimed to protect—those who, by virtue of their disability, may experience discrimination impairing their 'right to fully participate in all aspects of society.'" *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d at 160-61 (quoting 42 U.S.C. § 12101(a)(1)). Mr. Sampson is not in this class of persons.

Mr. Sampson also notes regulatory language which provides that "[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence." Pl. Br. 14 (partially quoting 28 C.F.R. § 36.105(d)(1)(vii)). This regulation in no way precludes the use of medical evidence for purposes of determining whether someone is substantially limited. *See id.* ("Nothing in this paragraph (d)(1) is intended … to prohibit or limit the presentation of scientific, medical, or statistical evidence in making such a comparison where appropriate."). Indeed, Mr. Sampson himself relies heavily on such evidence.

Mr. Sampson also references the "best ensure" language found at 28 C.F.R. § 36.309. *See* Pl. Br. 2, 12-13. This regulation, however, addresses the type of accommodation that is appropriate **<u>if</u>** an individual is found to be disabled within the meaning of the ADA. There is not a different definition of "disability" applicable only in the context of standardized tests.

### B.   Major Life Activities Under the ADA

Mr. Sampson must demonstrate that he is substantially limited in a *major life activity* under the ADA. He now claims to be "substantially impair[ed]" in "the major life activities of reading, spelling, cognitive processing speed, attention [*sic*] concentration and taking standardized exams," which differs in some respects from the list he provided in his Complaint. *Compare* Pl. Br. at 3 *and* Complaint ¶ 19. Reading and concentration are major life activities. 42 U.S.C. § 12102(2)(A); 28 C.F.R. § 36.105(c)(1). Mr. Sampson cites no authority for "spelling" as a major life activity, and this point is irrelevant, because Step 1 is a multiple-choice test. It is also not clear whether "attention" is a major life activity or how it differs from "concentration," and again, Mr. Sampson cites nothing in support. "Cognitive processing *speed*" is not an *activity*.[3]

---

[3] Mr. Sampson's cognitive processing is also decidedly unimpaired. Bernier Decl. ¶ 20; Murphy Decl. ¶ 29.

Although subject to debate,[4] for purposes of this motion, NBME is not contesting whether "taking standardized exams" is a major life activity.

In all events, Mr. Sampson has not shown a substantial limitation in reading, concentrating, "cognition processing," "taking standardized tests," or any major life activity relevant to taking the Step 1 exam.

### C.    Mr. Sampson Is Not Disabled Within the Meaning of the ADA

If a diagnosis is unwarranted, or if an impairment does not result in substantial limitations compared to most people, the individual is not disabled under the ADA.

Here, there is significant reason to question whether Mr. Sampson meets the diagnostic criteria for either a learning disability or ADHD; four qualified professionals who have reviewed his file say otherwise, and a fifth agrees that it is questionable. *See* Lovett Decl.; Murphy Decl.; Ortiz Decl.; Bernier Decl.; Flanagan Decl. Moreover, even if the diagnoses are warranted, Mr. Sampson has not clearly shown that he is substantially limited in any major life activity relevant to taking Step 1 as compared to most people in the general population. *See id*.

Across his three evaluations, Mr. Sampson points to a small number of diagnostic testing or assessment scores to demonstrate his alleged disability. *See* Pl. Br. 6-9. First, he points to a few scores on picture-based memory tasks, specifically, a score at the 16th percentile on the Woodcock Johnson Picture Recognition subtest, his subtest scores on the Rey-Complex Figure test (RCFT) at the 16th percentile, and his score in the 4th percentile on the Recognition Total Correct assessment on the RCTF. *Id.* at 6. But "on the vast majority of the visual-spatial diagnostic tasks that Mr. Sampson has taken, his scores have actually been in the average range or

---

[4] *See Hentze v. CSX Transportation, Inc.*, 477 F. Supp. 3d 644, 660-667 (S.D. Ohio 2020) ("While test taking, or more accurately, struggles with test taking, may in some circumstances have major *consequences*, it is simply not a major *activity*, at least not in the same sense as the enumerated activities [in the ADA]").

above." Lovett Decl. ¶ 30. Just as important, the tasks measured on these assessments "do not resemble the requirements of real-world exams such as the Step 1 exam." *Id.* and Ex. 6. [5]

Mr. Sampson references the Scholastic Abilities Test for Adults (SATA) administered by Dr. Anderson, Pl. Br. 7, but he scored in the average range on this timed reading comprehension test, without any additional time. Lovett Decl. ¶ 17(b); Bernier Decl. ¶ 23.

