# EXHIBIT 1

## United States Medical Licensing Examination® (USMLE®)

## REQUEST FOR TEST ACCOMMODATIONS

*Use this form if you are requesting accommodations on USMLE for the first time*

---

### The National Board of Medical Examiners® (NBME®) processes requests for test accommodations on behalf of the USMLE program

If you have a documented disability covered under the Americans with Disabilities Act (ADA), you must notify the USMLE in writing <u>each time</u> you apply for a Step examination for which you require test accommodations. Submitting this form constitutes your official notification.

- Review the USMLE Guidelines for Test Accommodations at <u>www.usmle.org</u> for a detailed description of how to document a need for accommodation.

- Complete all sections of this request form and submit it together with all required documentation at the same time you submit your Step exam application.

- Incomplete, illegible, or unsigned request forms and/or insufficient supporting documentation will delay processing of your request.

- Do not send originals. Please retain the originals of all documentation that you submit as we are unable to return submissions or provide duplicate copies to third parties.

- Submitting duplicate and/or bound documentation may delay processing of your request.

- NBME will acknowledge receipt of your request by e-mail and audit your submission for completeness. If you do not receive an e-mail acknowledgement within a few days of submitting your request, please contact Disability Services at 215-590-9700.  You may be asked to submit additional documentation to complete your request.

- Requests are processed in the order in which they are received. Allow at least 60 days for processing of your request.  Processing cannot begin until sufficient information is received by NBME and your Step exam registration is complete.

- The outcome of our review will not be released via telephone.  All official communications regarding your request will be made in writing.  If you wish to modify or withdraw a request for test accommodations, contact Disability Services by e-mail at <u>disabilityservices@nbme.org</u> or by telephone at 215-590-9700.

---

**You MUST provide supporting documentation verifying your current functional impairment.**

In order to document your need for accommodation, **submit** the following with this form:

✓ A **personal statement** describing your disability and its impact on your daily life and educational functioning.

✓ **Supporting documentation** such as psychoeducational evaluations; medical records; copies of report cards, academic and score transcripts; faculty or supervisor feedback; job performance evaluations; clerkship/clinical course evaluations; verification of prior academic/test accommodations; etc.

✓ A **complete and comprehensive evaluation**.  Reports from qualified professionals must be typewritten on letterhead, signed and include the professional's qualifications.

RECEIVED

APR 0 3 2017

Disability Services

USMLE® Request for Test Accommodations

## Section A: Exam Information

Place a check next to the examination(s) for which you are currently registered and requesting test accommodations: (Check all that apply)

☑ Step 1

❑ Step 2 CK (Clinical Knowledge)

❑ Step 2 CS (Clinical Skills)

❑ Step 3

## Section B: Biographical Information
**Please type or print.**

**B1.** Name:  Sampson                    Robert                    D
              _____              _____              _____
                  Last                     First               Middle Initial

**B2.** Gender:  ☑ Male       ❑ Female

**B3.** Date of Birth: ██████████

**B4.** USMLE #  5 - 3  8  5 - 6  2  4 - 1  (required)

**B5.** Address:
 11 Whitford Rd
_____
Street

 Stony Brook                    NY                    11790
_____
City                    State/Province          Zip/Postal Code

 USA
_____
Country

 631-833-4418
_____
Daytime Telephone Number

_____
Alternate Telephone Number

 rds911@gmail.com
_____
E-mail address

**B6.** Medical School Name: Stony Brook University School of Medicine
_____

Country of Medical School: USA _____        Date of Medical School Graduation: 05/19

**USMLE® Request for Test Accommodations**

## Section C: Accommodations Information

**C1**. Do you require wheelchair access at the examination facility? ☐ Yes ☑ No
If yes, and you require an adjustable height computer table, indicate the number of inches required from the bottom of the table to the floor: _____

**C2.** Describe the accommodation(s) you are requesting. Accommodations must be appropriate to the impairment within the context of the examination task and setting:

50% additional test time (time and 1/2) on the USMLE Step 1 exam.

**C3.** Check **ONLY ONE** box for the exam(s) for which you are registered.

### STEP 1:
**Additional Break Time**
☐ Additional break time over 1 day
☐ Additional break time over 2 days

**Additional Testing Time**
☐ 25% Additional test time (Time and 1/4) over 2 days
☑ 50% Additional test time (Time and 1/2) over 2 days
☐ 100% Additional test time (Double time) over 2 days

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 2 days

### STEP 2 CK:
**Additional Break Time**
☐ Additional break time over 2 days

**Additional Testing Time**
☐ 25% Additional test time (Time and 1/4) over 2 days
☐ 50% Additional test time (Time and 1/2) over 2 days
☐ 100% Additional test time (Double time) over 2 days

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 2 days

### STEP 3:
**Additional Break Time**
☐ Additional break time over 4 days

**Additional Testing Time**
☐ 25% Additional test time (Time and 1/4) over 3 days
☐ 50% Additional test time (Time and 1/2) over 4 days
☐ 100% Additional test time (Double time) over 5 days

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 4 days

### STEP 2 CS:
Describe the accommodations you are requesting for each section of Step 2 CS (i.e., patient encounter, patient note). If you are requesting additional time, state the **amount** of additional time you require in **minutes per encounter/note**.

☐ Patient Encounter:_____
☐ Patient Note:_____

USMLE® Request for Test Accommodations

## Section D: Information About Your Impairment

**D1.** Check the box that best describes the **nature of your impairment** and list the **year** it was first diagnosed by a qualified professional.  Check only those for which you are requesting accommodations.

**Sensory**                                         **Year first diagnosed**
☐  Hearing                                  _____
☐  Vision                                      _____
☐  Other (specify):_____    _____

**Learning**
☑  Reading                                   ___2013___
☐  Writing                                     _____
☐  Mathematics                            _____
☑  Other (specify):  Dyslexia        ___2013___

**Language**
☐  Expressive
☐  Receptive                                 _____
☐  Other (specify):_____   _____

**Physical**
☐  Mobility/motor
☐  Endocrine                                _____
☐  Neurological                            _____
☐  Other (specify):_____   _____

**Psychiatric**
☐  Anxiety Disorder                     _____
☐  Depression/Mood Disorder      _____
☑  Attention Deficit/Hyperactivity Disorder     ___2015___
☐  Other (specify):_____   _____

**Other Impairment** (specify) _____    _____

**D2.**  List your **current** DSM/ICD diagnosis/diagnoses for which you are requesting accommodations:
Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling (315.00)

Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing (315.9)

Attention deficit hyperactivity dissorder, predominantly inattentive (F90.2)

**D3.  Personal Statement**

✍  **Attach a signed and dated personal statement describing your impairments(s) and their impact on daily life.**  Narratives should **not** be confined to standardized test performance.  The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limit your current functioning in a major life activity.  In your own words, discuss how your impairment(s) would interfere with your access to the relevant USMLE Step and how the specific accommodation(s) you are requesting will alleviate this impact.

USMLE® Request for Test Accommodations

## Section E:  Accommodation History

## STANDARDIZED EXAMINATIONS

**E1.** List accommodations you received for all standardized examinations such as college, graduate and professional school admissions tests and professional licensure and certification examinations.  If no accommodations were provided, write NONE.

   ♾ **Attach copies of official documentation from each testing agency confirming the test accommodations they provided.**

   ♾ **Attached a copy of your official examination score report(s).**

| | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|
| ☐ SAT®, ACT® PSAT | Fall '07 (PSAT), 5/05, 6/08, 6/08, 10/08, 11/08 | NONE |
| ☐ MCAT® | 8/13, 9/14 | NONE |
| ☐ GRE® | | |
| ☐ GMAT® | | |
| ☐ LSAT® | | |
| ☐ DAT® | | |
| ☐ COMLEX® | | |
| ☐ Bar Examination(s) | | |
| ☒ Other(s) NBME Shelf Exams (also attached and below in E2) | | Time and 1/2 on NBME shelf exams: 12/8/16, 12/16/16, 1/13/17, all others previously (since 10/6/16) under standard time conditions. |
| OLSAT | May 1999 | NONE |

## POSTSECONDARY EDUCATION

**E2.** List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

   ♾ **Attach copies of official records from the school(s) listed confirming the accommodations they provided.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **Medical/Graduate/ Professional School** | Stony Brook University School of Medicine | 1.5 Time on exams | November '16-->Current (specifically received on 12/8/16, 12/16/16, 1/13/17) |
| **Undergraduate School** | University of Virginia | NONE | |

## E3.  Certification of Prior Test Accommodations

   ♾ If you receive/received accommodations in medical school and/or residency, the appropriate official at your medical school/residency must complete and submit the **Certification of Prior Test Accommodations** form available at **www.usmle.org.**

USMLE® Request for Test Accommodations

## PRIMARY AND SECONDARY SCHOOL

**E4.** List each school and all formal accommodations you received, and the dates accommodations were provided:

✎ **Attach copies of official records from the school(s) listed confirming the accommodations they provided.**

| SCHOOL | | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **High School** | Ward Melville High School | NONE | |
| **Middle School** | Paul J Gelinas JHS | NONE | |
| **Elementary School** | Minnesauke Elementary School | NONE | |

## Section F:  Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate.  I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:

- Evaluating my eligibility for accommodations.  When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research.  Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information.  I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information (see "Indeterminate Scores and Irregular Behavior"), if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print):  Robert Drew Sampson

Signature:  _Robert Sampson_                          Date:  4/1/17

**USMLE® Request for Test Accommodations**

## What to Submit

- ✓ Legible copies of all documents, not originals
- ✓ Typewritten and signed letters and reports from professionals on their letterhead
- ✓ Complete reports with all pages including test scores
- ✓ All documents in English. You are responsible for providing certified English translations of all non-English documentation
- ✓ Childhood records - if your request is based on a developmental disorder (e.g., LD, dyslexia, ADHD)
- ✓ Official transcripts and standardized test score reports
- ✓ Documentation beyond self-report of your functional impairment
- ✓ Documentation of your functional impairment in activities other than test-taking

## What NOT to Submit

- ✗ Original documents
- ✗ Handwritten or unsigned letters from physicians or evaluators
- ✗ Copies of reports with redactions or missing pages
- ✗ Multiple copies of documentation (i.e., faxed and mailed copies of a document)
- ✗ Duplicate documentation previously submitted to Disability Services
- ✗ Previous correspondence from Disability Services
- ✗ Research articles, your résumé or curriculum vita
- ✗ Staples, binders, page protectors, folders, or similar items

**Mail, fax or e-mail (as a pdf) your completed request form and supporting documents to the address below <u>at the same time</u> you submit your Step examination application.**

**Disability Services**
**National Board of Medical Examiners**
**3750 Market Street**
**Philadelphia, PA 19104-3190**
**Telephone: (215) 590-9700**
**Facsimile: (215) 590-9422**
**E-mail: disabilityservices@nbme.org**

# EXHIBIT 2

**Review of Accommodation Request**

**Applicant Name:** Robert Sampson
**Date of Birth:** ▮▮▮▮▮▮▮▮
**Date of Review:** April 25, 2017
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested extended time testing accommodations (50% additional time) on Step 1 of the USMLE. He reports diagnoses of ADHD and learning disabilities, as well as a recent history of accommodations in medical school. In a personal statement, Mr. Sampson describes a long history of problems acquiring academic skills and says that he did well until medical school because he worked so hard.

In support of his request, Mr. Sampson has submitted the following documents:
- A record of performance on Shelf exams in medical school
- A record of performance on a group-administered IQ test (the OLSAT) in second grade
- Score reports from the PSAT, SAT, ACT, and MCAT
- The reports from diagnostic evaluations completed in 2013
- Supportive letters from a disability services office administrator, a tutor, a learning specialist, and a treating psychiatrist
- Confirmation of eligibility for accommodations in medical school
- Evidence of being called before a committee in medical school to explain marginal performance there

This review has three purposes: to evaluate the evidence for the reported disability conditions, to determine if the conditions (if present) cause a substantial limitation in any major life activities, and to determine if the requested accommodations are appropriate for Mr. Sampson.

Evidence of ADHD
There is clearly insufficient evidence to support a diagnosis of ADHD. Indeed, Mr. Sampson's diagnosis is one of the most irresponsible that I have ever seen. There is very substantial evidence *against* the presence of ADHD.

In August 2013, Mr. Sampson completed his first diagnostic evaluation, and at that time, based on his concerns, the evaluator did not even assess for ADHD; it appears that there were no concerns related to ADHD, and the evaluator noted that Mr. Sampson "was very focused throughout the testing sessions." In December 2013, Mr. Sampson nonetheless completed a second evaluation with a different evaluator, and this time he "wondered whether" ADHD "might explain attentional difficulties he is having." The evaluator obtained standardized ratings of Mr. Sampson's current and childhood ADHD symptoms from Mr. Sampson himself as well as from various informants (his mother, his father, his girlfriend, and a friend/tutor). With regard to childhood symptoms, only Mr. Sampson endorsed clinically significant levels; neither of his parents did. With regard to current symptoms, *neither Mr. Sampson nor any third-party informants endorsed clinically significant symptom levels*. This is very strong evidence *against* ADHD, and the evaluator did not make that diagnosis. Nonetheless, the evaluator claimed that Mr. Sampson "does appear to be experiencing attention problems," perhaps based on a small

number of below-average scores on highly artificial neuropsychological tasks.

At some point in 2015, Mr. Sampson was reportedly diagnosed with ADHD; indeed, his psychiatrist reports the diagnosis, but there is no record of what evidence was used to make the diagnosis, and as I discussed above, there is very clearly substantial evidence against the diagnosis.

<u>Evidence of Learning Disabilities</u>
The current official diagnostic criteria for learning disabilities require that someone's "academic skills are substantially and quantifiably below those expected for the individual's chronological age."[1] Every time that Mr. Sampson's academic skills have been measured against age peers on diagnostic tests, the skills have been in the average range or above.[2] Similarly, on real-world academic tests taken by the general population (ACT, PSAT, SAT) and even by medical school applicants (MCAT), his scores have always been in the average range or above, compared to his peers.[3] This is very strong evidence *against* the presence of any learning disabilities.

In August 2013, Mr. Sampson received a diagnosis of Learning Disorder Not Otherwise Specified (LD-NOS). However, the evaluator explicitly acknowledged that this was not based on any academic skill weaknesses, but on a discrepancy between Mr. Sampson's "verbal and visual/spatial reasoning abilities," neither of which were found to be below-average either. LD-NOS is an old diagnostic term (outdated even in August 2013) that was used to refer to problems that did *not* meet the full criteria for any well-understood learning disabilities. Even if LD-NOS is a valid diagnostic category generally, learning disabilities clearly concern academic skill weaknesses, and so the LD-NOS term was misapplied.

In December 2013, Mr. Sampson was diagnosed with a learning disability "with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling," but again there is no evidence that he has ever performed below the average range compared to age peers on measures of any of those skills. The diagnosis was made in the face of clear evidence to the contrary; it was a remarkably unsupported diagnosis.

<u>Evidence of Other Disabilities</u>
Finally, Mr. Sampson was diagnosed in December 2013 with "Unspecified Neurodevelopmental Disorder." There are no detailed diagnostic criteria for such a disorder; the term is used when someone does *not* meet the criteria for any of the known disorders. Therefore, there is no way to determine if the term was applied correctly; instead, we should ask (as I do below) whether Mr. Sampson meets the standard for being disabled, and whether he needs any accommodations.

---

[1] See page 67 of the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5; American Psychiatric Association, 2013).
[2] In August 2013, Mr. Sampson's academic skills were measured by the Woodcock-Johnson Tests of Achievement, and all of his scores were in the average range or above, when compared to age peers. In December 2013, he was given the reading comprehension measure from the Scholastic Abilities Test for Adults, and again, his score was in the average range (without any extended time) compared to age peers.
[3] Mr. Sampson took the SAT several times, including once very early (at the age of 14) as part of the requirements for entrance into a special non-college program, and so his scores from that administration, which compared him to college-bound high school seniors, cannot be taken as evidence of his own age- or grade-level abilities. His scores on all *other* administrations of the SAT were in the average range or above.

Evidence of Functional Limitations and Accommodations Needs

There is simply no credible evidence that, compared to most people in the general population, Mr. Sampson is substantially limited in any major life activities. He has not always done well on tests in medical school, but obviously, most people are not expected to do well in medical school, and so performance problems there are not strong evidence of a disability. In addition, he has occasionally obtained below average scores on highly artificial neuropsychological tasks, but variability in performance on such measures is typical and expected, and his lowest scores are not buttressed by credible, *real-world* evidence of deficits compared to most people in the general population.

Finally, there is clearly insufficient evidence that Mr. Sampson requires any accommodations at all to access Step 1 of the USMLE. In the past, when he has taken tests that most people in the general population take, he does well without any accommodations. His SAT scores were in the average range or above, without any accommodations. His ACT scores were similarly in the average range or above, without any accommodations. Even his MCAT scores were better than those of most medical school applicants, without accommodations. Admittedly, some of his Shelf exam scores have not been very high, but if the only setting where someone experiences functional impairment is on medical school exams, this would not rise, in my opinion, to the level of a true disability.

Benjamin J. Lovett, Ph.D.

# EXHIBIT 3



**NBME**

1114461     5-385-624-1
**Denial-Decision Letter (a**

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

<u>**Confidential**</u>

June 13, 2017

Robert D. Sampson
11 Whitford Rd.
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed the documentation provided in support of your request for test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You report the basis of your request to be "*Specific Learning Disorder with Impairment in reading (dyslexia),*" diagnosed in 2013, "*Unspecified Neurodevelopmental Disorder,*" and "*Attention deficit hyperactivity disorder, predominantly inattentive*" diagnosed in 2015. In your personal statement, you report a childhood history of stuttering and difficulties with reading and learning. You write, "*Throughout my entire life, especially most recently in my medical education, I have significantly struggled with my reading speed and ability, especially on timed exams, even though I have otherwise proven in the rest of the course that I learned the material well.*" You report that it was not until 2013 when you were preparing for the MCAT that you decided to seek professional guidance and pursue an evaluation, which resulted in a learning disability diagnosis in August 2013. According to your request, however, you did not receive academic or test-taking accommodations until 2016 when you were already in medical school. You report that your performance on medical school "*NBME shelf exams*" improved with 50% additional time and have requested the same accommodation for Step 1.

Included with your request was an August 26, 2013 Confidential Report of Psychological Evaluation in which Suzanne Michels, Ph.D. concludes that variation in your test scores "*indicate the presence of a Learning Disorder Not Otherwise Specified*" (LD-NOS) and states, "*Robert's significant personal weakness on tasks requiring visual/spatial skills has negatively affected aspects of his academic performance.*" She recommends 150% "*extra time on reading comprehension tasks*" and "*those involving significant visual/spatial components.*" In a December 16, 2013 Supplemental Testing Report, Allison Anderson, Ph.D. writes that you were interested in further testing "*to explore learning issues more thoroughly.*" She writes, "*He also wondered whether Attention Deficit/Hyperactivity Disorder (ADHD) might explain attentional difficulties he is having.*" Dr. Anderson rules out a diagnosis of ADHD but concludes that you meet criteria for an "*Unspecified Neurodevelopmental Disorder*" and a "*Specific Learning Disorder with impairment in reading (dyslexia)*" and makes recommendations including 50% extended time for exams.

In a March 29, 2017 letter, Thomas A. Aronson, M.D. writes that you have been under his psychiatric care since November 2015 for "*Learning Disabilities and mild ADD*" and that your performance in medical school has significantly improved since he began prescribing Dexedrine and accommodations were approved for exams. He references your 2013 evaluations and reports that Learning Disorder and ADD substantially impact your major life activities in and out of the classroom, "*e.g., avoid reading, difficulty finishing tests on time, difficulty completing tasks.*" However, no further detail was provided about your functioning and no information at all was provided about how the diagnosis of "*ADD*" was made in 2015, how you meet key diagnostic criteria for ADHD, or why your evaluators did not reach the same diagnostic conclusion during their assessments in 2013. In additional letters

dated March 29, 2017, your former MCAT tutor, Andrew Lam, and Stony Brook University Learning Specialist, Linda De Motta, also report that you have difficulties with reading skills and reading speed that impact your ability to complete exams within standard time limits.

Despite these statements and the diagnostic conclusions of your evaluators, your 2013 performances on a range of cognitive and academic tasks, including reading/passage comprehension, reading fluency, spelling, perceptual reasoning, visual-spatial thinking and processing speed were all well within the range of average functioning or above relative to national samples of same-aged peers. For example, Dr. Michels notes that although your visual/spatial problem-solving abilities (as measured by the *Wechsler Adult Intelligence Scale, Fourth Edition*) were *"weaker"* than your *"exceptional"* cognitive abilities in other areas, they still *"fall solidly within the average range."* On the *Woodcock-Johnson Tests of Achievement-Third Edition (WJ-III)*, your Reading Fluency performance was better than 80% of a national sample of same age peers. Although Dr. Michels emphasizes your performance on the *Nelson-Denny Reading Test* (NDRT), a screening measure of reading, the NDRT Reading Rate is not considered by experts to be a reliable measure of reading efficiency because it is determined on the basis of a single, one-minute sample of words-per-minute.

According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, specific learning disorder and ADHD are both neurodevelopmental disorders that first manifest in childhood. Even if not formally diagnosed until later in life, each is characterized by persistent and impairing difficulties that that interfere with functioning or development over a long period of time. The documentation you provided does not show a record of chronic and pervasive problems managing daily demands for attention, organization, behavioral regulation, or executive functioning during your development or currently, nor does it demonstrate a developmental history of problems with reading or learning that impacted your academic functioning or limited a major life activity. As best one can tell, you successfully progressed throughout your education with an academic record and scores on timed standardized tests sufficient to gain admission to both college and medical school, without formal accommodations. Regarding your performance on timed standardized tests, your records show that on multiple administrations of the SAT under standard conditions in 2008, you obtained scores in the 74th to 96th percentile range compared to a national sample of college-bound seniors. In November 2008, your Critical Reading score on the SAT was better than 93% of a national sample of peers. Additionally, under standard conditions on the MCAT in 2013 and 2014, your Total Scores were better than 67% and 73% of a highly select sample of medical school applicants (respectively). Overall, these data do not demonstrate impaired functioning relative to most people or suggest that standard testing conditions are a barrier to your access to the USMLE.

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people. Your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

We will advise Applicant Services to process your exam application without test accommodations. You may inquire at usmlereg@nbme.org or call Applicant Services directly at (215) 590-9700 with any questions about your scheduling permit.

Sincerely,

Michelle M. Goldberg, Ph.D.
Manager, Disability Services

# EXHIBIT 4

## Review of Accommodation Request

**Applicant Name:** Robert Sampson (reconsideration)
**Date of Birth:** █████████
**Date of Review:** July 16, 2017
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested extended time testing accommodations (50% additional time) on Step 1 of the USMLE. He reports diagnoses of ADHD and learning disabilities, as well as a recent history of accommodations in medical school.

I first reviewed Mr. Sampson's request in April 2017. At that time, in support of his request, he had submitted the following documents:

- A record of performance on Shelf exams in medical school
- A record of performance on a group-administered IQ test (the OLSAT) in second grade
- Score reports from the PSAT, SAT, ACT, and MCAT
- The reports from diagnostic evaluations completed in 2013
- Supportive letters from a disability services office administrator, a tutor, a learning specialist, and a treating psychiatrist
- Confirmation of eligibility for accommodations in medical school
- Evidence of being called before a committee in medical school to explain marginal performance there

Based on the documentation described above, I concluded that there was clearly insufficient evidence to support Mr. Sampson's request. Although he had been diagnosed with ADHD, the only current evidence of his core ADHD symptoms (as rated by himself and by others who knew him well) showed that none of the ratings were above clinical thresholds. Although he had been diagnosed with a learning disability affecting reading and spelling skills, diagnostic tests measuring those skills found them to be in the average range or above. Finally, on standardized, high-stakes tests such as the ACT, SAT, and even the MCAT, Mr. Sampson had repeatedly performed in the average range or above without any accommodations. Please see my report, dated April 25, 2017, for more details.

The NBME denied Mr. Sampson's request, and he has now appealed. In addition to reviewing the documents listed above, I have now also reviewed the following documents:

- An appeal letter from Mr. Sampson
- Supportive letters from his parents, and from a disability services office administrator at his university
- Various documents from Mr. Sampson's elementary school years, including report cards and letters, along with a summary of chosen quotations from those documents
- Additional correspondence

Unfortunately, there is still clearly insufficient evidence to support Mr. Sampson's request, and there is a great deal of evidence that argues *against* his request. Below I summarize the new documentation:

- The letter from Mr. Sampson's parents asserts that they overlooked their son's early educational problems due to his good performance in school. The parents also report that their son benefited from extensive tutoring, especially in high school, and the letter lists the names of many tutors. They do not mention what was noted by Mr. Sampson's August 2013 evaluator, that his high school classes "were typically honors or AP level" and that "he earned A's in most classes."
- The letter from the disability services office administrator contains many legal claims but does not provide any unique, relevant information about Mr. Sampson's case. The administrator also makes clear that she determines accommodations needs by comparing Mr. Sampson's diagnostic test scores to each other (even when all scores were average or above) and by comparing Mr. Sampson's skills to what would be needed in medical school. She clearly does *not* use a general population, average person comparison standard.
- The documents from Mr. Sampson's elementary school years do not contain any clear evidence that ever would have met the criteria for ADHD or learning disabilities. Admittedly, not all of the documents are entirely legible, but the summary of quotes from those documents appears to show "sour cherry picking"—that is, the choosing of unrepresentative comments that, in context, would paint a very different picture of Mr. Sampson. Certainly, there is no evidence that Mr. Sampson's behavior or performance in school was substantially below that of most of his peers. Of course, even if there were credible evidence of significant childhood problems (and there is no such evidence), this would not mean that Mr. Sampson is *currently* impaired.

