IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT SAMPSON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Action No. 2:22-CV-05120-JMA-AYS ) |
| NATIONAL BOARD OF MEDICAL EXAMINERS, | ) ) ) |
| Defendant. | ) ) ) |

## DECLARATION OF BENJAMIN J. LOVETT, PH.D.

I, Benjamin J. Lovett, declare as follows:

1.  I am over 18 years of age and, unless otherwise stated, this declaration is based on my personal knowledge.

2.  I am a licensed psychologist in New York State and the director of the Ph.D. program in school psychology at Teachers College, Columbia University, where I serve as an Associate Professor of Psychology and Education. I teach courses on psychological assessment and on the legal and ethical framework for school psychology practice. A true and correct copy of my curriculum vitae is attached at Exhibit 1.

3.  I earned my B.A. in Psychology from the Pennsylvania State University, followed by an M.S. in Psychology and a Ph.D. in School Psychology from Syracuse University.

4.  My professional expertise is in the diagnosis and management of neurodevelopmental conditions, particularly learning disorders (LD) and Attention Deficit/ Hyperactivity Disorder (ADHD), and I regularly write and speak on these topics. As part of my work, I assess young adults who have diagnoses of learning and attention problems, and I measure

both their self-reported symptoms and their objective performance on various tests of cognitive, academic, and behavioral functioning.

5. In my courses on psychological assessment, I train graduate students to use evidence-based techniques to diagnose LD, ADHD, and related disorders. I also supervise students on assessment cases in our on-campus clinic, advising them on cases that address these disorders.

6. Much of my research involves testing accommodations for students with disabilities, and in 2015, the American Psychological Association published a book that I co-authored on that topic, <u>Testing Accommodations for Students with Disabilities: Research-Based Practice</u>. I have published two other books as well as over 100 papers on disability diagnosis, testing accommodations, and other topics in psychology and education.

7. In addition to my teaching and research responsibilities, I have served as an independent reviewer for numerous organizations that administer or rely upon standardized tests, including the New York State Board of Law Examiners, the National Board of Medical Examiners (NBME), and the National Board of Osteopathic Medical Examiners (NBOME).

8. I was asked by NBME to review Robert Sampson's request for extended time testing accommodations on Step 1 of the USMLE in April 2017 (at that time, he had requested 50% additional time). I also reviewed Mr. Sampson's requests for reconsideration submitted in June 2017, November 2017, and June 2018 (again seeking 50% additional time on Step 1), and the supplemental documentation that was submitted with those requests. True and correct copies of my evaluation reports dated April 25, 2017, July 16, 2017, December 18, 2017, and July 12, 2018, are attached at Exhibits 2, 3, 4, and 5, respectively. The documents that I reviewed are listed on the first page of each report. I have reviewed these reports and reaffirm my conclusions in each report.

9. It is my understanding that Mr. Sampson sent additional requests for accommodations to NBME following my July 2018 review. I have reviewed these later requests, including the following additional material:

   a. A new application and personal statement from August 2018
   b. A denial letter dated September 7, 2018
   c. A November 14, 2018 letter from Ms. JoAnne Simon, Mr. Sampson's attorney
   d. A denial letter dated January 4, 2019
   e. A new application and personal statement from April 2022
   f. The report from a 2020 neuropsychological evaluation
   g. A denial letter dated June 1, 2022

10. I have also reviewed the Declaration of Robert Sampson and the Declaration of Jeannette Wasserstein, Ph.D., ABPP, along with the attachments to each declaration, which I understand were filed in this case.

11. Based on my review of this material, it is my opinion that there is insufficient evidence that Mr. Sampson has any disabling conditions or is substantially limited in any major life activities relevant to taking the USMLE Step 1 exam. The documentation shows that Mr. Sampson's "test access" skills—that is, his skills that are needed to access tests under standard conditions—are not substantially limited relative to most people in the general population, and extra time or other modifications to the standard test administration are not warranted in this case.

**Diagnostic Evaluations**

12. Psychological evaluations for learning and attention problems typically consist of a battery of formal psychological tests as well as a review of historical documents (e.g., childhood records such as report cards and medical clinic notes), interviews, completion of questionnaires

and rating scales, and clinical observations. Frequently, the professional writing the evaluation report is not the person who administers the psychological tests and records the individual's behavior during testing. This task is often delegated to a trained technician.

