**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT SAMPSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 2:22-CV-05120-JMA-AYS |
| | ) |
| NATIONAL BOARD OF MEDICAL | ) |
| EXAMINERS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF KEVIN MURPHY, PH.D.

1.      My name is Kevin Murphy.  I am over 18 years of age and, unless otherwise stated, I have personal knowledge of the matters addressed herein.

2.      I provided two reports to the National Board of Medical Examiners ("NBME") regarding a request by Robert Sampson ("Mr. Sampson") for testing accommodations on Step 1 of the United States Medical Licensing Examination ("USMLE"), on November 26, 2018 and May 9, 2022.  True and correct copies of these reports are attached at **Exhibits 1 and 2**.

3.      In both reports, I concluded that the documentation submitted by Mr. Sampson did not substantiate a diagnosis of ADHD much less a degree of ADHD-related impairment that would warrant a finding that he is substantially limited in any major life activity that is relevant to taking the USMLE.  I therefore recommended that his request for accommodations on Step 1 based upon his ADHD diagnosis be denied.  In my report of May 9, 2022, I also concluded that Mr. Sampson's documentation did not establish that he is entitled to accommodations based upon the Specific Learning Disorder diagnoses that he received.  I firmly stand by these conclusions.

4.      I have over 35 years of professional experience in the field of psychology.  My training and experience have included diagnosing learning disorders, but I specialize in Attention Deficit Hyperactivity Disorder ("ADHD").

5.      I am the President of the Adult Attention Deficit/Hyperactivity Disorder (ADHD) Clinic of Central Massachusetts, and I regularly evaluated and treated adolescents and adults for ADHD in this practice from January 2003 through December 2021.  I retired from seeing patients in January 2022.  I was also Chief of the Adult ADHD Clinic at UMass Medical School under the direction of Dr. Russell Barkley from January 1992 through January 2003 where I ran a specialty clinic devoted to research, assessment, and treatment of adults with ADHD.  I estimate that I have conducted approximately four thousand ADHD evaluations during my career.  My area of specialty is adult ADHD.  I also have a faculty appointment at the University of Massachusetts Medical School, and I have taught and published in the area of Adult ADHD.  I am a former member of the National Advisory Board of Children and Adults with Attention Deficit Disorder (CHADD) and was elected to the CHADD Hall of Fame in 2001.

6.      In addition to my years of clinical practice, research, and teaching, I have served for many years as an independent, external consultant for various organizations that administer standardized licensing examinations on which individuals sometimes make disability-based requests for testing accommodations.  The organizations for which I have served as an external consultant include the Boards of Bar Examiners for California, Connecticut, Delaware, Florida, Louisiana, Massachusetts, Missouri, New York, Oklahoma, and Washington, D.C; the National Board of Medical Examiners; the National Board of Osteopathic Medical Examiners; and the Educational Commission for Foreign Medical Graduates.

7.      It is a common practice for testing entities to retain external experts to review documentation submitted in support of an accommodation request and advise on matters of disability assessment and diagnosis, level and type of functional impairment demonstrated by an applicant, and the appropriateness of specific test accommodations.  This practice is similar to the process in other contexts where benefits are provided if a person meets a given definition of disabled, such as requests for disability benefits under federal and state programs, and requests for accommodations by university students.  The practice of reviewing supporting documentation and providing an opinion based upon that documentation is well established and professionally sound, especially in the case of ADHD and learning disorders, where so much of the diagnosis relies on historical information, not just behavior in a clinician's office. Although an in-person consultation can sometimes provide relevant information, it is not essential to formulating a reliable opinion where the documentation contains relevant historical information and the results of previously administered assessment.

8.      My qualifications are further described in my CV, which is attached as **Exhibit 3.**

**PROFESSIONAL CRITERIA FOR ADHD**

9.      To evaluate a patient for ADHD, clinicians must follow generally-accepted diagnostic criteria. These diagnostic guidelines are set forth in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5).  For adults, the consensus guidelines set forth certain criteria that must be present to justify a diagnosis of ADHD.  These guidelines are discussed below.

