IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT SAMPSON,<br><br>    Plaintiff,<br><br>    v.<br><br>NATIONAL BOARD OF MEDICAL EXAMINERS,<br><br>    Defendant. | Civil Action No. 2:22-CV-05120-JMA-AYS |

## DECLARATION OF SAMUEL O. ORTIZ, PH.D.

I, Samuel O. Ortiz, declare as follows:

1. My name is Samuel O. Ortiz. I am over 18 years of age and, unless otherwise stated, this declaration is based on my personal knowledge.

2. I am Professor of Psychology and Director of the Graduate Programs in School Psychology at St. John's University, Queens, New York. I train and consult nationally and internationally on topics ranging from nondiscriminatory assessment to contemporary evaluation of learning disabilities. In addition to my faculty and research responsibilities, I have served on various committees of the American Psychological Association (APA), including serving as the Chair of the APA Committee on Psychological Tests and Assessments, and I have served on editorial boards for various journals including for the Journal of School Psychology, School Psychology Quarterly, and the Journal of Applied School Psychology. A true and correct copy of my curriculum vitae is attached at Exhibit 1.

3. In November 2018, I was asked by NBME to review Robert Sampson's request for extended time (50% additional time) as an accommodation on Step 1 of the USMLE. The purpose

of my review was to assess whether the submitted documentation supported Mr. Sampson's assertion that he has a learning disability in the area of reading, and, if so, whether his requested accommodations were reasonable and appropriate. The analysis, conclusions, and recommendations provided in my review were presented only from this perspective and did not address his request for accommodations based on "Attention Deficit/Hyperactivity Disorder." A true and correct copy of my report is attached at Exhibit 2. I have reviewed this report and reaffirm my belief in its conclusions. I would like to correct one typo (a missing word) on page 4 of the report. I wrote: "*The very reason elementary school students are not required to learn calculus is precisely because it is known that such an expectation is developmentally appropriate.*" This sentence is missing the word "not." It should read: "*The very reason elementary school students are not required to learn calculus is precisely because it is known that such an expectation is not developmentally appropriate.*"

4. The documents that I reviewed as part of my November 2018 analysis are listed on pages 1-2 of my report.

5. As part of preparing this declaration, I also reviewed the Declaration of Robert Sampson and the Declaration of Jeannette Wasserstein, Ph.D., ABPP, along with the attachments to each declaration, which I understand were filed in this case.

6. Based on my review of this material, it is my opinion that the documentation does not support a diagnosis of specific learning disorder in the area of reading as there is no evidence that Mr. Sampson ever had any difficulty learning to read. To the contrary, the documentation is replete with information and evidence that he learned to read successfully and in the manner typically expected of the average person in the general population, including during the elementary school years where reading skills are first acquired and later refined.

7. Based upon my understanding that one or more other reviewers had already provided input to NBME regarding the assessment data that was contained in the reports that Mr. Sampson provided in support of his accommodation request (from Dr. Michels and Dr. Anderson) at the time of my November 2018 review, I focused my review of Mr. Sampson's documentation on the threshold question whether Mr. Sampson satisfies the core diagnostic criteria for a Specific Learning Disorder as set out in the Diagnostic and Statistical Manual of Mental Impairments, 5th Edition ("DSM-V"). As I noted in my report, "[w]hatever debate may ensue from examination of recent evaluations does not alter the one most important consideration necessary for supporting a learning disability in reading -- evidence of impairment in early reading acquisition." His documentation contained no such evidence and in fact contained evidence to the contrary. Therefore, as noted in my report, "whatever difficulties he may have in completing timed tests or reading assignments in comparison to his medical school peers cannot be attributed to the presence of a learning impairment in reading."

8. A Specific Learning Disorder in reading is generally characterized as difficulties in learning to read and problems in the use of reading skills. Accordingly, identification of a learning disability cannot be based solely on current evaluation of reading skills, as evidence of difficulty in "learning" to read is an integral part of the definition. According to the DSM-V, the diagnostic criteria for a Specific Learning Disorder "are to be met based on a clinical synthesis of the individual's history (developmental, medical, family, educational), school reports, and psychoeducational assessment." Current testing or evaluation alone is insufficient for rendering such a diagnosis; instead, historical documentation is required regarding the acquisition of reading, writing, and mathematics skills. The reason a learning disability is a learning disability is precisely

because it is evident in the observable and documentable process of development and education in reading, writing, or mathematics.

