**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT SAMPSON,          ) | |
|          ) | |
|    Plaintiff,          ) | |
|          ) | Civil Action No. 2:22-CV-05120-JMA-AYS |
|    v.          ) | |
|          ) | |
| NATIONAL BOARD OF MEDICAL          ) | |
| EXAMINERS,          ) | |
|          ) | |
|    Defendant.          ) | |
|          ) | |

## <u>DECLARATION OF JOSEPH E. BERNIER, PH.D.</u>

I, Joseph E. Bernier, declare as follows:

1.     My name is Joseph Bernier and, unless otherwise stated, this declaration is based on my personal knowledge.

2.     I am a licensed psychologist in New York State.  I have an independent practice that includes providing diagnostic psychological evaluations of children, adolescents, and adults suspected of having learning disorders, attention disorders, or other mental impairments.  I have been in practice since 1978, and I have conducted hundreds of diagnostic evaluations over the course of my career, spanning 46 years.   A true and correct copy of my curriculum vitae is attached at <u>Exhibit 1</u>.

3.     I was asked to review documentation relating to Mr. Sampson's most recent request for accommodated testing on the United Sated Medical Licensing Examination - Step 1, and to address whether the documentation demonstrates that Mr. Sampson has a disability that warrants accommodations on the Step 1 exam.

4.       Mr. Sampson applied to the National Board of Medical Examiners for testing accommodations in April of this year. The accommodations he requested included 100% extended time over two days of testing and additional break time. His request was denied on June 1, 2022. In its decision letter, the National Board explained, "*Regardless of the assigned diagnoses, there is insufficient evidence to support a need for accommodations to access the* USMLE". Six prior requests for testing accommodations were also denied. Writing to the candidate, the Board noted that his documentation "*did not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations were an appropriate modification of your test administration*" (June 1, 2022). The candidate is currently basing his request for accommodations on diagnoses of Specific Learning Disorders in reading and writing, Unspecified Neurodevelopmental Disorder affecting visual processing, and Attention Deficit Hyperactivity Disorder (combined presentation).  Mr. Sampson is contesting the decision to not provide him with accommodations.

5.       I reviewed the documents Mr. Sampson submitted to support his most recent accommodations request as listed in the undated "Declaration of Robert Sampson":

COM Certification of Prior Test Accommodations (Heedles, March 27, 2017)

Psychological Evaluation Report (Wasserstein, August 9, 2020)

Psychological Evaluation Report (Michels, August 26, 2013)

Supplemental Testing Report (Anderson, December 16, 2013)

Clinician Letter from Dr. Anderson (August 10, 2017)

Appeal Letter and Clinical Summary (Aronson, September 6, 2017)

Clinician Letters from Dr. Aronson (June 12, 2018 and March 29, 2017)

Letters from COM Learning Specialist (DeMotta, March 29, 2017 and February 15, 2018)

COM Supportive Education Counselor Letter (Heedles, March 3, 2017)

Parent Letter with Attachments from Shelley and Steven Sampson (June 26, 2017)[1]

MCAT Tutor Letter (Lam March 29, 2017)

Appeal Letters from Educational Consultant (Serrantino, June 22, 2017 and Oct. 9, 2017)

 "NBME Shelf Exam Score Reports for Robert Sampson" (March 28, 2017)

MCAT Score Report (examinations taken on August 16, 2013 and September 18, 2014)

ACT Score Report (college admissions examination, June 2008)

College Board SAT Scores (May 2005, June 2008, October 2008, November 2008)

PSAT Score Report (2007)

Otis-Lennon School Ability Test Scores (May 28, 1999)

I also reviewed the following documents:

NBME Decision Letter (Disability Services, June 1, 2022)

Declaration of Robert Sampson (undated)

Declaration of Jeanette Wasserstein (September 19, 2022)

6.      Based on the documents provided, Mr. Sampson has apparently experienced difficulties in medical school and in passing the medical licensing examination. He claims that he is a disabled person due to neurodevelopmental disorders that impair his learning, reading, thinking, cognitive processing, and test taking, and that he is entitled to extra testing time and extra breaks as accommodations on the Step 1 exam.

