**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

ROBERT SAMPSON,                          :
                                         :
            Plaintiff,                   :
                                         :        CIVIL ACTION NO. 22-cv-05120
      v.                                 :
                                         :
NATIONAL BOARD OF MEDICAL                :
EXAMINERS,                               :
                                         :
            Defendant.                   :

**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

NBME invites the Court to do exactly what federal law, regulations, and guidance specifically instruct should not happen.  Sampson has offered a mountain of evidence of his need for accommodations, including reports of evaluating and treating experts authoritatively documenting disability based on comprehensive evaluation and observation, Sampson's history of needing and receiving the accommodations requested on NBME shelf exams and in medical school, records all the way back to early childhood documenting extraordinary mitigation necessary to overcome impairment, and letters of support based on observations by tutors, learning specialists, and his medical school.

NBME commits a key legal error in asserting that as a matter of law it is not required to defer to the conclusions of evaluating professionals who evaluated Sampson. The Department of Justice (DOJ), which is entitled to substantial deference in interpreting its own regulations, has issued explicit guidance stating that testing entities such as NBME *shall* defer to such conclusions. It was error for NBME to substitute the conclusions of those who have met, educated, or evaluated Sampson with those of its paid consultants who have never met Sampson.  In so doing, NBME

1

disregards substantial real-world evidence of disability that corroborates the diagnoses of every professional to evaluate Sampson.

## A. SAMPSON IS LIKELY TO PREVAIL ON THE MERITS OF HIS CLAIMS

NBME does not contest the reasonableness of the accommodations that Sampson seeks. NBME contests only whether Sampson is an individual with a disability. Since under the Americans with Disabilities Act Amendments Act (ADAAA), establishing disability is not meant to be a demanding standard, *e.g.*, 28 C.F.R. § 36.105(d)(1)(i), Sampson is substantially likely to prevail on the merits of his claim.[1]

## 1. NBME Is Required To Defer to the Conclusions of Evaluating Professionals

NBME errs in declaring that it "was not required to defer" to the evaluations that Sampson submitted.  NBME Br. at 21.  DOJ explicitly stated when promulgating Title III regulations:

> Reports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment."

Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56,236, 56,297 (Sept. 15, 2010). DOJ further explained that "when testing entities receive documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation, or aid requested, they shall generally accept such documentation and provide the accommodation." *Id.*  Consistent with this regulatory guidance, DOJ published technical

---

[1] NBME erroneously cites cases relying on case law predating the ADA Amendments Act that imposed now-rejected stringent tests for establishing disability.  *Singh v. George Wash. Univ.*, 508 F.3d 1097 (D.C. Cir. 2007) (predating ADAAA); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83 (D. Conn. 2011) (involving events prior to the ADAAA's effective date).

assistance for testing entities stating that such entities "should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations."  U.S. Dep't of Justice, Testing Accommodations, *at* https://www.ada.gov/regs2014/testing_accommodations.html.

NBME does not dispute that extensive regulatory guidance requires it to defer to the conclusions of Sampson's evaluating professionals. Rather, NBME asserts that the guidance is without the force of law and therefore should be ignored. However, as the Supreme Court has stated, DOJ's interpretations of Title III are entitled to deference because DOJ is charged with issuing implementing regulations under Title III, 42 U.S.C. § 12186(b), and rendering technical assistance, 42 U.S.C. § 12206(c).  *Bragdon v. Abbott,* 524 U.S. 624, 646 (1998).[2]

In *Ramsay v. Nat'l Bd. of Med. Exam'rs*, the Third Circuit explained that DOJ's guidance was well-founded, noting that pursuant to DOJ regulations, disability determinations "require[] an individualized assessment."  968 F.3d 251, 260 (3rd Cir. 2020) (quoting 28 C.F.R. § 36.105(d)(1)(vi)).  The Third Circuit explained that "[s]uch assessments benefit from the reports of professionals who know or have personally examined the individual" and have had the opportunity to "evaluate the individual's behavior, effort, and candor."  *Id.* (citing DOJ's guidance accompanying regulations DOJ promulgated following notice-and-comment rulemaking).