Mr. Sampson also references the Nelson Denny Reading Test (NDRT), where he answered only 12 questions in 20 minutes, "which placed his score in the 1st percentile or at a 7th grade level." Pl. Br. 9. When Mr. Sampson took this same test in 2013 with Dr. Anderson, however, he scored in the average range when compared to first-year college freshmen. *See* Lovett Decl. ¶¶ 19-20; Bernier Decl. ¶ 27.[6] Courts have cautioned against use of NDRT results when making a disability determination. *See Glueck v. Nat'l Conf. of Bar Exam'rs*, 2018 WL 3977891, at *5 & n.4 (W.D. Tex. 2018) (holding that the plaintiff was not disabled as a matter of law, despite scoring in the fourth percentile on the NDRT, because "this comparison was made 'using end of college norms'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157, at *8 (E.D. Pa. 2016) ("[T]he Nelson-Denny compared Bibber to other four-year college graduates, which is assuredly not representative of the general population when over half of the people in the country lack a bachelor's degree.").

Mr. Sampson also emphasizes his improved NDRT score with additional time, *see* Pl. Br. 9, but "it is very common for NDRT comprehension scores to improve with additional time. Lovett Decl. ¶ 21; *see also Wright*, 2021 WL 5028463, at *7 ("Courts have found individuals are

---

[5] *See also Argen v. New York State Bd. of Law Exam'rs*, 860 F. Supp. 84, 89 (W.D.N.Y. 1994) (discussing the Rey-Osterreith test).

[6] Dr. Wasserstein references Mr. Sampson's 1% "reading rate" score on the Nelson Denny in her declaration, *see* Pl. Br. Ex. 2 ¶ 21, but Mr. Sampson does not discuss this particular score in his brief, and likely for good reason. *See* Lovett Decl. ¶ 22 (one-minute "reading rate" test on NDRT cannot be used for diagnostic purposes).

not disabled under the ADA even when there are significant score increases under extended-time conditions") (citation omitted).

Mr. Sampson points to "several of his subtest scores" in the "single digits" on the California Verbal Learning Test, Pl. Br. 9, but again, this measure (where he was asked to repeat lists of words that he hears) is irrelevant to whether Mr. Sampson needs accommodations on the Step 1 exam. Lovett Decl. ¶ 47.

Finally, with respect to his ADHD diagnosis, Mr. Sampson argues that "on normed behavior rating scales, many of his scores were in the clinically significant range." Pl. Br. 9 (citing Wasserstein Eval. ¶ 24). This discussion does not actually appear in Dr. Wasserstein's declaration, but in any event, "[s]ymptom endorsement on self-administered ADHD rating scales is not sufficient to establish an ADHD diagnosis," Murphy Decl. ¶ 29, and although Mr. Sampson rated himself with clinically-significant levels of impairment to an extreme degree in 2020, *see* Lovett Decl. ¶ 42, he did not report even *mild* current symptoms in 2013, and others who know him well and have spent significant time with him have not reported clinical-level symptoms, Pl. Br. Ex. 4 at 5.

Even if the handful of tests identified by Mr. Sampson were relevant to assessing his ability to access the Step 1 exam (many were not), and even he had below-average scores on all of those particular tests (which he does not, as shown with respect to the SATA reading comprehension test and the 2013 NDRT), variability across test scores is not indicative of an impairment or a disability. It is "the type of profile of performance that virtually everyone has (at least in some domains)." Lovett Decl. ¶ 47. And even if someone exhibits "statistically significant variation in test scores sufficient to support a clinical diagnosis," that is based on "an internal referent. When the test scores are compared to an external referent as the ADA requires—that is, the gen-

eral population—that person may nevertheless exhibit average abilities." *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012); *see also* Murphy Decl. ¶ 30; Bernier Decl. ¶ 20 ("*having disparate abilities is not itself evidence of substantially limited functions*").