The essential state of the evidence, then, has not changed. The one comprehensive assessment of ADHD symptoms failed to find adequate evidence to support such a diagnosis (since no one, including Mr. Sampson himself, rated him as having current clinical levels of symptoms). The diagnostic evaluations of his academic skills have failed to find any below-average skills compared to his age peers or to most people in the general population. And on high-stakes tests when he is compared to general population peers (e.g., on the SAT and ACT), and even when he was compared to medical school applicants (on the MCAT), his scores have been in the average range or above without accommodations.

One of the skills needed to access Step 1 of the USMLE is reading fluency—that is, the ability to decode and understand text under a time limit. Every time that Mr. Sampson's ability to do this has been compared to age peers or to general population standards, his skills have been in the average range or above:

- His SAT and ACT scores were consistently in the average range or above, except the one time that he took the test several years early (and so was not compared to peers).
- In August 2013, his score on the Woodcock-Johnson Tests of Achievement (WJ-Ach) reading fluency task (where he needed to silently read and demonstrate understanding of sentences as quickly as possible) was better than 80% of his age peers.
- In August 2013, his score on the timed reading comprehension task from the Nelson-Denny Reading Test (NDRT) was in the average range for a general population proxy group (first-year college students). Although the evaluator reports a score at the 16th percentile, this was based on a comparison to graduating college seniors, not a relevant comparison group.

- In December 2013, his score on the standard-timed version of the reading comprehension task from the Scholastic Abilities Test for Adults (SATA) was in the average range for his age peers.

Finally, let me again note that even on the MCAT, when Mr. Sampson was compared to a very high performing group of individuals (i.e., medical school applicants), all of his scores were consistently in the average range or above without any accommodations.

This is not a "gray area" or "borderline" case; there is clearly insufficient evidence to support Mr. Sampson's request, and instead there is credible, consistent evidence suggesting that he does *not* have relevant substantial limitations compared to most people in the general population.

Benjamin J. Lovett, Ph.D.

# EXHIBIT 5

 **NBME**

1115560        5-385-624-1
Reconsideration-Denial-De

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

<u>**Confidential**</u>

August 1, 2017

Robert D. Sampson
11 Whitford Rd.
Stony Brook, NY 11790

RE: USMLE Step 1                              USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed your request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

NBME carefully considers all evidence in determining whether an individual is substantially limited within the meaning of the ADA, including information contained in the individual's personal statement; professional evaluation reports; letters from advocates; and objective documentation such as school records and scores obtained on standardized tests taken with and without accommodations. Supporting documentation submitted from qualified professionals is a necessary part of any request for accommodations and is thoroughly reviewed by the NBME. Though not required to defer to the conclusions or recommendations of an applicant's supporting professional(s), we give considerable weight to the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.

Included with your current submission is a June 22, 2017 letter from Jan D. Serrantino, Ed.D., Director of the Disability Services Center at UC Irvine, which you state *"should serve as the unifying document of my appeal."* Dr. Serrantino writes that you contacted her for advice and support with your appeal, and refers to your originally submitted documentation as well as the supplemental information supplied with your reconsideration request. She recommends 50% extended time on all USMLE Step exams on the basis of reading and neurodevelopmental disabilities. Dr. Serrantino states that although you are able to read at the level of an average person, reading *"as well as the 'average person' is not congruent with* [your] *overall ability… and the level of reading ability required to obtain the medical knowledge needed to become a physician."* She references your *"Verbal IQ of 141"* and states, *"The discrepancy between his ability and reading (and writing) achievement clearly necessitates the need for accommodation."*

Her conclusions and recommendations notwithstanding, currently validated theories and empirical research do not support using a discrepancy model as the basis of a diagnosis or rationale for accommodations. Average range academic skills, no matter how discrepant from one's IQ or other

scores, are Average nonetheless and do not demonstrate impaired functioning that limits a major life activity. Overall, the documentation submitted to date reveals consistent evidence of intact cognitive and academic functioning relative to most people, and does not demonstrate that standard testing time is a barrier to your access to the USMLE.

The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people in the general population. Accommodations are provided when there is clear documentation of functional impairment as compared to most people and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance.

Our thorough review of all of your documentation found no new substantive information or evidence that alters our original decision communicated in my June 13, 2017 letter. Therefore, I must inform you that we are unable to provide you with the requested accommodations.

Sincerely,

Michelle M. Goldberg, Ph.D.
Manager, Disability Services

# EXHIBIT 6

## Review of Accommodation Request

**Applicant Name:** Robert Sampson (<u>second</u> reconsideration)
**Date of Birth:** ▮▮▮▮▮▮▮
**Date of Review:** December 18, 2017
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested extended time testing accommodations (50% additional time) on Step 1 of the USMLE. He reports diagnoses of ADHD and learning disabilities, as well as a recent history of accommodations in medical school.

I first reviewed Mr. Sampson's request in April 2017. At that time, in support of his request, he had submitted the following documents:

- A record of performance on Shelf exams in medical school
- A record of performance on a group-administered IQ test (the OLSAT) in second grade
- Score reports from the PSAT, SAT, ACT, and MCAT
- The reports from diagnostic evaluations completed in 2013
- Supportive letters from a disability services office administrator, a tutor, a learning specialist, and a treating psychiatrist
- Confirmation of eligibility for accommodations in medical school
- Evidence of being called before a committee in medical school to explain marginal performance there

Based on the documentation described above, I concluded that there was clearly insufficient evidence to support Mr. Sampson's request. Although he had been diagnosed with ADHD, the only current evidence of his core ADHD symptoms (as rated by himself and by others who knew him well) showed that none of the ratings were above clinical thresholds. Although he had been diagnosed with a learning disability affecting reading and spelling skills, diagnostic tests measuring those skills found them to be in the average range or above. Finally, on standardized, high-stakes tests such as the ACT, SAT, and even the MCAT, Mr. Sampson had repeatedly performed in the average range or above without any accommodations. Please see my report, dated April 25, 2017, for more details.

The NBME denied Mr. Sampson's request, and he appealed, submitting the following additional documents:

- An appeal letter from Mr. Sampson
- Supportive letters from his parents, and from a disability services office administrator
- Various documents from Mr. Sampson's elementary school years, including report cards and letters, along with a summary of chosen quotations from those documents
- Additional correspondence

Unfortunately, there was still clearly insufficient evidence to support Mr. Sampson's request. The letter from Mr. Sampson's parents noted that their son received extensive tutoring in school, but given that Mr. Sampson was receiving A grades in honors and advanced placement courses, such tutoring would not be evidence of a disability. Meanwhile, the disability services office

administrator made clear in her letter that she believes that (a) discrepancies between different test scores and (b) low performance relative to other medical students are sufficient evidence of a disability. Finally, the documents from Mr. Sampson's elementary school years did not clearly show evidence of atypical levels of attention/behavior problems or poor academic performance beyond what most students experience at times. The new documentation also failed to address the substantial evidence *against* the request (noted above). Therefore, I had to again conclude that there was insufficient evidence to support the request. Please see my report, dated July 16, 2017, for more details.

The NBME denied Mr. Sampson's appeal, and he has again requested reconsideration. In addition to his own brief letter, he has submitted three new supportive letters from the following individuals:
- Dr. Allison Anderson, a psychologist who evaluated Mr. Sampson in December 2013
- Dr. Thomas Aronson, a psychiatrist who has been treating Mr. Sampson since November 2015
- Dr. Jan Serrantino, an "educational consultant" who had written earlier supportive letters as the disability services office administrator mentioned above

Unfortunately, this new documentation provides no new evidence relevant to Mr. Sampson's case. Moreover, the arguments presented in these letters are based on either irrelevant or inaccurate information. Finally, and most remarkably, none of the letters attempt to address the very considerable evidence that argues against Mr. Sampson's request. Let me respond to the major claims in these letters:

1. Dr. Anderson claims that Mr. Sampson is below average in relevant areas. But as support for this claim, she only cites irrelevant facts:
    - Mr. Sampson scored at the 16th percentile on the Nelson-Denny Reading Test (NDRT) timed reading comprehension task compared to *graduating college seniors*, not compared to age peers or to the general population (indeed, fewer than half of adults in the United States have a college degree). Compared to the general population proxy group of first-year college students, his score was well within the average range.
    - Mr. Sampson scored at the 25th percentile on a timed version of the reading comprehension task from the Scholastic Abilities Test for Adults. This score is in the average range. Dr. Anderson points out that any test score has a range of uncertainty around it (the "standard error of measurement"), but this is irrelevant, since as she notes, that uncertainty extends in both directions from the score, and so if tested on a different day, Mr. Sampson's score might have been somewhat lower than the 25th percentile, but *it might just as likely have been higher*.
    - Mr. Sampson scored below the average range on artificial neuropsychological tests that are not at all like Step 1 of the USMLE, such as a test where he needed to draw a complex figure from memory.
    Worse still, Dr. Anderson does not even mention the evidence from real-world tests such as the SAT, ACT, and MCAT that show much better performance than the diagnostic tests that she chooses to discuss.

2.  Dr. Anderson repeatedly bases her accommodations recommendations on facts that *do not show below-average functioning*. For instance, she notes that Mr. Sampson improved his performance on time-pressured tests when given more time (as many nondisabled people do). Similarly, she notes that Mr. Sampson's reading scores were lower *compared to some of his other test scores*. Facts like these are irrelevant to a disability determination even if true.

3.  Dr. Aronson firmly asserts that Mr. Sampson meets the diagnostic criteria for ADHD, but never states the evidence that he used to make that judgment. The closest that Dr. Aronson comes to doing so is when he says that "ADHD is a clinical diagnosis made over several visits triangulating patient self-reported symptoms and impact with key data points from a multitude of sources." But Dr. Aronson never acknowledges that in December 2013, when Mr. Sampson's self-reported symptoms were combined with reports about his symptoms from a multitude of other sources (his mother, his father, his girlfriend, and his friend/tutor), *none* of these sources (including Mr. Sampson himself) described Mr. Sampson as having ADHD symptoms in the clinical range. Therefore, the only direct evidence of core ADHD symptoms on validated diagnostic measures undermines Dr. Aronson's assertion, *even when using assessment methods that Dr. Aronson appears to endorse*.

4.  Dr. Aronson makes other assertions that are directly contradicted by objective evidence. For instance, he refers to Mr. Sampson's information processing speed as "very slow." But when Mr. Sampson's processing speed has been measured directly, it has been at least in the average range, and usually far above that range. For instance, in 2013, his processing speed score on the Wechsler Adult Intelligence Scale was better than 93% of people his age.

5.  Dr. Serrantino notes that in one of the denial letters, the NBME cited research showing that students with *and without* disabilities both benefit from extended time accommodations. Rather than attempting to criticize this research, she proceeds to note that the cited research study used the NDRT, and she argues that the NBME has elsewhere criticized the NDRT. The NBME's point about students without disabilities benefiting from extended time stands (apparently without disagreement from Dr. Serrantino), and it is highly relevant to Mr. Sampson's case.

6.  Dr. Serrantino appears to argue in favor of "discrepancy" models in the diagnosis of learning disabilities. What counts as a discrepancy model varies from one reference to another, but in general, Dr. Serrantino appears to be arguing that even if all of someone's diagnostic test scores are in the average range or above, discrepancies between those scores can be evidence of a learning disability. Such a claim is admittedly debated within the field, with different scholars coming down on different sides of the issue. However, even if we grant that a learning disability could be diagnosed using these kinds of discrepancies, this would clearly not meet the *legal* definition of disability, which requires substantial limitations compared to most people in the general population (not just compared to the person's other skills). Moreover, the official diagnostic criteria for learning disabilities in the *Diagnostic and Statistical Manual for Mental Disorders*

clearly require that someone's academic skills be at least 1 standard deviation below the mean for the person's age group (among other requirements).

7. Finally, Dr. Serrantino makes a variety of legal claims, as she has in the past, but some of those claims appear to me to be at best misleading or else misapplied to Mr. Sampson's case. For instance, she reports that someone can be substantially limited in reading if they take longer to read. But as I have noted, there is no credible evidence that Mr. Sampson's *timed* reading skills are below the average range compared to the general population. She also reports that evidence of past student success cannot be used when making accommodations decisions. But as she no doubt knows, educational performance in real-world settings is core evidence of a learning disability (or the lack thereof), even mentioned in the *Diagnostic and Statistical Manual of Mental Disorders*. She is right that past success does not automatically mean that someone does not have a disability, but she extends this point beyond all reasonable application.

As I noted in an earlier report, Mr. Sampson's case is not in a "gray area." Not only is there insufficient evidence supporting his disability diagnoses and accommodation needs, but there is a tremendous amount of consistent evidence *against* those diagnoses and needs. He and his advocates have passionately argued in support of his case, but they never even acknowledge the very clear evidence undermining their claims.


Benjamin J. Lovett, Ph.D.

# EXHIBIT 7

 NBME

1121197        5-385-624-1
**Reconsid. Denial-Decision**

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**

January 12, 2018

Robert D. Sampson
11 Whitford Rd.
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed your recent request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and all submitted supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

The NBME provides reasonable and appropriate test accommodations to examinees who provide supporting documentation that shows that they have a disability within the meaning of the ADA.
The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people in the general population. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances.

Though not required to defer to the conclusions or recommendations of an applicant's supporting professional(s), we carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.
Accommodations are provided when there is clear documentation of functional impairment and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance. Your documentation does not demonstrate that standard testing time is a barrier to your access to the USMLE. The records provided reveal a consistent history of unimpaired performances on timed standardized tests when compared to appropriate national normative samples.

Our thorough review of the supplemental documentation provided found no new substantive information or evidence that alters our decision communicated in our June 13 and August 1, 2017 letters. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

Sincerely,

*Catherine Farmer*

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

# EXHIBIT 8

 **NBME**®

1123493     5-385-624-1
**Reconsideration-Denial-De**

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

<u>**Confidential**</u>

March 6, 2018

Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We are in receipt of your recent request for an explanation as to why you are not being granted disability related accommodations on the USMLE Step 1.  You write in you February 22, 2018 letter addressed To Whom It May Concern, *"My school, health care professionals and I have provided NBME with overly burdensome, yet comprehensive documentation that complies with the guidelines posted on the USMLE website. I also have provided supplemental letters from my health care providers and evaluators and the former director of Disability Services from the University of California, Irvine...on January 12, 2018, I received a vague emailed letter from Catherine Farmer, Psy [sic]...Ms. Farmer did not acknowledge or respond to any of the evidence of my disability. She states, that the qualified professionals who spent numerous hours evaluating me, and the Stony Brook staff who are constantly observe me '...did not demonstrate that standard testing time is a barrier to your access to USMLE.'* **Ms. Farmer's vague denial is troublesome and I believe that** *USMLE is creating a barrier to me and all individuals with disabilities, creating burdensome processes and denying equal access for a student, me, who has a clear and obvious disability to STEP 1 and, as a result, hindering my educational program* (emphasis original). *I have provided clear evidence of my long history of disability that is documented in line with your requirements. You have been provided counter points to each of your reasons for denial. Stoney Brook is also providing an additional letter that I am attaching with my letter. I am requesting reconsideration of your decision. I am requesting 50% extended time, extra breaks, testing over two days in a private room.*

Please be assured that each and every document submitted in support of your April 3, 2017 request for accommodations, and subsequent requests for reconsideration received on June 26, 2017 and November 30, 2017, have been thoroughly reviewed. We endeavor to communicate our decisions as clearly and thoroughly as possible. I regret that you found my January 12, 2018 communication to be vague or that you expected a point by point, document by document response.  Dr. Goldberg's June and August 2017 letters are quite detailed and complete with regard to how your documentation does not support the diagnostic conclusions of Drs. Michels, Anderson, and Aronson or demonstrate the presence of a disabling condition within the meaning of the ADA.

In a September 6, 2017 letter written in support of your appeal for accommodations, Dr. Aronson asserts that you are "severely impacted" by learning disabilities (specifically reading speed and

Robert D. Sampson                                                    USMLE ID#: 5-385-624-1
March 6, 2018                                                                          Page 2

comprehension) and ADHD.  He writes, *"My diagnosis was developed through direct clinical assessment over several visits...ADHD is a clinical diagnosis made over several visits triangulating patient self-reported symptoms and impact with key data points from a multitude of sources."* Dr. Aronson does not acknowledge that your August 2013 evaluation did not identify any concerns about attention, concentration, impulsivity, hyperactivity, or executive functioning.  To the contrary, Dr. Michels states in her 2013 report that you gave a high level of effort and focus during the assessment and observed, *"When stressed, his style can become somewhat obsessive, and he appears prone to overthinking minute details...Robert is likely to experience more anxiety than is necessary in some situations.  During testing, Robert put forth a high level of effort on all tasks, even asking to review all of his responses on some untimed tasks.  He did not necessarily work more slowly than is typical, but his need to check his responses led to longer than average testing times."*

Dr. Aronson does not address Dr. Anderson's December 2013 evaluation report in which she describes your responses to standardized ratings of current and childhood ADHD symptoms, as well as the responses of various informants.  While you endorsed clinically significant levels of childhood symptoms, neither of your parents did.  Regarding current symptoms, Dr. Anderson writes, *"...Robert did not rate himself as having significant levels of inattentiveness compared to responses typical of individuals with ADHD. Nor did he see himself has having problems with impulse control, or physical restlessness compared to others his age...Similarly, neither Robert's friend and tutor, nor his girlfriend rated him as having significant levels of problems in any area typically associated with ADHD...Robert does appear to be experiencing attention problems, but his testing results and history supply little evidence that these problems are the result of ADHD."*

Dr. Aronson makes other assertions that are directly contradicted by objective evidence. For instance, he refers to your information processing speed as 'very slow.' When measured directly, your processing speed is not slow or even below average range. In 2013, your Processing Speed Index on the *Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV)* is Above Average range, better than 93% of national sample of same age peers.  Furthermore, your Cognitive Fluency Index and Broad Reading are Above Average range, better than 75-80% of a national sample of same age peers.

In her August 10, 2017 letter, Dr. Anderson writes, *"Mr. Sampson's Nelson Denny Reading Test Comprehension score under standard time limits was in the low-below average range at the 16th percentile. Mr. Sampson's score on the Reading Comprehension subtest of the Scholastic Abilities Test for Adults (SATA) was in the low average range...With both the NDRT and SATA reading comprehension scores, Mr. Sampson showed marked improvement to the average-above average range when given extended time...Both Dr. Michels and I agree that there is a clear record of consistent academic struggles experienced by Mr. Sampson, beginning in elementary school years through the present time."*

Dr. Anderson's conclusions notwithstanding, the *Nelson-Denny Reading Test (NDRT)* percentile scores reported by your evaluator compare your performance to a select group of about 500 college educated individuals. *NDRT* scale scores are derived from the pooled standardization sample of approximately 8000 individuals, a group whose aggregate characteristics more closely resemble the average person from the general population, the appropriate frame-of-reference when assessing disability under the ADA. Your *NDRT* comprehension scale score of 208 obtained under standard time conditions is Average range compared to the pooled standardization sample, where the mean is 200 and the standard deviation is 25.  Although Dr. Anderson characterizes your *Scholastic Abilities Test for Adults (SATA)* Reading Comprehension score as 'low average range,' you reportedly earned

a standard score of 8 under standard time conditions. According to the *SATA Examiner's Manual* (1991), standard scores of 8-12 are described as Average range. Furthermore, the *SATA Examiner's Manual* (1991) states *"...two subtests impose time limits even when testing individually. Examinees are given 15 minutes to complete as many items as thy can in Reading Comprehension. They are also limited to 15 minutes for Writing Comprehension."* There is no extended time administration for the *SATA* and the validity of any inferences drawn from such a nonstandard administration are unclear. Most importantly, there is a body of research which shows that many people, with and without disabilities, score higher on tasks when given more time.

Dr. Serrantino's October 9, 2017 advocacy letter cites test data from your 2013 evaluations but offers no new performance data or information to support her opinions. She repeats and restates many of the same conclusions made by Drs. Michels, Anderson, and Aronson which have been addressed elsewhere in this and prior letters. While she and Dr. Anderson cite below average range performances on a few isolated subtests as evidence of "severe impairment" on the recall of visual images, these tests are not at all like Step 1. When viewed within the context of your history of Average to Above Average range performances on academic achievement tasks that require visual memory, impaired range scores on the *Rey Complex Figure Test* are largely irrelevant with respect to your real-world functioning. For example, under standard conditions you earned SAT scores of Verbal 680, Math 720, and Writing 680 in November 2008, better than 93-96% of a national sample of college-bound seniors. In 2013 and 2014, you earned MCAT Total Scores of 28 and 29 under standard conditions, better than 67-73% of a highly select group of medical school applicants. These data provide substantial evidence *against* a conclusion that standard time conditions present a barrier to your access to Step 1.

In a February 5, 2018 letter addressed To Whom It May Concern, Linda De Motta Learning Specialist at Stoney Brook School of Medicine writes, *"I am professionally trained and qualified to comment on my observations of the manifestations of Robert's disabilities in reading, writing, managing time, memory organization and other academic and life activities. Robert meets the criteria, through our disabilities services office and according [sic] the guidelines of the ADA, for appropriate testing accommodations...the records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude. In medical school that is not what the record shows at all. The medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions. Clearly Robert requires the time extension to gain access to the exam."*

Ms. De Motta's advocacy letter, while well-intentioned, is inconsistent with the medical school records that you provided to us in April, 2017. According to a document entitled *NBME Shelf Exam Score Report for Robert Sampson Generated on 3/28/17*, you obtained a passing score (65% or higher) on 11 exams taken under standard conditions from October 2015 through November 2016, and failed seven (7) exams taken under standard conditions during that time period.

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and

circumstances. The ADA defines disability as a physical or mental impairment that substantially
limits one or more major life activities as compared to most people in the general population.

Your documentation does not demonstrate that you are currently substantially limited in a major life
activity as compared to most people.  It does, however, provide considerable compelling evidence
against a conclusion that you are disabled within the meaning of the ADA and that standard testing
time is a barrier to your access to the USMLE.

Your recent submission found no new substantive information or evidence that alters our decision
communicated in my January 12, 2018 letter.  Therefore, after a thorough review of all of your
documentation, I must inform you that we are unable to provide you with the requested
accommodations.

Sincerely,

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

# EXHIBIT 9

## Review of Accommodation Request

**Applicant Name:** Robert Sampson (<u>third</u> reconsideration)
**Date of Birth:** ███████
**Date of Review:** July 12, 2018
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested testing accommodations (50% additional testing time, and possibly other accommodations as well now) on Step 1 of the USMLE. He has diagnoses of neurodevelopmental disorders including ADHD and learning disabilities, as well as a recent history of accommodations in medical school.

I have reviewed Mr. Sampson's request and accompanying documentation three times in the past. Each time, the evidence has clearly failed to support his request. Mr. Sampson's case is rather unusual in my experience, in that he has submitted very clear, consistent evidence that argues *against* his request. He has consistently performed in the average range and above on diagnostic tests of academic skills that compared him to age peers. He has consistently performed in the average range and above on real-world standardized tests of academic skills taken without accommodations. And he and several other people who know him well have described him, on standardized rating scales, as having ADHD symptom levels that are in the normal (rather than the clinical) range. It is hard to think of what would be more consistent evidence against the presence of ADHD and learning disabilities. Please see my prior reports, dated April 25, 2017, July 16, 2017, and December 18, 2017, for more details, along with complete listings of all documents that I have reviewed in the past.

Since my last review of his file, Mr. Sampson has submitted additional documents:
- A new appeal letter
- A letter from an attorney representing him, Ms. Jo Anne Simon
- A letter from a psychiatrist, Dr. Thomas Aronson
- A letter from a learning specialist, Ms. Linda De Motta

The new documents do not contain any new evidence bearing on the questions in this case. The substantial evidence against the request is never addressed adequately (the strongest evidence against the ADHD diagnosis is not addressed at all), and the evidence and arguments made in support of the diagnoses and request continue to be irrelevant or inaccurate. In the present report, my goal is to address several issues where there may be genuine misunderstandings or where clarification can otherwise help.

1. In her letter, Ms. Simon claims that "here the record clearly demonstrates that Mr. Sampson's impairments significantly and, often severely, restrict his ability to read, comprehend, learn, concentrate, process information, write, sleep, work, and take tests." As I discussed above and in my past reports, the "impairments" (learning disabilities and ADHD) are actually not supported by the evidence, but let me put that to one side. Even if I assume for the moment that Mr. Sampson has one or more relevant "impairments," there is clearly insufficient evidence to show that Mr. Sampson is substantially limited in any major life activities (including the ones that Ms. Simon lists) *relative to most people*

*in the general population.* That final clause might be a key source of the misunderstanding and disagreement here; I have used a general population comparison whereas it is clear that at times, Mr. Sampson's advocates have not. Instead, they have compared him to graduating college seniors, to other medical students, and to his own highest skills.[1]

The comparison to medical students and to medical school standards requires more discussion. Both Dr. Aronson and Ms. De Motta note that Mr. Sampson has had trouble performing in medical school. They argue that medical school and the USMLE are more difficult than prior academic tasks that Mr. Sampson has faced. Ms. Simon also makes similar comments comparing the USMLE to the MCAT. But if someone is able to get to medical school without accommodations, and to perform well on standardized measures of academic skills without accommodations for the purposes of admission to college and medical school, it is (at the very least) highly unlikely that they are limited in their ability to access tests, relative to most people in the general population.