13. Generally, identifying disorders and disabilities requires consistent findings across multiple diagnostic measures as well as data from real-world settings. Scattered "abnormal" scores across lengthy batteries of diagnostic tests or occasional indications of difficulties in real-world settings are *not* indicative of a disorder or disability. Indeed, research has repeatedly found that almost all healthy (nondisabled) people show areas of strength and weakness in different areas of cognition.[1] If isolated difficulties were sufficient to show disability, virtually everyone would meet this criterion. Because diagnostic and real-world data are commonly quite voluminous (as they are in Mr. Sampson's case), it is not enough to have just some evidence that points for or against a diagnosis or disability determination. Instead, we must look for where *most* of the available evidence points.

14. Identifying disorders or disabilities requires consistent findings of deficits relative to most other people, not relative to the individual's own skills in other domains. This is particularly important in the case of individuals like Mr. Sampson who have very high ability levels in some areas. When someone has very high abilities in one or more domains, it is almost impossible for them to match this level of accomplishment in every other domain. For instance, research has found that most people with a high IQ will have achievement in at least one academic

---

[1] This is the case even in high-functioning people. For instance, in one recent study, 92% of graduate students who completed a neuropsychological battery were found to have at least one score that was at least one standard deviation below average (equivalent to a score at the 16th percentile or below for the population). See Jeffay, E., Binder, L. M., & Zakzanis, K. K. (2021). Marked intraindividual cognitive variability in a sample of healthy graduate students. *Psychological Injury and Law*, *14*(3), 171-183.

area that is substantially lower than their IQ, but still at least average relative to most other people.[2] In the same way that a champion runner with only average upper body strength would not be identified as disabled, a person with very high cognitive or academic skills in one domain but only average skills in another domain should not be, either.

**Mr. Sampson's Learning Disorder Diagnoses**

15. From the records I reviewed, Mr. Sampson has received the following learning disorder diagnoses:

    a. Learning Disorder, Not Otherwise Specified (Dr. Suzanne Michels, August 2013)

    b. Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling (Dr. Allison Anderson, December 2013)

    c. Specific Learning Disorder with impairment in reading (reading fluency and reading comprehension) and impairment in written expression (spelling and handwriting) (Dr. Jeannette Wasserstein/Dr. Kim Miller, December 2020)

16. The current official diagnostic criteria for LD require that someone's "academic skills are substantially and quantifiably below those expected for the individual's chronological age."[3]

17. Every time that Mr. Sampson's academic skills have been measured against age peers on diagnostic tests, his skills have been in the average range or above:

---

[2] Maddocks, D. L. (2018). The identification of students who are gifted and have a learning disability: A comparison of different diagnostic criteria. *Gifted Child Quarterly, 62(2)*, 175-192.

[3] *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5), American Psychiatric Association, 2013, at p. 67.

    a. In August 2013, as part of an evaluation by Dr. Suzanne Michels, Mr. Sampson completed academic skills measures from the Woodcock-Johnson Tests of Achievement. On all such measures, his scores were in the average range or above, even on the measures that were timed. According to Dr. Michels, he obtained "a Broad Reading Score within the High Average range." His timed writing skills were also measured with the Test of Written Language, and both of his scores from this test were in the above average range.

    b. In December 2013, as part of an evaluation by Dr. Allison Anderson, Mr. Sampson's timed reading comprehension skills were measured with the Scholastic Abilities Test for Adults, and his score was in the average range without any additional time.[4]

    c. In August 2020, as part of an evaluation by Dr. Jeanette Wasserstein and Dr. Kim Miller, Mr. Sampson's academic skills were measured with the Wechsler Individual Achievement Test. On all parts of this battery, his scores were in the average range or above. In addition, his timed academic skills were measured with the Woodcock-Johnson Tests of Achievement, and here, all of his scores were in the above-average range.

Thus, based upon the results obtained by his own supporting professionals, Mr. Sampson's academic skills have not been "substantially and quantifiably below those expected" for his chronological age.