10.     The diagnosis of ADHD depends on evidence of significant developmentally deviant impairment that has a childhood onset.  It must be documented beyond self-report that such symptoms have consistently and pervasively disrupted the individual's functioning.  Without

compelling evidence of early-appearing and chronic impairment across settings (*e.g.*, home, school, socially, work), the diagnosis is inappropriate. It must also be demonstrated that the symptoms cannot be better explained by other factors (*e.g.*, anxiety).

a. **Age of Onset**

11.     First, and most importantly, evidence must exist that the individual experienced meaningful impairment since early in life. The requirement for a childhood onset flows from ample evidence that ADHD is a neurodevelopmental disorder that, by definition, must appear during development. The logic underlying this criterion is as follows: Extensive research has shown that individuals with ADHD, largely because of genetics and/or birth-related factors, come into the world with a diminished ability to inhibit behavior and focus attention. Since the ability to pay attention and exert self-control is central to a child's healthy growth and adjustment, the impact of those deficits would necessarily be discernible during childhood. In fact, much of what children need to learn, whether at home, in the classroom, or on the playground, hinges on the capacity to stop their behavior long enough to allow for a considered response. Without an adequate ability to inhibit behavior and deploy attention, children will inevitably encounter trouble learning rules, getting along with others, controlling emotions, acquiring academic skills, benefiting from past experience, and anticipating future events. The capacity to exert self-control and concentrate is so necessary for normal development that any significant deficits in these areas would unavoidably have an early and observable impact on adjustment in the same way that a reading disability would be obvious during the years children typically learn to read. The main point, though, is that an individual does not suddenly "come down" with ADHD later in life. The symptoms must be evident and problematic from early on.

12.     According to current criteria, symptoms must be evident prior to age 12.

13.     The early onset of symptoms must be documented through tangible evidence of impairment during childhood.  Hard evidence is required because many non-ADHD adults self-report that they experienced ADHD-like symptoms of inattentiveness and disorganization as children.  For example, in a published study reporting on the standardization of an ADHD rating scale, 719 normal individuals were asked if they experienced ADHD symptoms during childhood.  On average, 80% of these normal adults reported having experienced at least 6 of the 18 symptoms listed in the DSM-5 criteria at least "sometimes" during childhood.  Twenty-five percent endorsed at least 6 items as having occurred "often."  It is therefore quite normal for people to look back on their childhood and identify themselves as having ADHD-like symptoms.

14.     For individuals who meet the full diagnostic criteria and who have "walked the walk" with respect to knowing what it is like to live with ADHD, providing evidence of pervasive impairment is almost always a straightforward task.  They can provide numerous examples of how ADHD has disrupted their lives in multiple domains of functioning and in many cases documented accounts of poor academic or work performance, behavioral/self-control problems, impaired social adjustment, and, for some, highly impulsive and unruly behavior.  It should also be noted that these ADHD symptoms emerge despite reasonable efforts at compensation on the part of the individual, parents, and teachers.  The mark of a true disorder is that despite one's best efforts at controlling symptoms, the symptoms overwhelm the person's ability to manage them, resulting in developmentally deviant real-world impairment that is problematic in multiple life domains, persistent, and quite noticeable to others.  Indeed, this is what makes it a disorder.

   **b.  Consistency and Pervasiveness of Symptoms**

15.     The next two elements of the diagnosis focus on the pervasiveness and consistency of the impairment.  ADHD symptoms not only appear early in life, but they disrupt someone's adjustment with relative consistency from year to year and from setting to setting (namely, home,

school, work, and the community).  Therefore, ADHD affects more than just discrete slices of academic or social interaction or job performance.  The concept here is that this disorder represents a "hard-wired," enduring set of characteristics that have a broad and pervasive impact on a person's functioning.  Except in unusual circumstances, an individual with ADHD will show those characteristics most of the time and in most situations.

### c.   Evidence of Impairment

16.     In the case of ADHD, DSM-5 calls for "clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning."  It is assumed by the clinical research community that psychiatric diagnoses should only be assigned to individuals who function abnormally relative to most other people of the same age.