9. According to DSM-V, "one essential feature of specific learning disorder is persistent difficulties learning keystone academic skills (Criterion A), with onset during the years of formal schooling (i.e., the developmental period)." Beyond this feature, DSM-V highlights the fact that academic skills are learned via specific instruction and are not acquired merely as a function of maturation. The Diagnostic Features section of DSM-V adds: "Specific learning disorder disrupts the normal pattern of learning academic skills…The learning difficulties manifest as a range of observable descriptive behaviors or symptoms (as listed in Criteria A1-A6)" and they are "persistent, not transitory." Further delineation of the core features of Specific Learning Disorder are noted by observation "that the learning difficulties are readily apparent in the early school years in most individuals (Criterion C). However, in others, the learning difficulties may not manifest fully until later school years, by which time learning demands have increased and exceed the individual's limited capacities."

10. This last specification does not mean that one can succeed in school without displaying any learning difficulties at all, and then have a learning disorder become evident only when the curricular expectations rise above what one can do, such as high school subject matter, college requirements, or medical school reading loads. Otherwise, everyone would "become" learning disabled upon reaching the point in which school suddenly becomes too "hard" or beyond a person's knowledge or abilities. Similarly, this specification does not mean that a learning disability can go completely unnoticed. What the specification states is that a learning disorder "may not manifest fully" until sometime later. The key word here is "fully," and it is intended to

convey that learning problems are indeed observable and noticeable in earlier years, but they may not rise to a level that constitutes impairment or qualifies as a disability.

11. Based on the essential features outlined in DSM-V, the hallmark of a learning disability is difficulty in the development and acquisition of basic academic skills particularly during the period of time in which these skills are first taught—early elementary school. Therefore, any proper diagnosis of learning disability, especially one that was first rendered at the age of 22, requires a clear indication that, in fact, difficulty "learning" to read was a manifest and observable characteristic of someone's early education.

12. The documentation provided by Mr. Sampson does not show that Mr. Sampson had meaningful, observable difficulties learning to read.

13. Mr. Sampson's documentation included copies of some elementary school grade reports and comments. These reports and comments do not in any way demonstrate that Mr. Sampson was having troubles in learning to read at this point in his education. Rather, a positive indication of reading acquisition is noted. For example, in Mrs. Feinberg's class (which appears to be 1st grade, according to Mr. Sampson's notes), his marks in Reading at the first, second, third, and fourth marking periods were "4," "5," "5", and "5+" on a scale of 1-5.  These marks reflect good reading scores across all terms as well as clear and steady improvement over time.

14. The comments by Mrs. Feinberg also reflect appropriate reading acquisition. In the first marking period, her comments appear to state: "In reading, Robert enjoys reading books, has a good sight vocabulary and uses a number of strategies to figure out new words. We will be working on having Robert say "blank" and coming back to harder words, as well as breaking up larger words into parts." In the 2nd marking period, she commented: "In reading, Robert continues to build upon his good sight vocabulary and use of strategies. Next quarter, we will be working on

- 5 -

Robert's fluency and expression when reading aloud." By the 3rd and 4th marking periods, her comments are: "In reading, Robert continues to grow as a reader. He has developed a strong sight vocabulary and has good phonetic sense. Very good job, Robert!" and "Welcome to the 'life long reader's club', Robert! Please make sure you continue to practice your reading and writing over the summer." The enthusiastic exhortation regarding his reading achievement noted in the last marking period comments, along with his 5+ mark in Reading that term, can only be viewed as a clear and strong indication that Mr. Sampson was quite successful in learning to read and was developing reading skills at the exact level that was required of him at that age and grade.

15.     During the first term of 4th grade, Mr. Sampson's teacher commented: "Robert is a very capable fourth grader. He is inquisitive and well-informed. He especially likes math and science activities. Robert is especially pleased about being a math team captain because he is very good at math. He enjoyed our trip to the pond and studying pond water under the microscope. Robert's test averages for this quarter are as follows: reading 83%, math 95%, spelling 97%, social studies 91% and science 95%. He needs to put more effort into written assignments…" The comment about improving his writing becomes a very minor concern in light of his scores which indicate very superior functioning including in the one area in which he presumably had a learning disability—reading—where his test average was "83%." A review of his marks on this report shows the following reading categories and scores: "Reads and understands grade-appropriate material" (4) [Very Good]; "Reads silently for sustained periods" (4); "Selects appropriate books independently" (4); "Uses reading strategies to construct meaning" (3); "Is developing an awareness of genres and authors" (3) [Satisfactory]; and "Attempts to acquire, interpret, evaluate, and apply information" (3). These comments and marks do not in any way suggest that Mr. Sampson was having any troubles in learning to read at this point in his education.