7.      The first question that I consider when evaluating an accommodation request such as Mr. Sampson's is whether --- taking the diagnosis at face value -- the examinee has shown that the diagnosed impairment substantially limits the person's ability to perform relevant major life

---

[1] Included were school records/report cards. Some of the attachments were unreadable due to poor copy or otherwise illegible.

activities.  Stated differently, do Mr. Sampson's difficulties in medical school or on the USMLE (and otherwise) reflect a substantial limitation in his functioning as compared to most people in the general population that is attributable to one or another of the neurodevelopmental conditions with which he has been diagnosed?

8.      My review of the documents leads me to the conclusion that Mr. Sampson is not substantially limited when his abilities are compared to those of individuals in the general population.

9.      Despite the reports of symptoms and difficulties in academic functioning going as far back as childhood and using the supports his parents and tutors provided, the documentation does not substantiate the claim that these difficulties put Mr. Sampson at a significant disadvantage as compared to students in general. There is no history of academic accommodations for a disability in any school setting before medical school. He did not receive disability accommodations in primary or secondary school or in college. There was no IEP or Section 504 Plan. With regards to his primary school education, Dr. Anderson (December 16, 2013) wrote, "*He had no formal interventions for academic difficulties, no special services, grade retentions, or behavior problems".* Reportedly Mr. Sampson attended a competitive high school and was enrolled in many advanced level courses where he typically obtained A and B grades and used tutoring to remain in these demanding classes. Mr. Sampson attended the University of Virginia, an academically competitive institution, and obtained an overall grade point average of 3.4. At no point before medical school was he identified as a person with a disability or as someone who was deprived access to a curriculum. In short, he did not require disability accommodations to access a general education or college curriculum and performed as well as or better than his peers.

10.     Mr. Sampson likewise did not require accommodations to access college or medical school admissions examinations. Indeed, he performed better than most of his similarly educated peers on these assessments. His performance on those tests does not support, and in fact contradicts, the claim that he is substantially impaired in his learning, reading, thinking, cognitive processing, or taking tests relative to the general population.

11.     Mr. Sampson took the PSAT without any accommodation as a student in the eleventh grade. He scored higher than 52% of high school juniors in critical reading, higher than 86% of juniors in writing skills, and higher than 80% in mathematics.

12.     On the ACT college admissions examination taken in June 2008, Mr. Sampson scored higher than 89% of high school graduates overall on this assessment. His Reading score was higher than 74% of high school graduates, and combined English and Writing was higher than 86% of this group. He was in the top 2% of high school graduates in Mathematics and in the top 27% in science. He completed the ACT under standardized time and other conditions.

13.     Mr. Sampson sat for the College Board SAT examination four times. He used no accommodations on this demanding timed test. The percentile scores reflect his standing relative to college-bound high school seniors nationally.

|  | May 2005 | June 2008 | October    2008 | Nov. 2008 |
|---|---|---|---|---|
| Critical  Reading | 18% | 74% | 84% | 93% |
| Math | 43% | 91% | 91% | 96% |
| Writing |  | 93% | 92% | 94% |

Putting aside the test he took in 2005, apparently as a freshman, these scores are mostly high average and very high as compared to other college-bound seniors.

14.     Mr. Sampson took the Medical College Admissions Test in 2013 and again in 2014. He received no testing accommodations. His standing relative to other medical school applicants included a top 16% performance in Verbal Reasoning on one of the test dates, as follows:

|  | MCAT Total | Physical Sciences | Verbal Reasoning | Biological Sciences |
|---|---|---|---|---|
| September 2014 | 73% | 79% | 67% | 76% |
| October 2013 | 67% | 67% | 84% | 56% |

15.     These unaccommodated performances are average and high average as compared to *medical school* applicants, a much more capable and selective group than the general population or the average college graduate.  Note that the Verbal Reasoning component of the examination requires critical reading and that he scored average and high average as compared to other college-educated applicants.