---

[2] NBME cited *Perez v. Mortg. Bankers' Ass'n*, 575 U.S. 92 (2012), which held that an agency must go through notice-and-comment rulemaking when promulgating rules that deviate significantly from prior regulatory guidance.  *Id.* at 95.  Here, DOJ's determination that testing entities should generally accept the conclusions of evaluating professionals followed extensive notice-and-comment rulemaking.  75 Fed. Reg. at 56,297.

Although the DOJ's subsequent technical assistance for testing entities states that the technical assistance has "no legally binding effect," it accurately summarizes its regulations and interpretive guidance that are entitled to deference.  *E.g.*, *Disabled Rights Action Comm. v. Las Vegas Events, Inc*., 375 F.3d 861, 875-876 (9th Cir. 2004) ("The guidance provided in the technical assistance manual is an interpretation of the DOJ's regulation, and, as such, is entitled to significant weight as to the meaning of the regulation.") (citations omitted).

NBME errs in relying on *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), for the proposition that this Court should disregard DOJ's on-point guidance. In *Nord*, the Supreme Court held that ERISA does not require plan administrators to defer to the conclusions of treating physicians. 538 U.S. at 829. As the Supreme Court noted, however, ERISA has no statutory or regulatory guidance requiring such deference; the Ninth Circuit's then-existing requirement that plan administrators defer to treating physicians was a judge-made rule. 538 U.S. at 829-32. In this case, as noted, DOJ has spoken and has determined that testing entities must defer to the conclusions of evaluating professionals.

## 2. In the "Battle of Experts," Deference Should Be Given to Professionals Who Actually Met and Evaluated Sampson

As NBME acknowledged, establishing disability typically should not require "scientific, medical, or statistical evidence." 28 C.F.R. § 36.105(d)(1)(vii). Nonetheless, Sampson has offered a wealth of such evidence, obtaining evaluations from three psychologists who conducted intensive evaluations and concluded that he has learning disabilities. NBME attempts to create a "battle of experts" by offering affidavits of psychologists who did not conduct such evaluations.

*Ramsay* is instructive because it featured such a battle of experts. In that case, the district court noted that given such competing expert testimony, the ADAAA's mandate requiring that disability "be construed broadly in favor of expansive coverage" served as a tie-breaker. 2019 WL 7372508, at *17-18 (E.D. Pa. Dec. 31, 2019). The Third Circuit affirmed, noting that since "the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis," the district "could reasonably have concluded that [NBME's] experts were too demanding in what they required to prove a disability," for example, by "substituting

4

their own opinions for those of Ramsay's healthcare providers."  968 F.3d at 260 (quoting 28

C.F.R. § 36.105(d)(1)(ii)).[3]

NBME's brief is precisely the sort of nit-picking that Congress sought to avoid in enacting

the ADAAA, and which DOJ wished to avoid in requiring testing entities to defer to the

conclusions of evaluating professionals. In essence, NBME seeks to restore the judicially exacting

standard of disability which the ADAAA was expressly enacted to reject, *see, e.g.*, Pub. L. No.

110-325, § 2(b).  Further highlighting the inappropriateness of NBME's scrutiny of Sampson's

requests for accommodations, one of NBME's own consultants acknowledged that there is "mixed

evidence" whether Sampson has disabilities.  Bernier Decl. ¶ 37, Dkt. 25.  When Sampson has a

lifelong history of being referred to learning specialists, tutors, and extensive neuropsychological

testing documents disabilities, there is no need to go further under the ADAAA.

Further, the assertions of NBME's paid consultants are suspect for numerous reasons.

Most significant is that NBME's hired consultants never observed or evaluated Sampson.