Mr. Sampson's standardized testing history also undermines any argument that he is substantially limited compared to most people in any major life activity relevant to taking the Step 1 exam. Mr. Sampson's performance on standardized tests has been stellar: average to well above average scores on the PSAT, ACT, SAT, and MCAT, all taken under standard, non-accommodated testing conditions. *See supra* at 4. His scores on the MCAT are particularly notable, given his strong performance in comparison to the highly selective group of individuals taking that test—college students or college graduates interested in applying to medical school. "Of course, average (or above-average) performance presumptively establishes the absence of a substantial limitation." *Black v. NBME*, 281 F. Supp. 3d 1247, 1249-50 (M.D. Fla. 2017); *see also Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d at 620 (same).

In an effort to explain away his excellent performance on these other high-stakes tests, with no accommodations, Mr. Sampson suggests that the MCAT, SAT and ACT contain much shorter passages than Step 1, and that the questions on those exams can be answered without actually having to read the passages or the prompts found in independent questions. Pl. Br. 3, 10. He offers no support for either of these assertions, and both are inaccurate. Relatively speaking, the Step 1 exam does not contain "lengthy reading passages," nor are the passages "longer" or "more complex" than anything Mr. Sampson has encountered on any other standardized test. Pl. Br. 3. This is shown by comparing a set of sample Step 1 questions with sample questions for the

MCAT, the ACT, and the SAT. *Compare* Decl. of A. Mandelsberg Ex. F *with id.* Exs. A, D, and E. There is a reason Mr. Sampson did not provide any sample Step 1 questions to the Court.

The average word count for questions on the Step 1 exam is only 132 words. *See* McGeehan Decl. ¶ 37. By contrast, at the time he tested, the Verbal Reasoning section of the MCAT contained seven passages with an average word count of 600 words per passage. *See MCAT Essentials for 2014 and January 2015*, at 7 (Mandelsberg Decl. Ex. A). The Physical Sciences and Biological Sciences sections of the MCAT also contained seven passages, with corresponding multiple-choice questions, plus 13 independent questions. *See id.* at 6-7. The MCAT passages were thus longer than the typical passage found on Step 1. *See id.* Ex. F.

And, contrary to Mr. Sampson's suggestion, the MCAT does not evaluate examinees on simplistic subjects. The MCAT tested Mr. Sampson "on the skills and knowledge medical educators and physicians have identified as key perquisites for success in medical school and the practice of medicine." *Id.* Ex. A at 5 (*MCAT Essentials*). His verbal reasoning skills were tested, as was his knowledge of "biology, general chemistry, organic chemistry, and physics." *Id.* And to do well on the Verbal Reasoning section (as he did), Mr. Sampson had to "read attentively and make reasonable inferences based on the information provided [in the passages]." *The Official Guide to the MCAT Exam*, at 309 (2d Ed. 2011) (Mandelsberg Decl. Ex. B).

The ACT exam that Mr. Sampson took in 2008 also included passages or independent questions that are longer than what he will encounter on Step 1. *See Preparing for the ACT*, at 14-56 (sample questions) (Burgoyne Decl. Ex D). The ACT Reading test was "a 40-question, 35-minute test that measures ... reading comprehension." *Id*. at 6. Examinees had to "use referring and reasoning skills to determine main ideas; locate and interpret significant details; understand sequences of events; make comparisons; comprehend cause-effect relationships; determine the

meaning of context-dependent words, phrases, and statements; draw generalizations; and analyze the author's or narrator's voice and method." *Id.* ACT advised examinees to "read the entire passage thoroughly" before answering a question, and that it was "important that you read every sentence rather than skim the text." *Id.* at 8; 9 (same advice for the Science Test).

Finally, the SAT exam, which Mr. Sampson took three times, also included numerous lengthy passages and independent prompts. *See Official SAT® Practice Test* 2007-08. (Burgoyne Decl. Ex. E). As noted, Mr. Sampson did very well on the Critical Reading section, which "measures a student's ability to read and think carefully based on sentence completions and items related to passages ranging in length from 100 to approximately 850 words and on topics from literary fiction to natural sciences." E. Shaw, "Discrepant SAT Critical Reading and Writing Scores: Implications for College Performance," 16 Educ. Assessment 145, 149 (2011).