2.  Ms. Simon notes that someone can be substantially limited in the manner in which they perform a major life activity. She then claims that "[i]n order to accurately read, comprehend written material, and write, Mr. Sampson must work slower and more carefully than most people. He must reread several times and contend with external and internal distractions that most people will never face." Claims like these are why it is so important to inspect Mr. Sampson's performance on timed, standardized tests taken in typical settings without accommodations, and his record of performance shows average and better scores, arguing against Ms. Simon's contentions. Her speculations (and Mr. Sampson's) that he is unusual in his manner of reading and writing are severely undermined by the actual evidence of his performance under constrained conditions.

3.  There has also been discussion recently of the Nelson-Denny Reading Test (NDRT). As with most published tests, the NDRT has advantages and disadvantages, and must be interpreted carefully and properly to be useful. In my professional opinion, the NDRT comprehension task can be a valid measure of a student's timed reading comprehension skills, and such skills are a key foundation for being able to access Step 1 of the USMLE under standard time limits. One disadvantage of the NDRT is that it has no age norms, only grade norms. Compared to graduating college seniors, Mr. Sampson's NDRT comprehension score was at the 16th percentile, in what is often referred to as the "low average" range. But graduating college seniors are not representative of the general population; indeed, most United States adults do not have a college degree. Therefore, many evaluators use first-year college students as a proxy group to represent the general population; this is obviously not optimal, but it is the best we can do without age norms. Compared to such a group, Mr. Sampson's timed reading comprehension performance was clearly in the average range. Ms. Simon and Mr. Sampson both cite the 16th percentile score, but given the comparison group, this is not a valid technique.

---

[1] Dr. Aronson does also seem to claim that Mr. Sampson is limited relative to most people in the general population. But he supports his claim only with irrelevancies (e.g., discrepancies between different cognitive scores), inaccuracies (e.g., his claim that most high school students finish the Nelson-Denny Reading Test within the standard time), or statements so subjective that they cannot be evaluated.

The NDRT also has a kind of supplemental score, the reading *rate* score. Mr. Sampson's rate score was at the 24th percentile, also in the "low average" range, compared to graduating college seniors. If he were compared to the general population proxy group, the score would again be in the average range, but the rate score is highly problematic, such that it should never be used, in my opinion, either in favor or against an accommodations request. The NDRT manual shows the score to have low reliability (reliability below generally accepted standards for psychoeducational tests), and it involves only 1 minute of silent reading with no check on comprehension. Therefore, it is essentially a meaningless score anyway; the fact that, compared to a general population proxy group, Mr. Sampson's score was in the average range does not actually argue against his request, and if his score were far lower, it would not argue in favor of his request; absolutely no valid conclusions follow from this score.

Before leaving the issue of the NDRT, I should note that, even if Mr. Sampson's NDRT comprehension score were low, it is just one piece of evidence, and when we examine his SATA diagnostic reading comprehension score, his Woodcock-Johnson reading fluency score, his scores on the reading comprehension sections of the SAT, ACT, and MCAT, etc., and all of these show average and better skills (even compared to other medical students), the evidence for his good timed reading comprehension is consistent and converges across many sources of information.

4.  The recently submitted documents involve discussion of a 2013 study published in the *Journal of Psychoeducational Assessment* examining the effect of time extensions on the scores of college students with and without learning disabilities.[2] Ms. Simon and Dr. Aronson both criticize the study, although Ms. Simon admits that the study's authors were open about its limitations. I am a co-author of the study and would like to note how I see its relevance here. The study is part of a large body of literature examining the effects of time extensions on the test performance of students with and without disabilities, and that literature, *taken as a whole*, has shown that on time-pressured tests, students without disabilities tend to benefit from the time extensions. I am aware of three systematic reviews of that literature,[3] and all three drew that conclusion. Any individual study has expected limitations, but that body of research literature, taken as a whole, is relevant to this case insofar as it shows that benefiting from extended time is not a valid indicator of a disability. So when Mr. Sampson and his advocates report—and even provide evidence suggesting—that he does better on tests with additional time, this is not evidence of a disability, since many nondisabled students will improve their performance when given additional time.

[2] Lewandowski, L., Cohen, J., & Lovett, B. J. (2013). Effects of extended time allotments on reading comprehension performance of college students with and without learning disabilities. *Journal of Psychoeducational Assessment*, *31*(3), 326-336.

[3] Cahan, S., Nirel, R., & Alkoby, M. (2016). The Extra-Examination Time Granting Policy: A Reconceptualization. *Journal of Psychoeducational Assessment*, *34*(5), 461-472.

Lovett, B. J. (2010). Extended time testing accommodations for students with disabilities: Answers to five fundamental questions. *Review of Educational Research*, *80*(4), 611-638.

Sireci, S. G., Scarpati, S. E., & Li, S. (2005). Test accommodations for students with disabilities: An analysis of the interaction hypothesis. *Review of Educational Research*, *75*(4), 457-490.

5.  Mr. Sampson's advocates claim that the discrepancy model of diagnosing learning disabilities is valid. As I noted in an earlier report, there are many different ways of using discrepancies, and there is not a single clear referent that the "discrepancy model" corresponds to. There are some scholars who argue that discrepancies between test scores can be a useful source of evidence. However, what is key is that (a) the official criteria for diagnosing learning disabilities, found in the *Diagnostic and Statistical Manual of Mental Disorders*, require substantially below-average academic skills compared to age peers, and (b) the legal disability threshold would require substantial limitations, compared to most people in the general population, in academic skills or other major life activities.

6.  Mr. Sampson's advocates have argued that he has below-average visual processing skills, and that this will require accommodations on Step 1 of the USMLE, since a portion of that test's items have visual figures. However, the evidence that has been cited for Mr. Sampson's purported deficits in visual processing comes from highly artificial tasks unlike Step 1 of the USMLE in key ways. For instance, the Rey Complex Figure Test (RCFT) involves copying an unusual figure, then redrawing it from memory, and then needing to recognize (from memory) whether various drawings show parts of that figure. On the Step 1 exam, it is my understanding that any figures will be available for reference as many times as Mr. Sampson wishes to view them, and he will not need to copy, redraw, or memorize elements of a figure for delayed retrieval. Similarly, on the Woodcock-Johnson Picture Recognition test, Mr. Sampson was shown one set of pictures and then asked to identify which pictures of a second set he had already seen. The Step 1 exam will not require such skills.

7.  Mr. Sampson and his advocates cite a number of self-reported statements about various subjective/speculative phenomena (e.g., needing to work harder and longer than others) and other purportedly atypical behaviors (e.g., playing a musical instrument without learning to read music). These comments are difficult to evaluate, but in any case they are irrelevant to the request. On core measures of ADHD symptoms and academic skills, Mr. Sampson has consistently obtained evidence against ADHD and any learning disabilities, and his real-world test performance parallels this.

I have no reason to doubt that Mr. Sampson's request is in good faith, and I understand that professionals have told him that he has disability conditions. But their own evidence contradicts these diagnoses. If a physician diagnosed a patient with paralysis of both legs but also reported that the patient was an excellent long distance runner without any accommodations or assistive technologies, I would be skeptical of the diagnosis. Mr. Sampson's case is analogous to this; his evaluators have ignored strong, consistent evidence that they themselves report or are otherwise aware of.

Benjamin J. Lovett, Ph.D.

# EXHIBIT 10

### United States Medical Licensing Examination® (USMLE®)

## REQUEST FOR TEST ACCOMMODATIONS
*Use this form if you are requesting accommodations on USMLE for the first time*

---

### The National Board of Medical Examiners® (NBME®) processes requests for test accommodations on behalf of the USMLE program

If you have a documented disability covered under the Americans with Disabilities Act (ADA), you must notify the USMLE in writing <u>each time</u> you apply for a Step examination for which you require test accommodations. Submitting this form constitutes your official notification.

- Review the USMLE Guidelines for Test Accommodations at www.usmle.org for a detailed description of how to document a need for accommodations.

- Complete all sections of this request form; submit the form and all required documentation to Disability Services once you have submitted your Step exam application to your registration entity.

- NBME will acknowledge receipt of your request by e-mail and audit your submission for completeness. If you do not receive an e-mail acknowledgement within two business days of submitting your request, please contact Disability Services at 215-590-9700 or disabilityservices@nbme.org. You may be asked to submit additional documentation to complete your request.

- Requests are processed in the order in which they are received. Processing cannot begin until sufficient information is received by NBME **and** your Step exam registration is complete. Please allow at least 60 days for processing of your request.

- The outcome of our review will not be released via telephone. All official communications regarding your request will be made in writing. If you wish to modify or withdraw a request for test accommodations, contact Disability Services by e-mail at disabilityservices@nbme.org or by telephone at 215-590-9700.

---

**As explained in the Guidelines to Request Test Accommodations (www.usmle.org), you MUST provide supporting documentation verifying your current functional impairment.**

<u>Submit</u> the following with this form:

✓ A **personal statement** describing your disability and its impact on your daily life and educational functioning.

✓ A **complete and comprehensive evaluation** from a qualified professional documenting your disability.

✓ **Supporting documentation** such as academic records; score transcripts for previous standardized exams; verification of prior academic/test accommodations; relevant medical records; previous psycho-educational evaluations; faculty or supervisor feedback; job performance evaluations; clerkship/clinical course evaluations; etc.

**Please be sure to review the Guidelines for more detailed information regarding supporting documentation.**

---



USMLE® Request for Test Accommodations

## Section A: Exam Information

Place a check next to the examination(s) for which you are **currently registered** *and* requesting test accommodations: (Check all that apply)

- ☑ Step 1
- ☐ Step 2 CK (Clinical Knowledge)
- ☐ Step 2 CS (Clinical Skills)
- ☐ Step 3*

*Please be aware that additional test time for Step 3 may involve 3 to 5 days of testing, depending on the requested accommodation (See Section C1).

## Section B: Biographical Information
**Please type or print.**

**B1.** Name: <u>Sampson</u>      <u>Robert</u>      <u>D</u>
           Last            First        Middle Initial

**B2.** Gender:  ☑ Male    ☐ Female

**B3.** Date of Birth: ▮▮▮▮▮▮

**B4.** USMLE # <u>5</u> - <u>3 8 5</u> - <u>6 2 4</u> - <u>1</u> (required)

**B5.** Address:
<u>11 Whitford Rd</u>
Street
<u>Stony Brook</u>      <u>NY</u>      <u>11790</u>
City        State/Province    Zip/Postal Code
<u>USA</u>
Country
<u>631-833-4418</u>
Preferred Telephone Number
<u>rds911@gmail.com</u>
E-mail address

**B6.** Medical School Name: <u>Stony Brook University School of Medicine</u>

Country of Medical School: <u>USA</u>    Date of Medical School Graduation: <u>05/20</u>

USMLE® Request for Test Accommodations

## Section C: Accommodations Information

### C1.  Step 1, Step 2 CK, or Step 3 (computer-based examinations)

Check the appropriate box to indicate the accommodations you are requesting. Check **ONLY ONE** box for the exam(s) for which you are currently registered:

**STEP 1:**

| **Additional Break Time** | **Additional Testing Time** |
|---|---|
| ☐ Additional break time over 1 day | ☐ 25% Additional test time (Time and 1/4) over 2 days |
| ☐ Additional break time over 2 days | ☑ 50% Additional test time (Time and 1/2) over 2 days |
| | ☐ 100% Additional test time (Double time) over 2 days |

☐ Additional break time and 50% Additional test time (Time and 1/2) over 2 days

**STEP 2 CK:**

| **Additional Break Time** | **Additional Testing Time** |
|---|---|
| ☐ Additional break time over 2 days | ☐ 25% Additional test time (Time and 1/4) over 2 days |
| | ☐ 50% Additional test time (Time and 1/2) over 2 days |
| | ☐ 100% Additional test time (Double time) over 2 days |

☐ Additional break time and 50% Additional test time (Time and 1/2) over 2 days

**STEP 3:**

| **Additional Break Time** | **Additional Testing Time** |
|---|---|
| ☐ Additional break time over 4 days | ☐ 25% Additional test time (Time and 1/4) over 3 days |
| | ☐ 50% Additional test time (Time and 1/2) over 4 days |
| | ☐ 100% Additional test time (Double time) over 5 days |

☐ Additional break time and 50% Additional test time (Time and 1/2) over 4 days

**Describe** any other accommodation(s) you are requesting for **Step 1, Step 2 CK,** or **Step 3**.

_____

_____

### C2.  STEP 2 CS (Clinical Skills)

Review the Step 2 CS Onsite Orientation video and Step 2 CS Content Description and General Information Booklet at www.usmle.org for detailed information about the format and delivery of the Step 2 CS examination.

Describe the accommodations you are requesting for each section of Step 2 CS (i.e., patient encounter, patient note). If you are requesting additional time, state the **amount** of additional time you require in **minutes per encounter or note**.

☐ Patient Encounter:_____

☐ Patient Note:_____

USMLE® Request for Test Accommodations

**C3.** Do you require wheelchair access at the examination facility? ☐ Yes ☑ No
If yes, please indicate the number of inches required from the bottom of the table to the floor: _____

## Section D: Information About Your Impairment

**D1.** List the **specific DSM/ICD diagnostic code(s) and disability** for which you are requesting accommodations and report the year that it was **first** diagnosed.

| DIAGNOSTIC CODE | DISABILITY | YEAR DIAGNOSED |
|---|---|---|
| 315.00 | Specific Learning Disorder with Impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling. | 2013 |
| 315.9 | Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing. | 2013 |
| F90.2 | Attention Deficit hyperactivity dissorder, predominantly inattentive. | 2015 |

**D2. Personal Statement**

✒ **Attach a signed and dated personal statement describing your impairment(s) and how a major life activity is substantially limited.** The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limits your current functioning in a major life activity and how the standard examination conditions are insufficient for your needs. In your own words, describe the impact of your disability on your daily life (do not confine your statement to standardized test performance) and provide a rationale for why the specific accommodation(s) you are requesting are necessary in the context of this examination.

**Section E: Accommodation History**

Relevant copies were previously provided to NBME

**E1. Standardized Examinations**

✒ **Attach copies of your score report(s) for any previous standardized examination taken.**

✒ **If accommodations were provided, attach official documentation from each testing agency confirming the test accommodations they provided.**

List the accommodations received for previous standardized examinations such as college, graduate, or professional school admissions tests and professional licensure or certification examinations (if no accommodations were provided, write NONE).

| | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|
| ☐ SAT®, ACT® PSAT | Fall '07 (PSAT), 5/05, 6/08, 6/08, 10/08, 11/08 | NONE |
| ☐ MCAT® | 8/13, 9/14 | NONE |
| ☐ GRE® | | |
| ☐ GMAT® | | |
| ☐ LSAT® | | |
| ☐ DAT® | | |
| ☐ COMLEX® | | Time and ½ on NBME shelf exams: 12/8/16, 12/16/16, 1/13/17, all |
| ☑ Other (specify) | NBME Shelf Exams (previously provided to NBME) | others previously (since 10/6/16) under standard time conditions. |
| OLSAT | May 1999 | NONE |

USMLE® Request for Test Accommodations

**E2. Postsecondary Education** | Relevant copies were previously provided to NBME |

List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

   ✎ **Attach copies of official records from each school(s) confirming the accommodations they provided.**

   ✎ **If you receive/received accommodations in <u>medical school and/or residency</u>, have the appropriate official at your medical school/residency complete and submit the <u>USMLE Certification of Prior Test Accommodations</u> form available at <u>www.usmle.org</u>.**

|  | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **Medical/Graduate/ Professional School** | Stony Brook University School of Medicine | 1.5 Time on exams | November '16—>Current (specifically received on 12/8/16, 12/16/16, 1/13/17) |
| **Undergraduate School** | University of Virginia | NONE | |

**E3. Primary and Secondary School** | Relevant copies were previously provided to NBME |

List each school and all formal accommodations you received, and the dates accommodations were provided:

   ✎ **Attach copies of official records from each school listed confirming the accommodations they provided.**

|  | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **High School** | Ward Melville High School | NONE | |
| **Middle School** | Paul J Gelinas JHS | NONE | |
| **Elementary School** | Minnesauke Elementary School | NONE | |

USMLE® Request for Test Accommodations

## Section F:  Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate.  I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:

- Evaluating my eligibility for accommodations.  When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research.  Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information.  I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information, if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print): Robert Sampson

Signature: _Robert Sampson_                                    Date: 8/2/18

**E-mail (as a pdf), fax or mail your completed request form and supporting documents to the address below <u>at the same time</u> you submit your Step examination application.**

**Disability Services**
**National Board of Medical Examiners**
**3750 Market Street**
**Philadelphia, PA 19104-3190**
**Telephone: (215) 590-9700**
**Facsimile: (215) 590-9422**
**E-mail: <u>disabilityservices@nbme.org</u>**

# EXHIBIT 11



**NBME**®

5-385-624-1
1129519
Denial- 9/7/18-Decision L

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**

September 7, 2018

**Via E-mail to rds911@gmail.com**
Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed the documentation provided in support of your request for test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You report the basis of your request to be Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling and Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing diagnosed in 2013 and Attention Deficit/Hyperactivity Disorder (ADHD) diagnosed in 2015. In your personal statement you report having early speech problems, difficulty reading, poor handwriting, and difficulty spelling. You write, *"I welcomed 4th year level undergraduate course work and masters level classes routinely because not only did I enjoy them more, but the exams were easier for me even though the level of detail and rigor of the material was far greater. The assessments were often project based, not timed, an instead of recalling factoids, they required either creative thought, or the synthesis of ideas...Until medical school, I attempted to continue to do it on my own without accommodations. But medical school exams were even longer in both length of words themselves and the length of the questions and answer choices than I had encountered before. These long vignettes took considerably longer for me to read and exacerbated my weaknesses; I would always run out of time on tests, often being the last person in the exam room when time was called...When my school confronted me about my scores on timed NBME shelf exams (despite doing very well in the rest of the course), I finally realized that 'trying my best' was not enough. I needed to use the testing accommodations that were granted to me. With accommodations, I was finally able to finish tests, and the result was immediate: I wasn't failing my exams anymore."*

In a February 15, 2018 letter addressed To Whom It May Concern, Linda De Motta, Learning Specialist, Stony Brook School of Medicine writes, *"The records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude. In medical school, that is not what the record shows at all. The medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions."* Attempts to understate your performances on standardized tests notwithstanding, the records provided show that your performances on every administration of the PSAT, SAT, ACT, and MCAT that you took under standard conditions

are well within the Average range compared to the appropriate reference group. These data do not demonstrate impairments that limit any major life activity.

In a June 2018 letter addressed to the NBME, Thomas A. Aronson, M.D. writes, *"As a medical student, he is now dealing with an altogether different level of cognitive demands than the subjects in the mentioned body of research...He floundered during his first year of medical school. As Linda De Motta argued, 'the medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions...' The issue here is that his cognitive deficits do in fact limit him (for example, reading, concentrating, writing, test taking) in his pursuit of a medical degree as substantiated by several properly qualified, credentialed clinicians who conducted individualized assessments of Mr. Sampson...The amount of material to read and master in medical school is at another level. It was first in medical school that he began to academically fail due to his 'disabilities,' where his time-consuming compensatory strategies met their match – he simply ran out of hours in the day."*

The documentation provided to date shows that on standardized rating scales, you and other raters describe levels of ADHD symptom that are in the normal range, rather than the clinical range. Furthermore, you have consistently performed in the average range and above on standardized tests of academic skills taken without accommodations. These data do not demonstrate cognitive deficits or impaired reading, concentrating, writing, or even test taking.

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities compared to most people in the general population.

Accommodations are provided when there is clear documentation of functional impairment and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance. Your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

We will advise Applicant Services to process your exam application without test accommodations. You may inquire at usmlereg@nbme.org or call Applicant Services directly at (215) 590-9700 with any questions about your scheduling permit.

Sincerely,

*Catherine Farmer*

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

C: Jo Anne Simon, Esquire to JoAnne@joannesimon.com

Catherine Farmer

1129507          5-385-624-1
Simon, J. 11/14/18-E-mail

| | |
|---|---|
| **From:** | Jo Anne Simon <JoAnne@joannesimon.com> |
| **Sent:** | Wednesday, November 14, 2018 2:12 AM |
| **To:** | Catherine Farmer; disabilityservices |
| **Cc:** | Nabina Sinha (Nabina.Sinha@usdoj.gov) |
| **Subject:** | Sampson/NBME |
| **Attachments:** | Letter to NBME - RDSampson 11-14-18 .pdf |

Dear Dr. Farmer:

Enclosed please find my letter appealing the NBME's most recent rejection of Mr. Sampson's application for testing accommodations.

Very truly yours,

Jo Anne Simon, Esq.
**Jo Anne Simon, P.C.**
356 Fulton Street, 3rd Floor
Brooklyn, NY 11201
Phone: 718 852-3528 | Fax: 718 875-5728
Web: www.joannesimon.com
E-mail: JoAnne@JoAnneSimon.com

**CONFIDENTIALITY NOTICE:** The information contained in and accompanying this electronic transmission is or may be confidential and/or is legally privileged or otherwise protected by law from disclosure.   The information is intended for the use of the individual or entity named as the recipient above.  If you are not the intended recipient you are prohibited from reading this transmission and any disclosure, using, copying, distribution, dissemination or retention of any part of this message is strictly prohibited.  If you have received this transmission in error, please immediately contact  the sender by telephone 718 852-3528 and delete this message and all attachments from your electronic storage files.

1



# JO ANNE SIMON, P.C.
### 356 Fulton Street, 3rd Floor
### Brooklyn, New York 11201
### www.joannesimon.com

(718) 852-3528 (V/TTY)
(718) 875-5728 (FAX)

Admitted NY & NJ Bars

November 14, 2018

**Via e-mail to cfarmer@nbme.org and disabilityservices@nbme.org**

Catherine Farmer, Psy.D.
Director of Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, Pennsylvania 19104-3102

Re:     Robert Sampson/ USMLE ID#: 5-385-624-1
        Disability Accommodations for USMLE STEP 1

Dear Dr. Farmer:

We are in receipt of your letter dated September 7, 2018 denying once again Robert Sampson's request for testing accommodations on the Step 1 of the United States Medical Licensing Exam (USMLE) in violation od the Americans with Disabilities Act, as amended, 42 U.S.C. §12101, *et seq.* (hereinafter "ADA"), and the New York State Human Rights Law, N.Y. Exec. L. § 290, *et seq.* (hereinafter "NYSHRL"). We request a reversal of the NBME's latest discriminatory decision.

As noted previously, the documentation submitted in support of Mr. Sampson's requests for accommodations was more than sufficient to demonstrate disability, protection by the aforementioned civil rights laws, and his present and continuing need for, and entitlement to, the extended test time that he requested. The record clearly demonstrates that Mr. Sampson's prior requests for extended time accommodations should have been approved. Nevertheless, by letter dated June 28 we enclosed additional documentation and requested a review of the entire record and a decision to provide 50% extended time accommodation that is needed to best ensure that his scores accurately reflect his knowledge of the subject matter being tested, *his right under the applicable laws.*

An individual has a disability within the meaning of the ADA if that individual suffers a physical or mental impairment that substantially limits one or more of the individual's major life activities or major bodily functions. 42 U.S.C. §12102(2)(A). Major life activities include activities such as reading, writing, concentrating, thinking, learning, processing information, sleeping, working, and test-taking,[1] and major bodily functions include the operation of the brain.

---

[1] *See* 29 C.F.R. § 1630.2 (i).

The legislative history confirms that the protections of the ADA are to be construed liberally.[2] Case law and regulations are consistent with this liberal construction, including case law prior to the 2008 amendments.[3]

Your response indicates not an analysis of the clinical information submitted by his clinicians in accordance with the NBME's extensive documentation requirements, but rather generalized suspicion and a deliberate attempt to paint Mr. Sampson as illegitimately seeking accommodations. For example, you quote Mr. Sampson's description of 4th year undergraduate exams being easier as they were "often-project based, not timed" and "required. . . creative thought or synthesis of ideas" as if this were inconsistent with his having disabilities, when his description clearly goes to the issue of time. Further, after quoting the medical school's learning specialist discussing Mr. Sampson's compensatory strategies for managing his disabilities by over-preparing for basic admissions exams and confirming his having failed standardized medical school tests taken under timed conditions, but passing those same tests when provided with 50% extended  time, you state, "Attempts to understate your performances on standardized tests notwithstanding, the records provided show that your performances on every administration of the PSAT, SAT, ACT, and MCAT that you took under standard conditions are well within the Average range compared to the appropriate reference group. These data do not demonstrate impairments that limit any major life activity."

That however, is not the standard under the law. Major life activities include activities such as reading, writing, concentrating, thinking, learning, processing information, sleeping, working, and test-taking,[4] and major bodily functions include the operation of the brain. Mr. Sampson has demonstrated substantial limitations in several major life activities. Throughout his education, he has used many tutors and specialists to assist him in extensive preparation – all consistent with the nature and extent of his disabilities. *Moreover, despite your not-so-veiled assertions otherwise, nothing that Mr. Sampson or his clinicians has said regarding his disabilities is inconsistent with his having said disabilities, or his need for the extended time he has requested on the USMLE.*[5] Quite the opposite, the evidence all points to his need for the accommodations he has requested on the USMLE, the only test for which the NBME is responsible for providing

---

[2] *See* 42 U.S.C. § 12102(a)(4).