---

[4] In her declaration, Dr. Wasserstein asserts that during Dr. Anderson's evaluation, Mr. Sampson "showed absolute weaknesses" in reading "compared to same age peers under regularly timed conditions" (p. 23). But there was only a single reading score in that evaluation (i.e., the score from the Scholastic Abilities Test for Adults), and Mr. Sampson's SATA score was in the average range compared to same-age peers.

18. Mr. Sampson's timed reading skills were also measured using the Nelson-Denny Reading Test (NDRT) in two evaluations (Dr. Michels in 2013 and Drs. Wasserstein and Miller in 2020). In my opinion, an advantage of using the NDRT as part of a clinical assessment is that it has timed reading passages followed by multiple-choice questions, similar in general format to high-stakes reading-based tests. However, the NDRT has a number of limitations that require careful attention. One limitation is that the version of the NDRT given to Mr. Sampson in 2013 and in 2020 compares people to *educational* peers rather than *age* peers. Mr. Sampson was compared to graduating college seniors in the 2013 and 2020 evaluations, thus leading to scores that underestimate his actual reading skill levels under timed conditions relative to most people in the general population.

19. Mr. Sampson first took the NDRT in 2013, when he was evaluated by Dr. Michels. At that time, his performance on the NDRT timed reading comprehension task was at the 16th percentile for graduating college seniors (which was in the "low average" range). However, when compared to first-year college students (who are more representative of the general adult population), his score would be well within the average range.

20. Mr. Sampson was readministered the NDRT timed reading comprehension task in 2020 as part of the Wasserstein/Miller evaluation, and this time, Mr. Sampson worked much more slowly. Indeed, his comprehension score after 20 minutes plummeted to the level of a typical child starting the seventh grade. No mention or explanation was made in the evaluation report of this substantial change in Mr. Sampson's performance on the same reading test.

21. Drs. Wasserstein and Miller have emphasized that Mr. Sampson's timed reading comprehension score on the NDRT improved with extra time, but it is very common for NDRT comprehension scores to improve with additional time.

22. A second limitation of the NDRT is that it offers a "Reading Rate" score based on how far a client gets in reading the test's first passage in one minute. Unfortunately, this score is unreliable; the test's own manual shows its reliability to be below the minimal standards for any diagnostic test. It therefore cannot be used for diagnostic purposes. Nevertheless, I should note that Mr. Sampson's 2013 NDRT Reading Rate score was in the average range for a general population proxy group (i.e., first-year college students), whereas in 2020, he worked much more slowly and his one-minute reading rate score was so low that I cannot even estimate the approximate grade level. Again, Dr. Wasserstein and Dr. Miller did not comment in their report on this sharp decline in Mr. Sampson's performance on the same test between 2013 and 2020.

23. The report from the Wasserstein/Miller evaluation states that the evaluation of Mr. Sampson took about 15 hours, "almost twice as long as usual for this type of evaluation," which "resulted from Mr. Sampson's extremely slow rate of reading and his deliberate and slow work style" (p. 14 of report). Similarly, in her declaration, Dr. Wasserstein states that the evaluation took "more than twice as long as such testing typically requires, demonstrating the real world impact of [Mr. Sampson's] disabilities" (¶12 of declaration). It is widely understood, however, that behavior during a clinical evaluation is not "real world" behavior.[5] Dr. Wasserstein's comment also ignores that on all timed measures of academic skills except the NDRT, Mr. Sampson performed well without any additional time. That is, when he needed to work under time constraints, he did so and generally performed well. He did exhibit very slow behavior when taking the NDRT, but this was inconsistent with his behavior on the same test in 2013. And a "deliberate and slow work style" in and of itself is not indicative of an impairment or a disability, particularly

---

[5] Sbordone, R. J. (2008). Ecological validity of neuropsychological testing: Critical issues. In A. M. Horton & D. Wedding (Eds.), The neuropsychology handbook (3rd ed., pp. 367–394). New York: Springer.

when someone can effectively increase working speed when necessary, as Mr. Sampson has demonstrated he can do.

24. The official diagnostic criteria for LD require that academic skill deficits "cause significant interference with academic or occupational performance, or with activities of daily living," relative to age expectations.[6] An individual's performance on standardized tests such as the ACT or SAT is appropriately considered as evidence of real-world academic functioning.