17.     Because many psychiatric symptoms tend to represent extremes of universal human traits, it becomes even more important for clinicians to ensure that they identify a disorder only when it causes significant functional impairment.  If not, definitions of mental disorders can be stretched so thin that they encompass either normal expressions of personality style or expectable reactions to common life events (like failing a class exam, earning a low grade in Organic Chemistry, or being fired from a job).  In essence, that someone manifests symptoms associated with a psychiatric classification does not necessarily mean that he or she is sufficiently impaired to justify a diagnosis.  In fact, research has established that the degree to which someone has symptoms of a disorder (such as inattention or distractibility) is only weakly related to how much impairment those symptoms cause (such as school failure, difficulties on the job, etc.).  Therefore, a person can be rated as highly inattentive but not necessarily impaired.  Conversely, an individual might not show many traits associated with ADHD, but nonetheless experience meaningful maladjustment.  The sine qua non of a disorder is clear evidence of functional impairment or what has been termed "harmful dysfunction."  Such impairment emerges as a significantly diminished

capacity to meet age-appropriate expectations in major life activities, such as work, school, social relations, and self-care.  In clinical parlance, the individual shows significant deficits in adaptive functioning.

18.     It is considered inappropriate by clinical researchers to assign a psychiatric diagnosis to someone who functions well, but perhaps not as well as he or she might prefer.  To do so would be like considering an individual to be physically disabled because he could run fast, but not as fast as he would prefer, or as fast as one would predict based on his overall athletic ability.  Furthermore, having a high IQ is not a guarantee for unlimited success in every endeavor. Very intelligent people can nonetheless underperform relative to their abilities for any number of reasons. Those might include motivational factors, substance use disorders, test anxiety, subclinical mood problems, personality issues, economic stressors, other situational stressors, and severe mental illness.  For ADHD, impairment is determined by the extent to which the symptoms preclude an individual from managing, as well as most others, routine life tasks across multiple settings (home, school, work, and the social environment).

### d.   Ruling Out Other Possible Explanations for the Symptoms

19.     Inattention is a highly non-specific symptom that can emerge as a feature in any number of psychiatric, educational, medical, or routine life circumstances, from schizophrenia, depression, and anxiety to migraine headaches, boredom, and unrecognized cognitive limitations. Inattention as a symptom therefore resembles fever or chest pains in that its presence alone does little to narrow the field of diagnostic possibilities.  It simply means that the individual experiences sufficient distress or distraction to affect concentration.  Because an individual can be inattentive for so many reasons, the DSM-5 and the consensus of professional opinion require that other disorders and circumstances be ruled out as explanations for ADHD-type symptoms. ADHD

assessments should pursue a differential diagnosis by gathering information from multiple domains and sources to verify that any inattention is not due to some other factor.

20.     Similarly, exhibiting episodic hyperactive and/or impulsivity symptoms or personality traits does not necessarily mean one has ADHD or a disability.  For example, one can endorse being talkative, energetic, fidgety, restless, being always on the go, exhibiting hyperactive behavior at times, and interrupting others, but if these behaviors do not result in "harmful dysfunction" or significant real-world impairment relative to same aged peers, there is no disorder.

**DIAGNOSIS VERSUS DISABILITY**

21.     The DSM-5 expressly notes that clinical criteria may not be directly relevant in making decisions as to whether someone is disabled in a nonclinical context.  According to DSM-5, in "most situations, the clinical diagnosis of a DSM-5 mental disorder … does not imply that an individual with such a condition meets a legal criteria for the presence of a mental disorder or a specified legal standard....  For the latter, additional information is usually required beyond that contained in the DSM-5 diagnosis, which might include information about the individual's functional impairments and how these impairments affect the particular abilities in question."  The DSM-5 further states that "[a]ssignment of a particular diagnosis does not imply a specific level of impairment or disability."  Hence, it is possible for someone to meet clinical criteria for a mild form of a diagnosis but not be disabled by it.

22.     Several surveys indicate that many clinicians fail to understand (or at least fail to reflect in their recommendations) the distinction between a clinical diagnosis and a legal determination.  They proceed as if a clinical diagnosis is tantamount to a legal qualification of disability.  There may be a difference, however, between having a diagnosable impairment and having an impairment that rises to the level of a "disability" for the purposes of a particular law.

23.     In the context of reviewing requests for accommodations on standardized tests, the legal criteria are supplied by the Americans with Disabilities Act ("ADA").  It is my understanding that an impairment does not rise to the level of a "disability" for purposes of ADA coverage unless it results in a substantial limitation on an individual's ability to perform one or more major life activities, as compared to most people.  Thus, when considering whether testing accommodations are warranted for a given individual, a clinician must consider not only whether the individual meets the DSM-5 criteria for an ADHD diagnosis, but also how the individual functions relative to most people in the general population.