16. The documentation provided thus indicates Mr. Sampson developed and acquired reading skills in a manner comparable to age and grade-level expectations. There simply are no indications that Mr. Sampson had any type of difficulty in reading development. Rather, it appears that he learned to read and became a solid reader precisely at the time he was expected to do so. His teachers were in the proper and prime position to observe even the slightest bit of difficulty he may have had in learning to read, and there were no comments to this effect noted by any of them.

17. Mr. Sampson has described his mother reading assignments to him in elementary school. He said that she did this because reading comprehension and focus were challenging for him at that age. It is not uncommon for parents to read with their young children, however, and apparently this practice helped Mr. Sampson learn to read at a developmentally appropriate time, something that would not have been possible had he had a learning disability, because merely reading to him would not have overcome any difficulties he had in learning to read.

18. In an attachment to a letter submitted to NBME in support of Mr. Sampson's testing accommodation request, Mr. Sampson's parents indicated that Mr. Sampson was tutored by a "reading specialist" in 4th and 5th grade and by a Kumon tutor in reading and math in 3rd through 5th grade, but by this point in time, Mr. Sampson either had already learned to read or he had not. Although tutoring, much like his mother reading to him, may have facilitated further development of his reading skills, it does not serve as an ameliorative activity for problems rooted in the process of learning to read in the first place. If it did, all such learning disabilities in reading would be resolved simply with tutoring and learning disabilities would exist only in those who were unfortunate enough not to receive tutoring. There is no indication, however, that Mr. Sampson struggled in his efforts to learn to read during the time in which he was expected to learn how to

read. Moreover, with some tutoring, he was able to expand and further his reading ability with apparent success as noted in the documentation by his elementary school teachers.

19. Mr. Sampson and his parents have also discussed his stuttering at an early age and the therapy he received for this issue. That he received speech-language therapy for articulation difficulties has no direct relationship to problems in learning to read or any relevance to the presence of discrepancies between his verbal (cognitive) abilities and other subject areas. Having a speech-language impairment in articulation does not prevent an individual from being able to learn to read normally or fluently or to develop average or better verbal abilities as reflected in cognitive functioning and reasoning.

20. The fact that Mr. Sampson learned to read at a developmentally appropriate age is of course confirmed by how he has performed over the course of his life in situations that require reading. His educational record (from the documents and information that I reviewed) was consistently well above average from kindergarten through college, with no accommodations. The same is true of his performance on standardized tests. On the 2008 SAT college admission test, for example, he initially obtained Critical Reading scores of 580 (74th percentile rank), 620 (84th percentile rank), and 680 (93rd percentile rank), all of which reflect not just passing but exceptional scores, on a test that evaluates reading abilities in a real-world setting. Moreover, within a 5-month period (June to November 2008) he increased his performance, particularly in Critical Reading, where he achieved a score to 680 (93rd percentile rank). There is no intervention or strategy or compensatory mechanism that can be implemented in the presence of a learning disability in the area of reading that would elevate an individual in such a pronounced manner. Rather, this is an indication that he is quite capable of learning and that with appropriate assistance, such as tutoring and preparation, he can not only perform well, he can in fact perform in an exceptional manner.

21. In summary, a review of the documentation provides only one reasonable conclusion—that Mr. Sampson cannot have a learning disability in the area of reading precisely because he has never demonstrated any problems in learning to read. By definition, a learning disorder is characterized by difficulties in the early acquisition period, that is, elementary school, where basic academic skills are first taught and first learned. It matters not whether there is any formal evaluation or diagnosis rendered at that time or even whether any difficulties rise to the level of substantial impairment. What is required and what does matter is that there is some evidence that the acquisition and development of a basic skill, such as reading, did not proceed in the manner that is typically expected for a given age or grade. And while there are a variety of academic concerns sprinkled throughout Mr. Sampson's early education, none of them implicate or suggest that reading was of any concern. Without a clear history of reading difficulties during this period, it my opinion that it is inappropriate to assign a diagnosis of learning disability, as such a history is an essential criterion for doing so.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 29, 2022.

*Samuel O. Ortiz, Ph.D.*
Samuel O. Ortiz, Ph.D.