16.     While reading arguably emerged as a personal weakness relative to his strengths in other areas on some of these admissions tests, all scores were average or better and  no score could be considered evidence of substantially limited functioning on a standardized assessment, even when the comparator group was a more capable and selective group of examinees than most people in the general population.

17.     The fact that Mr. Sampson achieved higher (and passing) scores on what he has identified as NBME Shelf examinations with accommodations does not necessarily indicate that his ability to read, think, cognitively process information, or concentrate is substantially limited as compared to the general population. Nor does it indicate that he is substantially limited in test taking as compared to the general public.

18.     On balance, the documentation from standardized tests supports the contrary conclusion, namely, that Mr. Sampson is not substantially limited in the skills used when taking a test like the Step 1 exam as compared to the general population.

19.     Clinical evaluation of Mr. Sampson's intellectual functioning did not indicate substantially limited cognition when compared to the general population. The files include two sets of intelligence testing scores using the Wechsler Adult Intelligence Test-IV. These assessments were conducted seven years apart (see Psychological Evaluation Reports by Michels, 2013, and Wasserstein, 2020). The composite and index (%) scores are presented below.

| WAIS-IV | Wasserstein 2020 | Michels 2013 |
|---|---|---|
| Full Scale IQ Score | 121 (92%) | 124 (95%)[2] |
| Genal Ability Index | 120 (91%) | |
| Verbal Comprehension Index | 134 (99%) | 141 (99.7%) |

[2] Dr. Michels did not compute the FSIQ because of the dispersion among the composite index scores. She explained that the large discrepancies rendered the overall score not a useful measure of general ability.  The fact of the matter is that generally major cognitive and achievement test batteries normed on the general population show that variability is the rule, and lack of variability is less common.  The FSIQ is only invalid if there are too few valid subtests to derive the full score. This is not the case in the evaluation. The differences do not erase the robust nature of the FSIQ score to be a reliable measure of overall facility for learning and reasoning. Although Dr. Michels did not report the FSIQ, I computed the score based on the data provided.

| Perceptual Reasoning Index | 102 (55%) | 102 (55%) |
|---|---|---|
| Working Memory Index | 114 (82%) | 114 (82%) |
| Processing Speed Index | 122 (93%) | 122 (93%) |

20.    These findings are consistent in showing that Mr. Sampson's general ability to process information is within the top eight percent of the population (FSIQ). This is superior functioning and superior overall facility for learning and reasoning. The most recent assessment indicates that even when the demands for working memory and processing speed (cognitive processing efficiency) are reduced, Mr. Sampson still displayed superior performance (GAI). Mr. Sampson presents very superior knowledge and ability to process verbal information (VCI). His general ability to process visual and spatial information is average (PRI). The testing indicates high average ability to hold onto information about a situation currently being attended to (WMI). It further indicates superior speed of mental processing and visual discriminations (PSI). In other words, his performance was superior under pressure to maintain focused attention when performing timed visual inspection tasks. In the context of the general population, average and better than average performance is not substantially limited performance. While there are some disparities shown in his ability to perform the various tasks that make up the WAIS-IV, *having disparate abilities is not itself evidence of substantially limited functions.  Virtually everyone has disparate abilities.*

21.     The reports from Drs. Anderson and Michels provide additional specific information regarding Mr. Sampson's cognitive processing proficiency. Dr. Anderson (2013) administered certain specific tests of cognitive functioning from the WJ-III NU. The composite scores (which generally have the best construct coverage) are listed below.

Visual-Spatial Thinking:      41st percentile for age

Working Memory:              58th percentile for age

Broad Attention:              64th percentile for age

These are all average performances.