NBME's reliance on its purported experts who have never met Sampson is the same "blatant

error" that NBME made in *Ramsay* when it second-guessed the conclusions of the evaluating

professionals who actually administered individualized assessments or conducted clinical

interviews.  2019 WL 7372508, at *17. For instance, Dr. Wasserstein's report was the result of 15

hours of evaluation. She wrote a detailed report incorporating not only psychometric scores but

also describing observations of Sampson and reviewing Sampson's voluminous records describing

his substantial impairments. *See generally* Wasserstein Report, Dkt. 17-2 (filed under seal) .  For

instance, during evaluation Sampson committed errors of visual perception, mistaking the "+"

---

[3] NBME made no effort to distinguish *Ramsay* other than to claim near the end of its brief
that every case is different.  NBME Br. at 23.  NBME made this assertion about *Ramsay* even
while drawing parallels to other cases.

character for "x". Wasserstein Report, at 17, Dkt. 17-2.  In contrast, the NBME consultants, having never met or observed Sampson, are unable to offer detailed observations and conclusions. NBME consultant Flanagan even twice admitted in her affidavit that she did not have adequate time to review Sampson's file. Flanagan Decl. ¶¶ 7-8, Dkt. 26. To the extent that the NBME consultants address the observations of Wasserstein, Sampson's educators, and physician, the consultants chose to simply disbelieve those observations despite having never met Sampson.

The NBME consultants' opinions are also rife with factual inaccuracies and glaring omissions. The consultants assert, for instance, that Sampson had no history of accommodations prior to medical school, overlooking that even as far back as elementary school, Sampson was referred by his teacher to a reading specialist and that Sampson has had a lifelong need of having to work extensively with tutors to help him learn the material orally because he cannot not learn the material by visually reading the text. The NBME consultants also make no mention of or downplay the accommodations that Sampson has received in medical school, omitting all reference to the fact that without extended time, Sampson was unable to read all of the questions on the shelf exams that are identical to Step 1 exams. Nor do the consultants mention that in medical school, Sampson had to work with a learning specialist who reported his slow reading speed.  Significantly, none of the NBME consultants found it noteworthy enough to mention that Sampson has been prescribed medication for ADHD.

With respect to the actual psychometric testing that Sampson's evaluating professionals conducted, the NBME consultants do not challenge the evaluators' competency in administering or scoring the evaluations. The NBME consultants instead single out only certain tests for misplaced criticism,[4] lodging no objection to the rest, and ignoring numerous instances where

---

[4] For instance, the NBME evaluators critique the Nelson-Denny test based on comparative norms, in which Sampson was able to answer only 12 of 38 questions with limited time, scoring in

Sampson placed below the tenth percentile, *see, e.g.*, Wasserstein Report, at 17-18, Dkt. 17-2. NBME's heightened focus on select tests to the exclusion of others misses the forest for the trees: the neuropsychological testing, taken as a whole, paint a comprehensive picture of Sampson as an individual with learning disabilities. The evaluators did not treat any one psychometric test as dispositive—rather, it was the consistent pattern that emerged across multiple tests, that led Sampson's evaluators to conclude that he has disabilities.[5]

Further, NBME's consultants—none of whom are lawyers—erroneously claim that disparity between performance on test and actual intellectual capacity cannot be used to establish disability. In *Ramsay*, however, the Third Circuit specifically noted DOJ guidance stating that score disparities can be used to diagnose disability. 968 F.3d at 257-58.[6]  In Sampson's case, score disparities demonstrate that without accommodations, his scores reflect his disabilities rather than measuring the extent of his content knowledge.  *See* 28 C.F.R. § 36.309(b)(1)(i) (requiring accommodations when necessary to "best ensure" that test scores do not measure disability).

---

the bottom first percentile, but with extended time, correctly answered 37 of 38 questions. Wasserstein Report, at 16, Dkt. 17-2.  Even compared against college students, Sampson's performance in the bottom first percentile is striking evidence of disability.

   Further, as then-Judge Sotomayor observed based on a review of the literature regarding such testing, extended time benefits students with disabilities in a way that it does not for students without disabilities.  *Bartlett v. N.Y. Bd. of Law Exam'rs*, 93 Civ. 4986 (SS), 2001 WL 930792, at *28 (S.D.N.Y. Aug. 15, 2001).  Sampson's performance on this test is notable for the significant improvement with extended time, a powerful indicator that he has a disability.