Mr. Sampson may argue that NBME is improperly relying on "outcomes" by examining his performance on timed, standardized tests, *see* 28 C.F.R. § 36.105(d)(3)(iii), but: (1) Mr. Sampson is also relying on "outcomes"—including his scores on medical school exams and Step 1—as evidence that he *is* disabled; (2) "[T]he DOJ's guidance does not preclude the consideration of grades and outcomes; rather, they simply cannot be the only determining factor," *Wright v. NBME*, 2021 WL 5028463, at *4; and (3) Mr. Sampson's performance on *timed*, *standardized* tests taken *without accommodations* demonstrates that his ability to read, concentrate, and "take standardized tests" under *real world* conditions (the very conditions that are relevant to evaluating his functional limitations), and compared to external referent groups (as opposed to his own subjective impressions of how he should perform), he is not substantially limited. Courts routinely rely on such "outcomes" in evaluating whether someone is disabled within the meaning of the ADA. *See, e.g.*, *Schimkewitsch v. New York Inst. of Technology*, No. CV 19-5199-GRB-AYS,

2020 WL 3000483, *5 (E.D.N.Y. June 4, 2020) (holding that plaintiff student had not shown he was substantially limited because of his diagnosed anxiety disorder and noting he had "maintained 3.5 GPA"). Simply stated, individuals who perform at the level Mr. Sampson has performed without any accommodations—academically and on other high-stakes standardized tests—are not substantially limited in their reading, learning, or testing abilities and do not have a reading or attention disorder that rises to the level of a disability under the ADA.[7]

It is true, of course, that Mr. Sampson has struggled with at least some exams in medical school. However, the determination whether Mr. Sampson is substantially limited must be made in comparison to most people, not against other medical school students or his own high expectations. *See, e.g., Singh v. George Wash. Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007); *Doherty v. NBME*, 791 F. App'x 462, 465 (5th Cir. 2019); *Black v. NBME*, 281 F. Supp. 3d at 1249-50; *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011).

Mr. Sampson's available school history also refutes any argument that he is substantially limited compared to most people in the general population with respect to reading, concentrating, or any other major life activity relevant to taking the Step 1 exam. Mr. Sampson appears to have performed well in elementary school and then earned A's and B's while taking AP-level classes

---

[7] *See, e.g.*, *Black v. NBME*, 281 F. Supp. 3d at 1251 (relying, among other evidence, on plaintiff's average or above-average performance on the MCAT and other standardized exams in holding that plaintiff was not disabled within the meaning of the ADA despite being diagnosed with ADHD by a qualified professional, and stating that "average (or above-average) performance presumptively establishes the absence of substantial limitation" when evaluating a person's ability to perform "in comparison to 'most people in the general population'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157 (E.D. Pa. 2016) (individual who scored in the 71st percentile on the GRE and in the "average" range on the reading section of the MCAT without accommodations was not substantially limited compared to most people in reading); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d at 621 ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, . . . stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *Love v. Law Sch. Adm. Council*, 513 F. Supp. 2d 206, 214 (E.D. Pa. 2007) (holding that plaintiff with LD and ADHD diagnoses was not disabled and denying accommodations on the LSAT, where plaintiff had ACT and SAT scores "within the average range" with no accommodations).

at a competitive high school. He attended the University of Virginia and earned a 3.43 GPA in a pre-med curriculum. All of this occurred without any school-based accommodations.

Mr. Sampson testifies that "[d]uring my K-12 education, I needed both tutors and a reading specialist and by the time of my graduation from high school, I had worked with no less than 24 different tutors." Pl. Br. Ex. 1 ¶ 8. But nothing in his school records indicate that his teachers thought he needed extra tutoring. He informed his evaluator there was "widespread tutoring" due to the competitive nature of his high school, and that he used a math tutor to keep up with the *accelerated pace* of his classes. Pl. Br. Ex. 3 at 2. He had "no need for any specific academic intervention" in elementary school, *id.*, and "[h]e had no formal interventions for academic difficulties, no special services, grade retentions, or behavior problems" at any point prior to medical school, Pl. Br. Ex. 4 at 1; McGeehan Decl. Ex. 16 at 5.