[3] 2 Cong. Rec. H8291 (Sept.17, 2008) *see also* Bartlett v. N.Y. Bd. of Law Examiners, 2001 WL 930792 (S.D.N.Y. Aug 15, 2001) (hereinafter Bartlett VI); Root v. Ga. Bd. of Veterinary Medicine 114 F.Supp.2d 1324 (N.D. Ga. 2000) *rev'd on other grounds*, No. 00-14751 (11th Cir. 2001); Heiko v. Colombo Savings Bank, 434 F.3d 249 (4th Cir. 2006); Capobianco v. City of N.Y. & NYC Department of Sanitation, 422 F.3d 47 (2d Cir. 2005); Lawson v. CSX Transp., Inc., 245 F.3d 916 (7th Cir. 2001); Fraser v. Goodale, 342 F.3d 1032 (9th Cir. 2004).

[4] *See* 29 C.F.R. § 1630.2 (i).

[5] The NBME appears not to have engaged in the required individualized analysis of Mr. Sampson's request for accommodations, but rather appears to have taken pains to substitute its own view of disability and accessibility, notably failing to explicitly refute the multiple examples of substantial limitations to major life activities that   Mr. Sampson has described in his personal statement, and further described by his clinicians. The NBME has only made disconcertingly vague statements calling into question Mr. Sampson's disabilities, and further fails to rebut Mr. Sampson's claim. The NBME's continual failure to specify any specific reason for disqualifying Mr. Sampson's (and his experts') multiple examples of substantial limitations in major life activities just adds hardship and stress, exacerbating Mr. Sampson's documented disabilities.

accommodations.[6] Indeed, even while misstating the legal standard, your letter nevertheless states that accommodations are to be provided "appropriate to the setting and the circumstance," and that is all that Mr. Sampson has requested: accommodations for the USMLE – a test like no other he has taken – so that he can take it under conditions that best ensure his ability to demonstrate his knowledge of the material being tested – his right under the law.

The NBME's reliance on outdated statutory interpretations rejected by Congress in the 2008 Amendments to the ADA in order to buttress its decision is particularly disingenuous given that the NBME was the successful defendant in two of the cases Congress later unequivocally rejected as inconsistent with the ADA's intent: Price v. Board of Medical Examiners, 966 F.Supp. 419 (S.D. W.Va. 1997) and Gonzalez v. National Board of Medical Examiners, 225 F.3d 620 (6th Cir. 2000). See 2 Cong. Rec. H 8286, 8291 (Sept. 17, 2008). The NBME knows that what it is doing here is a violation of the law. It must reverse course now and provide Mr. Sampson with the accommodations he has requested, accommodations similar to those the NBME has provided for other similarly situated and similarly disabled test takers.

The regulatory language and the seminal case in this area indicate quite clearly that average scores or grades do not obviate the presence of disability or the legitimate need for accommodations.[7] See also "Dear Colleague Letter", dated January 19, 2012, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201109.html.[8] Moreover, Mr. Sampson has a longstanding history of disability, including an Individualized Education Plan (IEP) provided under federal and state special education laws and years of additional tutoring to assist him in his studies and the development of compensatory techniques. Like many young people with dyslexia, his parents read his assignments to him because he would never have been able to read them fluently enough to get through his homework – classic evidence of the presence of a learning disability. Evidence of each of these facts was provided previously. Your correspondence indicates a dismissiveness of the evidence which you try to support by the cherry picking of scores, and a substitution of NBME's unqualified judgment that he does not have a disability. The NBME is not entitled to ignore the clinical reports and diagnostic impressions of his psychiatrist and psychologists who have personally examined him numerous times.

   The record amply demonstrates that Mr. Sampson's constellation of impairments continues to impose substantial limitations on his ability to perform the aforementioned major life activities under standard time constraints and conditions. Mr. Sampson is undoubtedly

---

[6] Your characterization of scores being average is not true. Scores in the 16th or 12th or 4th percentile are hardly within the average range, let alone "well within" the average range, as you have stated. Nor is Mr. Sampson's 16th percentile performance on the Nelson Denny Reading Test belied by the below average range reading speed calculation at the 24th percentile.

[7] See Appendix to Part 1630—Interpretive Guidance on Title I, 29 CFR Part 1630) ("This does not mean that disability cannot be shown where an impairment, such as a learning disability, is clinically diagnosed based in part on a disparity between an individual's aptitude and that individual's actual versus expected achievement, taking into account the person's chronological age, measured intelligence, and age-appropriate education.")

[8] See, "Questions and Answers on the ADA Amendments Act of 2008 for Students with Disabilities Attending Public Elementary and Secondary Schools," http://www2.ed.gov/about/offices/list/ocr/docs/dcl-504faq-201109.html.

protected by the ADA and state laws protecting him from disability discrimination;[9] he is entitled to the 50% extended time and a separate room that he has requested from the NBME.

**As stated previously, the record is clear and so is the law:** "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. §1630.2(j)(1)(ii).   However, here the record clearly demonstrates that Mr. Sampson's impairments significantly and, often severely, restrict his ability to read, comprehend, learn, concentrate, process information, write, sleep, work, and take tests.  Pursuant to 29 C.F.R. § 1630.2(j)(4)(iii) "... the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." (Emphasis added).  Federal guidance clarifies further, stating that:

> [c]ondition, manner, or duration may also suggest the amount of time or effort[10] an individual has to expend when performing a major life activity because of the effects of an impairment, *even if the individual is able to achieve the same or similar result as someone without the impairment.*

Appendix to Part 1630—Interpretive Guidance on Title I, 29 C.F.R. Part 1630) (emphasis added).[11]

Additionally, it is irrational and improper for the NBME to use Mr. Sampson's performance on prior standardized exams taken in high school and/or college to dismiss his current need for extended time accommodations for Step 1, let alone insinuate that those performances would somehow be more relevant to whether accommodations are needed on the USMLE than medical school exams, including the NBME-created shelf exams, of which Mr.

---

[9] As Dr. Aronson stated in his letter submitted on June 28, 2018, "The proper clinical basis of comparison for his disability is the reading behaviors of most people in the general population. Most people do not have widely discrepant cognitive profiles (VCI = 141; PRI = 102), let alone a 2½ standard deviation discrepancy. Most people read with automaticity. Most people don't get exhausted from reading. Most high school students can complete a NDRT within standard time; Mr. Sampson completed only half of the items, and even with 50% extended time, only completed ⅔ of the items, suggesting that double time might be more efficacious. His LD and ADD affect his ability to read, reading speed, writing, concentration, and test taking."

[10] In Bartlett VI at 51, Justice Sotomayor, ruling under the narrower pre-ADA Amendments Act standard articulated in Sutton v United Airlines, 527 U.S. 471 (1999), held of a plaintiff who was not formally diagnosed until the age of 40:

> I find that plaintiff is an individual with a disability as defined by the ADA and Section 504. With respect to the specific questions before me on remand, I find that when considering both the positive and negative effects of the mitigating measures which plaintiff employs, plaintiff is substantially limited in the major life activity of reading when compared to most people by her slow reading rate and by the fatigue caused by her lack of automaticity.

Similarly, Mr. Sampson has consistently reflected on the exhaustion caused by his reading disability, and that evidence is entirely in keeping with the law.

[11] *See also* "Dear Colleague Letter", dated January 19, 2012, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201109.html.

4

Sampson failed seven (7) taken before securing accommodations from his school – only passing them after 50% extended time was provided by his medical school.

The NBME's refusal to defer to the informed observations and recommendations of Mr. Sampson's highly competent clinicians is a clear violation of the law.[12] The federal enforcement guidance states: "Testing entities should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations. . . Reports from qualified professionals who have evaluated the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate for diagnosis and treatment.[13] (*Emphasis added.*)

In Argenyi v. Creighton University, Nos. 11–3336, 11–3461, 2013 WL 149803 (C.A.8. Jan 15, 2013), the United States Court of Appeals for the 8th Circuit found that Plaintiff Argenyi's allegations of disability discrimination against his school refused to grant his requests for accommodation, and pointed to Argenyi's clinicians, and urged the school "to consider Argenyi's specific requests, explaining that Argenyi 'is the best person to judge what [assistance may be necessary] since no one else can really understand'" the impact of his disabilities. Id. at 4.[14] Indeed, the same is true for Mr. Sampson and his clinicians.

## CONCLUSION

Mr. Sampson's accommodation request is entirely reasonable given the current impacts of his longstanding learning and attention deficits. The extended time accommodations that Mr. Sampson seeks would not fundamentally alter the USMLE. There can be no other legally acceptable reason for denial of accommodations. We urge you to re-address this matter and provide the requested accommodations forthwith.

Very truly yours,

Jo Anne Simon

cc:   Robert Sampson
      U.S. Department of Justice,
         Disability Rights Section

---

[12] Courts have found that entities such as the NBME are not entitled to deference in determining whether an applicant is disabled or what accommodations are necessary to provide equal access. The NBME has no inherent expertise in this regard, and thus its determination is entitled to little, if any, weight. As the Second Circuit in Bartlett IV stated, "where deference is due . . . it is not because of the fact finder's status . . . but because of [its] inherent expertise on 'technical matters foreign to the experience of most courts.'" 156 F.3d at 327 (quoting N.Y. Ass'n for Retarded Children v. Carey, 612 F.2d 644, 650 (2d Cir. 1979)).

[13] http://www.ada.gov/regs2014/testing_accommodations.html (Emphasis in original).

[14] Remanded for trial, a jury found that Creighton had violated Argenyi's civil rights.



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**<u>Confidential</u>**

January 4, 2019


**<u>Via E-mail to</u> <u>rds911@gmail.com</u>**
Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed your request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

In a November 14, 2018 letter, your attorney, Ms. Jo Anne Simon, writes, *"Mr. Sampson's accommodation request is entirely reasonable given the current impacts of his longstanding learning and attention deficits. The extended time accommodations that Mr. Sampson seeks would not fundamentally alter the USMLE. There can be no other legally acceptable reason for denial of accommodations."*

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities compared to most people in the general population.

The NBME carefully considers all evidence in determining whether an individual is substantially limited within the meaning of the ADA and what, if any, accommodations are appropriate to the particular Step exam context. Submitted documentation including the individual's personal statements; letters from advocates; reports of evaluations; and objective information such as school records and scores obtained on high stakes tests taken with and without accommodations are thoroughly reviewed.

Supporting documentation submitted from qualified professionals is a necessary part of any request for accommodations and is carefully reviewed by the NBME. Though not required to defer to the conclusions or recommendations of an applicant's supporting professional, we carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.

According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, the hallmark of a learning disability is difficulty in the development and acquisition of basic academic skills particularly during the period of time in which these skills are first taught in early elementary school. Developmental reading difficulties were not reported by your evaluators and there is no indication that you struggled in your efforts to learn to read during the time in which you were taught to read. The complete absence of reading difficulties in elementary school strongly belies the presence of a learning disorder in the area of reading.

Likewise, it is necessary to establish a childhood onset of developmentally deviant symptoms/impairment to receive the ADHD diagnosis as an adult.  Beyond self/parent report and testimonials, your documentation provides no objective evidence of clinically significant real world functional impairment in academic, work, social, daily adaptive, or executive functioning relative to most people in the general population.

Ms. Simon's November 14, 2018 letter requesting reconsideration provided no new substantive information or evidence that alters our decision communicated in my letters dated September 7, 2018 and March 6, 2018. Once again, our thorough review found that your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that additional testing time is an appropriate modification of your USMLE Step 1 test administration.

Sincerely,

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

C: Jo Anne Simon JoAnne@joannesimon.com

# EXHIBIT 12

Date: 26 November 2018

To: Catherine Farmer, Manager, Disabilities Services and ADA Compliance Officer

From: Samuel O. Ortiz

Re: Consultation Evaluation

      This review concerns Robert Sampson who is appealing a denial of a previous request for reconsideration by the NBME which followed a prior request for reconsideration that stemmed from an initial denial of his application for accommodation on Step 1 of the USMLE. His initial request appears to have been denied in June of 2017 after which, he requested an initial reconsideration that was also later denied by the NBME in August of 2017. Following the second denial and additional correspondence clarifying the grounds for the denial by the NBME dated January 12, 2018, March 6, 2018, and September7, 2018, Mr. Sampson appears to have once again requested a reconsideration. Mr. Sampson's application is being made on the basis of a "Learning" impairment, specifically listed as "Reading" and "Other (specify): Dyslexia" both of which are indicated as having first been diagnosed in 2013 at the age of 22. Mr. Sampson has also indicated a "Psychiatric" impairment "Attention Deficit/Hyperactivity Disorder" that was subsequently diagnosed in 2015 as an additional consideration in support of his request for accommodation which is noted as "50% Additional test time (Time and ½) over 2 days." In addition to his application requesting accommodations, Mr. Sampson has submitted various supporting documentation which includes:

      Step 1 Request Form
      Step 1 Request Form - Req/Personal Statement
      Personal Statement
      School Records - Teacher Comments/Parent Ltrs Grade 1-6
      Test Scores (MCAT, GRE, SAT, etc.) - NBME Shelf Exam Score Report
      Test Scores (MCAT, GRE, SAT, etc.) - Minnesauke Elementary School OLSAT
      Test Scores (MCAT, GRE, SAT, etc.) - PSAT/NMSQT
      Test Scores (MCAT, GRE, SAT, etc.) - ACT
      Test Scores (MCAT, GRE, SAT, etc.) - SAT
      Evaluations - Supplemental Testing Report 12/16/13
      Evaluations - Psychological Eval. 8/26/13
      Attorney Letter - Simon, J. 6/29/18
      Attorney Letter - Simon, J. 11.14.18
      Attorney Letter - Corrected- Simon, J.
      E-mail - Sampson, R. 6/26/17
      E-mail - Simon, J. 11/14/18
      Testing Accommodation Records - Stony Brook Univ.
      Testing Accommodation Records - CPTA
      Testing Accommodation Records - MCAT
      Letters from Individuals and other supporting doc. - Lam, A. 3/29/17
      Letters from Individuals and other supporting doc. - Exhibit A- Aronson, T. 6/12/18
      Letters from Individuals and other supporting doc. - De Motta, L. 2.15.18

Letters from Individuals and other supporting doc. - Sampson, R. 2.22.18
Letters from Individuals and other supporting doc. - Anderson, A. 8/10/17
Letters from Individuals and other supporting doc. - Aronson, T. 9/6/17
Letters from Individuals and other supporting doc. - Serrantino, J. 10/9/17
Letters from Individuals and other supporting doc. - Steven & Shelley Sampson 6/17/17
Letters from Individuals and other supporting doc. - Serrantino, J. 6/22/17
Letters from Individuals and other supporting doc. - Sampson, S. (Handwritten)
Letters from Individuals and other supporting doc. - De Motta, L. 3/29/17
Letters from Individuals and other supporting doc. - Aronson, T. 3/29/17
Letters from Individuals and other supporting doc. - De Motta, L. 3/28/16
Reconsideration Request Letter - Sampson, R.
Reconsideration Request Letter - Sampson, R.
Decision Letter (approval and denial) - Denial
Decision Letter (approval and denial) - Reconsideration-Denial
Decision Letter (approval and denial) - Reconsid. Denial
Decision Letter (approval and denial) - Reconsideration-Denial
Decision Letter (approval and denial) - Denial- 9/7/18

Although Mr. Sampson's request for accommodation is based, at least in part, on a psychiatric impairment listed as "Attention Deficit/Hyperactivity Disorder," the focus of the current review will be based on whether the evidence supports the provision of accommodations solely on the basis of his listed learning impairment in the area of reading. That is, the purpose of this review is determine whether the submitted documentation supports Mr. Sampson's claim regarding a learning disability in the area of reading, and, if so, whether the requested accommodations are reasonable and appropriate. Therefore, the analysis, conclusions, and recommendations provided in this review are presented only from this perspective and should not be construed as having any direct bearing on the merit of his request for accommodations with respect to the additional psychiatric impairment he has indicated.

The documentation in this case is varied and numerous and the relative merits of Mr. Sampson's request for accommodations, at least as far as the purposes of this review are concerned, hinge on a relatively straightforward determination—that is, to what extent does the documentation fully support the claimed learning impairment in reading indicated in his application. Should the documentation be compelling in this regard then perhaps the only question becomes that of what the appropriate accommodations should be. But should the documentation fail in this regard, then the NBME is faced with a decision regarding whether accommodations under the auspices of ADA are appropriately warranted. After all, it is presumed that the purpose of ADA is to protect those with a disability that limits a major life activity and not to provide those protections to those who are not disabled. In the present case, Mr. Sampson has retained an attorney with considerable experience in these matters whose three letters demanding the provision of accommodations under ADA by the NBME are replete with opinion, commentary, and legal citations that seem unassailable and would likely pressure most organizations to simply capitulate to the request. Ms. Simon has even provided an argument stemming from federal enforcement guidance that claims that the NBME cannot even deny the request by Mr. Sampson for a variety of reasons, one of which includes the idea that "testing entities should defer to documentation from a qualified professional who has made an

individualized assessment of the candidate that supports the need for the requested testing accommodations." In other words, if any individual with a degree and a license says that someone is disabled, then it must be accepted as truth. Of course, were the NBME to follow this recommendation, there would be little point to this or any other review. Putting aside the concept and practice of second opinions in medicine, accepting as valid on its face, any report submitted by anyone with sufficient resources to obtain an evaluation that documents and asserts a diagnosis of their choosing, would likely mean that the entire concept and definition of disability loses all semblance of meaning. It cannot be disputed that there are "qualified" professionals who are not experts in every arena of disability who routinely keep up with the literature and maintain competency in current methods, techniques, and research. Clinicians are often subconsciously inclined to please the client who will be paying them by providing whatever documentation may be necessary in this regard. This is not to say, of course, that this is what has occurred in Mr. Sampson's case or that the evaluation reports provided are based on such factors. Rather, it is only mentioned here to counter the notion that one is unquestionably disabled merely because someone else has said so. Whether Mr. Sampson has a learning impairment or not is not a simple matter to discern and there is always the possibility that prior evaluators have indeed gotten things wrong. And while Ms. Simon further quotes federal enforcement guidance in asserting that "reports from qualified professionals who have evaluated the candidate should take precedence over report from testing entity reviewers who have never conducted the requisite assessment of the candidate" the follow up conclusion that "this is especially important for individuals with learning disabilities because fact-to-face interaction is a critical component of an accurate evaluation, diagnosis, and determination of appropriate testing accommodations" is inaccurate and grossly distorted. Whereas this claim may be true with respect to various psychiatric impairments that depend on aspects of interpersonal functioning, it is not true when it comes to a learning disability that can be plainly determined by a host of current measures, combined with prior information. According to DSM-V, the diagnostic criteria for a Specific Learning Disorder "are to be met based on a clinical synthesis of the individual's history (developmental, medical, family, educational), school reports, and psychoeducational assessment." In essence, current testing or evaluation is insufficient for rendering such a diagnosis and instead an abundance of documentation is required regarding the acquisition of reading, writing, and mathematics skills. The reason a learning disability is a learning disability is precisely because it is evident in the observable and documentable process of development and education in reading, writing, or mathematics. For these reasons, face-to-face interaction reveals very little information useful for diagnostic purposes in the case of learning disorders, especially in comparison to a careful and considered examination of an individual's academic performance during the period of time in elementary school when such skills are first formed and developed.

Because this case has been reviewed at least twice prior, it is unlikely that a third opinion centering primarily on the current test data would prove persuasive in any way on the matter. The prior reviewers have no doubt commented on what the specific test data from the evaluations conducted in 2013 reveal and, as noted by comments the NBME provided in the letters denying Mr. Sampson's request for accommodations, has likely already concluded that the current test data do not support the presence of a reading disorder. To cover the same ground here would be somewhat redundant and pointless and only lead to further debate regarding their meaning. Instead, it may be more fruitful for this review to examine more closely the qualitative data and information available regarding Mr. Sampson's early educational history and their

relationship to the various criteria necessary for establishing a learning disability in reading. Perhaps from this angle, new information may be generated and the documentation may be seen in a different light that could prove to be far more instructive and beneficial in arriving at a reasonable conclusion regarding whether or not Mr. Sampson exhibits a learning disorder in the area of reading or not. This approach does not overlook current test results or their meaning per se, but instead of trying to further the debate as to whether current scores are or are not consistent with a learning impairment, the primary focus will be on whether the evidence supports the fundamental criteria regarding a learning disorder that specify the basic characteristics of the disorder—notably, the impact on learning to read.

According to DSM-V, "one essential feature of specific learning disorder is persistent difficulties learning keystone academic skills (Criterion A), with onset during the years of formal schooling (i.e., the developmental period)." Beyond this feature, DSM-V highlights the fact that academic skills are learned via specific instruction and not acquired merely as a function of maturation. The Diagnostic Features section of DSM-V adds that "Specific learning disorder disrupts the normal pattern of learning academic skills…The learning difficulties manifest as a range of observable descriptive behaviors or symptoms (as listed in Criteria A1-A6)" and they are "persistent, not transitory." Further delineation of the core features of Specific Learning Disorder are noted by observation "that the learning difficulties are readily apparent in the early school years in most individuals (Criterion C). However, in other, the learning difficulties may not manifest fully until later school years, by which time learning demands have increased and exceed the individual's limited capacities." I believe this specification is often misinterpreted to mean that one can succeed in school without displaying any learning difficulties at all and that a learning disorder only becomes obvious when the curricular expectations rise above what one can do, such as high school subject matter, college requirements, or medical school reading loads. However, this cannot be the proper interpretation since it would mean that everyone would become learning disabled upon reaching the point in which school suddenly becomes "hard." The reality is that school does not become any harder at any age or grade and that expectations of academic performance always remain appropriate to the developmental level of the individual. What is expected academically for a college junior to be able to manage is no more or less difficult than what is expected academically of a kindergarten student. The very reason elementary school students are not required to learn calculus is precisely because it is known that such an expectations is developmentally appropriate. The other misinterpretation of this specification is the idea that a learning disability can go completely unnoticed when in fact, the specification states that it "may not manifest fully" until sometime later. The key word here is "fully" and indicates that the learning problems are indeed observable and noticeable but that they may not rise to a level that constitutes impairment or qualifies as a disability. It might be claimed that perhaps Mr. Sampson exhibits a pattern called "gifted LD" which are described in DSM-V as individuals who "may be able to sustain apparently adequate academic functioning by using compensatory strategies, extraordinarily high effort, or support, until the learning demands or assessment procedures (e.g., timed tests) pose barriers to their demonstrating their learning or accomplishing required tasks." This specification also seems to suffer from the misconception that "timed tests" are things that only happen in college or medical school, such as when taking the NBME. The educational system today is characterized largely by accountability standards that are evaluated via standardized test data obtained from testing students with just such "timed tests." Moreover, there is often an accompanying belief that students are given all the time in the

world while in elementary or high school and that it is not until later that constraints are placed on academic requirements. This is false and even when in elementary school, a teacher must retain certain expectations regarding the completion and submission of assignments and tests and should a student exhibit difficulties in managing these constraints at any age or grade, it would be readily documented. In summary, when coupled with the initial specification regarding problems in "learning keystone academic skills," DSM-V clearly indicates that learning problems, even those that do not seem to represent significant impairment, are still manifest, evident, and discernable during the period of time in which these skills are being taught and learned.

Based on the essential features outlined in DSM-V, it cannot be debated that the hallmark of a learning disability is difficulty in the development and acquisition of basic academic skills particularly during the period of time in which these skills are first taught—early elementary school. Therefore, to support any diagnosis of learning disability, especially one that was first rendered at the age of 22, requires a clear indication that in fact, "learning" to read was a manifest and observable characteristic of Mr. Sampson's early education. In general, however, the documentation provided in this regard do not appear to provide any significant support that Mr. Sampson did indeed struggle to learn to read. What comments are made about this period of time are mostly in connection with potential ADHD issues, such as "comments from early report cards portray ADHD criteria" and "difficulty with executive functioning skills." It was also noted that he had "exceptional ability" and that because of it, his "difficulties were often viewed as a child's lack of effort or interference because of behavioral problems." Not content with their son's education, Mr. Sampson's parents sought and paid for "years of individualized speech therapy and regular tutoring" although it is not clear why only speech therapy was being provided when the learning concerns appeared to be more ADHD related. More importantly, however, references to reading difficulties during this time are vague and nonspecific at best, for example "difficulty" in executive functioning skills are connected to presumed "reading and writing" problems, but no details are provided. Likewise, there is no mention regarding how speech-language therapy was related to learning to read in any way and in one case, the letter by Dr. Serrantino suggests that the parents could have sought SLP services within the school but provides no mention of what aspect of language was problematic or how it possibly related to reading, which, in any event, would not have been the concern of a speech-language therapist. Most likely the therapy was for articulation, as indicated in the letter from Mr. Sampson's parents wherein a speech-language pathologist is listed as providing services for "stuttering" and from a "myofunctional oral therapist" neither of which are a necessary or predictive component of learning to read. Dr. Serrantino later asserts that because the parents provided "increased" tutoring support in middle and high school that this attests to him having a disability. Mr. Sampson's parents indicate that a "reading specialist" was sought in 4th and 5yh grade, but by this point in time, either Mr. Sampson had already learned to read or he had not. If he indeed required any reading intervention, it would have been evident and necessary beginning in 1st grade, not 4th or 5th. In fact, from the 5th grade forward, all of the tutoring that is listed is content based—that is, based on school subject matter, and none of it is related to remediation of basic reading skills. Extra tutoring in subject areas would not have affected or changed the development of his reading skills and the additional instruction provided in a tutoring environment is not evidence that he either needed it to support his reading development or that it was provided because his reading development was poor. There is simply no indication that Mr.