25. Mr. Sampson took the PSAT, SAT, and ACT without any accommodations (and thus under standard time conditions) while he was in high school. **All** of his scores on all sections of these tests were in the average range or above.[7] On the ACT, his composite score was in the 89th percentile, which means that he performed better than the vast majority of students nationwide who took the ACT exam in the same year. Similarly, on the SAT, his timed reading section scores on the three test administrations were in the 74th, 84th, and 93rd percentiles, meaning that he performed better than the vast majority of students nationwide who took the SAT in the same year. Both the ACT and SAT require examinees to read test questions under timed conditions, including questions that contain lengthy reading passages.

26. Although the ACT and SAT were not designed for diagnostic purposes, they are critical and appropriate pieces of evidence demonstrating Mr. Sampson's real-world functioning. Mr. Sampson's performance on the PSAT, SAT, and ACT is strong and consistent evidence

---

[6] *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5), American Psychiatric Association, 2013, at p. 67.

[7] Mr. Sampson took the SAT four times. Three of those times were in 2008, close to his applications to college. He did once take the SAT in 2005 as part of a special program requirement, and I am not counting that administration, since it compared him to high school seniors when he appeared to be in eighth or ninth grade.

*against* LD. A student with LD would be expected to show deficits on such tests, particularly when taken without accommodations.

27. Mr. Sampson took the MCAT twice, both times without any accommodations. Each time, all of his scores on all sections were in the average range or above. This includes his scores on the Verbal Reasoning section, which is essentially a timed reading comprehension measure where Mr. Sampson read passages and answered multiple-choice questions about the passages to show his comprehension and ability to reason about what he had read. On this section, his scores were at the 67th and 84th percentiles, better than most test-takers. All of his scores on all MCAT sections were actually above the 50th percentile, and so better than most test-takers. Importantly, these comparisons were made to other medical school applicants rather than to the general population. Therefore, on the MCAT, even relative to a highly select group, he performed well without any accommodations.

28. In documentation that I reviewed, Mr. Sampson and his advocates argued that he prepared considerably for standardized admissions tests, at least for some of the administrations. However, this does not in any way invalidate the resulting scores as measures of Mr. Sampson's unaccommodated academic skills. Not only is preparation for admissions tests common, but its effects are typically modest. Even when the preparation is sufficiently extensive that it actually improves the student's genuine academic skills, the admissions tests remain valid measures of such skills. Moreover, the fact that Mr. Sampson may have spent considerable time preparing to take the SAT, ACT, or MCAT does not negate the fact that, on the actual test day, he needed to read, concentrate, focus, and otherwise demonstrate the functional abilities that are required to do well on those tests. Mr. Sampson's test results show that his functional abilities in those areas are not substantially limited compared to most people in the general population.

29.     It is my understanding that Mr. Sampson failed several exams administered by his medical school (exams measuring his knowledge of different preclinical medical subjects) and I understand that Mr. Sampson failed Step 1 of the USMLE in 2020. Although this was deficient performance relative to medical school standards, it is not evidence of LD. Most people of Mr. Sampson's age in the general population are not expected to perform at all in medical school, and so poor performance there is not indicative of functional limitations in academic skills relative to age peers.

30.     Both in 2013 and 2020, Mr. Sampson obtained a few scores on picture-based memory tasks that were at least a bit below the average range, such as on the Woodcock-Johnson Picture Recognition test and the Rey Complex Figure Test (a.k.a. the Rey-Osterrieth). However, the argument connecting these scores to Step 1 accommodation needs fails for several reasons. First, on the vast majority of visual-spatial diagnostic tasks that Mr. Sampson has taken, his scores have actually been in the average range or above. Second, diagnostic tasks of visual-spatial skills are highly artificial, in the sense that they do not resemble the requirements of real-world exams such as the Step 1 exam. For instance, Mr. Sampson occasionally showed deficits on tasks requiring that he draw a complex figure from memory or match pictures—things that he does not need to do on the Step 1 exam.[8] Finally, if Mr. Sampson actually had visual-spatial skill deficits that impact his real-world test performance, this impact should be seen on the science sections of the MCAT, which also have graphs and figures. But as I discussed above, Mr. Sampson took the MCAT twice, both times without any accommodations, and his scores on all sections of the test,

---

[8] For reference, a figure used in past administrations of the Rey Complex Figure Test is included at Exhibit 6. The individual is asked to copy the picture and then draw it from memory at two time points, typically immediately after first copying it and then again approximately 30 minutes later (after engaging in other activities), and then is asked to say whether various pictures show parts of the figure.