### APPLYING THE DIAGNOSTIC CRITERIA TO MR. SAMPSON

24.     In accordance with the diagnostic criteria, when assessing whether an adult has ADHD, I look for evidence that:  (a) the individual had a *childhood onset of symptoms* (prior to age 12) that resulted in *clinically-significant impairment*, (b) the *symptoms have been chronic* and have resulted in *pervasive impairment over time and across situations*, (c) there was *developmental deviance compared to same-aged peers*, and (d) the *symptoms are not better explained by other factors* such as another mental disorder or transient situational stressors.

25.     In my opinion, the documentation submitted to NBME on behalf of Mr. Sampson does not substantiate an ADHD diagnosis for Mr. Sampson and does not demonstrate that he is substantially limited in a major life activity as a result of his claimed ADHD, and therefore does not support the conclusion that Mr. Sampson is disabled within the meaning of the ADA.

26.     Mr. Sampson's reported problems appear to be largely specific to taking the USMLE Step 1 exam and his medical school exams.  ADHD, however, is more global than difficulty with test-taking or finishing tests.  As discussed above, it is a neurodevelopmental disorder with a childhood onset that typically results in a chronic and pervasive pattern of

developmentally deviant impairment in academic, social, vocational, and daily adaptive functioning.  ADHD seriously disrupts one's functioning over time and across situations in multiple areas of functioning and not just in one fairly circumscribed area, such as medical school test-taking.  Indeed, one of the diagnostic criteria for ADHD is that it must meaningfully impact an individual in multiple settings.

27.     As previously stated, the lives of people with ADHD are typically characterized by academic and vocational underachievement, unsatisfactory personal relationships, problems with behavior and self-control, and general difficulty managing the routine tasks of daily life.  I see no evidence of this in Mr. Sampson's documentation.

28.     In my opinion, the ADHD diagnoses that Mr. Sampson received from Dr. Aronson and Dr. Wasserstein were not adequately substantiated.  Dr. Aronson did not provide a diagnostic report showing how Mr. Sampson met full DSM-5 criteria for ADHD, nor did he adequately substantiate a childhood onset of ADHD symptoms in his letters.  His ADHD diagnosis was apparently based mostly on self-report over several visits and what Dr. Aronson referred to as the "impact of key data points from a multitude of sources".  I am not sure what this means, as Dr. Aronson did not provide details or specifics on what these "multitude of sources" were.  Dr. Aronson also made several statements that were not supported by objective evidence.  For example, Dr. Aronson stated Mr. Sampson had slow processing speed, when he actually had a WAIS IV Processing Speed Index score of 122 (Superior range), a history of excellent grades, excellent scores on past standardized tests, consistently high real-world achievement, and a Cognitive Fluency Index score in the Above Average range.  Dr. Aronson also stated Mr. Sampson was "profoundly disabled currently" and that he "cannot concentrate and read efficiently".  I saw no convincing evidence to support these statements.  For example, his total scores on the MCAT

were in the 67th and 73rd percentiles for the two times he tested, with a Verbal Reasoning score

in the 84th percentile; he scored a 25 on the ACT Reading section; his Critical Reading scores on

the SAT were 580, 620, and 680 (74th, 84th, and 93rd percentiles respectively); his PSAT Reading

score was in the Average range; a reading assessment from age 10 using the Woodcock Reading

Mastery Tests indicated he was on grade level; his Terra Nova Reading score from 5th grade was

in the Average range (59th percentile); and his Broad Reading score on the Woodcock Johnson

was at the 80th percentile (High Average range).  Moreover, he was never referred for any reading

assessments or treatment during childhood, graduated from a highly regarded university with a 3.4

GPA, has a 4.0 GPA in Business school currently, and according to his clinical rotation evaluations

reads a lot to help increase his medical knowledge.  All of this is inconsistent with someone who

is "profoundly disabled" and cannot read efficiently.