22.     Dr. Michels (2013) evaluated cognitive fluency using tests from the WJ-III. The Cognitive Fluency Index or composite score placed Mr. Sampson above 75% of others at his age in this function. The component scores are as follow:

Retrieval Fluency:           90th percentile

Decision Speed:              61st percentile

Rapid Picture Naming:        74th percentile

These performances do not indicate substantially limited functioning as compared to others in Mr. Sampson's age group. (These subtest names are accurate descriptions of the specific ability being measured.)   Considered together, the cognitive ability test scores document superior general intellectual functioning and superior overall facility for learning and reasoning, regardless of the influence of cognitive processing proficiency.

23.     Mr. Sampson has demonstrated average and above average basic academic skills for age on *appropriate* achievement tests of reading, writing, and mathematics.  The achievement testing scores shown below largely speak for themselves.

**Reading**

| WIAT-III 2020 | *Percentile for age* | WJ-III 2013 | *Percentile for age* |
|---|---|---|---|
| Word Reading | 82nd | Word Reading | 78th |
| Pseudoword Decoding | 73rd | Word Attack | 86th |
| Reading Comprehension | 45th | Passage Comprehension | 53rd |
| Oral Reading Fluency | 42nd | Sentence Reading Fluency | 80th |
| Accuracy | 88th | Broad Reading | 80th |
| Rate | 37th | | |

All of these reading ability scores are in the average and high average range when compared to others at Mr. Sampson's age.  Dr. Anderson (2013) administered the timed reading comprehension subtest from the Scholastic Abilities Test for Adults. Mr. Sampson scored in the low average to average range on this particular measure (25th percentile) - thus, no normative impairment was identified on this assessment either.

**Writing**

| WIAT-III 2020 | *Percentile for age* | WJ-III | *Percentile for age* |
|---|---|---|---|
| Sentence Composition | 93rd | Writing Samples | 65th |
| Combining | 92nd | Punctuation and Caps | 46th |
| Sentence Building | 86th | Sentence Writing Fluency | 94th |
| Essay Composition | 95th | Spelling | 44th |
| Word Count | 95th | Broad Written Language | 77th |
| Theme Development and Organization | 93rd | | |
| Spelling | 63rd | | |

Most of these writing-ability scores are high average or above. The remainder are average scores for age.  Dr. Michels (2013) also used the Test of Written Language-4 as part of her writing evaluation. She reported that Mr. Sampson scored above average in writing on this instrument.

**Math**

| WIAT-III 2020 | *Percentile for age* | WJ-III 2013 | *Percentile for age* |
|---|---|---|---|
| Math Problem Solving | 99th | Applied Problems | 98th |
| Number Operation | 97th | Calculation | 97th |
| | | Broad Math | 99th |
| | | Math Fluency | 97th |

Math is obviously an area of relative strength for Mr. Sampson.  These math scores are within the superior to very superior range when compared to others at Mr. Sampson's age.

**Academic Fluency**

| | WJ-IV 2020 *Percentile for age* | WJ-III 2013 *Percentile for age* |
|---|---|---|
| Sentence Reading Fluency | 78th | 80th |
| Sentence Writing Fluency | 96th | 94th |
| Math Facts Fluency | 89th | 97th |

These fluency scores indicate high average reading fluency, superior writing fluency, and high average and above-average math fluency, again as compared to others of comparable age. In other words, they show that, compared to the general population, Mr. Sampson fluently executes basic academic operations.

24.     In summary, there is no indication whatsoever of substantially limited functioning on instrumental academic skills when compared to the general population.