   [5] NBME consultants also misinterpreted the import of certain psychometric tests that Wasserstein administered.  For instance, Wasserstein stated that she administered the tests such as the WAIS-IV to ensure that Sampson "put forth genuine effort throughout the testing session." Wasserstein Report, at 14, Dkt. 17-2.  Sampson's resulting high scores on these tests designed to be easy for him confirmed that he made a conscientious effort to do well on the testing, confirming the validity of the actual tests designed to measure his deficits.  *See id.*  NBME's consultants, however, relied Sampson's WAIS-IV scores as evidence of no learning disability even though the test was not designed or administered for this purpose.  *E.g.*, Bernier Decl. ¶ 19, Dkt. 25.

   [6] NBME cites cases such as *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012), for the proposition that score disparity cannot be used as part of the disability determination.  *Healy*, however, overlooks DOJ regulatory guidance entitled to deference which states that such disparities are evidence of disability.  *See supra*.

NBME, citing its own paid consultants, claims it is common for people without disabilities to obtain improved scores with additional time, but this claim is belied by the fact that it routinely grants extended time as an accommodation. If an individual does not have a solid understanding of medicine, no amount of additional time is going to help that student improve his Step 1 score.

### 3.  Sampson's Real World Substantial Limitations

NBME argues that "real world" evidence should be considered in evaluating Sampson's disability yet then disregards a wealth of such evidence documenting his long history of reading challenges that required extraordinary mitigating measures all the way back to his early childhood. There is no need for a "battle of experts" when educators, learning specialists, and tutors who have worked closely with Sampson have all noted Sampson's substantial impairments.

Sampson's grade school records are replete with mention of difficulties with attention, focus, organization, inability to complete assignments in a timely manner, difficulty with comprehension, and difficulty with reading.  Ex. 1, Decl. of Shelley Sampson at ¶ 14. Before fifth grade, Sampson's teacher advised his parents that Sampson needed to see a reading specialist and he did so, seeing reading specialists in elementary school and high school.  *Id.* at ¶ 4. NBME notes that Sampson was an honors student, but in the real-world Sampson had to petition to be in honors classes because his standardized test scores did not match his actual knowledge. *Id.* at ¶ 13. NBME also paid no attention to the numerous accommodations that Sampson used from elementary school through college, including going to more than twenty tutors who helped him learn material orally that he could not learn through reading due to his disabilities. *Id.* at ¶ 4. These tutors noted Sampson's substantial limitations, for instance personally observing Sampson "reverse letters and numbers, and otherwise miswrite numbers."  Ex. 2, Decl. of Andrew Lam, M.D. at ¶ 6. Dr. Lam, a tutor who spent hundreds of hours observing Sampson, described how

when "trying to read passages, [Sampson] would get bogged down and struggle to parse long

sentences, especially sentences with multiple clauses," and "when he would finally comprehend,

he would move on to the next sentence only to forget the previous sentence." *Id*. at ¶ 5.

Likewise in medical school, Stony Brook's learning specialist, Linda DeMotta worked

with Sampson for a year and a half to develop mitigating strategies. *See*, Linda DeMotta's March

29, 2017 Letter, Dkt. 16-7. Notably, Ms. DeMotta reports that Sampson has a slow reading rate.

*Id*.  She further reported, "[Sampson] struggled to learn from his textbooks, so we worked on

finding other resources – video, hands-on interactions, discussions, drawings- that were most

appropriate and least restrictive for [his] needs as a student with a learning disability. *Id*.

Stony Brook noted that with 50% additional time on examinations, Sampson had more

time to read and understand the examination questions, though he still did not have enough time to

read all of the questions. Robert Sampson Decl. ¶ 19, Dkt. 16-4. Stony Brook later gave 100%

extended time following a more current evaluation and recommendation. *Id*. ¶ 39, Dkt. 16-4.

Further, Stony Brook provided testing accommodations on NBME shelf examinations which are

retired questions from actual Step examinations. *See,* Linda DeMotta's March 29, 2017 Letter,

Dkt. 16-7. NBME cannot and does not attempt to distinguish these examinations from the Step

examinations at issue in this case. NBME failed to give this history of accommodations "in similar

testing situations" the "considerable weight" expressly mandated by the ADA.  28 C.F.R.

§ 36.309(b)(1)(v). During clinical rotations, reading is not timed, so NBME's attempts to use

Sampson's glowing performance reviews as somehow demonstrating that he does not have a

disability are particularly inappropriate and offensive.