Mr. Sampson argues that "NBME … disregarded comprehensive neuropsychological and medical evaluations…," Pl. Br. 18, but this is untrue. NBME may have disagreed with the recommendations of his evaluators, but it thoroughly considered their opinions. *See* McGeehan Decl. Exs. 2-9, 11-14, 17-18. And NBME was not required to defer to his supporting professionals.  As one court recently explained:

> Mr. Wright … argues that the 'ADA effectively mandates that the Board provide accommodations based on the recommendations from professionals … who [have] provided … in-person evaluations of Mr. Wright….' It would certainly make courts' jobs easier if that were the case. But a professional evaluation is not the only piece of evidence a court should consider under the ADA. A diagnosis alone does not satisfy the ADA disability standard.… Nor does Mr. Wright provide precedent that a diagnos[tic] evaluation alone qualifies an individual as disabled under the ADA. In fact, courts have frequently denied motions for preliminary injunctions where the plaintiff had a professional evaluation and diagnosis.

*Wright v. NBME*, WL 5028463, at *7 (denying motion for PI); *see also Valles v. ACT,* 2022 WL 2789900, *3-4 (E.D. Tex. 2022) ("Even accepting the diagnoses and evaluations from his physi-

cians as true, Valles has not demonstrated that he will likely succeed in proving he has a disability for which he is entitled to receive accommodations under the ADA.").

The DOJ "statement" referenced by Mr. Sampson (as quoted in *Ramsay*), Pl. Br. 14-15, is a non-binding opinion of the agency, without the force of law. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2012). Despite seemingly contradictory language in its opinion regarding deference to evaluating professionals, the Third Circuit in *Ramsay* recognized that, when there is a "mountain of evidence" that an individual is not disabled, a finding of disability is not warranted even in the face of conflicting impressions from an evaluating professional. *See Ramsay*, 968 F.3d at 259 n.10 (distinguishing *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*). In *Berger*, the court did not blindly defer to the conclusions of the plaintiff's evaluators either, but rather, after examining *all* the evidence in the record, found that the weight of the evidence supported his evaluator's findings. 2019 WL 4040576, at \*25. In *D'Amico v. N.Y. State Bd. of Law Exam'rs*, the Board did not challenge that the plaintiff was disabled and offered no contrary medical opinion to support its conclusion. 813 F. Supp. at 223. The *Agranoff* court relied solely on *D'Amico* in affording "great weight" to the plaintiff's treating physician. 97 F. Supp. 2d at 87.[8]

Although Mr. Sampson complains that NBME has not "so much as even met with Sampson or conducted independent testing of its own," Pl. Br. 18, NBME did not need to meet in person with Mr. Sampson to analyze the data presented in his evaluators' reports and other objective evidence in the record. Murphy Decl. ¶ 7. Nothing in the ADA or its implementing regulations requires a testing entity to conduct an in-person meeting or independent testing. Indeed, the regulations make clear that a testing organization can request "documentation" relating

---

[8] The *D'Amico* and *Agranoff* cases were decided prior to the Supreme Court's decision in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832 (2003), where the Court held that—in the absence of a statutory directive—ERISA plan administrators are not required to accord special deference to a claimant's treating physician, as compared to experts consulted by the plan, in determining whether the claimant has a disability.  While the present case involves the the ADA, the same conclusion is warranted in this context.

to the need for any modification, accommodation, or auxiliary aid or service. 28 C.F.R. § 36.309. And were testing entities to conduct such personal evaluations for the thousands of accommodation requests that they receive, decisions would be significantly delayed, and examinees and their advocates would inevitably object that the testing entities were being unduly invasive.

Mr. Sampson argues that NBME should give "considerable weight" to his receipt of accommodations in medical school, citing 28 C.F.R. § 36.309(b)(1)(v). Pl. Br. 18. However, as the Fifth Circuit reasoned in an analogous case, a medical school might provide accommodations even if they are not warranted under the ADA, and its decision in that regard does not bind other entities. *Doherty v. NBME*, 791 F. App'x 462, 466 (5th Cir. 2019). And while prior accommodations are of course relevant, so is their absence. Mr. Sampson's history of strong performance in school and on standardized tests without accommodations, and the fact that he only began receiving accommodations in medical school, weighs *against* a finding of disability or the need for accommodations on the Step 1 exam. *See Wright*, 2021 WL 5028463, at *6.