Sampson struggled in his efforts to learn to read during the time in which he was taught to read. This conclusion is reinforced by the fact that reading difficulties are not even reported in the background sections of the evaluations that were conducted. For example, in her "background" section, Dr. Michels' report of evaluation notes that "as a young child, he was a severe stutterer, but this issue resolved in his early elementary school years." She adds that "Spelling" was "relatively poor" (which is false when compared to teacher comments) and the only mention of reading problems comes while in high school where Dr. Michels' notes that "he struggled with reading comprehension" and that "he has typically read to learn, not for pleasure, so he rarely reads fiction." No other mention of reading problems are noted and no reading issues were presented in elementary school. Yet, at the very end of her report, Dr. Michels offers a diagnosis of "Learning Disorder, Not Otherwise Specified." Certainly, one might understand Dr. Michels' use of an NOS diagnosis in this case given the relative lack of any developmental issues in the acquisition of basic academic skills. Even the problems in "writing" are motoric and related to hand writing more than they are to basic writing skills or written expression. But the complete absence of reading difficulties in elementary school strongly belie the presence of a learning disorder in the area of reading, even though Dr. Michels did not actually provide such a diagnosis. The same pattern of the absence of reported or observed manifest problems in learning to read is evident in Dr. Anderson's report of evaluation where she states that "he was described as a severe stutterer, but this was corrected through speech therapy in elementary school." She adds that "Robert has no history of diagnosed learning disorders" and that "his mother provided extra help with reading." No other reference to any type of reading problem is mentioned in the report, until the end where a diagnosis of "315.00 Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling" is provided without ever having established a foundation of early reading problems. Whereas Dr. Anderson may have felt that current test results suggested a reading problem (an issue that has already been examined and disputed by the NBME), it has been noted that a diagnosis of Specific Learning Disorder cannot be rendered in the absence of developmental and educational indicators of early reading problems. Thus, current difficulties in reading cannot not be viewed as automatically attributable to a learning disability. Without any evidence of developmental problems in learning to read, Dr. Anderson's diagnosis is effectively invalidated. The resulting diagnosis in this case appears to have evolved over time by building on perceptions of problems that were never actually reported and a failure to gather actual developmental and educational data of learning difficulties in service of unquestioned explanations related to learning disorder that eventually had to settle on reading given Mr. Sampson's absolutely stellar performance in the area of mathematics. Yet, for such conclusions to be reasonable there must be some evidence that Mr. Sampson displayed some type of difficulty in learning to read—evidence that does not appear to exist, particularly as illustrated in the teacher's comments and grade reports from Ms. Sampson's elementary school years.

The documentation contains copies of some comments made by his elementary school teachers on official grade reports. Some are hand written, some are typed, and some are illegible for which Mr. Sampson has attempted to provide transcriptions of the commentary. Unfortunately, the transcriptions appear to have been done somewhat selectively so as to emphasize negative observations while minimizing positive ones. For example, in quoting his 4th grade teacher, Ms. Eugene, Mr. Sampson writes only that she believed he "needs to put more effort into written assignments because he needs to improve the quality of his work." However,

the actual hand written comments, as discerned from the original report card read, "Robert is a very capable fourth grader. He is inquisitive and well-informed. He especially likes math and science activities. Robert is especially pleased about being a math team captain because he is very good at math. He enjoyed our trip to the pond and studying pond water under the microscope. Robert's test averages for this quarter are as follows: reading 83%, math 95%, spelling 97%, social studies 91% and science 95%. He needs to put more effort into written assignments…" When placed in context, the comment about improving his writing becomes a very minor concern in light of his scores which indicate very superior functioning including in the one area in which he presumably had a learning disability—reading—where his test average was *only* "83%." A review of his marks on a scale from 1 to 5 where 1 is unsatisfactory, 3 is satisfactory, and 5 is outstanding, it can be seen that his reading his abilities related to "reads and understands grade-appropriate material" (4), "reads silently for sustained periods" (4), "selects appropriate books independently" (4), uses reading strategies to construct meaning" (3), "is developing an awareness of genres and authors" (3), and attempts to acquire, interpret, evaluate, and apply information" (3) were all at a satisfactory level or higher. His writing skills are similar in that he was marked as "3" in all areas of writing. These comments and marks do not in any way suggest that Mr. Sampson was having any troubles in learning to read at this point in his education and at a point where they would have been supremely evident. Moreover, in examining his earlier development in reading, an even more positive indication of reading acquisition is noted. For example, in Mrs. Feinberg's class (appears to be 1st grade, according to Mr. Sampson's notes), he was marked in Reading at the second, third, and fourth marking periods as "5," "5", and "5+" as well as all "5" in writing and she noted that he "continues to build upon his good sight vocabulary and use of strategies." This shows clear and steady improvement from a "4" in reading and writing in the first marking period. Mrs. Feinberg's specific comments related to reading are again not transcribed fully by Mr. Sampson perhaps because they are not consistent with notions of a reading disorder. Although difficult to make out, the comments by Mrs. Feinberg in the first marking period appear to indicate that "In reading, Robert enjoys reading books, has a good sight vocabulary and uses a number of strategies to figure out new words. We will be working on having Robert say "blank" and coming back to harder words, as well as breaking up larger words into parts." By the 3rd and 4th marking periods, her comments are "In reading, Robert continues to grow as a reader. He has developed a strong sight vocabulary and has good phonetic sense. Very good job, Robert!" and "Welcome to the 'life long reader's club', Robert! Please make sure you continue to practice your reading and writing over the summer." When coupled with additional comments to the effect that "Next quarter we will be working on Robert's fluency and expression when reading aloud," and "we will continue to work on improving Robert's fluency and expression, building on his knowledge of vowel sounds (long and short) and consonant blends" the enthusiastic exhortation regarding his reading achievement noted in the last marking period comments can only be viewed as a clear and strong indication that Mr. Sampson was quite successful in learning to read and was developing reading skills at the exact level that was required of him at that age and grade and that he possessed this skill at a satisfactory level well into the end of his elementary education.

The preponderance of evidence which indicates Mr. Sampson developed and acquired reading skills in a manner comparable to age and grade level expectations cannot be discounted. There simply are no indications that Mr. Sampson had any type of difficulty in reading

development and that he learned to read and became a solid reader precisely at the time he was expected to do so. His teachers were in the proper and prime position to observe even the slightest of difficulty he may have had in learning to read and yet, there were no comments to this effect noted by any of them. Despite what is compelling evidence, in his personal statement, Mr. Sampson attempts to provide his own argument that this was not the case. He claims that "the roots of my learning disability began in early childhood. I was diagnosed as a severe stutterer at the age of four. This language disability significantly affected my verbal communication, and tended to isolate me from peers." Mr. Sampson seems unaware of the difference between oral language that encompasses verbal communication and symbolic language which is the process of decoding language written in abstract symbols. Having a speech-language impairment in articulation does not prevent an individual from being able to learn to read normally or fluently. They are simply not the same thing. Indeed, Mr. Sampson extends the notion of stuttering to account for oral language issues, not reading issues, as evidenced by his comments that "I experienced anxiety and frustration when I had no idea how long it would take to relay a simple thought. At times, my speech was so disrupted that people around me did not have the patience to wait." Clearly, Mr. Sampson is describing problems in oral language and articulation, not in reading development. Mr. Sampson also seems to feel that there was some relationship between his stuttering and other academic functioning based on his claim that "my stuttering was evidenced by a substantial discrepancy between my verbal processing skills and my excellence in math and science." It is not clear where Mr. Sampson developed the notion that stuttering was diagnosable via a discrepancy between verbal processing skills and math/science but he is nonetheless, significantly mistaken. This connection appears to be drawn, perhaps, from the desire to connect a discrepancy to a learning disability as he states that "the educational resources in my public school were not well suited for learning disabilities" and "when my parents realized I was not growing out of my stuttering problem, they sought outside professional speech pathology treatment, which continued for years." That he received speech-language therapy for articulation difficulties has no direct relationship to reading problems or the presence of any discrepancy between his verbal abilities and other subject areas. These comments represent a conflation of elements that do not belong together and seem to have been connected only in the attempt to justify the presence of a learning disability that could not, based on the documentation, implicate reading problems. In fact, Mr. Sampson alludes to the fact that his *ability* in reading was what he used to overcome his stuttering problem. He notes that "the way I overcame my stuttering was not through silent reading, but with verbal expression of sound and deliberate vocalization." Thus, rather than having a learning disability which was believed to have been caused by a stuttering issue, Mr. Sampson ameliorated his stuttering via his solid reading ability.

These comments by Mr. Sampson, along with the data contained in the documentation appear to make a very compelling case that he had no real difficulties in learning to read or in becoming a fluent reader as compared to the average person in the general population. Where he displayed any difficulties in reading at all was only in terms of having to read out loud where, in his own words, "when we read aloud in class, I used to shun begin called on to read aloud (even though I otherwise enjoyed participating in my classes) because on top of some lingering stuttering, I was quite scared that I would mispronounce or see a word that my classmates would all know, but I did not." The nature of the anxiety that Mr. Sampson must have felt in attempting to pronounce words that might not be familiar to him is very understandable and entirely natural

for someone with a stuttering problem. But again, these comments reflect that reading itself was not the problem, only his stuttering was. When not faced with the prospect of having to enunciate publicly, Mr. Sampson performed quite well and adequately as indicated by the comments and marks he received in elementary school. This is an important point in the sense that there is no evidence of developmental problems in reading but it does not mean that he should or must enjoy reading or that he should be better or faster at it. Because of the presence of his stuttering issues and the anxiety it engendered in him, it is not surprising that as he continued in his education he found reading a less than enjoyable exercise. For example, he notes that "when I got to junior high school and high school, I continued to avoid reading books for enjoyment" and that "I did not read for pleasure." These are not essential elements of a reading disorder but instead, in this case are a normal and reasonable reaction to his anxiety that was borne from situations in which he was asked to engage in an activity that was potentially embarrassing to him and which made him feel that his classmates thought he was "stupid." But his avoidance of reading, whatever the cause, has a predictable effect in that those who read more become better readers and those who read less lose ground to those who do. The result can be viewed primarily as an issue of advanced reading fluency and Mr. Sampson's avoidance of reading did not serve him well, but the fact that he did not continue to improve or excel in reading is also not an indication of a disability. According to DSM-V, "difficulties mastering these key academic skills may also impede learning in other academic subjects (e.g., history, science, social studies), but those problems are attributable to difficulties learning the underlying academic skills." In Mr. Sampson's case, this is precisely the opposite of what is being claimed. Mr. Sampson had problems with stuttering, not reading, and it was his stuttering that affected his love of reading and induced him to avoid it, not the other way around. Mr. Sampson also appears to try and make a connection between difficulties in reading music and basic reading. Given that reading music and reading words are not comparable abilities, there is no need to pursue any discussion of the matter and it is pointed out here primarily as an example regarding how this observation is not evidence of any manifest problems in learning to read words. By the time Mr. Sampson reaches college he seems to feel that a book on famous individuals with dyslexia are characteristic of his own experiences as a child and begins to believe he may have a learning disability. He cites issues such as "I always knew I had to work infinitely harder than my contemporaries to achieve academic success" and "I had difficulty remembering names of people and places, a childhood history of reading and spelling difficulties, slow reading abilities, inability to comprehend while reading aloud, and suffered extreme fatigue when reading even short periods of time no matter what the subject matter." It is likely that just about any student, including those who have and have not achieved much academic success, would relate to these experiences just as well. In most cases, including Mr. Sampson's, working hard is simply the nature of the beast for getting good grades. The idea that success comes to the many without effort is a convenient fallacy. Not remembering people's names or places is not a reading issue. Mr. Sampson already described his inability to remember what he was reading due to anxiety, not a learning problem. And according to the documentation, there was in fact, no "childhood history of reading and spelling difficulties" a claim that was also noted in the "background" section of the report of evaluation conducted by Dr. Michels. According to his report card, in the first marking period, Mr. Sampson's 5th grade teacher, Ms. Eugene, gave him a "3" (satisfactory) in Spelling and then added a hand written notation for "Formal Spelling" in which she gave him a "5" (outstanding). Mr. Sampson's recollections and Dr. Anderson's claims in this regard are simply in error and factually incorrect. Mr. Sampson also claims that his "first extensive external

tutoring" began during junior high school but according to the letter submitted by his parents, he was provided tutoring beginning in 5th grade (general academic tutoring), followed by Math Enrichment in 6th grade as well. One might wish to see one's difficulties through the lens of a disability as it offers a very easy and palatable explanation for a life of perceived struggles. But such desire cannot obscure the facts in this case which are consistent and powerful in illustrating that Mr. Sampson did not display or evidence any of the necessary characteristics regarding learning problems that are required for meeting criteria related to the diagnosis of a learning disability in the area of reading. And when Mr. Sampson's performance for his "private MCAT tutor" did not reach expectations, whatever the causes of it could not and still cannot be ascribed to a learning disability. In her letter dated June 29, 2018, Ms. Simon also references the tutor's concerns as evidence of a learning disorder where she states "Dr. Andrew Lam, his MCAT tutor, observed his struggles and advised him to have an evaluation for learning disabilities" but no details are provided regarding what these struggles were and at that age, such observations do not serve to bolster learning problems in the early developmental period. Whatever concerns Dr. Lam had regarding Ms. Sampson's work or efforts, Mr. Sampson would have already had to have demonstrated some history of reading difficulties. That he never did and that the documentation supports the fact that he learned to read normally and without any incident or issue indicates that whatever struggles they were, they were not rooted in some type of learning disability in reading.

The letter from Ms. De Motta of Stony Brook University claims support for a disability by stating that it is "a mental impairment that substantially limits his reading ability and reading speed on a daily basis." Yet, the only complaint seen in the documentation and the one pointed to in the letter is "his failing to borderline marginal performance on timed NBME shelf exams taken without accommodations were causing him to fail." It appears that the argument here is that Mr. Sampson is "failing" in medical school only because he can't pass the NBME exams with better than marginal performance but that he is quite able to perform daily life activities that require reading without any real issue. Indeed, this is the first point that Mr. Sampson's attorney, Ms. Simon, raises in her letter dated Jun 29, 2018 where in quoting a decision from Bartlett v N.Y. State Board of Law Examiners, she asserts that the opinion is that taking tests constitutes an example of a major life activity. Ms. Simon further emphasizes this point in a follow up letter on the same matter dated November 14, 2018 where she notes that "An individual has a disability within the meaning of ADA if that individual suffers a physical or mental impairment that substantially limits one or more of the individual's major life activities or major bodily functions." The point here, however, is not whether taking a test is or isn't a major life activity, but more that if an individual is impaired to the point that it interferes with a major life activity, one would expect, by definition, that interference to involve any aspect of daily living in which the activity is required. Because, for the purposes of this review, Mr. Sampson is claiming that his impairment is in the area of reading, it stands to reason that he would and should have problems in any daily life activity that requires reading—including taking timed tests. But this is not what the documentation demonstrates. In contrast, and as noted specifically in the letter from Ms. De Motta of Stony Brook University, Mr. Sampson does not have problems in any daily life activity that requires reading, he apparently has difficulty only in taking time tests, which is a condition that would belie the presence of a learning disability and hence, any subsequent impairment in daily activities. The nature of learning disabilities, in particular, are specific only to their manifestation, not their application in that while reading may be affected without

concomitant impairment in writing or math, the impairment would not be evident only in taking timed tests and then be absent when say, reading a restaurant menu. Reading is reading, and if Mr. Sampson has impairment that is substantial, as compared to the average person in the general population, he cannot pick and choose in which way it will or will not affect his daily life. And yet, he describes his learning disability not as an impairment in daily functioning but specifically as related to taking the NBME exams mostly because his school defines it that way. He states that, "my school defines a student to have marginal performance when a student has either failed or come very close to failing multiple NBME subject exams, or the courses themselves on their first attempt." In essence, Mr. Sampson is allowing his disability to be defined by a school that will not accept passing as the standard by which success is defined and only something better than passing is allowed. He further asserts that "the point of this administrative label is to identify students who are substantially underperforming the academic expectations of the school and who are in need of an intervention to fix a major learning or education issue." Here Mr. Sampson makes a very flawed and large leap in logic—because the school expects better than just passing performance, failure to do so must be an indication of "a major learning or education issue." Mr. Sampson would prefer of course that the matter relate to the former (a major learning issue) as it supports his contention of learning disability but the documentation available only support the latter—an education or instructional issue that is unrelated to any reading impairment. This sentiment seems to consolidate Mr. Sampson's view of his experiences as he notes later in his personal statement, "hours of intensive preparation spread over years with multiple tutors and multiple external resources were used to help assist me with my reading and learning disability…I now know that I had to work much harder than my peers and I am 100% confident that without these extreme efforts of preparation to compensate for my disability, I would not have passed them." Mr. Sampson may be forgiven for recognizing that millions of students took these very same exams without the benefit of the extensive and extreme preparations that were accorded to him, but he is incorrect in believing that without such "help" he would not have passed. Not only did Mr. Sampson pass the SAT, he obtained Critical Reading scores of 580 (74th percentile rank), 620 (84th percentile rank), and 680 (93rd percentile rank), all of which are well beyond "passing" and indicate exceptional performance on a test of reading accomplished without accommodation. Of course, in her letters, Ms. Simon admonishes the NBME that "average scores or grades do not obviate the presence of disability or the legitimate need for accommodations." Of course, a legitimate need for accommodations is in fact predicated on the presence of a disability and in this case, Mr. Sampson's performance was not merely "average" but far above that—far enough to suggest the presence of ability, not disability. That is, were Mr. Sampson actually impaired in the area of reading, taking a timed, standardized test like the SAT would have been a difficult task and yet his performance was more than merely adequate, it was rather exceptional. Again, Ms. Simon argues that "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." Again, such a statement opens the door for identification of learning impairments in any individual but she clarifies and suggests that "Mr. Sampson's impairments significantly and, often severely, restrict his ability to read, comprehend, learn, concentrate, process information, write, sleep, work and take tests." Whereas the issues of concentration, sleeping, and working are beyond the scope of this review, reading, comprehension, learning, and writing are not and to that extent, Ms. Simon is incorrect in believing that his "record clearly demonstrates" anything other than

normal learning and ability, in particular during the period of time in which such difficulties should have been most manifest and clearly evident.

Ms. Simon also attempts to clarify her point that "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." While this may well be a highly debatable proposition, it cannot be argued that the basis of the limitation, however it is being manifested, must be from the presence of a disability." If that which causes the limitation in a major life activity is other than a disability, then ADA would not appear to apply given its emphasis on protecting individuals with disabilities. The same can be said for a specific learning disability in that learning problems that stem from external factors such as "lack of educational opportunity, consistently poor instruction, learning in a second language" cannot be used as the basis for identification of a learning disability. In furthering her arguments that Mr. Sampson has a learning disability, Ms. Simon points to the fact that federal guidance indicates that "[c]ondition, manner, or duration may also suggest the amount of time or effort an individual has to expend when performing a major life activity because of the effects of an impairment, even if the individual is able to achievement the same or similar result as someone without the impairment." It has been documented and discussed already that Mr. Sampson's progress in elementary school, apart from stuttering, was unremarkable. According to his teachers, Mr. Sampson displayed no difficulties or struggles whatsoever during his elementary education and that by the end of 1st grade, he was rated as having reading skills that exceeded the highest ranking of "5" as indicated by his teacher's rating of "5+." Moreover, not only are there no comments or observations regarding the presence of reading difficulties, of all the statements transcribed by Mr. Sampson that cannot be read from the originals concerning 5th and 6th grade, there is not a single mention of any issue related to reading. Were Mr. Sampson displaying any type of struggle that could be characterized by "condition, manner, or duration" that exceeds that of the average child in elementary school, it was neither reported nor documented in the report cards and comments contained in the documentation. Mr. Sampson provides a considerable amount of current anecdotal evidence in his personal statement as well in some of the various documents submitted in support of his request. Unfortunately, none of it points to what is required to form the basis for a developmental problem in reading. This is not to say that Mr. Sampson has not or is not experiencing any of the difficulties that he is currently be reporting but rather, suggests that whatever the cause of the current difficulties, they are highly unlikely to be rooted in any intrinsic disorder that could be construed as a learning disability in the area of reading. One can imagine that it must be difficult for Mr. Sampson to accept that he likely does not have a learning disability in the area of reading. Such a conclusion does not bear upon the presence of any other disability or the impact that his other listed impairments may have on reading or any other major life activity. Mr. Sampson may well feel that he must work harder than most, read more slowly than many, need to review material more carefully, and require more time than average and these may all be quite true. But at this time, based on the documentation submitted by Mr. Sampson, there is simply no evidence that any of these conditions are due to the presence of a learning disability in the area of reading. One simply cannot develop a reading disability while in college or medical school, and one's current struggles cannot change the nature of one's original development in which there are no reports, no observations, and no data to support difficulties in the acquisition or development of reading skills.

In summary, a review of the documentation submitted in support of his appeal of the denial of Mr. Sampson's reconsideration request provides only one reasonable conclusion that can be reached—that he cannot have a learning disability in the area of reading precisely because he has never demonstrated any problems in learning to read. By definition, a learning disorder is characterized by difficulties in the early acquisition period, that is, elementary school, where basic academic skills are first taught and first learned. It matters not whether there is any formal evaluation or diagnosis rendered at that time or even whether any difficulties rise to the level of substantial impairment. What is required and what does matter is that there is some evidence that the acquisition and development of a basic skill, such as reading, did not proceed in the manner that is typically expected for a given age or grade. And while there are a variety of academic concerns sprinkled throughout his early education, none of them implicate or suggest that reading was of any concern. Without a clear history of reading difficulties during this period, it is inappropriate to assign a diagnosis of learning disability as it is an essential criterion for doing so. This is an important point in this review because it is not predicated on any debate regarding the meaning of current or previous test scores or their interpretation regarding impairment. Arguments that suggest that Mr. Sampson developed a reading disability because he stuttered are specious and unsupportable, and any references regarding a "history of reading difficulties" is merely speculation and uncorroborated by the documentation. In addition, improvements in performance when given extra time cannot change the fact that there is a conspicuous absence of any reports or observations of early reading difficulties. Whatever debate may ensue from examination of recent evaluations does not alter the one most important consideration necessary for supporting a learning disability in reading—evidence of impairment in early reading acquisition. That there is none can only suggest one thing—that Mr. Sampson's current reading issues, and their relation to his taking a timed test, are not attributable to a reading disorder. Thus, whatever difficulties he may have in completing timed tests or reading assignments in comparison to his medical school peers cannot be attributed to the presence of a learning impairment in reading. Instead, the available data in this case argue quite strongly and convincingly that Mr. Sampson learned to read comparably to his same-grade peers in early and late elementary school and that while he may find reading or taking timed tests more challenging within the context of a rigorous medical school curriculum and in the presence of the most academically successful student body in education, it still does not render him disabled by history or by comparison. Therefore, on the basis of all of the documentation submitted in this case, it is my opinion that a diagnosis of learning impairment in reading is wholly unsupported and that his appeal regarding denial of his reconsideration of accommodation remains unwarranted and should therefore be denied.

# EXHIBIT 13

November 26, 2018

Catherine Farmer, Psy.D.
Manager, Disability Services and ADA Compliance Officer, Testing Programs
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

RE:   Application of Robert Sampson for Step 1 exam accommodations (ID # 12391)

Dear Dr. Farmer:

Thank you for forwarding the materials on Mr. Sampson for review.  He is again requesting the accommodations of extended time (time and one-half over 2 days), extra breaks, and a private testing room based on diagnoses of Attention Deficit Hyperactivity Disorder Predominantly Inattentive Type, Specific Learning Disorder with Impairment in Reading (Dyslexia), Reading Fluency, Word Reading Accuracy, and Spelling, and Unspecified Neurodevelopmental Disorder; Visuospatial Memory and Visuospatial Processing.  Several previous requests for these accommodations have been denied by the NBME.  Mr. Sampson has appealed these denials and has provided additional documentation each time in an effort to support his request for these accommodations and explain from his perspective why he believes they are necessary.  I have not been involved in this case until now.  You have asked me to provide another opinion on his accommodation requests primarily with respect to the ADHD diagnosis as another Consultant will also be reviewing this documentation on the basis of the Specific Learning Disorder and Unspecified Neurodevelopmental Disorder diagnoses.  I have carefully reviewed **all** of the voluminous documentation he has provided.

In my opinion, the documentation provided does not adequately substantiate an ADHD diagnosis, a history or magnitude of chronic and pervasive real world impairment consistent with ADHD, or the existence of an ADHD-related disability and is therefore insufficient to warrant granting his requested accommodations on the basis of ADHD.  My reasons for this opinion are as follows:

1.   Mr. Sampson's difficulties seem to be largely contiguous with his entrance into the medical school environment.  ADHD is a developmental disability with a *childhood* onset that typically results in a chronic and pervasive pattern of developmentally deviant functional impairment in academic, social, and vocational arenas, and also in daily adaptive functioning.  Research shows that ADHD is a serious disorder that significantly disrupts functioning in multiple life domains including school, social, vocational, and daily adaptive domains, executive functioning, planning ahead, completing tasks, organization, and time management to name just a few.  For someone who truly suffers from this disorder at the magnitude of a clinical diagnosis or a disability, life is characterized by disrupted interpersonal relationships, underperformance in school and jobs, trouble managing the routine tasks of daily life, and generally inadequate adjustment.  People with bona fide ADHD struggle to succeed in life and typically leave a paper trail in their wake

that is a testament to their longstanding history of developmentally deviant functional impairment. Examples of the paper trail are things like negative teacher comments relating to poor self control, poor or inconsistent academic achievement, report cards/transcripts that show inconsistent/variable grades and/or low ratings in effort, citizenship, and behavior, special education records, 504 Plans, negative job performance reviews, and the like. Indeed, ADHD is a seriously impairing disorder that leaves its mark on a wide swath of an individual's life. Mr. Sampson's documentation and overall history does not reflect a magnitude of symptoms or pervasive impairment that is consistent with ADHD or a disability, in my opinion.