- 11 -

including the science sections, were consistently in the average range or above, even compared to other medical school applicants (a very high-achieving group to begin with, relative to the general population).

31.     In 2020, Mr. Sampson was first diagnosed with a learning disability in *writing*. His writing skills had been assessed thoroughly in each of his three diagnostic evaluations, and each time, all of his scores were in the average range or above, even when his writing was assessed under timed conditions. Relatedly, Dr. Wasserstein's declaration states that Mr. Sampson has a learning disability affecting "written expression (spelling and handwriting)." But her own evaluation of Mr. Sampson found average-range spelling performance, and handwriting is not an area of learning disability. Moreover, the SAT and ACT both have writing sections, and on these tests, Mr. Sampson consistently scored in the average range or above (while handwriting, incidentally). There is clearly insufficient evidence of a learning disability in writing. (There also is no writing component on the Step 1 exam.)

32.     Mr. Sampson reportedly stuttered as a child and received speech therapy. In my experience, this is a common occurrence, particularly in boys, and many children receive speech services without further need for any special education or related supports from their school. Mr. Sampson appears to be one such case.

33.     Dr. Wasserstein asserts that Mr. Sampson's profile of abilities shows a "metaphorical limp," because his verbal reasoning performance was noticeably stronger than his nonverbal reasoning performance. The comparison of verbal and nonverbal scores is correct, but there is nothing pathological about this. Dr. Wasserstein may be correct that the gap between scores is larger than what most people have, but what is key is that both scores show at least average skill levels. In Dr. Wasserstein's diagnostic evaluation, Mr. Sampson's performance on the nonverbal

reasoning part of an IQ test (the Wechsler Adult Intelligence Scale's Perceptual Reasoning Index) was well within the average range, and better than more than half of his same-age peers. Discrepancies between verbal and nonverbal reasoning skills are not a reliable or valid indicator of LD anyway, as much research has shown.[9] The official diagnostic criteria for learning disabilities certainly do not consider discrepancies between reasoning ability areas.

34. Finally, LD-related deficits are typically observed first in childhood, at least when formal, standardized testing of academic skills is conducted. It appears that Mr. Sampson completed such testing at age 10 and in fifth grade, as mentioned at page 2 of the Michels evaluation report. Mr. Sampson reportedly completed several subtests from the Woodcock Reading Mastery Test (a diagnostic reading test) at age 10, and all of his scores appear to have been in the average range. In fifth grade, he completed the Terra Nova test (a group-administered standardized achievement test), and both of the reported scores (for "Reading" and "Language") were in the average range. These scores from childhood are further evidence against the presence of LD.

**Mr. Sampson's ADHD Diagnoses**

35. One of Mr. Sampson's evaluators correctly concluded that Mr. Sampson does **not** meet the diagnostic criteria for ADHD. As discussed further below, Dr. Anderson concluded that Mr. Sampson does not have ADHD after administering "a number of measures designed to thoroughly evaluate this possibility." (Anderson Rep., pp. 4-7).

---

[9] See, for instance, D'Angiulli, A., & Siegel, L. S. (2003). Cognitive functioning as measured by the WISC-R: Do children with learning disabilities have distinctive patterns of performance? *Journal of Learning Disabilities*, *36*(1), 48-58.

36. One of Mr. Sampson's evaluators (Dr. Michels) did not evaluate Mr. Sampson at all for ADHD, and it appears that there were not even concerns about possible attention problems at that time. Dr. Michels did note that Mr. Sampson was "very focused throughout the testing sessions."

37. His other supporting professionals, however, have assigned an ADHD diagnosis to Mr. Sampson -- Dr. Wasserstein and Dr. Aronson. I believe that there is insufficient evidence supporting their diagnosis, and considerable evidence *against* their diagnosis.