29.     Dr. Wasserstein's report also did not adequately substantiate an ADHD diagnosis

with hard evidence of real-world functional impairment across domains.  Her ADHD diagnosis

was based on self-report, symptom endorsement on self-administered ADHD rating scales

(CAARS, CAADID), a review of past evaluations and letters of support from Mr. Sampson's

teachers, parents, and tutors, and test scores/statistical discrepancies that are not diagnostic of

ADHD or a disability.  She did not show a pattern of developmentally deviant real-world functional

impairment consistent with the diagnosis. Symptom endorsement on self-administered ADHD

rating scales is not sufficient to establish an ADHD diagnosis, especially in the absence of any

documented or credible evidence of real-world functional impairment that would rise to the level

of a disability.  Almost all of Mr. Sampson's test scores in this evaluation were within the Average

range or better (and many were in the Above Average to Superior ranges), suggesting no

neurological dysfunction.  A Processing Speed Index score of 122 on the WAIS-IV is in the

Superior range, is not deficient, is not supportive of slow cognitive speed or a need for extra time, is not diagnostic of ADHD, and is not evidence of impaired functioning.  Continuous Performance Tests (such as the IVA Plus) have not been shown to be particularly useful in either confirming or disconfirming an ADHD diagnosis due to their high false positive and false negative rates.  Low Average or Below Average scores at one snapshot in time on Trails B, the Stroop Interference subtest, the Rey, and the Nelson Denny Reading Test are not diagnostic of ADHD or LD and are not evidence of impaired functioning.  One cannot automatically assume that real-world functional impairment exists based on a low or lower-than-expected test score at one moment in time.   Real-world evidence of impairment is critical in the context of an ADHD diagnosis and disability determination; not merely diagnostic test scores or statistical discrepancies in individual areas of ability. Here, there was no convincing hard evidence of any significant academic, social, vocational, daily adaptive, or executive functioning impairment in Mr. Sampson's real-world functioning.  The fact that Mr. Sampson performed better on the Nelson Denny Reading Test when given unlimited time is not unusual and is not diagnostic of ADHD, LD, or a disability.  Finally, Dr. Wasserstein in my opinion did not adequately rule out other possible alternative explanations for Mr. Sampson's difficulties with medical school tests besides ADHD and Learning/Neurological disorders.   For example, anxiety or having a personal test-taking style/preference that is slow, deliberate, or too obsessive are other possibilities that were not adequately ruled out.  Dr. Wasserstein made reference to Mr. Sampson's "deliberate and slow work style" and that he "ruminated over his responses" on untimed tasks.  Dr. Michels stated that "when stressed his style can become somewhat obsessive, and he appears prone to overthinking minute details".  And Dr. Anderson noted that, during her testing, Mr. Sampson "appeared to distract himself by thinking about items he had just responded to even though the testing had

moved on."  Hence, it is possible that an obsessive, slow, and deliberate work style could explain his difficulty in finishing his medical school tests (which he reports has been his experience) rather than a learning or neurological disorder.

30.    In addition, Dr. Wasserstein seems to be making the argument that test scores that are "only Average" in the context of an overall Superior Verbal IQ are evidence of impaired functioning and a disability.  They are not.  More specifically, Dr. Wasserstein indicated that Mr. Sampson's PSAT Reading score was "only at the 52nd percentile", his ACT Reading Scores-- although still in the Average to High Average range--were "relatively weaker" than his other ACT domain scores that were in the Above Average to Superior ranges, and that his SAT Critical Reading score was "only Average" (it was at the 74th percentile) while his other scores were Superior.  Relative weaknesses that still fall within the Average range (and, in this instance, in the High Average range) are not diagnostic of ADHD or LD and are not evidence of impaired functioning.  Dr. Wasserstein also stated Mr. Sampson's nonverbal reasoning ability (Perceptual Reasoning Index on the WAIS IV) "albeit in the High Average range was significantly weaker than other cognitive domains".  She then says that by virtue of his High Average Perceptual Reasoning Index score, he has a "metaphorical limp between his various thinking skills, the extent of which creates significant handicaps on tasks that rely on perceptual reasoning and working memory, such as reading comprehension".  She states that "such variability in scores (from the lower end of Average to Very Superior) indicates disruption in underlying neurocognitive abilities, even with normal range scores".  I respectfully disagree with these statements. Average or High Average scores in the context of a Superior Verbal IQ are not reflective of significant handicaps and are not evidence of impaired functioning or a disability, especially when considering whether someone is limited as compared to most people in the general population, which is the relevant