25.     Mr. Sampson's assessment results suggest that he had some difficulties when taking the Nelson Denny Reading Test, according to results from administrations in 2013 and 2020:

**The Nelson Denny Reading Test**

|  | 2013: Percentiles for *grade* | 2020: Percentiles for *grade* |
|---|---|---|
| Comprehension (20 minutes) | 16th | 1st |
| Reading Rate (1 minute sample) | 24th | 1st |

26.     The NDRT is not an appropriate measure of reading impairment because the test scores were compared to an inappropriate reference group, specifically to college graduates, not the general population using age norms. The version of the test used in the assessments does not provide age-based norms.  Use of grade-based norms after the 12th grade often misclassifies normal readers as impaired readers. The impact is that Mr. Sampson is made to appear more limited in his reading abilities. This is clear in the contrast between these NDRT scores and the other reading ability scores found on the Wechsler and Woodcock reading achievement batteries. The results are

also questionable when viewed within the context of Mr. Sampson's performance on the standardized admissions test scores reported above -- all are tests that require reading skills.

27.   Note, too, that there were significant differences in the test scores reported for Mr. Sampson on the NDRT between the two administrations of that test, the first in 2013 (where his scores were low average) and the second in 2020 (where his scores were in the 1st percentile, suggesting that he reads at an extraordinarily low level). These differences raise additional questions about the reliability of Mr. Sampson's Nelson Denny scores.

28.   Mr. Sampson's evaluators overemphasize the NDRT findings and feature the results as a cornerstone of their conclusions that Mr. Sampson is an impaired reader who is consequently unable to access standardized examinations under normal time conditions. While reading may not be among Mr. Sampson's strongest abilities, the evidence from appropriate achievement tests do <u>not</u> support the conclusion that he is a substantially limited reader as compared to most people in the general population.

29.   The clinical evaluations included neuropsychological tests of certain highly specific functions. The findings are mixed. In the most recent evaluation performed by Dr. Wasserstein (2020), most of the neuropsychological testing scores were within normal limits, with only a few exceptions.

30.   On a continuous performance test (IVA+Plus), results suggested problems in response control (impulsive behavior) and some related difficulties sustaining attention. There was some evidence of confusion when memorizing a long word list and also when recalling a complex figure (CVLT-II, ROCFT). Yet when required to learn and retain stories he heard or basic visual designs, Mr. Sampson performed in the average and above average range for age (WMS-IV

auditory memory and visual memory). Limitations emerged on tests of motor coordination and dexterity, but those abilities are not needed on the Step 1.

31.     The results from neuropsychological tests must be viewed within the larger context of the other cognitive and achievement testing scores included in the assessment batteries. The neuropsychological scores might be of diagnostic interest, but otherwise they are of limited practical importance. Generally speaking, global or total intelligence test scores are a better predictor of future performance, not highly specific or narrow ability test scores.

32.     The narrative descriptions of Mr. Sampson's performance in clinical settings clearly do not reflect substantially limited functioning. These were submitted as Exhibit 1-A to Mr. Sampson's declaration. The narratives are overwhelmingly positive. Among the descriptions of his functioning one finds the following comments. With respect to reading:  "he read the medical literature and shared new knowledge with team members", "looks up medical literature", "proactive in his learning, readily and frequently reads up on his patients", "took initiative to look up information on interesting cases", "Researched his answers", "reads about patients' issues and problems in more depth to increase his fund of knowledge", "reflected evidence of his ability to use scientific literature effectively". With respect to organization: "able to work well in coordinating patient care with consultants", "helpful in getting all outside records", "without being directed, he met patients in preop, ensured consents were filled out appropriately, and updated the team with patients' progress to the OR", "well organized notes". With regards to attention, concentration, initiative, and follow through: "showed upon time was always eager to learn", "pays attention to detail", "took the initiative to look up information on interesting cases", "punctual, conscientious, attentive, professional", "behavior modeled reliability, collegiality and integrity". Finally with regards to initiative in learning: "uses every opportunity as a chance to learn

something", "able to synthesize information at a higher level than many of his peers", "consistently took the initiative to seek out tasks and additional learning opportunities".