NBME explicitly refuses to give any weight to Sampson's history of accommodations at

Stony Brook, claiming that a university's providing testing accommodations does not necessarily

mean that the university determined that the student had a disability. For that proposition, NBME

relied on the unreported decision of *Doherty v. Nat'l Bd. Of Med. Exam'rs*, 791 F. App'x 462 (5th Cir. 2019), which stated only that the record was silent as to why the university provided the student in question with testing accommodations.  *Id.* at 466 (noting the university's "unexplained accommodations").[7]  In this case, by contrast, Stony Brook has explicitly stated to the NBME that Sampson is an individual with a disability who needs testing accommodations. *See,* Linda DeMotta's March 29, 2017 and February 15, 2018 Letters, Dkts. 16-7 and 16-8 respectively. Stony Brook, which has interacted with Sampson, knows better than does NBME whether Sampson has disabilities. If Stony Brook, along with Sampson's evaluators, has determined that Sampson is an individual with disabilities, then the disability inquiry should have ended there with the NBME granting accommodations as the ADA as amended requires.

4. **NBME May Not Rely on Sampson's History of Using Mitigating Measures to Achieve Academic Success**

NBME errs in pointing to Sampson's history of academic success as proof that he is somehow not disabled. The ADA regulations specifically caution against such analysis, explaining that "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve."  28 C.F.R. § 36.105(d)(3)(iii).  The regulations further state, in direct opposition to NBME's argument:

> For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population.

---

[7] NBME also cited *Wright v. Nat'l Bd. of Medical Exam'rs*, which held only that a person's limited history of accommodations is "not dispositive."  21-cv-02319-DDD-NYW, 2021 WL 5028463, at *6 (D. Colo. Oct. 15, 2021), *appeal dismissed*, 2021 WL 8086740 (10th Cir. Nov. 19, 2021).  Further, *Wright* is distinguishable because as described, Sampson has a lifelong history of accommodations, including informal accommodations.

*Id.*; *see also* 28 C.F.R. § 36.105(d)(1)(v) ("An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.").  NBME acknowledges these regulations yet claims that it is entitled anyway to look at outcomes in deciding whether to provide accommodations.  NBME Br. at 19-20.[8]

NBME cites several cases in which courts noted a student's academic success in the course of ruling against the student. In those cases, however, the students' academic success was dispositive only in the absence of any evidence of disability.[9] NBME ignores other cases such as *Ramsay* in which the plaintiff was found to have a disability, with the stellar academic performance reflecting the student's mitigating measures.  *See, e.g.*, 968 F.3d at 257 n.7 (holding that the district could "consider and discount that [plaintiff] compensated for her very weak reading and writing abilities by devoting more effort to her assignments than most students"); *see also Berger*, 2019 WL 4040576, at *23 (noting student's use of compensatory strategies).

In light of the DOJ regulations that NBME itself acknowledges preclude reliance on outcomes, it was clear error for NBME to rely on Sampson's academic achievement while

---

[8] NBME falsely accuses Sampson of relying on outcomes too by referencing his medical school examinations. NBME Br. at 19.  Sampson's experience on these examinations is relevant, not because of the scores he obtained, but because he did not have the opportunity to read and understand all of the questions, demonstrating the need for extended time.

[9] For this proposition, NBME devotes footnote 7 of its brief to collecting cases.  The NBME, however, omitted mention that *Berger v. Nat'l Bd. of Med. Exam'rs* specifically distinguished each one of these cases, holding that "a definition of disability based on outcomes alone, particularly in the context of learning disabilities, would prevent a court from finding a disability in the case of any individual . . . who is extremely bright and hardworking, and who uses alternative routes to achieve academic success, a result that would be inconsistent with the goals of the ADA."  No. 1:19-cv-99, 2019 WL 4040576, at *23 (S.D. Ohio Aug. 27, 2019).

NBME also cited *Schimkewitsch v. N.Y. Inst. of Technology*, No. CV 19-5199-GRB-AYS, 2020 WL 3000483 (E.D.N.Y. June 4, 2020).  In that case, however, the court merely noted that the plaintiff's own psychologist had stated that any anxiety diagnosis did not affect the plaintiff's ability to participate in the program at issue. *Id.* at *5.

ignoring the mitigating measures he used to achieve those results.  The focus is not on the results Sampson achieved, but the condition, manner, and duration that it took to perform major life activities such as reading, learning, thinking, and concentrating.  *E.g.*, 28 C.F.R. § 36.105(d)(3)(i).