Mr. Sampson argues in this regard that NBME cannot consider his "mitigating measures," including "extensive one-on-one didactic tutoring, and significant test preparation." Pl. Br. 15-16, 19 (citing 42 U.S.C. § 12102(4)(E)(i)). But he has not demonstrated that these ubiquitous activities are mitigating an impairment versus helping him achieve his desired goals, *see, e.g.,* Bernier Decl. ¶ 45, and his early school records and diagnostic testing show that he performs at least as well, if not better, than most people even in the absence of such measures.

Finally, the facts of *Ramsay* are not "directly on point." Pl. Br. 16-18. Suffice it say that determining whether someone meets the ADA's definition of disabled is a "fact-specific" inquiry, *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 872 (2d Cir. 1998), and this case must be decided based on its own facts.

Mr. Sampson has failed to show a clear likelihood of success on the merits.

## IV.    NBME and Other Examinees Would Be Harmed by the Preliminary Injunction

Mr. Sampson argues that "NBME will not be harmed" by his requested injunction, because extended testing time "is not logistically difficult to provide" and "it will cost NBME nothing to grant this accommodation." Pl. Br. 22. But that reasoning misses the mark. The harm here has nothing to do with logistics or cost, and everything to do with ensuring fairness to other examinees, preserving the integrity of the USMLE, and protecting the public welfare. *Those* are the interests NBME seeks to protect, and they are important. *See, e.g., Rothberg v. Law Sch. Admission Council,* 102 F. App'x 122, 126-27 (10th Cir. 2004) (vacating preliminary injunction that allowed plaintiff to take the LSAT with extra time and noting LSAC would be irreparably harmed if the accommodated score were released prior to a decision on the merits).

As the Second Circuit noted in *Powell*, NBME's "procedures are designed to ensure that individuals with bona fide disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination." 364 F.3d at 88. The balance of harms favors NBME, not Mr. Sampson—all the more so because he waited years before seeking court relief yet now requests expedited relief. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("In considering the balance of equities…, we think that plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request.").

## V.    The Public Interest Does Not Support Mr. Sampson's Motion

Mr. Sampson argues that "enforcement of the ADA is in the public interest." Pl. Br. 23. This argument, however, is based on the mistaken premise that Mr. Sampson has shown he is disabled under the ADA and has a clear likelihood of succeeding on the merits of his claim. *See Valles v. ACT*, 2022 WL 2789900, at *5 ("The public certainly has an interest in ensuring that

those with disabilities are provided adequate accommodations, as required under the law.  However, the public also has an interest in ensuring that the ADA is enforced according to its requirements.") (denying preliminary injunction).

Mr. Sampson also argues that "[m]any areas of the United States are under-served by physicians, ... so increasing the number of physicians is in the public interest." *Id*. He does not say that he intends to practice in such "under-served" areas, however, and there is a significant question whether he will ever be licensed to practice medicine anywhere regardless of the outcome of his pending motion, given his status in medical school and the fact that he is also pursuing a business degree. In all events, it would be inappropriate to award relief that is not otherwise warranted simply because a Mr. Sampson might decide to practice in an under-served area if he becomes a licensed physician.

Contrary to supporting Mr. Sampson, the public interest weighs strongly against awarding his requested mandatory preliminary injunction. Like NBME, "the public ... has an interest in the fair administration of standardized tests." *Bach v. LSAC*, 2014 U.S. Dist. LEXIS 124632, at *8. That interest is particularly strong where, as here, medical licensing authorities rely on the test to assess the competency of potential doctors.

Moreover, if medical schools, residency programs or other third parties rely on USMLE scores earned with unwarranted accommodations, it will "alter[] the substance of the product because the resulting scores [will] not be guaranteed to reflect each examinee's abilities accurately." *Powell v. NBME*, 364 F.3d at 89. That would unfairly advantage Mr. Sampson to the detriment of such third parties, including examinees who meet the ADA's definition of disabled. The injunction would thus harm the very population the ADA is meant to protect.

## **CONCLUSION**

Mr. Sampson's motion for a preliminary injunction order should be denied.

Dated:  September 29, 2022                     Respectfully submitted,

                                               */s/ Adam R. Mandelsberg*
Adam R. Mandelsberg, Bar No. 065532013
Perkins Coie LLP
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone: +1.212.261.6867
Facsimile: +1.212.399.8067
AMandelsberg@perkinscoie.com

- 26 -