2. More specifically, despite his reported history of longstanding ADHD-like symptoms, he had no history of any early interventions or treatment for ADHD-like problems, had no documented history of behavioral/self control problems, was not diagnosed with ADHD until 2015 during medical school, reportedly had no history of seeking or receiving any formal accommodations prior to medical school Shelf Exams, scored in the Above Average to Superior ranges on the SAT and the ACT on several occasions without accommodations, scored at the 67th percentile and the 73rd percentile on the MCAT on two occasions without accommodations, reportedly earned A's in most of his high school classes which were typically Honors or Advanced Placement classes, reportedly "flourished socially and intellectually" in college at University of Virginia earning a GPA of 3.43 without accommodations, had no history of seeking or needing any mental health treatment prior to medical school, did not appear to have experienced any vocational impairment in his past work experiences including as a rescue squad volunteer or while in Korea doing immunology research, and he provided no convincing hard evidence that showed any history of significant ADHD-like impairment in his social, daily adaptive, or executive functioning. This is not the typical profile of someone struggling with ADHD at the magnitude of a clinical diagnosis or a disability.

3. It is necessary to establish a childhood onset of developmentally deviant symptoms/impairment to receive the ADHD diagnosis as an adult. It is not clear that Mr. Sampson was experiencing a magnitude of developmentally deviant symptoms or behavior in childhood that would be consistent with a clinical diagnosis of ADHD, in my opinion. Although there were a few teacher comments on his early report cards relating to distractibility, disorganization, listening, impulsivity, and following directions, these seemed to be few and far between, did not appear to significantly interfere in his progress, and did not appear to have persisted over time or interfere significantly in his adult functioning. In fact, there were a number of "positive" teacher comments as well such as "organizational skills continue to improve", "he continues to grow as a reader", "it is a pleasure to be his teacher", "he is more organized in the classroom and now keeps an immaculate desk", "appropriate behavior has increased and I feel this will continue", "pleased with his progress", and "writing is consistently improving". Further, there were no ratings of 1 or 2 ("unsatisfactory" or "inconsistent") on items relating to Work Habits or Citizenship on his report cards. One other teacher comment from a fourth quarter report stated "I am pleased by Robert's progress this year both academically and socially, he has developed better work habits, organizational skills, and a commitment to improving his academic performance". Overall, the trend was toward improvement and his later grades and behavior as he got older seemed to be quite impressive (mostly A's in Honors and AP classes) with no extraordinary interventions beyond tutoring and hard work; and no objective evidence of developmentally deviant real world functional impairment relative to same aged peers. Hence, it is not clear that he would have met criteria for ADHD as a child.

4. It is difficult to see where the history of developmentally deviant pervasive impairment is that would support an ADHD diagnosis or a disabling condition, in my opinion. There is little

objective documentation beyond self/parent report and testimonials to validate that he experienced a magnitude of clinically significant real world impairment over the course of his life in academics, work, social, daily adaptive, or executive functioning.  By all objective measures, Mr. Sampson seems to have performed quite well in his life with respect to grades (mostly A's and B's), behavior, social functioning, daily adaptive functioning, high SAT, ACT, and MCAT test scores, and no history of formal treatment for ADHD (or any other psychological condition) prior to medical school other than tutoring.  All of this is not indicative of impaired functioning or the presence of a disorder that would require a need for extra time, in my opinion.  Where is the paper trail of records that reflect a struggle with ADHD over the course of his life?  It seems Mr. Sampson's case for viewing himself as impaired is based mostly on areas that are very difficult to measure or quantify.  For example, he sees himself as impaired because he reports he has to re-read material for understanding, had a parent read aloud to him when he was a child, feared being called upon to read in class, reportedly does not read for pleasure, used Cliff notes because reading was so painful, has difficulty remembering names of people and places, gets extremely fatigued when reading, and had to play music by ear because he was unable to read music.  These examples of impairment strike me as being fairly ubiquitous and impossible to quantify; and is not the kind of impairment or magnitude of impairment that rises to the level of a disability, in my opinion.  Moreover, if someone can compensate so effectively for their symptoms and for so long (up until medical school) without any formal accommodations or extraordinary interventions beyond tutoring and concerted effort, that person is not likely to be considered disabled under the ADA's definition.

5.      Further, on the face of it, it is difficult to label someone with a Reading Disorder (Dyslexia) who earned almost all A's and B's throughout his school history, had no history of treatment or assessment for reading problems, scored at the 80th percentile on Reading Fluency, had a Critical Reading score on the SAT in November 2008 at the 93rd percentile, had ACT scores of 30 (superior range) in Reading and English, had a Woodcock Johnson Broad Reading score at the 80th percentile, and had a SATA reading score in the Average range (25th percentile).  His testing scores, past standardized test scores, history of stellar academic achievement, and absence of formal treatment strongly argue against his having a true reading disability.  Low Average or Below Average scores at one snapshot in time on tests such as the Nelson Denny Reading test are not enough to substantiate a Reading Disability.  Moreover, it was not entirely clear to me that he *required* tutoring in order to remediate something that was deficient or whether he chose to pursue tutoring to optimize his already unimpaired functioning.  For example, Dr. Michels' report indicated he "needed significant tutoring to remain in the highest math classes".  Again, this is not evidence of impaired functioning.  In short, his documentation fails to adequately substantiate the pervasive developmentally deviant impairment over time and across situations that typically characterizes ADHD, in my opinion.

6.      The ADHD diagnosis was not adequately substantiated, in my opinion.  First, there seems to be a lack of consensus on the ADHD diagnosis amongst Mr. Sampson's diagnosticians.  For example, Dr. Suzanne Michels did not make an ADHD diagnosis in 2013 and Dr. Allison Anderson concluded in 2013 that "his testing results and history supply little evidence that his problems are the result of ADHD".  Dr. Allison's report also indicated that ADHD Rating Scales (Barkley RS) were administered to Mr. Sampson, his girlfriend, both of his parents, and his tutor and **all** of their ratings were entirely normal and not supportive of ADHD.  Dr. Anderson further concluded "he does not appear to have the consistent and severe pattern of impulsivity, social problems, marked inattention, or physical restlessness that supports an ADHD diagnosis".  I agree that his overall history is not supportive of an ADHD diagnosis. Dr. Aronson's ADHD diagnosis was based mostly on self report over several visits and the "impact of key data points from a

4

multitude of sources".  I am not sure what this means.  Dr. Aronson stated he had slow Processing Speed despite his history of excellent grades, excellent scores on past standardized tests, consistently high real world achievement, and a WAIS IV Processing Speed Index score of 122 (Superior range).  Dr. Aronson also stated Mr. Sampson was "profoundly disabled currently" and that he "cannot concentrate and read efficiently".  I saw no convincing evidence to support these statements.  Further, test scores and/or statistical discrepancies are not diagnostic of ADHD. Almost all of his test scores were within at least the Average range (and many were in the Above Average to Superior ranges) suggesting no neurological dysfunction.  A Processing Speed Index score of 122 on the WAIS-IV is in the Superior range, is not deficient, is not supportive of slow cognitive speed or a need for extra time, is not diagnostic of ADHD, and is not evidence of impaired functioning.  Scores that are "only Average" in the context of an overall Superior Verbal IQ are not diagnostic of ADHD or evidence of impaired functioning.   Relative weaknesses that still fall within the Average range are not diagnostic of ADHD and are not evidence of impaired functioning.  Low Average or Below Average scores on the Rey, Trails B, Picture Recognition, and Stroop Interference at one snapshot in time is also not diagnostic of ADHD or evidence of a disability.  Dr. Aronson tended to over emphasize self report, test scores, and statistical discrepancies as the major bases for the ADHD diagnosis rather than building a case for the ADHD diagnosis by showing a magnitude of chronic and pervasive developmentally deviant real world impairment consistent with this diagnosis, in my opinion.  Mr. Sampson's statement that "he has to work infinitely harder" than his peers to succeed is difficult to quantify, and even if true is not necessarily evidence of impaired functioning.  It is also possible that other factors besides ADHD could account for his difficulty finishing medical school tests such as having a deliberate or obsessive test taking style/preference.

7.   In summary, Mr. Sampson's documentation fails to build a credible case for the existence of ADHD and fails to show that having ADHD is responsible for his reported difficulties with reading and finishing tests in medical school.  His documentation also fails to adequately show that he has a disability within the meaning of the ADA, in my opinion.  The fact that he may benefit from accommodations including extra time is not unusual and is not the issue.  Most people would.  However, to qualify for a disability under the American's with Disabilities Act, one must have a physical or mental impairment that substantially limits one or more major life activities.  He has not shown that he is substantially limited in any major life activity relative to the average person, in my opinion.  Earning all A's and B's throughout his school history and his very strong test scores and overall functional ability is not supportive of a disability, in my opinion.  The purpose of accommodations is not to optimize one's test scores, accommodate a personal test taking style/preference that may be slow or deliberate, or to guarantee that one finishes an exam.  The fact that he received accommodations in medical school and on Shelf Exams is not a guarantee he will qualify for accommodations on the Step 1 exam.  Because there is insufficient evidence of an ADHD diagnosis or an ADHD-related disability, I do not believe that granting his requested accommodations is warranted on the basis of ADHD in this case.

Sincerely,

_____
 Kevin Murphy, Ph.D.

# EXHIBIT 14



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**

January 4, 2019

**Via E-mail to rds911@gmail.com**
Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed your request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

In a November 14, 2018 letter, your attorney, Ms. Jo Anne Simon, writes, *"Mr. Sampson's accommodation request is entirely reasonable given the current impacts of his longstanding learning and attention deficits. The extended time accommodations that Mr. Sampson seeks would not fundamentally alter the USMLE. There can be no other legally acceptable reason for denial of accommodations."*

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities compared to most people in the general population.

The NBME carefully considers all evidence in determining whether an individual is substantially limited within the meaning of the ADA and what, if any, accommodations are appropriate to the particular Step exam context. Submitted documentation including the individual's personal statements; letters from advocates; reports of evaluations; and objective information such as school records and scores obtained on high stakes tests taken with and without accommodations are thoroughly reviewed.

Supporting documentation submitted from qualified professionals is a necessary part of any request for accommodations and is carefully reviewed by the NBME. Though not required to defer to the conclusions or recommendations of an applicant's supporting professional, we carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.

According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, the hallmark of a learning disability is difficulty in the development and acquisition of basic academic skills particularly during the period of time in which these skills are first taught in early elementary school. Developmental reading difficulties were not reported by your evaluators and there is no indication that you struggled in your efforts to learn to read during the time in which you were taught to read. The complete absence of reading difficulties in elementary school strongly belies the presence of a learning disorder in the area of reading.

Likewise, it is necessary to establish a childhood onset of developmentally deviant symptoms/impairment to receive the ADHD diagnosis as an adult.  Beyond self/parent report and testimonials, your documentation provides no objective evidence of clinically significant real world functional impairment in academic, work, social, daily adaptive, or executive functioning relative to most people in the general population.

Ms. Simon's November 14, 2018 letter requesting reconsideration provided no new substantive information or evidence that alters our decision communicated in my letters dated September 7, 2018 and March 6, 2018. Once again, our thorough review found that your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that additional testing time is an appropriate modification of your USMLE Step 1 test administration.

Sincerely,

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

C: Jo Anne Simon JoAnne@joannesimon.com

# EXHIBIT 15



# United States Medical Licensing Examination®

# Step 1 Score Report

FOR EXAMINEE USE ONLY. THIRD-PARTY USERS OF USMLE SCORES SHOULD RELY SOLELY ON OFFICIAL TRANSCRIPTS RECEIVED DIRECTLY FROM THE EXAMINEE'S USMLE REGISTRATION ENTITY.

**NAME:** Sampson, Robert Drew

**USMLE ID:** 5-385-624-1

**TEST DATE:** January 23, 2020

## Your Performance

| Test Result | Test Score |
|:---:|:---:|
| **FAIL** | **177** |

## Your Performance Compared to Other Examinees

The chart below represents the distribution of scores for examinees from US and Canadian medical schools taking Step 1 for the first time between January 1, 2018 and December 31, 2018. Reported scores range from 1-300 with a mean of 231 and a standard deviation of 20.



If you tested repeatedly under the same conditions on a different set of items covering the same content, without learning or forgetting, your score would fall within one standard error of the estimate (SEE) of your current score two-thirds of the time. The SEE on this exam is 8 points.

*Your score +/- SEE: 169 – 185*

# United States Medical Licensing Examination

# Step 1 Score Report

**FOR EXAMINEE USE ONLY. THIRD-PARTY USERS OF USMLE SCORES SHOULD RELY SOLELY ON OFFICIAL TRANSCRIPTS RECEIVED DIRECTLY FROM THE EXAMINEE'S USMLE REGISTRATION ENTITY.**

**NAME:** Sampson, Robert Drew

**USMLE ID:** 5-385-624-1        **TEST DATE:** January 23, 2020

## Your Relative Strengths and Weaknesses

The boxes below indicate areas of relatively lower or higher performance in each content area within the Step 1 examination. A box in the "Higher" column indicates that your performance in that area was higher than your overall Step 1 performance shown on page 1. A box in the "Same" column indicates that your performance in that area was similar to or the same as your overall Step 1 performance. A box in the "Lower" column indicates that your performance in that area was lower than your overall Step 1 performance. The percentage range of items from each content area on the Step 1 examination is indicated below.

This information can be used to identify areas of strength and weakness to guide future study. Because the exam is highly integrative, USMLE recommends reviewing all content areas if retaking the test.

## Performance by Physician Task Relative to Your Overall Step 1 Performance

|  | (% Items Per Test) | Lower | Same | Higher |
|---|---|---|---|---|
| **MK: Applying Foundational Science Concepts** | (52 - 62%) |  | ■ |  |
| **PC: Diagnosis** | (20 - 30%) |  | ■ |  |
| **PC: Management** | (7 - 12%) |  | ■ |  |
| **PBLI: Evidence-Based Medicine** | (5 - 7%) |  |  | ■ |

Abbreviations: MK, Medical Knowledge; PC, Patient Care; PBLI, Practice-based Learning and Improvement.

# United States Medical Licensing Examination

# Step 1 Score Report

FOR EXAMINEE USE ONLY. THIRD-PARTY USERS OF USMLE SCORES SHOULD RELY SOLELY
ON OFFICIAL TRANSCRIPTS RECEIVED DIRECTLY FROM THE EXAMINEE'S USMLE REGISTRATION ENTITY.

**NAME:** Sampson, Robert Drew

**USMLE ID:** 5-385-624-1                                    **TEST DATE:** January 23, 2020

## Performance by System Relative to Your Overall Step 1 Performance

| | (% Items Per Test) | Lower | Same | Higher |
|---|---|---|---|---|
| General Principles | (13 - 17%) | | | ■ |
| Behavioral Health & Nervous Systems/Special Senses | (9 - 13%) | | ■ | |
| Reproductive & Endocrine Systems | (9 - 13%) | | ■ | |
| Respiratory & Renal/Urinary Systems | (9 - 13%) | | ■ | |
| Blood & Lymphoreticular/Immune Systems | (7 - 11%) | | ■ | |
| Multisystem Processes & Disorders | (7 - 11%) | | ■ | |
| Cardiovascular System | (6 - 10%) | | ■ | |
| Musculoskeletal, Skin & Subcutaneous Tissue | (6 - 10%) | | ■ | |
| Gastrointestinal System | (5 - 9%) | | ■ | |
| Biostatistics & Epidemiology/Population Health | (5 - 7%) | | | ■ |

## Performance by Discipline Relative to Your Overall Step 1 Performance

| | (% Items Per Test) | Lower | Same | Higher |
|---|---|---|---|---|
| Pathology | (45 - 52%) | | ■ | |
| Physiology | (26 - 34%) | | ■ | |
| Pharmacology | (16 - 23%) | | ■ | |
| Biochemistry & Nutrition | (12 - 15%) | | ■ | |
| Gross Anatomy & Embryology | (11 - 15%) | | ■ | |
| Microbiology | (11 - 15%) | | ■ | |
| Histology & Cell Biology | (9 - 13%) | | ■ | |
| Behavioral Sciences | (8 - 12%) | | ■ | |
| Immunology | (7 - 11%) | | ■ | |
| Genetics | (5 - 9%) | | ■ | |

# United States Medical Licensing Examination
# Step 1 Score Report

## Supplemental Information: Understanding the Content Areas

The information below is a visual representation of the content weighting on this examination that may be informative in guiding remediation. Descriptions of the topics covered in these content areas, as well as other topics covered on USMLE Step 1, can be found in the information materials on the USMLE website (https://www.usmle.org). Please use the contact form on the USMLE website (https://www.usmle.org/contact/) if you have additional questions.



| Physician Task | (% Items Per Test) |
|---|---|
| MK: Applying Foundational Science Concepts | (52 - 62%) |
| PC: Diagnosis | (20 - 30%) |
| PC: Management | (7 - 12%) |
| PBLI: Evidence-Based Medicine | (5 - 7%) |

Abbreviations: MK, Medical Knowledge; PC, Patient Care; PBLI, Practice-based Learning and Improvement.



| System | (% Items Per Test) |
|---|---|
| General Principles | (13 - 17%) |
| Behavioral Health & Nervous Systems/Special Senses | (9 - 13%) |
| Reproductive & Endocrine Systems | (9 - 13%) |
| Respiratory & Renal/Urinary Systems | (9 - 13%) |
| Blood & Lymphoreticular/Immune Systems | (7 - 11%) |
| Multisystem Processes & Disorders | (7 - 11%) |
| Cardiovascular System | (6 - 10%) |
| Musculoskeletal, Skin & Subcutaneous Tissue | (6 - 10%) |
| Gastrointestinal System | (5 - 9%) |
| Biostatistics & Epidemiology/Population Health | (5 - 7%) |

| Discipline | (% Items Per Test) |
|---|---|
| Pathology | (45 - 52%) |
| Physiology | (26 - 34%) |
| Pharmacology | (16 - 23%) |
| Biochemistry & Nutrition | (12 - 15%) |
| Gross Anatomy & Embryology | (11 - 15%) |
| Microbiology | (11 - 15%) |
| Histology & Cell Biology | (9 - 13%) |
| Behavioral Sciences | (8 - 12%) |
| Immunology | (7 - 11%) |
| Genetics | (5 - 9%) |

# EXHIBIT 16

**United States Medical Licensing Examination® (USMLE®)**

## REQUEST FOR TEST ACCOMMODATIONS
*Use this form if you are requesting accommodations on the USMLE for the first time.*

---

### The National Board of Medical Examiners® (NBME®) processes requests for test accommodations on behalf of the USMLE program

If you have a documented disability covered under the Americans with Disabilities Act (ADA), you must notify the USMLE in writing <u>each time</u> you apply for a Step examination for which you require test accommodations. Submitting this form constitutes your official notification.

• Review the USMLE Guidelines for Test Accommodations at www.usmle.org/test-accommodations/ for a detailed description of how to document a need for accommodations.

• Complete all sections of this request form; submit the form and all required documentation to Disability Services. In order to begin processing your request, you must have a completed registration for the USMLE Step exam for which you are requesting accommodations.

• NBME will acknowledge receipt of your request by e-mail and audit your submission for completeness. If you do not receive an e-mail acknowledgement within two business days of submitting your request, please contact Disability Services at 215-590-9700 or disabilityservices@nbme.org. You may be asked to submit additional documentation to complete your request.

• **Requests are processed in the order in which they are received. Processing cannot begin until sufficient information is received by NBME and your Step exam registration is complete. Allow at least 60 business days for processing of your request.**

• The outcome of our review will not be released via telephone. All official communications regarding your request will be made in writing. If you wish to modify or withdraw a request for test accommodations, contact Disability Services by e-mail at disabilityservices@nbme.org or by telephone at 215-590-9700.

---

As explained in the Guidelines to Request Test Accommodations (www.usmle.org/test-accommodations/), you MUST provide supporting documentation verifying your current functional impairment.

<u>**Submit**</u> the following with this form:

✓ A **personal statement** describing your disability and its impact on your daily life and educational functioning.
✓ A completed **Certification of Prior Test Accommodations** form if you received test accommodations in medical school/residency.
✓ A **complete and comprehensive evaluation** from a qualified professional documenting your disability.

✓ **Supporting documentation** such as academic records; score transcripts for previous standardized exams; verification of prior academic/test accommodations; relevant medical records; previous psycho-educational evaluations; faculty or supervisor feedback; job performance evaluations; clerkship/clinical course evaluations; etc.

---

**USMLE® Request for Test Accommodations**

## Section A: Exam Information

Place a check next to the examination(s) for which you are **currently registered** *and* requesting test accommodations: (Check all that apply)

☑ Step 1

☐ Step 2 CK (Clinical Knowledge)

☐ Step 3*

*Please be aware that additional test time for Step 3 may involve 3 to 5 days of testing, depending on the requested accommodation (See Section C2).

## Section B: Biographical Information
**Please type or print.**

**B1.** Name: Sampson _____ Robert _____ D _____
          Last                              First                         Middle Initial

**B2.** Date of Birth: ███████████ _____

**B3.** USMLE # 5 - 3 8 5 - 6 2 4 - 1 (required)

**B4.** Address:
4118 43rd St Apt 2B _____
Street
Sunnyside _____ NY _____ 11104 _____
City                                    State/Province          Zip/Postal Code
USA _____
Country
631-833-4418 _____
Preferred Telephone Number
rds911@gmail.com _____
E-mail address

**B5.** Medical School Name: Stony Brook University School of Medicine _____

Country of Medical School: USA _____  Date of Medical School Graduation: 05/23

**USMLE® Request for Test Accommodations**

## Section C: Accommodations Information

**C1**. Do you require wheelchair access at the examination facility? ☐ Yes ☑ No
If yes, please indicate the number of inches required from the bottom of the table to the floor: _____

**C2.**     **Step 1, Step 2 CK, or Step 3 (computer-based examinations)**

Check the appropriate box to indicate the accommodations you are requesting for the exam(s) for which you are currently registered:

**STEP 1: Check ONLY ONE box**

**Additional Break Time**
☐ Additional break time **over 1 day**

☐ Additional break time **over 2 days**

**Additional Testing Time**
☐ 25% Additional test time (Time and 1/4) **over 2 days**

☐ 50% Additional test time (Time and 1/2) **over 2 days**

☐ 100% Additional test time (Double time) **over 2 days**

☐ Additional break time and 50% Additional test time (Time and 1/2) **over 2 days**

**STEP 2 CK: Check ONLY ONE box**

**Additional Break Time**
☐ Additional break time **over 2 days**

**Additional Testing Time**
☐ 25% Additional test time (Time and 1/4) **over 2 days**

☐ 50% Additional test time (Time and 1/2) **over 2 days**

☐ 100% Additional test time (Double time) **over 2 days**

☐ Additional break time and 50% Additional test time (Time and 1/2) **over 2 days**

**STEP 3: Check ONLY ONE box**

**Additional Break Time**
☐ Additional break time **over 4 days**

**Additional Testing Time**
☐ 25% Additional test time (Time and 1/4) **over 3 days**

☐ 50% Additional test time (Time and 1/2) **over 4 days**

☐ 100% Additional test time (Double time) **over 5 days**

☐ Additional break time and 50% Additional test time (Time and 1/2) **over 4 days**

**Describe** any other accommodation(s) you are requesting for **Step 1**, **Step 2 CK**, or **Step 3**.
Additional break time and 100% Additional test time (Double time)_____

_____

_____

_____

USMLE® Request for Test Accommodations

## Section D: Information About Your Impairment

**D1.** List the **specific DSM/ICD diagnostic code(s) and disability** for which you are requesting accommodations and report the year that it was **first** diagnosed.

| DIAGNOSTIC CODE | DISABILITY | YEAR DIAGNOSED |
|---|---|---|
| 315.00 | Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling. | 2013 |
| 315.9 | Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing. | 2013 |
| F90.2 | Attention Deficit hyperactivity dissorder, predominantly inattentive. | 2015 |
| 315.2 | Specific Learning Disorder with impairment in written expression (spelling and handwriting) | 2020 |
|  |  |  |

## D2. Personal Statement

 **Attach a signed and dated personal statement describing your impairment(s) and how a major life activity is substantially limited.** The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limits your current functioning in a major life activity and how the standard examination conditions are insufficient for your needs. In your own words, describe the impact of your disability on your daily life (do not confine your statement to standardized test performance) and provide a rationale for why the specific accommodation(s) you are requesting are necessary in the context of this examination.