38. The current official diagnostic criteria for ADHD require that someone have unusually high levels of symptoms of inattention and/or hyperactivity/impulsiveness that begin in childhood (by age 12), occur across settings, and interfere with real-world functioning. In addition, the symptoms should not be better explained by a different disorder (e.g., an anxiety disorder). Typically, young adults with valid ADHD diagnoses can point to evidence of their disorder that includes ratings of their symptoms by other parties who know them well (e.g., parents, friends, significant others), documented problems in school (e.g., low grades, problem behavior, or difficulty completing tasks and complying with teacher requests), and significant difficulties with current everyday life responsibilities that most people in the general population can successfully perform.

39. As discussed above, Mr. Sampson completed his first diagnostic evaluation with Dr. Michels in 2013. At that time, based on Mr. Sampson's reported concerns, Dr. Michels did not even assess for ADHD, and she noted that Mr. Sampson "was very focused throughout the testing sessions."

40. In December 2013, Mr. Sampson completed a second evaluation, this time with Dr. Anderson, and at that time Mr. Sampson "wondered whether" ADHD "might explain attentional

difficulties he is having." Dr. Anderson obtained standardized ratings of Mr. Sampson's current and childhood ADHD symptoms from Mr. Sampson as well as from various informants (his mother, his father, his girlfriend, and a friend/tutor). With regard to *childhood* symptoms, only Mr. Sampson endorsed clinically significant levels; neither of his parents did. With regard to *current* symptoms, neither Mr. Sampson nor any third-party informants endorsed clinically significant symptom levels. This is very strong evidence *against* ADHD, and Dr. Anderson did not make that diagnosis. To the contrary, she concluded that "his testing results and history supply little evidence that [his attention] problems are the result of ADHD," and that he "does not appear to have the consistent and severe pattern of impulsivity, social problems, marked inattentiveness or physical restlessness that supports an ADHD diagnosis." (Report, p. 7).

41.  According to Mr. Sampson's psychiatrist, Dr. Aronson, Mr. Sampson was diagnosed with "mild ADD" at some point in 2015. In a September 2017 letter, Dr. Aronson listed five symptoms of ADHD and made a partial review of the criteria for the disorder.[10] However, he did not provide the evidence showing that Mr. Sampson met those criteria, or say what evidence was used to determine that he met the criteria. Dr. Aronson also claimed that Mr. Sampson has "very slow processing speed." In fact, both before and after Dr. Aronson's letter, cognitive ability testing has consistently shown Mr. Sampson's processing speed scores to be above the average range.

42.  In 2020, Dr. Wasserstein diagnosed Mr. Sampson with ADHD. Among the evidence that she cited was Mr. Sampson's reports of symptoms during a standardized interview and on a rating scale. The rating scale showed that in all domains of official ADHD symptoms,

---

[10] Dr. Aronson cites the "DSM-IV" criteria but I assume that Dr. Aronson meant to cite the DSM-5 criteria, which went into operation in 2013, four years prior to his 2017 letter.

Mr. Sampson reported extreme levels of symptoms; his scores placed his self-reported symptom levels in the top 1% of the population (the 1% having the most severe symptoms). However, in 2013, he had not even reported *mild* current clinical symptoms. And, in 2013, other people who knew Mr. Sampson well also denied that he had clinically significant ADHD symptom levels. In 2020, Dr. Wasserstein and Dr. Miller did not obtain symptom ratings from third-party informants, a significant omission in their evaluation.[11]

43.  Another important piece of evidence when diagnosing adults with ADHD is a clear childhood history. As I noted above, in 2013, both of Mr. Sampson's parents had denied that he had significant ADHD symptoms in childhood, although Mr. Sampson believes that he did. In addition, his advocates have listed selected comments from elementary school teachers regarding inattention and related behaviors. Unfortunately, it is difficult to know whether these comments are representative, since complete, legible copies of the actual childhood records (including the records showing these comments) have not been submitted for review. Regardless, although ADHD symptoms must start in childhood, they must persist into adulthood for someone to continue to merit the diagnosis, and as I have noted, in his first diagnostic evaluation, neither Mr. Sampson nor others who knew him well described him as having any clinically significant symptoms in adulthood.