metric here.   Dr. Wasserstein's argument that Mr. Sampson's "only Average" scores represent a significant impairment flies in the face of this standard.  Trying to make the argument that someone is disabled because he is "only Average" in some areas while Superior in most other areas is not persuasive or accurate.  Further, Mr. Sampson's WIAT Written Expression scores were almost all in the Superior range, his WIAT Spelling score was at the 63rd percentile (which is not consistent with what Dr. Wasserstein called "poor spelling"), his SAT scores in Writing were at the 93rd, 92nd, and 94th percentiles, his Sentence Writing Fluency score on the Woodcock Johnson Tests of Achievement was at the 96th percentile (Superior range), his Timed Writing Fluency score from Dr. Michels' report was in the Superior range, his Story Composition score from Dr. Michels' report was in the Above Average range (she concluded "his ability to write eloquently was clear"), his Writing Samples score from Dr. Michels' report was at the 65th percentile (Average range), his punctuation and spelling skills were in the Average range in Dr. Michels' report, and he was commended by his clinical supervisors for his "outstanding write ups" and "good notes".  These facts and the fact that he has no history of developmentally deviant problems with written expression are all inconsistent with Dr. Wasserstein's new diagnosis of Specific Learning Disorder with Impairment in Written Expression. I see no basis to justify this new diagnosis, nor do I see how it would be relevant to Mr. Sampson's ability to take the multiple-choice Step 1 exam.

31.    In addition, the fact that Mr. Sampson used tutors over the years does not necessarily mean he had deficiencies relative to same-aged peers.  For example, he always had very strong math skills and had Superior math scores on the SAT, ACT, and the WIAT, so why did he need tutoring in math?  Dr. Michels report indicated he "needed significant tutoring to remain in the highest math classes". This is not evidence of impaired functioning.  There was no evidence that he required tutoring in order to remediate something that was deficient, as opposed

to choosing to pursue tutoring to help optimize his already unimpaired functioning.  Further, even though Mr. Sampson had WIAT scores in the "Very Superior" range (99th percentile) in Math Problem Solving and in the Superior range (97th percentile) in Numerical Operations, Dr. Wasserstein nevertheless indicated he exhibited "visual misperceptions" on these tests and "sometimes misinterpreted" a plus sign "+" as a multiplication sign "x" "suggesting vulnerable visual processing and/or inattention".  This at best illogical and certainly does not provide a persuasive basis for suggesting impaired visual processing functioning.

32.     Other parts of Mr. Sampson's documentation that do not support an ADHD diagnosis come from two of his own professionals, who evaluated him in 2013.  Dr. Suzanne Michels and Dr. Allison Anderson both concluded he did not have ADHD.  More specifically, Dr. Anderson concluded "Mr. Sampson's testing results and history supply little evidence that his problems are the result of ADHD".  Dr. Anderson's report also indicated that ADHD rating scales (Barkley RS) were administered to Mr. Sampson, his girlfriend, both of his parents, and his tutor, and ALL of their ratings were within the normal range for current functioning and not supportive of having a clinical diagnosis of ADHD. Dr. Anderson further concluded "he does not appear to have the consistent and severe pattern of impulsivity, social problems, marked inattention, or physical restlessness that supports an ADHD diagnosis."  Dr. Michels' report did not provide an ADHD diagnosis (presumably because there was insufficient evidence to support or suggest such a diagnosis).  Instead, she made a diagnosis of Learning Disorder, Not Otherwise Specified based on a statistical discrepancy between his Superior Verbal Comprehension Index and his "only Average" Perceptual Reasoning Index.  Again, Average Perceptual Reasoning scores in the context of Superior Verbal Comprehension scores is not evidence of impaired functioning or a disability.

33.     As noted above, ADHD, by definition, starts in childhood and causes developmentally deviant, chronic, and pervasive impairment in multiple domains of functioning; it does not just suddenly arise in medical school.  There is insufficient evidence that Mr. Sampson was experiencing a magnitude of developmentally deviant symptoms or behavior in childhood that would be consistent with a clinical ADHD diagnosis.  Although there were a few teacher comments on his early report cards relating to distractibility, disorganization, listening, impulsivity, and following directions, these were few and far between, did not appear to significantly interfere in his progress, and did not appear to have persisted over time or interfere significantly in his adult functioning.  Moreover, there were a number of "positive" teacher comments as well, such as "organizational skills continue to improve", "he continues to grow as a reader", "it is a pleasure to be his teacher", "he is more organized in the classroom and now keeps an immaculate desk", "appropriate behavior has increased and I feel this will continue", "pleased with his progress", and "writing is consistently improving".  Further, there were no ratings of 1 or 2 ("unsatisfactory" or "inconsistent") on items relating to Work Habits or Citizenship on his report cards.  One teacher comment from a fourth quarter report stated "I am pleased by Robert's progress this year both academically and socially, he has developed better work habits, organizational skills, and a commitment to improving his academic performance".  Overall, the trend was toward improvement and the early issues teachers commented on seemed to resolve and not persist or cause any significant impairment as he got older, as evidenced by earning mostly A's in Honors and Advanced Placement classes in high school without accommodations, graduating from college with a 3.43 GPA without accommodations, having no behavioral problems, earning strong scores on the SAT, ACT, and MCAT without accommodations, and having no documented social, vocational, or daily adaptive impairment as an adult.