33.     The negative comments, as few as these were, came primarily from his neurology rotation: "Learn ideal times to ask questions", "try to focus on the big picture - at times would focus on aspects of the patient  that were not the most important issues", and "continue to be more receptive to feedback".

34.     These contemporary, real-world observations clearly do not reflect the performance of someone who is substantially impaired, or someone who Dr. Aronson, writing on September 6, 2017, described as "*currently and profoundly disabled*". They are inconsistent with the claims of substantially impaired attention, memory, thinking, reading, or executive functioning.

35.     As noted above, I generally emphasize the issue of substantial limitation when evaluating whether testing accommodations are appropriate, rather than the threshold question whether a given diagnosis of an impairment is warranted. In my judgement, however, Mr. Sampson's documentation does not show that Mr. Sampson meets the DSM-5 criteria for a specific leaning disorder in reading and writing or the criteria for Attention Deficit Hyperactivity Disorder.

36.     I note what seems to be a tendency in many of these documents to use the words "disorder" and "disability" as if they were synonymous. The distinction between the two, however, is important. Here I will address the diagnosed *disorders*.

37.     As stated earlier, Mr. Sampson's supporting professionals indicate that he presents Specific Learning Disorders in reading and writing, Unspecified Neurodevelopmental Disorder affecting visual processing, and Attention Deficit Hyperactivity Disorder (combined presentation). At best, there is mixed evidence to support these diagnoses.

38.     The diagnosis of unspecified neurocognitive disorder simply reflects a manifestation of certain neurocognitive symptoms that cannot be categorized as meeting full criteria for any of the disorders in this diagnostic class. It is little more than labeling a problem that we otherwise know little about, and here we run the risk of mistaking a symptom or set of symptoms for a cause.

39.     The diagnosis of Specific Learning Disorders in Reading and Writing are also problematic. Based on her evaluation, Dr. Michels (2013) did not come to the diagnostic conclusion of a specific learning disorder in reading or writing. She instead labeled the problem as Learning Disorder, Not Otherwise Specified, which is used when perceived learning difficulties do not meet criteria for any specific learning disorder. This is the same problem discussed above with regards to the neurodevelopmental disorder.

40.     Dr. Anderson later (2013) diagnosed Unspecified Neurocognitive Disorder noting difficulties is visuospatial processing and related memory.  She added Specific Learning Disorder in Reading to the diagnostic list but concluded that an ADHD diagnosis was unwarranted. Writing on September 6, 2017, Dr. Aronson reported that Mr. Sampson has been under his care since 2015 and listed the diagnosis as Attention Deficit Hyperactivity Disorder. He also referenced "learning disabilities" involving reading. Dr. Wasserstein reported having most recently evaluated Mr. Sampson, and she diagnosed him as having a Specific Learning Disorder in reading and writing and Attention Deficit Hyperactivity Disorder (2020).

41.     The Specific Learning Disorder in Reading and Writing is not supported by the psychometric evidence as presented above, where there is substantial evidence of average or better than average reading and writing skills on appropriately normed tests. In addition, the college and graduate admissions test scores do not reveal impairment in reading skills. Although the candidate

is said to have spent countless hours preparing for these examinations, an individual must have mastered or possess the fundamental reading and writing skills needed for these examinations.

42.     In her evaluation report, Dr. Wasserstein quotes the sections of the DSM-5 that indicate a learning disorder can occur in intellectually gifted individuals (which indeed they can) who are able to sustain adequate academic functioning with considerable effort and hard work and substantial support. But the DSM-5 also says that impairment must be found on individually administered standardized achievement tests. Impairment is operationalized in the DSM-5 as performance that is a standard deviation and one-half below the mean for age -- meaning below the 8th percentile. The guidelines permit some use of clinical judgement in cases where converging evidence from diverse sources support the diagnosis, and in those instances the cut point can be lowered to achievement testing scores falling below 16th percentile. *None of the reading or writing scores on appropriately normed achievement tests for Mr. Sampson were below either of these cut points*.