### 5.  NBME Places Undue Weight on Standardized Examinations

NBME also argues, contrary to DOJ guidance, that Sampson's scores on the ACT, SAT, and MCAT mean that he is somehow not a person with a disability.  DOJ expressly rejected the practice of testing entities such as NBME of relying on such standardized tests as a determining factor in determining whether an individual has a disability, explaining that relying on testing performance has limited relevance and value with respect to disproving disability.  *See* Amendment of Americans with Disabilities Act Title II and Title III Regulations To Implement ADA Amendments Act of 2008, 81 Fed. Reg. 53,204, 53,237 (August 11, 2016).  NBME cannot offer any evidence that the ACT, SAT, and MCAT were designed to diagnose disability or that any competent psychologist uses these tests for such diagnostic purposes.

NBME spends a significant portion of its brief counting words in selected questions on ACT, SAT, MCAT, and Step 1, relying on an affidavit prepared by one of its lawyers.  This word-counting exercise misses the point. Sampson's experience is that the ACT, SAT, and MCAT do not require him to read every word of every question; he was able to read the question prompt, which would refer him to a specific portion of a passage, and he would read only that portion of the passage in answering the question. Robert Samson Decl. ¶¶ 33 and 42, Dkt. 16-3.  Step 1, in contrast, requires Sampson to read every word of every question, and as shown by his experience on shelf exams, which are recycled Step 1 questions, Sampson needs double-time to be able to read and understand the questions.  These shelf exams, which Stony Brook found noteworthy in its

12

determination that Sampson needs extended time, are far more probative of Sampson's need for accommodations on the identical Step 1 exam.

## B. SAMPSON WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTION

NBME acknowledges that Sampson "would seem to have a reasonable argument for irreparable harm" (NBME Br. at 7) yet resists the logical conclusion that Sampson will be irreparably harmed absent preliminary injunction.

First, NBME ignores *Ramsay*, a case factually on point. In that case, a medical student stood to be dismissed from medical school if she did not pass the Step examination on her next attempt. The Third Circuit held that this circumstance constituted irreparable harm and jeopardized the student's "opportunity to pursue her chosen profession." 968 F.3d at 262-63. NBME has not distinguished this case in arguing against irreparable harm.

NBME also makes a number of factual mischaracterizations in arguing against irreparable harm. NBME argues that because Sampson also seeks a preliminary injunction against Stony Brook, he cannot establish irreparable harm with respect to NBME. NBME overlooks, however, that even with a preliminary injunction against Stony Brook, Sampson will still not be able to resume medical school unless he passes Step 1, for which Stony Brook has said he needs accommodations. NBME claims that Sampson is subject to dismissal because he cannot graduate in seven years, but ignores the fact that NBME's own refusal to provide necessary accommodations has been a major reason cause of delay, and likewise ignores that Stony Brook's seven-year policy on its face does not apply to joint-degree students like Sampson.

NBME also argues that Sampson should simply take Step 1 again without accommodations. Sampson has already failed Step 1 without accommodations—given this history, it is likely that he will fail again without necessary accommodations. *See Ramsay*, 968

13

F.3d at 262 (noting that a student who had failed the test without accommodations was likely to fail again without accommodations). As NBME is well-aware, requiring Sampson to fail again would moot the case since if he fails, he will be dismissed from medical school.[10]

NBME erroneously claims that Sampson cannot demonstrate irreparable harm because he has not registered for the Step 1 exam. This argument is specious because Sampson did register for Step 1. Registration (and paying a fee to the NBME) was required in order for Sampson to request accommodations. https://www.usmle.org/sites/default/files/2021-09/Accommodations_Request_Form.pdf.  It would be futile for Sampson to register again when NBME refused his request for accommodations.  *See, e.g.*, *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 188-189 (2d Cir. 2013) (ADA does not require futile gestures).