## Section E: Accommodation History

> Relevant copies were previously provided to NBME

### E1. Standardized Examinations

 **Attach copies of your score report(s) for any previous standardized examination taken.**

 **If accommodations were provided, attach official documentation from each testing agency confirming the test accommodations they provided.**

List the accommodations received for previous standardized examinations such as college, graduate, or professional school admissions tests and professional licensure or certification examinations (if no accommodations were provided, write NONE).

|  |  | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|---|
| ☐ | SAT®, ACT® | PSAT   Fall '07 (PSAT), 5/05, 6/08, 6/08, 10/08, 11/08 | NONE |
| ☐ | MCAT® | 8/13, 9/14 | NONE |
| ☐ | GRE® |  |  |
| ☐ | GMAT® |  |  |
| ☐ | LSAT® |  |  |
| ☐ | DAT® |  |  |
| ☐ | COMLEX® |  |  |
| ✓ | Other (specify) | 2X time on NBME shelf exams: 10/15/20, 10/16/20, 1/8/21, 2/26/21, 4/9/21, 5/28/21, 7/9/21 1.5X time on NBME shelf exams: 12/8/16, 12/16/16, 1/13/17, all others previously (since 10/6/16) under standard time conditions. |  |

**USMLE® Request for Test Accommodations**

**E2. Postsecondary Education**

> Relevant copies were previously provided to NBME

List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

🖉 **Attach copies of official records from each school(s) confirming the accommodations they provided.**

🖉 **If you receive/received accommodations in <u>medical school and/or residency</u>, have the appropriate official at your medical school/residency complete the <u>USMLE Certification of Prior Test Accommodations</u> form available at www.usmle.org/test-accommodations/forms.html.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **Medical/Graduate/ Professional School** | Stony Brook University School of Medicine | 2X Time on exams 1.5X Time on exams | Oct '20—>Current Nov '16—>Oct '20 |
| | Stony Brook University College of Business | 2X Time on exams | July '21—>Current |
| | _____ | _____ | _____ |
| | _____ | _____ | _____ |
| | _____ | _____ | _____ |
| **Undergraduate School** | University of Virginia | NONE | _____ |
| | _____ | _____ | _____ |
| | _____ | _____ | _____ |

**E3. Primary and Secondary School**

> Relevant copies were previously provided to NBME

List each school and all formal accommodations you received, and the dates accommodations were provided:

🖉 **Attach copies of official records from each school listed confirming the accommodations they provided.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **High School** | Ward Melville High School | NONE | _____ |
| | _____ | _____ | _____ |
| **Middle School** | Paul J Gelinas JHS | NONE | _____ |
| | _____ | _____ | _____ |
| **Elementary School** | Minnesauke Elementary School | NONE | _____ |
| | _____ | _____ | _____ |

USMLE® Request for Test Accommodations

## Section F:  Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate.  I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:

- Evaluating my eligibility for accommodations.  When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research.  Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information.  I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information, if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print): ___Robert Sampson_____

Signature: ___*Robert Sampson*_____  Date:__4/13/22_____

### Submitting Your Completed Request Form and Supporting Documentation:
**(Do Not Send duplicate documents and Do Not Send by multiple methods as this will delay processing)**

- **Due to business restrictions in Philadelphia because of COVID-19 please submit your request form and supporting documentation via E-mail or Fax.**
- **Requests sent to us via mail may be delayed.**
- **E-mail: Maximum file size is 15 MB (including text in body of email, headers and all attachments). Files larger than 15 MB may require separate emails. All attachments must be in PDF format. Please scan your documents into as few PDF's as possible. Photographs of Personal Items may be in digital format such as JPEGs/JPGs. We are not able to access embedded links.**
- **Fax or Mail: Submit your completed request form and supporting documents to the address below once you register for your exam.**
- **DO NOT bind, staple, paper clip, or tab documents as this may delay processing.**

**Disability Services**
**NBME**
**3750 Market Street**
**Philadelphia, PA 19104-3190**
**Telephone: (215) 590-9700**
**Facsimile: (215) 590-9422**
**E-mail: disabilityservices@nbme.org**

# EXHIBIT 17

May 9, 2022

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

RE:   Fifth Appeal of Robert Sampson for Step 1 exam accommodations

Dear Disability Services:

Thank you for forwarding the additional materials on Mr. Sampson for review.  He is again requesting the accommodations of extended time (double time over 2 days) and additional break time based on diagnoses of Attention Deficit Hyperactivity Disorder Predominantly Inattentive Type, Specific Learning Disorder with Impairment in Reading (Reading Fluency, Word Reading Accuracy, and Spelling), Unspecified Neurodevelopmental Disorder in Visuospatial Memory and Visuospatial Processing, and a new diagnosis of Specific Learning Disorder with Impairment in Written Expression.  Four previous requests for these accommodations have been denied by the NBME.  Mr. Sampson has submitted some new documentation in support of his current request for Reconsideration.  The new documentation included an updated Personal Statement and a new Neuropsychological Evaluation report from Dr. Jeanette Wasserstein and Dr. Kim Miller. I have carefully reviewed all of the new documentation and the voluminous documentation he has previously provided.

In my opinion, the new documentation does not adequately substantiate any of his reported diagnoses, a history or magnitude of chronic and pervasive real world impairment consistent with ADHD/LD, or the existence of a disability and is therefore still insufficient to warrant granting his requested accommodations.  My reasons for this opinion are as follows:

1.   The new report from Dr. Wasserstein and Dr. Miller does not adequately substantiate any of the reported diagnoses with hard evidence of real world functional impairment, in my opinion.  Their ADHD diagnosis was based on self report, symptom endorsement on self-administered ADHD rating scales (CAARS, CAADID), a review of past evaluations and support letters from Mr. Sampson's teachers, parents, and tutors that I reviewed in my previous report, and test scores/statistical discrepancies that are not diagnostic of ADHD or a disabling condition.  Symptom endorsement on self-administered ADHD rating scales is not sufficient to establish an ADHD diagnosis, especially in the absence of any documented or credible evidence of real world functional impairment that would rise to the level of a disability.  Almost all of his test scores in this evaluation were within the Average range or better (and many were in the Above Average to Superior ranges) suggesting no neurological dysfunction.   A Processing Speed Index score of 122 on the WAIS-IV is in the Superior range, is not deficient, is not supportive of slow cognitive speed or a need for extra time, is not diagnostic of ADHD, and is not evidence of impaired functioning.  Continuous Performance Tests (such as the IVA Plus) have not been shown to be

2

particularly useful in either confirming or disconfirming an ADHD diagnosis due to their high false positive and false negative rates.  Low Average or below Average scores at one snapshot in time on Trails B, the Stroop Interference subtest, the Rey, and the Nelson Denny Reading Test are not diagnostic of ADHD or LD and is not evidence of impaired functioning.  The fact that Mr. Sampson performed better on the Nelson Denny when given "unlimited time" is not unusual and is not diagnostic of ADHD, LD, or a disability.

2. Dr. Wasserstein and Dr. Miller seem to be making the argument that test scores that are "only Average" in the context of an overall Superior Verbal IQ is evidence of impaired functioning and a disability.  They are not.  More specifically, they indicated that his PSAT Reading score was "only at the 52nd percentile", his ACT Reading scores were "relatively weaker" than his other scores falling in the Average range between the 69th to 79th percentiles, and that his SAT Critical Reading score was "only Average" (74th percentile) while his other scores were Superior.  Relative weaknesses that still fall within the Average range are not diagnostic of ADHD or LD and are not evidence of impaired functioning.  Low Average or Below Average scores on the Rey, Trails B, Picture Recognition, and Stroop Interference at one snapshot in time is also not diagnostic of ADHD or evidence of a disability.  Dr. Wasserstein also stated Mr. Sampson's nonverbal reasoning ability (Perceptual Reasoning Index on the WAIS-IV) *albeit in the High Average range* was significantly weaker than other cognitive domains.  She then says that by virtue of his *High Average* Perceptual Reasoning Index score that he therefore has a "metaphorical limp between his various thinking skills, the extent of which creates significant handicaps on tasks that rely on perceptual reasoning and working memory, such as reading comprehension".  She further states that "such variability in scores (from the lower end of Average to Very Superior) indicates disruption in underlying neurocognitive abilities, even with normal range scores".  I respectfully disagree with these statements.  Average or High Average scores in the context of a Superior Verbal IQ are not reflective of significant handicaps and are not evidence of impaired functioning or a disability.

3. Dr. Wasserstein also does not seem to acknowledge that the metric that is relevant here with respect to the ADA is the Average Person Standard.  The argument that Mr. Sampson's "only Average" scores represent a significant impairment flies in the face of the Average Person Standard.  This is a major theme in this new documentation and trying to make the argument that he is impaired because he is "only Average" in some areas while Superior in most is not persuasive or accurate.  Further, his WIAT Written Expression scores were almost all in the Superior range, his WIAT Spelling score was at the 63rd percentile (which is not consistent with what Dr. Wasserstein and Dr. Miller called "poor spelling"), the fact that he was "commended" by his professors for his great write ups of clinical cases, and the fact that he has no history of developmentally deviant problems with written expression are all inconsistent with his new diagnosis of Specific Learning Disorder with Impairment in Written Expression.  I see no basis to justify this new diagnosis.  In addition, the fact that he sought out help with numerous tutors over the years does not necessarily mean he had deficiencies relative to same aged peers.  For example, he always had very strong math skills and had Superior Math scores on the SAT, ACT, and the WIAT so why did he need tutoring in Math?  Dr. Michels' report indicated he "needed significant tutoring to remain in the highest math classes".  This is not evidence of impaired functioning.  It was not at all clear to me that he required tutoring in order to remediate something that was deficient as opposed to choosing to pursue tutoring to help optimize his already unimpaired functioning.  Further, although Mr. Sampson had WIAT scores in the "Very Superior" range (99th percentile) in Math Problem Solving and in the Superior range (97th percentile) in Numerical Operations, Dr. Wasserstein nevertheless indicated he exhibited "visual misperceptions" and  "sometimes misinterpreted "+" as "x" suggesting vulnerable visual

processing and/or inattention".  Suggesting that someone is impaired by visual misperceptions when they score at the 97th and 99th percentiles is not appropriate and is obviously not evidence of impaired functioning or a disability.

4.    Moreover, Mr. Sampson's statements that everyday tasks are harder for him than others and that he is slower in reading and processing information than others is difficult to quantify, and even if true is not evidence of impaired functioning.  Earning a C+ grade in Organic Chemistry and a C- grade in Genetics and Molecular Biology is not unusual and is not evidence of a disability.  Failing Shelf Exams in a medical school curriculum is not a symptom of ADHD/LD and is not evidence of a disability.  Dr. Wasserstein and Dr. Miller also in my opinion did not adequately rule out other possible alternative explanations for his difficulties in medical school besides ADHD and Learning/neurological disorders.  For example, anxiety or having a personal test taking style/preference that is slow, deliberate, or too obsessive are other possibilities that have not been adequately ruled out.  Based on the totality of his documentation, consistently high grades and test scores, not seeking or needing any assessments or treatments until his adult life when studying for the MCAT, lack of a history of behavioral/self control problems, and no hard or convincing evidence of real world functional impairment in other non-academic life domains, I just do not see a history that substantiates diagnoses of ADHD or LD, or that shows he meets the ADA's definition of disability.

5.    To provide further justification for my opinion that he does not meet the ADA's definition of disabled, I would like to list a number of facts from Mr. Sampson's history (most of which were described in my previous report dated 11/26/18) that argue against his qualifying as a person with a disability:  (a) his difficulties seem largely contiguous with his entrance into the medical school environment (b) he had no history of any early interventions or treatment for any ADHD-like or LD problems (c) he had no documented behavioral problems, was not diagnosed with ADHD until medical school, and had no history of seeking or needing any formal accommodations prior to encountering medical school Shelf exams (d) he scored in the Above Average to Superior ranges on the SAT and ACT on several occasions without accommodations (e) he scored at the 67th and the 73rd percentile on the MCAT on two occasions without accommodations (f) he reportedly earned A's in most of his high school classes which were typically Honors or Advanced Placement classes (g) he reportedly "flourished socially and intellectually" in college at University of Virginia earning a GPA of 3.43 without accommodations (h) he had no history of seeking or needing any mental health treatment prior to medical school (i) he did not appear to have experienced any significant ADHD-like vocational impairment in past work experiences as an EMT or rescue squad volunteer (j) he provided no convincing hard evidence that showed any history of significant ADHD-like impairment in his social, daily adaptive, or executive functioning and (k) the "negative" teacher comments from his early report cards seemed to be few and far between, did not appear to significantly interfere in his progress, and did not appear to have persisted over time or significantly interfere in his adult functioning, in my opinion.  In fact, all of the weaknesses I pointed out in my first report are still valid and were not adequately addressed with the new documentation he submitted.

6.    In summary, Mr. Sampson's new documentation fails to build a credible case for the existence of ADHD/LD and fails to show that having ADHD/LD is responsible for his reported difficulties with reading and finishing tests in medical school.  His documentation also still fails to adequately show that he has a disability within the meaning of the ADA, in my opinion.  The fact that he may benefit from accommodations including extra time is not unusual and is not the issue.  Most people would.  However, to qualify for a disability under the American's with Disabilities Act, one must have a physical or mental impairment that substantially limits one or more major

4

life activities.  He has not shown that he is substantially limited in any major life activity relative to the Average person, in my opinion.  Earning essentially all A's and B's throughout his school history and his very strong test scores and overall functional ability is not supportive of a disability, in my opinion.  The purpose of accommodations is not to optimize one's test scores, accommodate a personal test taking style/preference that may be slow or deliberate, or to guarantee that one finishes an exam.  The fact that he received accommodations in medical school and on Shelf Exams is not a guarantee he will qualify for accommodations on the Step 1 exam.  Because there is insufficient evidence of an ADHD/LD diagnosis or disability, I must continue to recommend denial of his requested accommodations.


Sincerely,


_____

Kevin Murphy, Ph.D.

# EXHIBIT 18



**Highly Confidential**

June 1, 2022

Robert D. Sampson
4118 43rd St., Apt 2 B
Sunnyside, NY 11104

RE: USMLE Step 1                          USMLE ID#: 5-385-624-1

Dear Robert D. Sampson:

We have thoroughly reviewed the documentation you provided in support of your request for test accommodations on the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You have requested 100% additional test time (double time) and additional break time on the basis of Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling, and Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing diagnosed in 2013; Attention-Deficit/Hyperactivity Disorder, predominantly inattentive (ADHD) diagnosed in 2015; and Specific Learning Disorder with impairment in written expression diagnosed in 2020. You previously submitted initial and reconsideration requests for accommodations for Step 1 on the basis of these disorders and in our June 13, 2017, August 1, 2017, January 12, 2018, March 6, 2018, September 7, 2018, and January 4, 2019 letters addressed to you, we explained that your documentation did not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations were an appropriate modification of your test administration.

You write in your April 13, 2022 Personal Statement for Accommodations, "*New testing concluded, as had past testing, that I require extended time in order to have access to examinations. Based on this new testing, my medical school which had previously been providing 1.5x, began providing double time for all examinations, including shelf exams…Because the USMLE Step 1 is a vignette based multiple choice exam, this style of exam exacerbates the impacts of both my low reading speed and my slow processing speed forcing me to leave large sections of the exam either unanswered, or guessed on. I need at 2X additional time, hence my request for 2X additional time on the Step 1 exam.*" We note the accommodations your medical school has elected to provide to you. While NBME gives considerable weight to documentation of past and present accommodations, the fact that you have previously received a particular accommodation in other contexts is not, in itself, a sufficient demonstration of your need for accommodations on the USMLE.

Received in support of your current request was an August 2020 report of Neuropsychological Evaluation by Jeanette Wasserstein, Ph.D. and Kim Miller, Ph.D. who write, "*Robert Sampson is a 3rd year medical student at Renaissance School of Medicine at Stony Brook University with a history of having received time accommodations throughout medical school, including on the NBME shelf exams. Mr. Sampson is currently requesting an updated neuropsychological evaluation as part of his appeal to the National Board of Medical Examiners' (NBME) regarding their past decisions to deny him accommodations on the USMLE Step Exams. Mr. Sampson's initial application was denied in June 2017. Thereafter he appealed this decision multiple time and received his 4th denial letter in March 2018…Given his significant reading comprehension difficulties, he meets criteria for a DSM-5 diagnosis of Specific Learning Disorder with impairment in reading (reading fluency*"

*and reading comprehension), as well as impairment in written expression (spelling and handwriting). Based on current test results and prior history and diagnosis, Mr. Sampson also meets criteria for Attention Deficit/Hyperactivity Disorder, Combined Presentation."* Your evaluators provide recommendations writing, *"For testing, standardized or in class, extended time is warranted. Currently, double time is strongly advised because of his significantly slowed reading fluency and because he has found even with time and half [sic] he is often not able to finish Step exams."*

We carefully reviewed and considered the information and recommendations presented by your evaluators, as well as the entirety of your submission for accommodations. Regardless of the assigned diagnoses, there is insufficient evidence to support a need for accommodations to access the USMLE. Your most recent 2020 performances on a range of relevant cognitive and academic achievement tasks, including Processing Speed, Working Memory, Logical Memory, Perceptual Reasoning, Executive Functions, Spelling , Essay Composition, Sentence Composition, Sentence Writing Fluency, Word Reading, Pseudoword Decoding, Reading Comprehension, Oral Reading Fluency, Oral Reading Accuracy, Oral Reading Rate, and Sentence Reading Fluency, are all largely within the Average to Superior range of functioning (under timed and untimed conditions) and not indicative of an impairment that substantially limits you in comparison to most people in the general population. While we note your reported below average scores on two select reading related tasks (Reading Rate and Reading Comprehension) on the *Nelson-Denny Reading Test*, these scores are inconsistent with your prior performance on your 2013 evaluation as well as your history of unimpaired performances on real-world high stakes standardized tests taken without accommodations. You report that you did not receive accommodations in any academic setting, up to medical school, or for any standardized testing including the PSAT, SAT, ACT, and MCAT. Taken altogether, your documentation does not demonstrate that standard test timing is a barrier to your access to the USMLE.

Accommodations are intended to ensure that individuals with a documented disability as defined by the Americans with Disabilities Act (ADA) can take the USMLE exams in an accessible place and manner. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment that substantially limits a person's ability to perform one or more major life activities, as compared to most people in the general population. Therefore, not every impairment will constitute a disability.

Your documentation does not demonstrate that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations. We will process your USMLE Step 1 exam application without test accommodations at this time. You may inquire at usmlereg@nbme.org or call Applicant Services directly at (215) 590-9700 with any questions about your scheduling permit.

**Please monitor the Prometric website at www.prometric.com/corona-virus-update for up-to-date information and test center procedures related to the impact of the coronavirus (COVID-19) pandemic.**

Sincerely,

Disability Services

# EXHIBIT 19

School  Minnesauke

Teacher  Mrs. Feinberg

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reading | | | | |
| Writing | | | | |
| Listening | 2 | | | |
| Speaking | 2 | | | |

Dear Parents,
    This report card summarizes information about your child's progress. Individual development levels create unique patterns of growth for children in the primary grades.

**MATH**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Participates in activities | M | | | |
| Works well with manipulatives | M | | | |
| Writes and identifies numerals | M | | | |
| Computes addition problems | M | | | |
| Understands and applies concepts | M | | | |
| Uses problem solving strategies | P | | | |
| Computes subtraction problems | | | | |

**KEY**

M = Most of the time          P = Part of the time
R = Requires extra support     N = Not yet

3rd Report Comments

| PERSONAL GROWTH AND WORK HABITS | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Is considerate of others | M | | | |
| Shares with others | M | | | |
| Listens when others speak | P | | | |
| Follows directions | P | M | | |
| Obeys rules | M | | | |
| Works cooperatively | M | M | | |
| Demonstrates self control | M | P | | |
| Accepts personal responsibility | P | | | |
| Seeks help when needed | M | | | |
| Uses learning materials appropriately | M | P | | |
| Accepts suggestions for improvement | P | | | |
| Completes tasks in a reasonable time | P | R | | |
| Demonstrates organizational skills | R | M | | |
| Demonstrates gross motor coordination | M | | | |
| Demonstrates fine motor coordination | M | | | |

1st Report Comments

Robert has made a good adjustment to his new school and our first grade class. He is friendly, cooperative and helpful much of the time. We are presently working on making sure Robert listens to and follows directions the first time they are given. We will also be working on having Robert pay more focused attention, so he may complete his task faster and stay more organized.

4th Report Comments

In reading Robert enjoys reading books, has a good sight vocabulary and uses a number of strategies to figure out new words. We will be working on having Robert say "blank" and coming back to standardized, as well as breaking up larger words into ...

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| ... activities | | M | | |

Parent Teacher Conference: Date  Nov 3, 1997

Parent's Signature

| ATTENDANCE | 1 | 2 |
|---|---|---|
| Absent | 5 | |

: Robert Sampson

Minnesauke Elementary

Mrs. Feinberg

nts,

rt card summarizes information about yo
ress.  Individual development levels cre
rns of growth for children in the primary

e time          P = Part of the time
tra support     N = Not yet

(see explanation of levels on reverse)

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reading | | 5 | 5 | 5+ |
| Writing | | 5 | 5 | 5 |
| Listening | | | 2 | 3 |
| Speaking | | | 2 | 3 |

### MATH

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Participates in activities | | M | M | M |
| Works well with manipulatives | | M | M | M |
| Writes and identifies numerals | | M | M | M |
| Computes addition problems | | M | M | M |
| Understands and applies concepts | | M | M | M |
| Uses problem solving strategies | | P | M | M |
| Computes subtraction problems | | M | M | M |

### OWTH AND WORK HABITS

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | | M | P | M |
| | | M | M | M |
| s speak | | M | M | M |
| | | P | M | M |
| | | M | M | M |
| ntrol. | | M | M | M |
| sponsibility | | M | M | M |
| ded | | M | M | M |
| s appropriately | | M | M | M |
| for improvement | | M | M | M |
| asonable time | | M | M | M |

**1st Report Comments**



Conference Date

**2nd Report Comments**

Robert is usually a **responsible** member of our class who tries to set **a good example** for others.  I am happy to see that Robert's **following directions** more readily and is a bit **more organized**.  Keep it up, Robert!  Next quarter we will continue to work on these important behaviors.

In reading, Robert continues to build upon his good sight vocabulary and use of strategies.  Next quarter, we will be working on Robert's fluency and expression when reading aloud.

In math, we have been working with adding, subtracting, fact families, counting by 1's, 5's and 10's to 100, place value, time to the hour, graphing, more and fewer, and money.  Next quarter we will be working on having Robert looks at the sign when he is adding and subtracting to improve his accuracy.  We will also be working on having Robert write number equations vertically, making sure Robert follows written directions more carefully and having Robert focus on the process and strategies (instead of only the answer).

**3rd Report Comments**

Robert's organizational skills have continued to improve.  He also continues to do a good job of following directions more often.  Keep it up Robert.  Presently, we are working on making sure Robert chooses his words more carefully when he speaks to others, so we don't have hurt feelings.

In reading, Robert continues to grow as a reader.  He has developed a strong sight vocabulary and has good phonetic sense.  Very good job, Robert!  Next quarter, we will continue to work on improving Robert's fluency and expression, building on his knowledge of vowel sounds (long and short) and consonant blends, and building upon Robert's higher level thinking skills.

In math,  I am happy to see Robert thinking about the process and strategies of solving problems more often.

**4th Report Comments**

Welcome to the "life long reader's club", Robert!  Please make sure you continue to practice your reading and writing over the summer.

In math, this quarter we have worked with fractions, geometry, number families, adding and subtracting above 10 and adding and subtracting two-digit numbers.  When doing number equations, Robert must remember to go back and check his answers to improve upon his accuracy .

It has been a pleasure to be Robert's teacher this year! Hav a wonderful summer and please come and visit me in Sept.,

| ATTENDANCE | 1 | 2 | 3 | 4 | TOTAL |
|---|---|---|---|---|---|



Three Village School District Pupil Progress Report
September - June

Student _____
School _____
Teacher _____

Dear Parents,
This report card highlights information about your child's progress in second grade. Use the reverse side of the report card to interpret the language arts level.

LANGUAGE ARTS LEVELS
(See explanation of levels on the reverse side)

|  | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reading |  |  |  |  |
| Writing |  |  |  |  |
| Listening |  |  |  |  |
| Speaking |  |  |  |  |

KEY
Always ........... 5
Most of the Time ... 4
Part of the Time ... 3
With Support ....... 2
Not Able to do This . 1

MATH
| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Participates in activities |  |  |  |  |
| Demonstrates accurate recall of basic facts |  |  |  |  |
| Computes accurately |  |  |  |  |
| Displays an understanding of math concepts |  |  |  |  |
| Applies a variety of problem solving strategies |  |  |  |  |

SCIENCE
| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Participates in activities |  |  |  |  |

LANGUAGE ARTS
The language arts curriculum is comprised of four areas: reading, writing, listening and speaking. Listed below are the expected behaviors in reading and writing for second graders.