---

[11] Research has shown third-party informants to be exceptionally important when assessing ADHD in young adults. See, for instance, Sibley, M. H., et al. (2012). When diagnosing ADHD in young adults emphasize informant reports, DSM items, and impairment. *Journal of Consulting and Clinical Psychology*, *80*(6), 1052-1061. Elsewhere, Dr. Wasserstein has acknowledged that third-party informant reports are helpful. See Wasserstein, J. (2005). Diagnostic issues for adolescents and adults with ADHD. *Journal of Clinical Psychology*, *61*(5), 535547 at 538 ("Sometimes people overreport because they are motivated to get the diagnosis in order to secure academic accommodations, provide an explanation for their dysfunction, or generally be symptom magnifiers.... It is helpful to have additional input from a collateral reporter, such as a spouse or parent (who can be given the same scales), and 539 ("Again, outside reporters are essential when poor self-awareness exists or is suspected. Work evaluations can also be very helpful.").

44. Finally, ADHD symptoms lead to noticeable impairment in real-world settings, but there is no evidence of clinically significant impairment in Mr. Sampson's case, at least relative to what most people are expected to be able to do. Even in his clinical rotations during medical school, there is ample evidence of traits and behavior that are *the opposite of active ADHD symptoms*. Mr. Sampson has attached rotation evaluations to his declaration, and they include repeated comments about his "very thorough and well thought out" work and his "mature" and "very professional" demeanor. Preceptors commented that he "pays attention to detail," his "data gathering was very organized" and he "performed comprehensive yet succinct presentations." One preceptor summed up Mr. Sampson's behavior thus: "punctual, conscientious, attentive, professional." Mr. Sampson has argued that he must simply work harder than everyone else, but the essence of ADHD is an *inability* to work hard enough to change basic traits such as these through willpower. At the very least, these evaluations of his work would suggest that he is not substantially limited by his ADHD symptoms, even in a highly demanding real-world setting.

**Evidence of Substantial Limitation and Accommodation Needs**

45. Based on the same evidence reviewed above, it is even clearer that Mr. Sampson has not demonstrated a substantial limitation in a major life activity relative to most people in the general population. In both diagnostic and real-world contexts, his documentation shows average or above average performance again and again on relevant measures. There are virtually no objective data even suggesting a substantial limitation, and there is a great deal of objective data showing a lack of any such limitation.

46. To be clear, Mr. Sampson has apparently exhibited difficulties in medical school, and I understand that he failed the Step 1 exam without accommodations. However, this is not evidence of disability. Most people in the general population are not expected to perform at all in

medical school or on medical licensure exams. Mr. Sampson's performance history without accommodations—that is, all A- and B-range grades in high school, above average scores on college admissions tests, good performance in college (GPA of 3.43 with all satisfactory grades), average and above average scores on a medical school admissions test—is very strong evidence of no substantial limitation. That Mr. Sampson encountered difficulties in performing academically in the unusually intense and challenging setting of medical school is undoubtedly disappointing and unfortunate, but it is not evidence of disability.

47. Nor does the fact that Mr. Sampson's documentation shows substantial variability across various data sources show that he is disabled. This is not indicative of disorder or disability; it is the type of profile of performance that virtually everyone has (at least in some domains), particularly those people with high abilities. In just the 2020 evaluation by Drs. Wasserstein and Miller, over 100 different scores were generated by the lengthy battery of tests and scales that the evaluators chose to use; that Mr. Sampson obtained occasional, scattered low scores is to be expected, and in his case, the scores are either on measures that are irrelevant to his Step 1 exam accommodation needs (e.g., scores on the California Verbal Learning Test, where he needed to repeat lists of words that he heard) or else on the Nelson-Denny, where his score fell so far below his average-range performance on that same test several years earlier.

48. I understand that Mr. Sampson began receiving accommodations at some point after his first year in medical school. I have considered this fact in forming my opinions. But difficulties encountered in medical school (which first prompted the accommodations) are not indicative of substantial limitations relative to most people in the general population.

49. Mr. Sampson might well benefit from having more time than other examinees to take the Step 1 exam, but research shows that most people, with or without disabilities, benefit

from extended time on time-pressured exams. Doing better with extra testing time does not establish that someone has an impairment, or that they are substantially limited in performing any major life activities that are relevant when taking a standardized licensing exam.

 I declare under penalty of perjury that the foregoing is true and correct. Executed on September 29, 2022.

                 Benjamin J. Lovett, Ph.D.