34.     It seems Mr. Sampson's case for viewing himself as impaired is based mostly on areas that are very difficult to measure or quantify.  For example, he sees himself as impaired because he reports he has to re-read material for understanding, had a parent read aloud to him when he was a child, feared being called upon to read in class, reportedly does not read for pleasure, believes he has to work harder than others, used Cliff notes because reading was so painful, has difficulty remembering names of people and places, gets fatigued when reading, and had to play music by ear because he was unable to read music.  These examples of impairment are quite ubiquitous and impossible to quantify; and is not the kind of impairment or magnitude of impairment that rises to the level of a disability, in my opinion.  Mild symptoms or mild impairments that do not substantially limit performance in a major life activity are not disabilities. Moreover, despite these self-reported "impairments", he was never referred for any evaluations, always got good grades, had no 504 Plans or IEP's, and had no history of receiving any kind of special education services.

35.     Despite his self-reported, longstanding ADHD-like symptoms, characterized as having existed since early childhood, Mr. Sampson was not diagnosed with ADHD until 2015, after he had started medical school.  He has no history of seeking or using any accommodations over his entire pre-medical school academic history.  As noted, he took the MCAT twice without any accommodations and performed better than 66% and 73% of the highly qualified individuals who took that exam when  he did.  He took the SAT three times as a junior or senior in high school, with scores on the reading, writing and math sections that ranged from a low of the 74th percentile to a high of the 96th percentile.  And his composite score on the ACT exam was in the 89th percentile. He also graduated from college at University of Virginia with a 3.43 GPA without

accommodations.  This is not the profile of someone struggling with ADHD and LD at the magnitude of a clinical diagnosis or a disability.

36.     As noted above, Mr. Sampson did not provide any convincing evidence of early reading or writing impairment, or an impairment in any non-academic domains of functioning.

37.     With respect to work, Mr. Sampson provided evaluation reports from his clinical rotations. These reports were consistently very positive and showed no evidence of any ADHD-like impairment or impairment consistent with learning disorders in Written Expression or Reading.  For example, quotes taken directly from these evaluation reports included "write ups were stellar", "excellent performance", "communication skills were polished", "excellent performance in small group", "he read the medical literature and shared new knowledge with team members", "got along with team members very well", "he passed the Final essay exam and the NBME Subject exam", "wrote good notes", "readily and frequently reads up on his patients", "looks up medical literature to share knowledge with his team", "did a great job during this rotation", "his data gathering was very organized and followed the appropriate sequence", "he routinely demonstrated great preparation and breadth of reading", "excellent student and did a great job on his anesthesia rotation", "showed up on time and pays attention to detail", "reads about patients' issues and problems in more depth to increase his fund of knowledge", "punctual, conscientious, attentive, and professional", "team player", and "his behavior modeled reliability, collegiality, and integrity". These stellar reports are not consistent with someone struggling with ADHD and learning disorders in reading and written expression. In fact, if anything, they describe the antithesis of ADHD and learning disorders in reading and written expression.

38.     With respect to his social life, Mr. Sampson reported to Dr. Michels in 2013 that he socialized "with a variety of friends," had a girlfriend, and participated in a fraternity while at

the University of Virginia (Michels report, pp. 2-3). She found him to be "engaging, personable, and intense", (Michels report, p. 3), and stated he "flourished socially and intellectually" at the University of Virginia (Michels report, p. 2).