43.     In their letter to the Board dated June 17, 2017, the candidate's parents discuss their early concerns and considerable efforts on their son's behalf throughout his early school years. They list the names of 27 individuals who have tutored Mr. Sampson throughout the years. Two were speech therapists for early stuttering difficulties that apparently remediated over time. Eleven appear to have been test prep tutors who provided instruction relative to the college and medical school admissions tests. Some were course tutors in chemistry, various math subjects, Spanish, and physics. And only two appear to  have been specific reading specialists.  Those tutors apparently worked with Mr. Sampson in grades 3 through 5. Student report cards from grades 1, 4, and 5 indicate at least satisfactory and often better performance in reading and writing.  Thus,

regardless of why Mr. Sampson's parents decided to employ tutors who were reading specialists, his academic records from the time reflect no impaired functioning in reading.

44.     The contention of early undiagnosed learning disorder would seem to suggest that all of his grade schoolteachers neglected to identify him as a student who lagged substantially behind his peers in acquiring basic academic skills, insofar as there is no evidence that any of Mr. Sampson's grade-school teachers reported the type of difficulties that Mr. Sampson and his parents described in support of his request for Step 1 testing accommodations. This seems an unlikely scenario, however, especially in years where teachers and schools are particularly attuned to tracking a student's development of academic skills and abilities.

45.     In a letter to the National Board, Dr. Anderson (August 10, 2017) wrote, "*Both Dr. Michels and I documented a history of functional impairment and additional supports that Mr. Sampson has needed since elementary school in order to maintain <u>a high level of academic achievement</u>*" (underscore added).  This is presumably a reference to the tutors discussed above, and not to any testing or other accommodations, as  Mr. Sampson confirmed in his accommodation request form that he received no accommodations at any point in his education prior to medical school.  The use of tutors to achieve a "high level of academic achievement" indicates not that he is disabled, but that he holds himself to high standards and is driven to maximize his perceived potential (as also evidenced by the fact that he is now pursuing a combined degree in business and medicine).  Not achieving his targeted performance level could easily make him anxious, and being anxious could easily affect his test performance.  As Dr. Michels (2013) wrote, "*Many students with disparate abilities develop anxiety about their school performance, and this appears to be the case for Robert*".

- 19 -

46.     In terms of the Attention Deficit Hyperactivity Disorder diagnosis, I do not believe that the real-world evidence found in the grade school records and the records from the clinical rotations are consistent with such a diagnosis. The teacher reports make sporadic comments about behaviors that could be consistent with ADHD. But many of these behaviors are not uncommon in children without any disorder. These comments alone do not indicate abnormal childhood development. Also, his work habits continued to improve during the first grade and were generally rated very good in the fourth-grade report card. At the end of the fifth grade, his teacher wrote, "*I am pleased by Robert's progress this year, both academically and socially. He has demonstrated a commitment to improving his academic performance and has developed better work habits and organizational skills*". Indeed, although a complete set of school records was not available, what has been provided appears to contradict a diagnosis of ADHD. The reports from his clinical rotations that were discussed earlier in this report adds to the doubt about the presence of ADHD, and at least one of his own professionals (Dr. Anderson) concluded that such a diagnosis was not supported.

47.     To conclude, Mr. Sampson claims that he is a disabled person due to neurodevelopmental disorders that substantially impair his learning, reading, thinking, cognitive processing, and test-taking, and that he is therefore entitled to receive double testing time over two days and additional breaks. The materials he has submitted, however, provide *scant objective and other evidence that Mr. Samson is substantially limited in learning, reading, thinking, cognitive processing, and test taking as compared to the average person in the general population, and in fact support the opposite conclusion*. In my judgment, the records do not present a substantive basis for providing him with any disability-based accommodations for the medical licensing examination.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 29, 2022.

DocuSigned by:

Joseph Bernier

A8CD725358E9469...

Joseph E. Bernier, Ph.D.