Finally, NBME errs in suggesting that Sampson waited too long to file suit.[11]  NBME errs in counting the initial three-year leave of absence against Sampson when Stony Brook reversed itself and told Sampson that it would no longer require him to take Step 1 earlier than the rest of his classmates.  Sampson therefore had no reason to pursue litigation at that time.  After Sampson completed his third-year clinical rotations, he was enrolled full-time in graduate business classes at Stony Brook.  Sampson then registered for the Step 1 prior to starting his fourth year of medical school.  This was in the spring of 2022, and Sampson submitted a request for accommodations

---

[10] NBME relies on the inapposite case of *Bach v. Law Sch. Admissions Council, Inc.*, 1:13-CV-888, 2014 U.S. Dist. LEXIS 124632 (M.D.N.C. Feb. 4, 2014).  There, the plaintiff could take that exam multiple times with minimal impact on his applications to law school.  *Id.* at *6-7.

[11] For this proposition, NBME cited inapposite cases.  *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (gerrymandering case in which plaintiffs waited until after three elections to bring challenge); *Wright*, 2021 WL 5028463, at *9 (plaintiff had additional opportunities to take examination even if he failed without accommodations); *Monowise Ltd. v. Ozy Media, Inc.*, 17-CV-8028 (JMF), 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018) (plaintiff waited until after defendant used trademark for a festival to bring suit); *Pazer v. N.Y. State Bd. of Bar Exam'rs*, 849 F. Supp. 284, 285-86, 288 (S.D.N.Y. 1994) (plaintiff waited until two weeks before the bar examination to seek preliminary injunction).

when he registered for the test.  NBME denied this accommodations request in June 2022.

Sampson's counsel contacted NBME's counsel in an effort to avoid litigation, and filed suit only

after NBME's counsel refused to provide a responsive answer.

### C.  THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR SAMPSON

NBME does not contest that it can readily provide Sampson with extended testing time but

implies that its standards would be somehow lowered if it is ordered to do so. This is not a speed-

reading test, however, as NBME routinely grants extended time as an accommodation. This is a

test designed to measure knowledge of medicine, and NBME has offered no support for the parade

of horribles it advances should it be required to provide Sampson with the same accommodations

that his medical school already provides on identical shelf examinations.[12]

NBME argues only that its examinations must be fairly administered. Sampson agrees

wholeheartedly with this proposition.  Per DOJ regulations, NBME must provide testing

accommodations to "best ensure" that the examinations measure Sampson's knowledge of

medicine rather than the extent of his disabilities—Sampson seeks only a fair chance to prove that

he has mastered the content.  When the NBME provides necessary accommodations, this inspires

confidence in the accuracy of its scores as truly measuring knowledge rather than disability.

### D.  CONCLUSION

Sampson requests that this Court enter a preliminary injunction as outlined in his Proposed

Order.

---

[12] NBME relies on *Rothberg v. Law Sch. Admission Council,* 102 F. App'x 122, 126-27 (10th Cir. 2004), which is not on point because in that case, the plaintiff would suffer no irreparable harm and the grant of preliminary injunction would moot further litigation.  Here, however, Sampson has established irreparable harm for the reasons briefed, and his motion for preliminary injunction is limited to the Step 1 examination.  Should he pass this examination, Sampson will still need to take Step 2-CK and Step 3 with accommodations.

Respectfully submitted,

s/Mary C. Vargas
Mary C. Vargas
Michael Steven Stein
STEIN & VARGAS LLP
10 G Street NE, Suite 600
Washington, DC  20002
Tel. (240) 793-3185
Fax (888) 778-4620
mary.vargas@steinvargas.com
Michael.stein@steinvargas.com

s/Charles Weiner
Charles Weiner
LAW OFFICE OF CHARLES WEINER
Cambria Corporate Center
501 Cambria Avenue
Bensalem, PA 19020
Tel. (267) 685-6311
Fax (215) 604-1507
charles@charlesweinerlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned served a true and correct copy of the foregoing by CM/ECF on the

following counsel for NBME:

Adam Mandelsberg
Caroline Mew
Perkins Coie LLP
1155 Avenue of the Americas
22nd Floor
New York, NY 10036

s/Mary C. Vargas
Mary C. Vargas