READING
| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Shows an interest in reading |  |  |  |  |
| Reads silently for sustained periods |  |  |  |  |
| Applies a variety of strategies |  |  |  |  |
| Demonstrates a strong sight vocabulary |  |  |  |  |
| Reads aloud with fluency and expression |  |  |  |  |
| Summarizes stories/retell |  |  |  |  |
| Comprehends grade level reading material |  |  |  |  |

WRITING
| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Expresses ideas in an organized manner |  |  |  |  |
| Uses appropriate vocabulary |  |  |  |  |
| Demonstrates sentence sense |  |  |  |  |
| Applies knowledge of sentence mechanics |  |  |  |  |
| Learns assigned spelling words |  |  |  |  |
| Uses correct spelling in written work |  |  |  |  |

SOCIAL STUDIES
| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Participates in activities |  |  |  |  |

ATTENDANCE

SOCIAL AND WORK HABITS

| | 1 | 2 | 3 | 4 | 2nd Report Comments |
|---|---|---|---|---|---|
| Follows oral directions |  |  |  |  |  |
| Follows written directions |  |  |  |  |  |
| Completes work |  |  |  |  |  |
| Respects property |  |  |  |  |  |
| Works well/conflicts with peers |  |  |  |  |  |
| Works cooperatively |  |  |  |  |  |
| Works independently |  |  |  |  |  |
| Listens attentively |  |  |  |  |  |
| Uses time well |  |  |  |  |  |
| Participates in class activities |  |  |  |  |  |
| Works neatly |  |  |  |  |  |
| Comes to school prepared |  |  |  |  |  |

Student Robert Sampson

School Minnesauke

Teacher Divine Eugene

| Social and Work Habits | | Achievement |
|---|---|---|
| Always | 5 | Outstanding |
| Most of the Time | 4 | Very Good |
| Part of the Time | 3 | Satisfactory |
| With Support | 2 | Inconsistent |
| Not Observed Yet | 1 | Unsatisfactory |

The language arts curriculum is comprised of four areas: reading, writing, listening, and speaking. Listed below are the expected behaviors for students in grades four and five. For your reference, a more comprehensive list of the language arts achievement levels can be found on the back of the report card.

| Grading for Special Areas | |
|---|---|
| E | = Excellent |
| VG | = Very Good |
| G | = Good |
| S | = Satisfactory |
| NI | = Needs Improvement |

2nd Repo

**READING**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reads and understands grade-appropriate material | | | | |
| Reads silently for sustained periods | | 4 | | |
| Selects appropriate books independently | | | | |
| Uses reading strategies to construct meaning | | 4 | | |
| Is developing an awareness of genres and authors | | 3 | | |
| Attempts to acquire, interpret, evaluate, and apply information | | 3 | | |

**AL AND WORK HABITS**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| rs organizational skills | | 4 | | |
| ges time constructively | | 4 | | |
| letes homework | | 4 | | |
| and legible work | | 3 | | |
| ndently | | | | |
| es class activities | | 4 | | |
| written directions | | 4 | | |
| school prepared | | 4 | | |
| peratively | | 4 | | |
| sideration for others | | 4 | | |
| gestions for improvement | | 4 | | |
| flicts with peers | | 4 | | |
| nority | | 4 | | |
| erty | | 4 | | |

**WRITING**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Expresses ideas in an organized manner | | 3 | | |
| Expresses ideas coherently | | 3 | | |
| Uses appropriate vocabulary | | 3 | | |
| Demonstrates sentence variety | | 3 | | |
| Applies knowledge of punctuation and capitalization | | 3 | | |
| Spelling | | 3 | | |

Formal Spelling    5

**SPEAKING AND LISTENING**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Participates in class activities | | | 4 | |
| Expresses ideas clearly | | | 4 | |
| Responds appropriately with class activities | | | 4 | |
| Follows directions | | | 4 | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| ately | | | | |
| rstanding of math concepts | | 4 | | |
| of problem solving strategies | | 4 | | |

**SOCIAL STUDIES**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Displays knowledge of content | | | 4 | |
| Demonstrates understanding of concepts | | | 4 | |

**RESEARCH**

**ART**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Effort | | | | |
| Achievement | | | | |

**MUSIC**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Effort | | | | |
| Achievement | | | | |

3rd Report

**HEALTH**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Effort | | | | |
| Achievement | | | | |

1st Report Comments Robert is a very capable fourth grader. He is inquisitive and likes math and science activities. Robert is especially pleased about being a math team captain because he is very good at math. He enjoyed our trip to the pond and studying pond water under the microscope.
Robert's test averages for this quarter are as follows: reading 83%, math 95%, spelling 97%, social studies 91% and science 95%. He needs to pay more attention to the quality of his work. He should be writing on every written assignment.

4th Report

Parent/Teacher C...

**HEALTH**

| | | | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|
| Effort | | | | | ▓ | |
| Achievement | | | | | ▓ | |

**1st Report Comments** Robert is a very capable fourth grader. He is inquisitive and well-informed. He especially likes math and science activities. Robert is especially pleased about being a math team captain because he is very good at math. He **4th Report Comments** enjoyed our trip to the pond and studying pond water under the microscope.

Robert's test averages for this quarter are as follows: reading 83%, math 95%, spelling 97%, social studies 91% and science 95%. He needs to put more effort into written assignments because he needs to improve the quality of his work. He should also use cursive writing on every written assignment.

**Parent/Teacher Conference Date** 11-13-00

_Shelley Mann_
**Parent's Signature**

| ATTENDANCE | 1 | 2 | 3 | 4 | TOTAL |
|---|---|---|---|---|---|
| Absent | 0 | | | | |
| Late | 2 | | | | |

5th grade – Mr Hardreere

## Robert Sampson

### First Quarter Report

Robert is adjusting to the many responsibilities and organizational aspects associated with being a fifth grade student. He is making new friends and shows interests and displays knowledge in a variety of subject areas.

Robert exhibits academic strength in many areas, and displays this through his participation in all class discussions. His input is valuable and comes from a unique perspective. Although he is always an active participant, he frequently fails to listen to directions the first time, and needs them to be repeated. Robert can also act impulsively on occasions, drawing attention to himself in ways that are not positive.

Among the areas to work on this year are his organizational skills and his writing skills. Robert often generates a product that is hard to decipher, because of his handwriting and the lack in organization. In the upcoming months, we will be focusing on these topics, as well as his behavior. Robert has the potential to be an outstanding student, and I feel confident he will accomplish these goals this year.

### Second Quarter Report

Robert is showing improvement in many areas. He is becoming more organized in the classroom and now keeps an immaculate desk. He continues to participate in all discussions and is beginning to use his listening skills to his advantage. The frequency of his appropriate behaviors has increased and I feel that these improvements will continue.

Robert has also tried to improve his handwriting and in most cases it is more legible than on previous occasions. Although Robert's handwriting is improving he still needs to organize how he writes more effectively. His writing at times lacks organization which makes it difficult for him to understand what he has written. As Robert learns more note-taking and summarizing skills, he will learn to use methods to help him document information and his own thoughts more effectively. This will be an area of focus for Robert in the upcoming months. I am pleased with Robert's progress and I look forward to seeing how these improvements will enable him to demonstrate his true potential.

### Third Quarter Report

Robert continues to excel in many academic areas, especially in mathematics. I am pleased with his desire to complete extra work. He has a particular talent for the study of fractions. Robert's writing is consistently improving as he is taking his time and organizing his thoughts before he begins a draft.

I would like for Robert to continue developing his listening skills. He appears at times to be confused with directions or questions that are presented during class. This will allow him to interact more effectively with his classmates. I predict these

improvements would allow him to feel more confident in his social interactions with peers.

## **Fourth Quarter Report**

I am pleased by Robert's progress this year, both academically and socially.  He has demonstrated a commitment to improving his academic performance and has developed better work habits and organizational skills.  I encourage Robert to continue concentrating on his organizational skills as they are necessary for his future academic success.



cial Areas

vmnt

VG
VG

## 2nd Report Comments

Robert is an intelligent sixth grader. H...
during class instruction, collaborative per...
group discussions. His reasoning ability ...
...wledge enable him to interact with under...
...ce. However, he is less self assured and product...
...pendent work periods. He consistently seeks...
...before self-initiating a task or asking for peer...
...ly distracted and often does not begin...
...tinue to encourage Robert to...
...in attentive behavior. He is...
...handling writing assignments...
Robert's good-nature and...
his outstanding computer...

his work
following
demonstrating inde...
at the computer lab,
helpfulness. He is con...

Robert's lowered grades in Social Studies and
Language Arts are a result of his incompletion of
required assignments particularly the Greek Study
Review packet and his memoir book, Through the
Grades. His distractions during work time at the
Technology Center have interfered with his
performance and completion of his work. I believe it
would be in Robert's best interest if he planned his
work schedule, utilized his time productively and
avoided peer interruptions. I look forward to hearing of
R... ...s future achievements

in all subject
weekly tests
...ignments

# EXHIBIT 20

Telephone (516) 474-7590
FAX: (516) 474-7591



**MINNESAUKE ELEMENTARY SCHOOL**
21 High Gate Drive
East Setauket, New York 11733-1876

**WRITER'S DIRECT DIAL NUMBER**

**DEBORAH L. BLAIR**
*Principal*

1112093     5-385-624-1
Minnesauke Elementary Sch

**THOMAS ELIAS SUGAR**
*Assistant Principal*

May 28, 1999

Dear Parents:

Please find below your second graders' OLSAT(Otis-Lennon Ability Test) results. These are normally attached to the CAT(California Achievement Test) results but are presented here for your information. We apologize for any confusion that this omission may have caused.

*OTIS-LENNON SCHOOL ABILITY TEST, Seventh Edition*

Sincerely,

*Thomas Elias Sugar*

Thomas Elias Sugar
Assistant Principal

SAMPSON, ROBERT D
GRADE: 02  GENDER: M
AGE: 7 YRS 10 MOS
STUDENT NO: 0009301207

|  |  | TOTAL | VERBAL | NON-VERBAL |
|---|---|---|---|---|
| 1995 NORMS MIDYEAR | RS/NP | 37/60 | 25/30 | 12/30 |
| NATIONAL | SAI | 104 | 124 | 88 |
| LEVEL/FORM: C/3 | AGE NCE | 55.3 | 81.1 | 34.4 |
| TEST DATE: 01/99 | NAT'L GRADE NCE | 55.9 | 79.6 | 33.7 |

## INTERPRETING YOUR CHILD'S TEST SCORES:

The Otis-Lennon School Ability Test (OLSAT) is designed to measure abstract thinking and reasoning ability. It is used to assess examinee's ability to cope with learning tasks to suggest their possible placement for school learning functions and to evaluate their achievement in relation to the talents they bring to school learning situations.

Raw Score (RS)          - The number of questions the student answered correctly. Interpret only in relation to the set of questions from which the score was obtained.

Number of Problems -  Total number of questions asked.
(NP)

School Ability Index -  An index of the student's ability in comparison with students of similar
(SAI)                   chronological age. Range is 50-150.

Age or Grade            - A direct conversion from percentiles rank, this type of standard score results
Normal Curve            from the division of the normal curve into 99 equal units.
Equivalent (NCE)

RECEIVED

APR 0 3 2017

Disability Services

## Scope and Sequence

| Cluster/Item Type | A (Kindergarten) | B (Grade 1) | C (Grade 2) | D (Grade 3) | E (Grades 4-5) | F (Grades 6-8) | G (Grades 9-12) |
|---|---|---|---|---|---|---|---|
| **VERBAL** | | | | | | | |
| Verbal Comprehension | | | | | | | |
| **Following Directions** | ● | ● | ● | | | | |
| Antonyms | | | | ● | ● | ● | ● |
| **Sentence Completion** | | | | ● | ● | ● | ● |
| Sentence Arrangement | | | | ● | ● | ● | ● |
| **Verbal Reasoning** | | | | | | | |
| Aural Reasoning | ● | ● | ● | | | | |
| **Arithmetic Reasoning** | ● | ● | ● | | | | |
| Logical Selection | | | | ● | ● | ● | ● |
| **Word/Letter Matrix** | | | | ● | ● | ● | ● |
| Verbal Analogies | | | | ● | ● | ● | ● |
| **Verbal Classification** | | | | ● | ● | ● | ● |
| Inference | | | | | ● | | ● |
| **NONVERBAL** | | | | | | | |
| Pictorial Reasoning | | | | | | | |
| **Picture Classification** | ● | ● | ● | | | | |
| Picture Analogies | ● | ● | ● | | | | |
| **Picture Series** | ● | | | | | | |
| Figural Reasoning | | | | | | | |
| **Figural Classification** | ● | ● | ● | ● | | | |
| Figural Analogies | ● | ● | ● | ● | | | |
| **Pattern Matrix** | ● | ● | ● | ● | ● | ● | ● |
| Figural Series | ● | ● | ● | | ● | ● | ● |
| **Quantitative Reasoning** | | | | | | | |
| Number Series | | | | ● | ● | ● | ● |
| **Numeric Inference** | | | | ● | ● | ● | ● |
| Number Matrix | | | | | | | |

RECEIVED
APR 30 3 PM
Disability Services

# EXHIBIT 21



**CollegeBoard** SAT

## STUDENT SCORE REPORT
### REPORT DATE: 5/21/05

**YOUR SCORES**

**Test Date:** **MAY 2005**

| SAT | Score | Score Range | Percentiles College-bound Seniors National | State |
|---|---|---|---|---|
| Critical Reading | 410 | 380-440 | 18 | 21 |
| Math | 500 | 470-530 | 43 | 45 |
| Writing | 490 | 450-530 | * | * |
| Multiple Choice | 47 | | | |
| Essay | 08 | | | |

**Seq#**     0335305

ROBERT D SAMPSON
11 WHITFORD ROAD
STONY BROOK NY 11790

**WHAT DOES YOUR SCORE RANGE MEAN?**
Your performance is best represented by the score ranges above. To consider one score better than another, there must be a difference of 60 points between your critical reading and math scores, 80 points between your critical reading and writing scores, and 80 points between your math and writing scores.

**HOW DO YOU COMPARE WITH COLLEGE-BOUND SENIORS?**
The national percentile for your critical reading score of 410 is 18, indicating that you did better than 18% of the national group of college-bound seniors. The national percentile for your math score of 500 is 43, indicating you did better than 43% of the national group of college-bound seniors. *

**\* Percentile, average score, and score change information for the writing section are not available. The test must be given to students for a full year before this information can be provided.**

**See reverse side for additional score details.**

**WHAT ARE THE AVERAGE SCORES?**
For college-bound seniors in the class of 2004, the average critical reading score was 508 and the average math score was 518. *

**WILL YOUR SCORES CHANGE IF YOU TAKE THE TEST AGAIN?**
Among students with critical reading scores of 410, 64% score higher on a second testing, 28% score lower, and 8% receive the same score. On average, a person with a critical reading score of 410 gains 20 point(s) on a second testing.

Among students with math scores of 500, 59% score higher on a second testing, 32% score lower, and 9% receive the same score. On average, a person with a math score of 500 gains 15 point(s) on a second testing. *

**ADDITIONAL SCORE INFORMATION**
Visit **www.collegeboard.com** for detailed information about your scores and to view your essay.

**ADDITIONAL SCORE REPORT INFORMATION**
To learn more about colleges, universities, and scholarship programs and to send additional score reports, visit **www.collegeboard.com.**

# EXHIBIT 22



# EXHIBIT 23

000006475

ROBERT D SAMPSON
11 WHITFORD RD
STONY BROOK NY   11790-1835

Detach upper portion at dashed line after receipt and discard.

---

N7239004-000006475

# *The ACT® Plus Writing*
## *Student Report*

| | |
|---|---|
| **STUDENT'S NAME:** ROBERT D SAMPSON | **ACT ID:** -14670034 |
| **HIGH SCHOOL NAME:** YOU REQUESTED NO REPORT TO HS | **SSN:** XXX-XX-4331 |
| **HIGH SCHOOL CODE:** 331-740 | **TEST DATE & TYPE:** JUN 2008 NATIONAL |



## Your ACT Scores

Rank: Approximate percent of ACT-tested students at or below your score

| | | In Your State | In the U.S. |
|---|---|---|---|
| **Composite Score** | **27** | 84% | 89% |
| **ENGLISH** | 28 | | 90% |
| Usage/Mechanics | 15 | | 90% |
| Rhetorical Skills | 14 | | 88% |
| **MATHEMATICS** | 32 | | 98% |
| Pre-Algebra/Elem. Algebra | 17 | | 97% |
| Algebra/Coord. Geometry | 15 | | 96% |
| Plane Geometry/Trig. | 16 | | 98% |
| **READING** | 25 | | 74% |
| Social Studies/Sciences | 12 | | 69% |
| Arts/Literature | 14 | | 79% |
| **SCIENCE** | 23 | | 73% |
| **COMBINED ENGLISH/WRITING** | 27 | | 86% |
| Writing (score range 2 to 12) | 09 | | 89% |

The Combined English/Writing score ranges from 1 to 36 and is a combined measure of the Writing and English tests. The Writing score ranges from 2 to 12. Your ranks for these two scores are based on recent ACT-tested students who took the Writing test.

- ACT® test scores and the Composite score range from 1 to 36; subscores range from 1 to 18.

- Your Composite score is the average of your scores on the four subject area tests. Subscores do not necessarily add up to your score for a subject area test.

- Your ranks tell you the approximate percentages of recent high school graduates in the U.S. and your state who took the ACT and received scores that are the same as or lower than yours. A rank of 70, for example, means that 70% of students received scores that are the same as or lower than your score.

- Your test scores are only estimates, not precise measures, of your educational development. You will find more information about interpreting your scores in the booklet you received with this report and at www.actstudent.org.

COMMENTS ON YOUR ESSAY: YOUR ESSAY SHOWED RECOGNITION OF THE COMPLEXITY OF THE ISSUE BY PARTIALLY EVALUATING ITS IMPLICATIONS. GENERAL STATEMENTS IN YOUR ESSAY WERE WELL SUPPORTED WITH SPECIFIC REASONS, EXAMPLES, AND DETAILS.



**Looking for more information about your individual strengths and**

RECEIVED
APR 03 /09
Disability Services

# EXHIBIT 24


**CollegeBoard** SAT

www.collegeboard.com

# STUDENT SCORE REPORT
## REPORT DATE:  6/24/08

## YOUR SCORES

**Test Date:**        **JUNE 2008**

| SAT | Score | Score Range | Percentiles College-bound Seniors | |
| --- | --- | --- | --- | --- |
| | | | National | State |
| Critical Reading | 580 | 550-610 | 74 | 77 |
| Math | 680 | 650-710 | 91 | 92 |
| Writing | 670 | 630-710 | 93 | 93 |
| Multiple Choice | 66 | | | |
| Essay | 09 | | | |

Seq#        0410417 OT

ROBERT D SAMPSON
11 WHITFORD RD
STONY BROOK NY 11790

### WHAT DOES YOUR SCORE RANGE MEAN?
Your performance is best represented by the score ranges above instead of one single score. The score range is an estimate of how your scores might vary if you were tested at different times within a short time period. Most of the time, your score would vary slightly within your score range, but it would likely fall within the range given. Colleges know this, and they receive the score ranges along with the scores.

### HOW DO YOU COMPARE WITH COLLEGE-BOUND SENIORS?
Percentiles compare your scores to those of other students who took the test. The percentile for your critical reading score of 580 is 74 , indicating that you scored higher than 74 % of last year's group of college-bound seniors. The percentile for your math score of 680 is 91 , indicating that you scored higher than  91 % of last year's group of college-bound seniors. The percentile for your writing score of 670 is 93 , indicating that you scored higher than  93 % of last year's group of college-bound seniors.

### WHAT ARE THE AVERAGE SCORES?
For college-bound seniors in the class of 2007, the average critical reading score was 502, the average math score was 515, and the average writing score was 494.

### WILL YOUR SCORES CHANGE IF YOU TAKE THE TEST AGAIN?
Among students with critical reading scores of 580, 52% score higher on a second testing, 39% score lower, and  9% receive the same score. On average, a person with a critical reading score of 580 gains   8 point(s) on a second testing.

Among students with math scores of 680, 43% score higher on a second testing, 48% score lower, and  9% receive the same score. On average, a person with a math score of 680 loses   2 point(s) on a second testing.

Among students with writing scores of 670, 41% score higher on a second testing, 52% score lower, and 7% receive the same score. On average, a person with a writing score of 670 loses   7 point(s) on a second testing.

### MORE SCORE INFORMATION
Visit **www.collegeboard.com** for detailed information about your scores and to view your essay.

### SENDING ADDITIONAL SCORE REPORTS
To send more score reports to colleges, universities, and other institutions, visit **www.collegeboard.com**.

Register now for next year via our website at www.collegeb

1112090
SAT-Test Scores (NCAT, GR

5-385-624-1

# EXHIBIT 25

# CollegeBoard SAT

## STUDENT SCORE REPORT
REPORT DATE: 11/07/08

### YOUR SCORES

**Test Date:** OCTOBER 2008

| SAT | Score | Score Range | National | State |
|---|---|---|---|---|
| Critical Reading | 620 | 590-650 | 84 | 86 |
| Math | 680 | 650-710 | 91 | 92 |
| Writing | 660 | 620-700 | 92 | 92 |
| Multiple Choice | 64 | | | |
| Essay | 10 | | | |

SEQ#   0001615   TR

ROBERT D SAMPSON
11 WHITFORD RD
STONY BROOK NY 11790

## WHAT DOES YOUR SCORE RANGE MEAN?

Your performance is best represented by the score ranges above instead of one single score. The score range is an estimate of how your scores might vary if you were tested at different times within a short time period. Most of the time, your score would vary slightly within your score range, but it would likely fall within the range given. Colleges know this, and they receive the score ranges along with your scores.

## HOW DO YOU COMPARE WITH COLLEGE-BOUND SENIORS?

Percentiles compare your scores to those of other students who took the test. The percentile for your critical reading score of 620 is 84, indicating that you scored higher than 84% of last year's group of college-bound seniors. The percentile for your math score of 680 is 91, indicating you scored higher than 91% of last year's group of college-bound seniors. The percentile for your writing score of 660 is 92, indicating you scored higher than 92% of last year's group of college-bound seniors.

## WHAT ARE THE AVERAGE SCORES?

For college-bound seniors in the class of 2008, the average critical reading score was 502, the average math score was 515, and the average writing score was 494.

## WILL YOUR SCORES CHANGE IF YOU TAKE THE TEST AGAIN?

Among students with critical reading scores of 620, 53% score higher on a second testing, 38% score lower, and 9% receive the same score. On average, a person with a critical reading score of 620 gains 10 point(s) on a second testing.

Among students with math scores of 680, 44% score higher on a second testing, 47% score lower, and 9% receive the same score.

Among students with writing scores of 660, 42% score higher on a second testing, 50% score lower, and 7% receive the same score. On average, a person with a writing score of 660 loses 4 point(s) on a second testing.

## MORE SCORE INFORMATION

Visit **www.collegeboard.com** for detailed information about your scores and to view your essay.

## SENDING ADDITIONAL SCORE REPORTS

To send more score reports to colleges, universities, and other institutions, visit **www.collegeboard.com**.

Visit **www.collegeboard.com** or refer to the *SAT Program Hanc*

# EXHIBIT 26

# CollegeBoard SAT

## STUDENT SCORE REPORT
REPORT DATE: 11/18/08

### YOUR SCORES

**Test Date: NOVEMBER 2008**

| SAT | Your Score | Score Range | Percentiles College-Bound Seniors Nation | State |
|---|---|---|---|---|
| Critical Reading | 680 | 650-710 | 93 | 94 |
| Math | 720 | 690-750 | 96 | 97 |
| Writing | 680 | 640-720 | 94 | 94 |
| Multiple-Choice | 64 | | | |
| Essay | 10 | | | |

SEQ# 0230361 OT

ROBERT D SAMPSON
11 WHITFORD RD
STONY BROOK NY 11790

**WHAT DOES YOUR SCORE RANGE MEAN?**
Your performance is best represented by the score ranges above instead of one single score. The score range is an estimate of how your scores might vary if you were tested at different times within a short time period. Most of the time, your score would vary slightly within your score range, but it would likely fall within the range given. Colleges know this, and they receive the score ranges along with your scores.

**HOW DO YOU COMPARE WITH COLLEGE-BOUND SENIORS?**
Percentiles compare your scores to those of other students who took the test. The percentile for your critical reading score of 680 is 93, indicating that you scored higher than 93% of last year's group of college-bound seniors. The percentile for your math score of 720 is 96, indicating you scored higher than 96% of last year's group of college-bound seniors. The percentile for your writing score of 680 is 94, indicating you scored higher than 94% of last year's group of college-bound seniors.

**WHAT ARE THE AVERAGE SCORES?**
For college-bound seniors in the class of 2008, the average critical reading score was 502, the average math score was 515, and the average writing score was 494.

**WILL YOUR SCORES CHANGE IF YOU TAKE THE TEST AGAIN?**
Among students with critical reading scores of 680, 47% score higher on a second testing, 45% score lower, and 8% receive the same score. On average, a person with a critical reading score of 680 gains 2 point(s) on a second testing.

Among students with math scores of 720, 41% score higher on a second testing, 51% score lower, and 8% receive the same score. On average, a person with a math score of 720 loses 6 point(s) on a second testing.

Among students with writing scores of 680, 40% score higher on a second testing, 54% score lower, and 7% receive the same score. On average, a person with a writing score of 680 loses 9 point(s) on a second testing.

**MORE SCORE INFORMATION**
Visit **www.collegeboard.com** for detailed information about your scores and to view your essay.

**SENDING ADDITIONAL SCORE REPORTS**
To send more score reports to colleges, universities, and other institutions, visit **www.collegeboard.com**.

**SUMMARY OF SCORES**

Visit **www.collegeboard.com** or refer to the *SAT Program Handb*

# EXHIBIT 27

# MCAT Score Report

**Name** ROBERT DREW SAMPSON

**Verification Code** JR2H-TP4U-KD8R-AGCT

**URL \*** https://apps.aamc.org/score-reporting-web/#/report/verify

**AAMC ID** 13629947

**Date of Birth** ▮▮▮▮▮

*\* This report will no longer be able to be verified after 06/27/2017*

In order to verify these scores, you will be directed to create a user name and password. When visiting this page, select "Register for an AAMC Account" to begin this process.

## MCAT Scores

### For exams taken after January 31, 2015

No Scores Available

## MCAT Scores

### For exams taken before January 31, 2015

| | | MCAT Total | | Physical Sciences | | Verbal Reasoning | | Writing Sample | | Biological Sciences | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Exam Date | Total Score | Confidence Band [1] | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] |
| 09/18/2014 | 29 | 27 to 31 | 73% | 10 | 79% | 09 | 67% | | | 10 | 76% |
| 08/16/2013 | 28 | 26 to 30 | 67% | 09 | 67% | 10 | 84% | | | 09 | 56% |

## Notes

[1] Test scores are the measures used to convey an examinee's performance. Scores that are shown for the other sections and the numerical value in the total test level. Each score represents a value on the confidence band in each section score, estimates the possible range of values for the examinee's true score of that test. Use the actual score value of scores.