39.     In short, Mr. Sampson's profile is not the profile of someone whose symptoms warrant a clinical diagnosis ADHD or LD, or a finding of disability within the meaning of the ADA.   Mr. Sampson's documentation does not substantiate a history or magnitude of developmentally deviant, pervasive impairment in school, work, social, or daily adaptive domains that is consistent with ADHD.   To the contrary, his records show a consistently successful academic (at least prior to medical school), work, and social history, without accommodations.

40.     Not performing as well as one would like or as well as may be expected on timed standardized tests can happen for any number of reasons, is not necessarily a symptom of ADHD, and is not evidence of impaired functioning.   For someone who truly suffers from this disorder at the magnitude of a clinical diagnosis and a disability, life is characterized by disrupted interpersonal relationships, underperformance in school and jobs, and generally inadequate adjustment.  People with ADHD struggle to succeed in life and typically leave a paper trail in their wake that is a testament to their longstanding history of developmentally deviant functional impairment.  The paper trail may include negative teacher comments relating to poor self-control and poor or inconsistent academic achievement, report cards/transcripts that show inconsistent/variable grades and/or low ratings in effort, citizenship, and behavior, special education records, 504 Plans, negative job performance reviews, treatment/intervention records that reflect efforts to remediate one's problems, and the like.  Indeed, ADHD is a seriously impairing disorder that leaves its mark on a wide swath of an individual's life.  I have seen no such records here.   To the contrary, the records Mr. Sampson did provide showed high academic

achievement and no documented evidence of significant impairment in any non-academic domains of functioning or indeed in any academic domains of functioning other than in connection with a substantively challenging, high-stakes licensing exam and his medical school exams. Merely proclaiming to experience ADHD-like symptoms without *documented* impairment is not sufficient to substantiate a diagnosis, much less a disability as that term is defined in the ADA.

41.     Mr. Sampson's test scores reported in Dr. Michels' evaluation report also were not supportive of an impairment in reading or learning, in my opinion. This is because almost all of his test scores were within the Average range or better and many were in the Above Average to Superior ranges.  The only "low" scores were on the Nelson Denny Reading Test, where he initially scored in the Low Average range on Reading Rate and Reading Comprehension (as reported in 2013 by Dr. Michels) but somehow dropped to the 1st percentile in 2020 when evaluated by Dr. Wasserstein. Putting aside that unexplained anomaly, the Nelson Denny is a screening test that by itself is not diagnostic of a reading disorder.

42.     Dr. Michels' diagnosis of Learning Disorder, NOS was based on a statistical discrepancy between his Very Superior Verbal Comprehension Index score and his "only Average Perceptual Reasoning Index score.  Relative weaknesses or "lower than expected" scores that still fall within the Average range are not evidence of impaired functioning or a disability.   This is especially true when there is no objective evidence of actual impairment in his real world functioning relative to the Average person.

43.     In my opinion, a careful review of Mr. Sampson's available historical documents and his consistently high achievement over the course of his life has shown (a) that his neuropsychological functioning is intact; (b) that the impairment he reports does not rise to the level of a disability; (c) that he is not substantially limited in a major life activity relative to the

average person; and (d) that he does not have an impairment that prevents him from having equal access to the USMLE Step 1 Exam.

44.     The purpose of accommodations is not to help one achieve an optimal score, accommodate a personal test-taking style/preference that may be slow, deliberate, or obsessive, or to facilitate a positive or optimal outcome.  Accommodation requests instead need to be tied to functional impairment that points to the need for the accommodation.  Mr. Sampson's documentation did not show developmentally deviant impairment that indicates a need for extra time or extra breaks in order to have equal access to tests.

45.     Mr. Sampson's statement that he has always had to work longer and harder than his peers to succeed is difficult to quantify, and even if true is not evidence of impaired functioning. It is not uncommon for individuals with no impairment to work harder -- or to perceive that they work harder -- than their peers.  Some individuals will have to work harder than others to succeed, and some will succeed without working as hard as others.  Such differences in work ethic or work requirements are not inherently indicative of whether a person has an impairment.

46.     In summary, it is my opinion that Mr. Sampson does not meet the diagnostic criteria for ADHD or a Specific Learning Disorder and that he is not disabled within the meaning of the ADA.  I therefore do not believe that granting Mr. Sampson's requested accommodations is warranted, because he does not need accommodations to take the USMLE Step 1 examination in an accessible manner.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 29, 2022.

DocuSigned by:

*Kevin Murphy*

CDD132E5CE3D4A1...

Kevin Murphy