**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

ROBERT SAMPSON,              :
                                       :
          Plaintiff,           :
                                         :
            v.               :
                                       :   CIVIL ACTION NO. 22-cv-05120
NATIONAL BOARD OF MEDICAL   :
EXAMINERS,               :
                                       :
          Defendant.      :

**ROBERT SAMPSON'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Before this Court is a Motion for Preliminary Injunction (Dkt. 16) filed by Robert Sampson ("Sampson") against defendant National Board of Medical Examiners ("NBME") seeking an order requiring the NBME to comply with federal law and provide extended time (double time), a separate testing room, and extra breaks for Sampson on Step 1 of the United States Medical Licensing Examination ("USMLE"). NBME filed its opposition to this motion on September 29, 2022. (Dkt. 20). Sampson filed his Reply on October 4, 2022. (Dkt. 32). A three-day hearing was held October 11, 2022 through October 13, 2022.

I.      **FINDINGS OF FACT**

A.  **The Parties and the USMLE**

1.      Robert Sampson is a joint-degree student in medicine and business who is approximately 40 weeks away from completing his medical degree. Tr. 36:20-22, 37:22-24, 38:6-7.

2.      Before Sampson can commence his final 40 weeks of medical school, he must take and pass the first part of the USMLE called Step 1. Tr. 38:16-17.

3.     The NBME is the testing entity that administers Step 1 of the USMLE.  NBME Br. (Dkt. 20) at 2.

**B.  Mr. Sampson's Educational History**

4.     Robert Sampson has been diagnosed on the basis of exhaustive evaluation by a board-certified neuropsychologist and by his treating psychiatrist with learning disabilities including Specific Learning Disorders of reading and written expression, and Attention Deficit Hyperactivity Disorder ("ADHD").  PX 31A, Letter of Dr. Aronson dated 6/12/2018; PX 37, Report of Dr. Wasserstein dated 12/6/2020.[1]

5.     Since his formal diagnosis, Sampson has been provided formal accommodations, specifically, extended time, a separate testing room, extended breaks, notetakers, and ADHD prescription medication.  Tr. 77:19-25, 115:24-116:20; PX 31A; PX 37 p.2.

6.     However, Sampson has required accommodations his entire life, including but not limited to mitigating measures such as "an army of tutors" who provided intensive intervention, referrals to reading specialists, extra time to take tests during lunch, and afterschool.  Tr. 39:1-3, 39:9-17, 41:18-42:2, 42:21-22, 52:7-53:12[2], 162:7-21, 163:2-20, 197:25-198:22; PX 19, Letter of Drs. Sampson to NBME dated June 17, 2017.

7.     As early as the age of 3 or 4, Sampson was diagnosed with severe stuttering that required lengthy and intense intervention over the course of multiple years.  Tr. 156:3-156:25, 196:4-12.  As part of this intervention therapy, Sampson's entire family slowed their speech on the advice of experts to allow longer processing time for Sampson.  Tr. 156:3-156:25, 157:5-

---

[1] "PX" refers to Plaintiff's Trial Exhibits.

[2] There is an error in the transcript at 53:11-53:12. The word "succinct" in both lines 11 and 12 should be "synced."

158:10.  Stuttering is extremely common during the developmental period among dyslexics like Sampson.  Tr. 195:2-8.

8.      In elementary school, Sampson's mother was taught by his speech pathologist to help Sampson focus by giving him only one-step instructions, waiting for him to process the single instruction, and then checking for completion.  Tr. 158:14-159:5.

9.      Sampson's parents devoted not only significant resources towards obtaining necessary supportive intervention and remediation services but also took an active role in teaching him themselves what he was not able to process in the classroom, even reading materials out loud to him when he was unable to read the materials fast enough himself.  Tr. 39:18-40:3, 42:10-18, 43:12-22.

10.      Sampson always struggled with reading both because he had challenges focusing and because his reading was slow.  Tr. 159:6-18.  He particularly hated having to read aloud in school because after reading aloud, he would be asked questions about what he had just read, and he would be unable to recall.  Tr. 45:19-46:4.

11.      Sampson's grade school records are replete with mention of difficulties with attention, focus, organization, inability to complete assignments in a timely manner, difficulty with comprehension, and difficulty with reading.  Tr. 91:22-93:6; Decl. of Dr. Shelley Sampson (Dkt. 32-1) at ¶ 14; PX 20; PX 21.  Before fifth grade, his classroom teacher advised his parents that Sampson needed to see a reading specialist and he did so, seeing reading specialists in elementary school and high school.  Tr. 89:13-17, 90:18-91:15, 162:7-21; Decl. of Dr. Shelley Sampson (Dkt. 32-1) at ¶ 4; PX 19.

12.     Sampson's reading is slow as compared to the most people in the general population and he experiences challenges with comprehension of what he reads.  Tr. 18:15-23, 19:1-11.

13.     Likewise, Sampson's writing is replete with hallmarks of learning disabilities including reversal of letters and copying numbers and letters in the wrong order.  Tr. 19:19-25.

14.     Further, despite being an accomplished cellist, as a child Sampson was unable to read music.  Tr. 49:21-51:9.

15.     Learning disabilities and attentional difficulties run in Sampson's family, with his brother, mother, father, and grandfather all experiencing learning difficulties and/or attentional difficulties which were never formally diagnosed.  Tr. 46:5-47:11, 164:15-166:6.

16.     All the way back to his earliest education, Sampson was not able to complete timed tests during the time allotted.  Even in elementary school, he routinely had to finish at lunch or after school the tests that other students finished during class.  Tr. 41:18-42:2.

17.     At times, for example in high school, Sampson required as much as 15 hours of formal tutoring per week just for a single class.  Tr. 44:20-45:8. This intensive tutoring was both different in volume and nature from the tutoring children without disabilities typically receive; tutors provided information through alternate means including verbal dialogue and greater repetition to help Sampson overcome his disabilities.  Tr. 43:14-22, 44:20-45:8, 197:25-198:22.

18.     In college, Sampson mitigated his disabilities in a multitude of ways, including recording lectures, using a livescribe pen, working with tutors who verbally engaged and discussed material with him, and by avoiding classes that had heavy reading and timed tests.  Tr. 51:14-53:12.

4

19.    Sampson has dreamed of and prepared to be a doctor his entire life.  Tr. 36:24-37:9.

20.    Students, like Sampson, who intend to apply to medical school must take a standardized test called the Medical College Admission Test ("MCAT").  Tr. 54:13-21.

21.    However, unlike most students who prepare for the MCAT for a period of months, Sampson prepared for the MCAT over a period of years.  Tr. 17:16-24, 55:5-16, 56:6-16.

22.    Sampson's father, a surgeon, devoted extensive efforts to helping Sampson prepare for the MCAT, as did a number of MCAT tutors.  Tr. 8: 6 -12, 55:5-56:23, 63:1-10.

23.    Dr. Andrew Lam, who tutored hundreds of students in elementary, middle and high school, college, and medical school, worked with and directly observed Robert Sampson during hundreds of hours of MCAT tutoring.  Tr. 15:18-20, 16:4, 16:12-14.

24.    Dr. Lam directly observed over these hundreds of hours that Sampson had substantial impairment as compared to most people in the general population.  Tr. 16:4, 20:15-20.

25.    Of the hundreds of students of different ages and levels that Dr. Lam tutored, Sampson was the one Dr. Lam saw experience the most severe impairments in reading and processing written text.  The only other students Dr. Lam observed who displayed the same types of challenges, albeit to lesser degrees than Sampson, had all been diagnosed with learning disabilities.  Tr. 20:15-20, 35:1-5.

26.    Even with mitigating measures including test-taking strategies, extensive preparation, and intensive tutoring, Sampson was not able to demonstrate on the MCAT the full extent of his knowledge.  Tr. 24:9-19.

27.     During hundreds of hours tutoring Sampson, Dr. Lam noticed that when Sampson was verbally asked a question, Sampson possessed the knowledge to answer questions correctly, but that when Sampson had to read the question himself, he would get the answer wrong.  Tr. 57:10-18.

28.     With Dr. Lam's help, Sampson found and used test-taking strategies to mitigate the impact of his disabilities, such as summarizing topic sentences in exam questions as he read them so as not to forget their meaning, reading question prompts and topic sentences, and reading only those portions of the text that question prompts directed him to, without reading the rest of the passage.  Tr. 19:8-11, 21:15-22:16, 57:25-58:23.

29.     Despite extraordinary preparation and use of these mitigating strategies, Sampson's MCAT score the first time he took the test was not high enough to earn admission to any medical school. After a second year of intensive preparation, his score improved only one point.  Tr. 59:6-8, 59:9-17, 63:21-24.

30.     The MCAT is not a test that diagnoses learning disabilities.  Tr. 265:15-17.

31.     Dr. Lam encouraged Sampson to go for comprehensive educational testing to determine if Sampson had learning disabilities.  Dr. Lam made this recommendation after witnessing Sampson struggle more than any other student Dr. Lam had ever encountered with slow reading, writing, comprehension, and recollection of what had been read.  Tr. 60:19-61:14.

**C.  Mr. Sampson Undergoes Comprehensive Education Evaluations in 2013**

32.     With Dr. Lam's encouragement, Sampson obtained educational testing in August 2013, with results confirming what Dr. Lam suspected—that Sampson had learning disabilities and needed testing accommodations.  Tr. 61:15-62:1.

33.     Suzanne E. Michels, Ph.D. evaluated Sampson on August 26, 2013, conducted a personal interview, and administered a battery of assessments.  Based on the totality of the data that she gathered, she diagnosed Sampson with a Learning Disorder, Not Otherwise Specified. She further documented that Sampson had significant weaknesses on tasks requiring visual/spatial skills, reading comprehension, and reading speed which have negatively affected aspects of his academic performance.  PX 3.

34.     Dr. Michels recommended that Sampson receive accommodations including extended time.  PX 3.

35.     Allison Anderson, Ph.D. conducted a supplemental evaluation of Sampson on December 16, 2013.  Based on her personal observations and the data collected from a battery of assessments, Dr. Anderson diagnosed Sampson with Unspecified Neurodevelopmental Disorder, visuospatial processing, and Specific Learning Disorder, with impairment in reading (dyslexia). PX 2.

36.     Like Dr. Michels, Dr. Anderson concluded that Sampson needed extended testing time. PX 2.


**D.  Sampson in Medical School**

37.     Sampson began medical school initially relying on mitigating strategies that had worked for him in the past such as the livescribe pen, lecture playbacks, tutoring sessions with his father, and supplemental supportive programs including audiovisual supplements and a cartoon-based learning program called Sketchy Micro.  Further, several professors informally permitted him extra time for tests.  Tr. 66:4-67:13.

38.     Although Sampson would perform well in classes, part of his grades were based on shelf exams which are exams consisting of old USMLE questions.  Sampson did not initially receive extended time as a formal accommodation on shelf exams, and his scores on these tests he could not finish negatively impacted his grades which were otherwise strong.  Tr. 67:13-68:11, 72:8-73:14.

39.     Notably, other students did not need to use all of the allotted time for the shelf exams, but Sampson struggled to read all of the questions and was always the only one of his classmates still there trying to complete the shelf exams until time ran out.  Tr. 73:24-74:10.

40.     Although Sampson passed all of his classes those first three semesters in medical school, his disabilities prevented him from being able to demonstrate fully his knowledge on the NBME shelf exams without accommodations.  He requested accommodations from his medical school's disability office.  Tr. 69:3-20.

41.     Stony Brook University's disability office reviewed the results of his comprehensive educational testing and personally interviewed Sampson.  Tr. 69:18-70:3.

42.     Based on the review of documents and educational testing as well as its interview of Sampson, Stony Brook University granted Sampson's request for accommodations and approved him for note-taking services, extended testing time, and a separate testing area.  Tr. 69:23-70:25.

43.     Sampson also met at least once a month with Stony Brook's learning specialist, Linda DeMotta, who was experienced in working with students with learning disabilities.  Tr. 71:2-19; PX 7, Letter from DeMotta 3/29/2017; PX 29, Letter from DeMotta dated 2/15/2018.

44.     However, even though Sampson passed all of his classes during the first year and a half of medical school, his medical school required him to either repeat the entirety of his medical education, or take Step 1 of the USMLE earlier than his peers.  Tr. 71:21-72:6.

**E.  Sampson's Requests for Accommodation and NBME Denials**

45.     In order to comply with his medical school's directive, Sampson began seeking accommodations from the NBME so he could have an opportunity to demonstrate his knowledge on Step 1.  Tr. 74:16-75:13.

46.     Accommodations are intended to put everyone on an equal playing field.  Tr. 272:12-13.

47.     Sampson submitted his first application for accommodations to the NBME so that he had the necessary accommodations in place to take Step 1 on a level playing field.  Tr. 74:25-75:25; PX 1.

48.     With his first request for accommodations Sampson submitted significant documentation including the following:

> a) application for accommodations;
> b) certification that his medical school was providing him the testing accommodations requested from the NBME;
> c) comprehensive psycho-educational evaluation by Suzanne Michaels, Ph.D.;
> d) supplemental education evaluation by Allison Anderson Ph.D.;
> e) personal statement/narrative describing the impact of his disabilities and need for accommodation;
> f) letter from his treating psychiatrist Thomas Aronson, M.D.;
> g) letter from Christopher Heedles, the licensed social worker at Stony Brook University's disability services offices who concluded that Sampson needed accommodations for his disability;
> h) letter from Linda DeMotta, Stony Brook University's learning specialist who had worked first-hand with Sampson;
> i) letter from Dr. Andrew Lam outlining what he had personally observed in regard to Sampson's disability and need for accommodations;

9

> j) letter from Andrew Wackett, M.D. comparing Sampson's performance on shelf
> exams with and without accommodations;
> k) his MCAT scores;
> l)  his ACT scores;
> m) his PSAT and SAT scores; and
> n) a score report from standardized testing Sampson took in second grade.

Tr. 76:1-86:11; PX 1-15.

49.     The NBME denied in full Sampson's request for accommodations.  Tr. 87:23-25;

PX 16.

50.     Sampson appealed the denial by submitting even more information to the NBME,

including a letter from Jan Serrantino, a disability expert at the University of California-Irvine

supporting his need for accommodations, a letter from his parents outlining their historical

observations of his disabilities during the developmental period, a list of tutors and reading

specialists he had relied on to mitigate his disability throughout his childhood, and report cards

and other educational records from early childhood.  Tr. 89:1-21, 90:2-91:21, 91:22-93:8; PX 17-

21.

51.     Despite this mountain of additional supporting materials establishing disability in

the developmental period, the NBME again denied Sampson's request for accommodation.  Tr.

93:9-11; PX 22.

52.     Sampson again tried to prove his disability and need for accommodations with a

new appeal containing additional documentation including yet another letter from his treating

psychiatrist Dr. Aronson, another letter from Jan Serrantino (the disability expert from the

University of California-Irvine), and a new letter from Dr. Anderson who had administered the

previously provided battery of psychological assessments.  Tr. 93:25-96:11; PX 23-26.

53.     Again, the NBME denied in full Sampson's request for accommodations. Tr.

96:12-14; PX 27.

10

54.     Sampson again appealed the NBME's decision and again provided additional support for his accommodation request.  Tr. 97:1-98:12; PX 28-29.

55.     The additional evidence that Sampson submitted included a letter from Linda DeMotta, the learning specialist at Stony Brook University who had worked extensively with Sampson and observed his disabilities directly.  DeMotta advised the NBME that her opinion that Sampson needed testing accommodations was based on her expertise as a learning specialist and her first-hand observations of Sampson.  DeMotta informed the NBME, "As I had noted in my previous letter dated March 29, 2017, I am professionally trained and qualified to comment on my observations of the manifestations of Robert's disabilities in reading, writing, managing time, memory organization and other academic and life activities.  Robert meets the criteria, through our disabilities services office and according the guidelines of the ADA, for appropriate testing accommodations."  PX 29, Letter from Linda DeMotta dated 2/15/2018.

56.     In her letter to the NBME, DeMotta also directly rejected an unsupported claim the NBME made in a prior denial letter that Sampson had a history of unimpaired performance on standardized tests. To the contrary, DeMotta explained that "the records do not show this at all.  The records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude.  In medical school, that is not what the record shows at all.  The medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions.  Clearly Robert requires the time extension to gain access to the exam.  Not all standardized exams are equal and the USMLE Step exams in particular require reading skills, interpretation, synthesis,

integration and pattern recognition well beyond any skills required on the college entrance

exams. Moreover, USMLE Step exams will require Robert to interpret images from histology

and gross pathology as well as graphs and charts, all of which will test his disabilities directly."

PX29.

57.     The NBME again denied in full Sampson's appeal.  Tr. 98:13-16; PX 30.

58.     Thereafter, Sampson retained an attorney who submitted a detailed appeal

reminding the NBME of its legal obligations to best ensure—as ADA regulations require—that

Sampson's scores reflect his knowledge rather than his disability. Tr. 98:24-99:10; PX 31.

59.     The attorney's appeal on Sampson's behalf included a new letter from Sampson's

treating source, Dr. Aronson.  Tr. 99:13-25; PX 31A, Letter from Dr. Aronson dated 6/12/2018.

60.     In this new letter to the NBME, Dr. Aronson noted that this was his third time

writing a letter to the NBME on Sampson's behalf and that he was "concerned by the [NBME's]

legalistic hairsplitting…" Dr. Aronson reminded the NBME that the proper comparison is to

compare Sampson with the general population and that unlike Sampson, the general population

does not exhibit widely discrepant cognitive profiles, reads with automaticity, does not get

exhausted from reading, and can complete tests within standard time.  Dr. Aronson explained

that Sampson was only able to get to medical school and was diagnosed late as the result of

"high intelligence, motivation and time consuming compensatory strategies (re-reading, working

extra hours, tutoring)…"  PX 31A.

61.     Again, the NBME denied in full Sampson's request for accommodations.  Tr.

100:1-3; PX 32.

62.     Sampson yet again appealed the NBME's denial of accommodations and yet again the NBME denied in full Sampson's request for accommodations.  Tr. 100:11-25; PX 33-34.

63.     In the face of multiple NBME denials, and unable to progress in medical school without taking and passing Step 1, Sampson was forced to take Step 1 without any accommodations in January of 2020.  Tr. 101:14-23.

64.     Sampson prepared extensively using multiple mitigating strategies as he had for examinations through his education.  He did thousands of practice questions, spent hours talking through concepts with his father, watched video lectures, and attempted time-saving measures he had utilized on the MCAT, but despite extraordinary effort, Sampson was unable to read all of the questions without extended time and consequently failed Step 1.  Tr. 102:8-107:12; PX 43.

65.     While MCAT questions have only 4 answer choices, USMLE questions can have as many as 11 answer choices.  Tr. 106:9-25, 270:7-9.

66.     Generally, the MCAT has one vignette for multiple questions and MCAT questions often direct test takers to a certain part of a vignette to find the answer to the question asked.  Tr. 106:9-25, 270:14-16, 271:3-7.

67.     Test-taking strategies allow students taking the MCAT to improve their scores.  Tr. 267:24-268:21, 271:15-20.

68.     These same strategies do not work on the USMLE.  Tr. 22:21-24:8, 34:22-25.

69.     For Sampson, finding out that he had failed Step 1 was earth-shattering.  Stony Brook began the process to force his withdrawal from medical school because of it despite Sampson having passed all his classes.  Tr. 107:17-22, 110:2-4.

**F.  Sampson Continues his Medical Education**

70.    Although Stony Brook University initially advised Sampson it was expelling him because he had not passed Step 1, Sampson's counsel advised Stony Brook that such expulsion would be discriminating against Sampson on the basis of disability. Tr. 102:1-7, 107:4-110:14.

71.    Stony Brook reversed its decision and permitted Sampson to continue into his third year of medical school and take Step 1 at the completion of his third year—the same time that the rest of his classmates were required to take Step 1.   Tr. 109:7-110:1, 110:8-14, 112:12-13, 112:19-113:3.

72.    Sampson excelled in his third year of medical school, earning stellar performance reviews that spoke of both his dedication to patients and his advanced knowledge.  Sampson also earned a 4.0 in his graduate business classes. Dkt. 16-3 at pp. 95-98; Tr. 116:11-12.


**G.  Sampson Undergoes Additional Comprehensive Educational Testing**

73.    Sampson underwent additional, comprehensive testing in August 2020 from a board-certified neuropsychologist who specializes in learning disabilities named Jeanette Wasserstein.  Tr. 113:23-114:5, 172:10-173:2, 186:12-19.

74.    Sampson underwent this testing during the height of the COVID pandemic and shortly after his testing, Dr. Wasserstein became gravely ill with COVID, delaying her report. Tr. 113:22-114:5, 118:13-18.

75.    Although Dr. Wasserstein's report was written in December of 2020, Sampson did not receive the final report until January of 2022.  Tr. 116:17-18, 118:8-119-13, PX 37, Report of Dr. Wasserstein.

76.     Dr. Wasserstein is in private practice and is a licensed psychologist and a board-certified neuropsychologist, which requires specialized training well beyond that of a clinical psychologist.  Tr. 172:2–173:2; PX 55.

77.     Dr. Wasserstein has numerous publications on ADHD and learning disabilities. Since 1996, she has served as Assistant Clinical Professor in the Department of Psychiatry at Mount Sinai School of Medicine.  Tr. 174:9–176:10, 177:2–8; PX 55.

78.     Dr. Wasserstein has been in a private clinical practice since 1981.  Dr. Wasserstein specializes in learning disabilities, ADHD and associated issues such as executive function deficits, anxiety, depression and other psychiatric issues.  Over the course of her practice, she has evaluated thousands of individuals, including for ADHD and learning disabilities.  Tr. 177:9-25.

79.     Dr. Wasserstein followed a comprehensive set of procedures in evaluating Sampson.  Dr. Wasserstein obtained a history through an extensive interview of Sampson and a complete history, review of prior evaluation reports, review of various educational records dating back to first grade, and review of documentation from tutors, learning specialist Linda DeMotta, and Sampson's parents.  Dr. Wasserstein and her assistant Dr. Miller then administered a battery of assessments.  Tr. 184:14-186:22, 189:4–192:18.

80.     Dr. Wasserstein testified that Sampson provided a complete history and thorough documentation.  Tr. 192:9–194:1.

81.     Dr. Wasserstein noted that Sampson has a history of difficulty hearing words and songs and often misinterpreted them.  Dr. Wasserstein also noted that when Sampson was in high school, he had trouble learning a foreign language because he could not discern diction.  Dr.

Wasserstein explained that difficulty discerning diction implies problems with phonemic processing, which is a common problem with dyslexia.  Tr. 194:5–21; PX 37 p. 2.

82.     Dr. Wasserstein also noted that Sampson started speech and language therapy for stuttering at relatively young age and received this therapy for a long time. She reported that there is a strong association between stuttering and dyslexia.  She further reported that Sampson had problems learning to read and that his mother read for him.  She also noted that Sampson started working intensively with tutors during elementary school.  Dr. Wasserstein further noted that Sampson's teachers reported problems with focusing and organization, which are symptoms associated with ADHD. Tr. 194:22–195:25; PX 37 p. 5.

83.     Dr. Wasserstein also testified that Sampson received "intensive" intervention in the form of extensive tutoring starting in elementary school.  The tutoring at times exceeded 10 hours a week.  Dr. Wasserstein noted that she does not recall ever having anybody receive that level of intervention unless necessary for remediation related to disability.  The significance of this tutoring is that it reflected that Sampson needed a lot of help in order to function.  Tr. 197:22–198:22; PX 37 p. 6.

84.     Dr. Wasserstein also noted that Sampson did not have enough time in medical school to read all of questions on the shelf exams without extended time.  She reported that when he was given extra time by his medical school, he was able to read the questions, finish the questions, and demonstrate the true extent of his knowledge.  Tr. 198: 25–200:10; PX 37 p. 7.

85.     Dr. Wasserstein reviewed the 2013 evaluation report of Dr. Michels, who had administered a battery of assessments.  Dr. Wasserstein found significant Dr. Michels's reporting on the Wechsler Adult Intelligence Scale-4th ed. (WAIS-IV), an IQ test.  On the Verbal Comprehension Index, Sampson received a score in the 99.7th percentile, while on the Perceptual

16

Reasoning Index, his score was in the 55th percentile.  Dr. Wasserstein testified that this degree

of discrepancy is significant, occurring in less than one percent of the general population and is

"extraordinarily rare."  Tr. 200:17–202:18; PX 3; PX 37 pp.7-8.

86.     Dr. Wasserstein referred to such a large discrepancy in cognition as an intellectual

or metaphorical limp, which disrupts unified functioning significantly. She testified that while

his Perceptual Reasoning score was in the average range, the discrepancy with his verbal score

was not average and suggests that he uses a lot of mitigating measures, or "detours", to get an

average score.  Tr. 202: 14–203:13; PX 3; PX 37 p. 8.

87.     Dr. Wasserstein  reported that Dr. Michels administered the Nelson Denny

Reading Test (NDRT), which is a timed reading test with longer reading passages administered

over 20 minutes.  Dr. Wasserstein testified that the NDRT requires a fair amount of executive

planning.  Under the standard administration, Sampson scored in the bottom 16th percentile.  Tr.

204:8–206:16; PX 3; PX 37 p. 8.

88.     Dr. Wasserstein also reviewed the 2013 evaluation report from Dr. Anderson. She

testified that Dr. Anderson administered the SATA, which is a standard tool to assess reading

similar to the NDRT in that it is timed and contains reading passages. The SATA differs from the

NDRT in that it uses age norms and is utilized more for older adults.  Tr. 208:15–210:3; PX 2;

PX 37 pp. 8-9.

89.     Dr. Anderson reported that under the standard time administration of the SATA,

Sampson was only able to complete half of the questions. Dr. Wasserstein testified that the

standard time has been developed because a majority of the people can get through all the

information. However, it is not unusual for a dyslexic person to answer only half the questions.

17

When Sampson was given 50% extended time, he was still unable to complete the assessment, answering only two-thirds of the items.  Tr. 210:4–25; PX 2; PX 37 p. 9.

90.     Dr. Anderson reported that Sampson's reading comprehension score on the SATA under standard time administration was in the 25th percentile. Dr. Wasserstein testified that this score reflects that 75 out of 100 persons in the general population would have done better, which reflects that a majority of people performed better than Sampson. Dr. Wasserstein found more significant than Sampson's reading comprehension score the fact that Sampson only finished half of the questions, which means he did particularly well on the questions he had time to read. However, when he was given 50% extended time, he was able to answer more questions and earned a superior score even though he only completed two-thirds of the items.  Tr. 211:1–212:5; PX 2; PX 37 p. 9.

91.     Dr. Wasserstein also found significant several assessments that Dr. Anderson administered, which indicated problems with visual memory and executive functions. Dr. Wasserstein testified that Sampson's low and below average scores on assessments including the Rey Osterrieth Complex Figure Test (RCFT), Woodcock-Johnson Test of Cognitive Abilities, Picture Recognition subtest, Trailmaking Test, Trial B subtest taken together indicate that Sampson has problems with visual memory, executive functioning, and shifting sets.  She noted the results reflect underlying neurocognitive deficits causing Sampson to do things more slowly such as reading and memorizing.  Tr. 211:22–214:9; PX 2; PX 37 pp. 9-10.

92.     Dr. Wasserstein also reviewed letters from Dr. Aronson, who is Sampson's treating psychiatrist.  She testified that Dr. Aronson's letters reflected that he had been treating Sampson for ADHD since 2015.  Dr. Aronson has prescribed a stimulant medication, Dexedrine,

which is a controlled substance that is prescribed only after a diagnosis of ADHD and for the treatment of ADHD.  Tr. 216: 4–217: 21, PX 5; PX 25; PX 37 pp. 10-12.

93.     In addition to reviewing Sampson's prior neuropsychological and psychological evaluations, Dr. Wasserstein administered her own battery of assessments.  As part of her evaluation, Dr. Wasserstein administered assessments evaluating Sampson's level of effort and symptom validity.  Dr. Wasserstein testified that these assessments are important to know whether the person is putting forth a good effort and to confirm that the resulting data is reliable.  Dr. Wasserstein found that Sampson was trying hard and giving his best efforts during his evaluation, confirming the validity of the results Dr. Wasserstein obtained during the battery of assessments.  Tr. 218: 2–219:19.

94.     Dr. Wasserstein administered the WAIS-IV.  Sampson's Verbal Comprehension Index was in the 99th percentile and his Perceptional Reasoning Index fell in the 55th percentile.  This was a very similar result to the 2013 evaluation.  Dr. Wasserstein testified that this discrepancy is seen in only 1.2 percent of the general population.  Tr. 220:8–221:10; PX 37 pp. 14-15.

95.     Dr. Wasserstein reiterated that the NDRT under standard time is a 20-minute assessment, where there are a number of passages and a total of 38 questions.  When the NDRT was administered to Sampson under standard time, he was only able to attempt 12 out of the 38 questions but answered those 12 questions attempted correctly.  This score fell in the 1st percentile based on grade 16 norms.  Dr. Wasserstein testified that this is significant and reflects something is getting in the way of his reading and is consistent with dyslexia.  Tr. 224:25– 226:11; PX 37 pp. 16-17.

96.     Sampson was then given additional time to complete the 38 questions of the NDRT, which he did in 54 minutes and answered 37 of the 38 questions correctly.  Dr. Wasserstein testified that Sampson needed double extended time to complete the NDRT and when he was given extended time, he was able to demonstrate his knowledge. Tr. 226:12–227:2; PX 37.

97.     Dr. Wasserstein also administered a series of neuropsychological assessments. On the Wisconsin Card Sort Test, which addresses visual processing and executive functioning. Sampson scored in the 21st percentile, reflecting the he was very weak in his ability to implement visually processed executive functions.  Dr. Wasserstein testified this score reflects an impairment in his ability to use visual information rapidly and correctly, and so would affect his performance on USMLE examinations.  Tr. 227:11–229:7; PX 37 pp. 17-20.

98.     Dr. Wasserstein reported that she administered the California Verbal Learning Test (CVLT).  On several portions of this assessment, he scored in the 7th percentile.  Dr. Wasserstein stated that while this is an auditory assessment, it reflects another neuropsychological deficit which provides a roadblock in his ability to retrieve information, causing him to do things more slowly, affecting his performance on timed examinations such as the USMLE.  Tr. 229:8–230:17.

99.     Dr. Wasserstein also administered the RCFT. Sampson performed below average on each subtest.  Dr. Wasserstein testified that similar to the prior administration by Dr. Anderson, Sampson was consistently impaired in retrieving complex information.  Dr. Wasserstein emphasized that the result reflect that performs tasks slower and with greater difficulty.  Tr. 230:18–231:7; PX 37 p. 20.

100.    Dr. Wasserstein diagnosed Sampson with a learning disorder based on reading, in accordance with the criteria set forth in DSM-V.  Tr. 236:6–21; PX 37 p. 24.

101.    Dr. Wasserstein also evaluated Sampson for ADHD.  Dr. Wasserstein administered the Conners Adult ADHD Rating Scale.  Dr. Wasserstein testified that Sampson had clinically significant problems in all the DSM attention and hyperactivity.  Tr. 232:8– 233:15; PX 37 p. 22.

102.    Dr. Wasserstein diagnosed Sampson with ADHD based on the criteria set forth in the DSM-V.  In making this diagnosis, she relied on several factors including the prior evaluations, teachers' reports, and educational performance, and her personal observations from conducting assessments of Sampson.  Tr. 233:16–235:5; PX 37 pp. 22- 25.

103.    Dr. Wasserstein testified that Sampson has substantial impairments in reading in that he reads at a slow rate and, due to ADHD, he does not function efficiently and has impaired concentration and attention.  Tr. 236:22–237:10.

104.    Dr. Wasserstein recommended accommodations for the USMLE to include double extended time.  She testified that while time and a half may be helpful, based on her empirical observations, Sampson needs double extended time, a separate exam room, and longer breaks.  Tr. 238:1–16; PX 37 p. 25.

105.    Stony Brook University discussed Dr. Wasserstein's conclusions with her and agreed that Sampson required double time on examinations, extra breaks, and a separate testing area.  Stony Brook also provided note-taking services.  Tr. 114:24-115:20.

106.    With this additional extended time, Sampson finally had enough time to read the questions, ensuring that the resulting scores accurately reflected the extent of his medical knowledge. Tr. 115:9-15.

21

**H.  Sampson Again Seeks Accommodations from the NBME**

107.    Sampson compiled another comprehensive request for accommodations and submitted the application to the NBME on April 13, 2022.  Tr. 117:3-5; PX 35, Sampson Request for Accommodation; PX 36, Sampson Personal Statement; PX 37, Wasserstein Report.

108.    On June 1, 2022, the NBME denied Sampson's request for accommodations despite Sampson having submitted extraordinary documentation of disability.  Tr. 119:14-15.

109.    Sampson had taken every possible action to avoid litigation because of the enormous cost of engaging in such litigation.  Tr. 122:8-123:5.

110.    Counsel for Sampson reached out to the NBME in an effort to resolve the matter short of litigation.  NBME, however, did not change its decision.  PX 44, Weiner Letter to NBME dated 7/18/222.

111.    To date, contrary to the conclusions of Sampson's medical school and every examining and treating source, NBME insists that Sampson does not have a disability, and will not provide any accommodations.  PX 38, NBME's 7th Denial of Sampson Request for Accommodation.


**I.  Sampson Files Suit and Seeks Preliminary Relief**

112.    On August 29, 2022, Sampson was left with no option but to file suit against the NBME to seek the accommodations he needs for his disability.  Tr. 122:8-123:5.

113.    In his Motion for a Preliminary Injunction, Sampson seeks only the opportunity to demonstrate his knowledge on Step 1 with the accommodations that his medical school provides him. Tr. 123:18-23.

114.    Sampson needs double-time, a separate testing area, and extra breaks as accommodations for his disability in order for his USMLE scores to reflect his knowledge rather than the extent of his disabilities.  Tr. 24:15-25:16, 38:18-22, 114:24-115:20; PX 9, Letter from Andrew Lam to NBME; PX 37, Report of Wasserstein.

115.    NBME relied on the affidavits of five paid consultants in opposing Sampson's motion for preliminary injunction (Dkts. 22-26).

116.    Of these paid consultants, NBME offered the testimony of only Dr. Lovett and Dr. Murphy.  Neither Dr. Lovett nor Dr. Murphy hold board certification. Tr. 369: 3 – 5, Benjamin J. Lovett CV – Dkt. 22-1 p. 1, Kevin Richard Murphy CV – Dkt. 23-1 p. 3. Moreover, Dr. Lovett does not do any clinical evaluations or administer assessments for diagnostic purposes or determination of disability. Tr. 353: 10 – 354: 7.

117.    NBME's outside consultants make recommendations to the NBME. The consultants are not the decision-makers.  Rather, the NBME is the decision-maker.  Tr. 407:17–408:8.

118.    Yet, NBME did not present the testimony of any employee or decisionmaker to explain the basis of its decision to deny Sampson's seven requests for accommodations.  Tr. 411:18-20.

119.    NBME submitted to its long-time paid consultant Benjamin Lovett, Ph.D. four of Sampson's first five requests for accommodations (received by NBME on April 3, 2017, June 22, 2017, November 30, 2017, and June 29, 2018).  Decl. of Lucia McGeehan (Dkt. 21) ¶¶ 13-25.[3]

---

[3] NBME did not refer Sampson's fourth request submitted on February 22, 2018 to an outside consultant, rather, NBME made the decision internally to maintain its denial of the request for accommodations. Decl. of Lucia McGeehan (Dkt. 21) ¶¶ 22–23.

120.     Dr. Lovett has testified for or submitted declarations for the NBME and the

National Board of Osteopathic Medical Examiners ("NBOME") on several occasions.  Dr.

Lovett admitted that he testified for the NBME or the NBOME in *Ramsay v. Nat'l Bd. of Med.

Exam'rs*, No. 19-CV-2002, 2019 WL 7372508 (E.D. Pa. Dec. 30, 2019); *Berger v. Nat'l Bd. of

Med. Exam'rs*, No. 19-CV-99, 2019 WL 4040576 (S.D. Ohio Aug. 27, 2019); *Bibber v. Nat'l

Bd. of Osteopathic Med. Exam'rs*, No. 15-CV-4987, 2016 WL 1404157 (E.D. Pa. Apr. 11,

2016), and that in each case the district court rejected his opinions and recommendations.  Tr.

359:11–360:17.

121.     Dr. Lovett stated that he recommends denying accommodations 80% of the time

in his work as a paid consultant for NBOME and could not assert that the data would be any

different for his work as a paid consultant for the NBME.  Tr. 364:6–365:6.

122.     Dr. Lovett admitted that when he reviews a reconsideration of an

accommodations denial, his approach is to go back to his report of his first recommendation to

deny accommodations.  Tr. 283:1–10.

123.     NBME submitted to Kevin Murphy, Ph.D. Sampson's sixth and seventh requests

for accommodations (received by NBME on November 14, 2018 and April 15, 2022).[4]

124.     When Dr. Murphy received the request for accommodations, he was aware of

NBME's prior denials.  Tr. 412:10–16.

125.     Dr. Murphy has also been a long-time paid consultant for the NBME.  He also is

paid to consult for the NBOME and a number of other testing entities.  Tr. 413:6–414:1; Decl. of

Kevin Murphy (Dkt. 23) ¶ 6.

---

[4] NBME also submitted the November 14, 2018 request to it long-time consultant Samuel
Ortiz, Ph.D.  Dr. Ortiz did not testify at the hearing.  Decl. of Samuel Ortiz (Dkt. 24-1), Ex. 1 at
5.

126.     Notably, Dr. Murphy believes that in order to be diagnosed with ADHD, a person must be "deviant" even though the DSM contains no such criteria. Tr. 425:11-430:9; PX 50.

127.     Dr. Murphy reviews for the NBME approximately 36 to 50 cases a year of applications from medical students with learning disabilities or ADHD seeking accommodations. He estimates that he recommends denying accommodation 85% to 90% of the time.  Tr. 415:24– 419:8.

128.     By repeatedly submitting Sampson's request for accommodations to the same paid consultants who have a penchant for recommending denial of accommodations requests and who were aware of the prior recommendations of denials in this case, NBME utilized a process that was inclined from the outset to reject Sampson's requests for accommodations.

129.     NBME consultants never met, interviewed, or evaluated Sampson in person.  Tr. 356:2-357:5, 423:21-424:13.  Neither Dr. Murphy nor Dr. Lovett ever met with or spoke to or evaluated Sampson.  Dr. Lovett admitted that he has never had the opportunity to observe the condition, manner or duration with which Mr. Sampson performs any major life activities.  He further admitted that he has not had the opportunity to observe the condition, manner or duration with which Sampson reads, thinks or concentrates.  Tr. 356:2-357:7.

130.     Each time that NBME relied on its paid consultants to review Sampson's requests for accommodations,  it did not give precedence to the recommendations of Sampson's evaluators and those who had personally encountered Sampson and had first-hand knowledge of Sampson's disabilities.  Decl. of Lucia McGeehan (Dkt. 21) ¶¶ 10, 14, 18, 21, 26, 29, and 33.

131.     Sampson has extraordinary potential.  He already has invented life-saving systems and received two United States patents on these inventions.  Tr. 141:13-142:18.

132.     Step 1 is a test that the vast majority of medical students pass readily.[5]  Yet

Sampson has not had the opportunity to demonstrate his knowledge with necessary

accommodations despite being "a highly motivated and compassionate student" who has been

described by the medical preceptors who observed his care of patients as having medical

knowledge "that is impressive for his level of training", and as having a "[h]igh fund of

knowledge" that is "above expected for the level of training" and who goes "above and beyond

expectations" and who can "synthesize information on a higher level than many of his peers".

Dkt. 16-3 at pp. 95-98.

133.     If Sampson does not take and pass Step 1, he cannot complete medical school,

cannot become a doctor—a dream that he has worked towards his entire life—and his career will

be over before it starts.  Tr. 36:24-37:9, 123:12-16.


## II.     CONCLUSIONS OF LAW

## A.     PRELIMINARY INJUNCTION STANDARD

134.     A party seeking a preliminary injunction in the Second Circuit must establish:

"(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently

serious questions going to the merits of its claims to make them fair ground for litigation, plus a

balance of the hardships tipping decidedly in favor of the moving party; and (3) that a

preliminary injunction is in the public interest."  *Green Haven Prison Preparative Mtg. of*

*Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d

Cir. 2021).

---

[5] Performance data published by the NBME reflects that 96% - 98% of first time test takers
of the USMLE Step 1 from US/Canadian Schools passed the exam administered in 2020 and
2021. https://www.usmle.org/performance-data (last viewed October 31, 2022).

## A.  LIKELIHOOD OF SUCCESS ON THE MERITS

135.    Title III of the ADA requires that testing entities such as NBME "offer such examinations . . . in a place and *manner* accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."  42 U.S.C. § 12189 (emphasis added).  The U.S. Department of Justice (DOJ) regulations interpret this provision of the ADA to require that

> [t]he examination is selected and administered so as to *best ensure* that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

28 C.F.R. § 36.309(b)(1)(i) (emphasis added); *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1162 (9th Cir. 2011) (quoting 28 C.F.R. § 36.309).[6]  DOJ's regulations state explicitly that "[r]equired modifications to an examination may include changes *in the length of time permitted for completion of the examination* and adaptation of the manner in which the examination is given."  28 C.F.R. § 36.309(b)(2) (emphasis added).

136.    An individual has a disability if he or she has "a physical or mental impairment that substantially limits one or more major life activities of such an individual."  42 U.S.C. § 12102(1)(A).  DOJ regulations make clear that the term "physical or mental impairment" includes ADHD and "dyslexia and other specific learning disabilities."  28 C.F.R. § 36.105(b)(2); *see also, e.g.*, *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 257 (3d Cir.

---

[6] This "best ensures" standard is distinct from the "reasonable accommodation" standard used in the employment discrimination context.  *E.g.*, *Enyart*, 630 F.3d at 1162.

2020); *Vinson v. Thomas*, 288 F.3d 1145, 1153-54 (9th Cir. 2002).  Major life activities include, but are not limited to, reading, concentrating, and thinking.  42 U.S.C. § 12102(2)(A).

137.    An impairment "will meet the definition of disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  28 C.F.R. § 36.105(d); *Ramsay*, 968 F.3d at 257 (quoting *J.D. v. Colonial Williamsburg Found.*, 925 F.3d 663, 670 (4th Cir. 2019)) (quotation marks and brackets omitted).  The regulations state that in determining whether an individual has a disability, "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve" despite the disability.  *Id.* § 36.105(d)(3)(iii).

138.    The test whether an individual has a disability "should not demand extensive analysis."  *E.g.*, *Ramsay*, 968 F.3d at 258 (citing 28 C.F.R. § 36.105(d)(1)(ii)).  Congress has explained that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."  ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, § 2(b)(5); *see also* 28 C.F.R. § 36.105(d)(1)(ii); *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 92-93 (2d Cir. 2021); *Alexiadis v. New York Coll. of Health Professions*, 891 F. Supp. 2d 418, 428 (E.D.N.Y. 2012) (Bianco, J.).[7]  Accordingly, the definition of disability is "construed in favor of

---

[7] Prior to the ADAAA's enactment in 2008, courts had imposed an exacting standard of disability that resulted in many cases being dismissed on the ground that the plaintiff was insufficiently disabled, without reaching the question whether there had actually been discrimination.  Congress specifically rejected Supreme Court decisions requiring that the ADA be "interpreted strictly to create a demanding standard for qualifying as disabled" and creating an "inappropriately high level of limitation necessary to obtain coverage under the ADA."  Pub. L. No. 110-325, § 2(b)(4), (5).  Congress further rejected the assertion that an individual with a disability "must have an impairment that prevents or severely restricts the individual from doing

broad coverage" and "to the maximum extent permitted."  42 U.S.C. § 12102(4)(A); 28 C.F.R. §

36.101(b); 28 C.F.R. § 36.105(a)(2)(i); *Hamilton*, 3 F.4th at 92-93.  The term "substantially

limits" is "not meant to be a demanding standard," 28 C.F.R. § 36.105(d)(1)(i), and "usually will

not require scientific, medical, or statistical evidence." *id.* § 36.105(d)(1)(vii).

139.    DOJ has explained that in determining what accommodations will "best ensure"

that the test scores fairly reflect the individual's skills and knowledge, the testing entity must

give "considerable weight to documentation of past modifications, accommodations, or auxiliary

aids or services received in similar testing situations. . . ."  28 C.F.R. § 36.309(b)(1)(v); *Ramsay*,

968 F.3d at 259 (discussing regulatory guidance).

140.    DOJ has stated in the course of promulgating Title III regulations:

> Reports from experts who have personal familiarity with the candidate should
> take precedence over those from, for example, reviewers for testing agencies,
> who have never personally met the candidate or conducted the requisite
> assessments for diagnosis and treatment."

Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial

Facilities, 75 Fed. Reg. 56,236, 56,297 (Sept. 15, 2010).  DOJ further explained that "when

testing entities receive documentation provided by a qualified professional who has made an

individualized assessment of an applicant that supports the need for the modification,

accommodation, or aid requested, they shall generally accept such documentation and provide

the accommodation."  *Id.*[8]

---

activities that are of central importance to most people's daily lives." *Id.* § 2(b)(4); *see also* 28
C.F.R. § 36.101(b) (stating that the definition of disability "shall be construed broadly in favor of
expansive coverage to the maximum extent permitted by the terms of the ADA").

[8] As the Supreme Court has stated, DOJ's interpretations of Title III are entitled to
deference because DOJ is charged with issuing implementing regulations under Title III, 42
U.S.C. § 12186(b), and rendering technical assistance, 42 U.S.C. § 12206(c). *Bragdon v. Abbott,*
524 U.S. 624, 646 (1998).

141.    Consistent with this regulatory guidance, DOJ published technical assistance for testing entities stating that such entities "should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations."  U.S. Dep't of Justice, Testing Accommodations, *at* https://www.ada.gov/regs2014/testing_accommodations.html.[9]

142.    In *Ramsay v. Nat'l Bd. of Med. Exam'rs*, the Third Circuit explained that DOJ's guidance was well-supported, noting that pursuant to DOJ regulations, disability determinations "require[] an individualized assessment."  968 F.3d 251, 260 (3rd Cir. 2020) (quoting 28 C.F.R. § 36.105(d)(1)(vi)).  The Third Circuit explained that "[s]uch assessments benefit from the reports of professionals who know or have personally examined the individual" and have had the opportunity to "evaluate the individual's behavior, effort, and candor."  *Id.* (citing DOJ's guidance accompanying regulations DOJ promulgated following notice-and-comment rulemaking); *see also, e.g.*, *Berger v. Nat'l Bd. of Med. Exam'rs,* 1:19-cv-99, 2019 WL 4040576, at *25-26 (S.D. Ohio Aug. 27, 2019) (finding the strong weight of the evidence support plaintiff's evaluator who personally administered multiple assessments and clinically observed performance and effort on assessments); *Agranoff v. Law Sch. Admission Council, Inc.*, 97 F. Supp. 2d 86, 87 (D. Mass. 1999) (noting the importance of direct medical examination of the plaintiff).

---

[9] DOJ's determination that testing entities should generally accept the conclusions of evaluating professionals followed extensive notice-and-comment rulemaking.  75 Fed. Reg. at 56,297.  Although the DOJ's subsequent technical assistance for testing entities states that the technical assistance has "no legally binding effect," it accurately summarizes its regulations and interpretive guidance that are entitled to deference.  *E.g.*, *Disabled Rights Action Comm. v. Las Vegas Events, Inc*., 375 F.3d 861, 875-876 (9th Cir. 2004) ("The guidance provided in the technical assistance manual is an interpretation of the DOJ's regulation, and, as such, is entitled to significant weight as to the meaning of the regulation.") (citations omitted).

143.    Establishing disability typically should not require "scientific, medical, or statistical evidence."  28 C.F.R. § 36.105(d)(1)(vii).  Nonetheless, Sampson has offered a wealth of such evidence, obtaining evaluations from three psychologists who conducted intensive evaluations and concluded that he has learning disabilities and offering multiple letters from his treating psychiatrist.  NBME improperly attempts to create a "battle of experts" by offering affidavits of psychologists who did not conduct such evaluations.

144.    *Ramsay v. Nat'l Bd. of Med. Exam'rs* is instructive because it rejected such a battle of experts.  In that case, the district court noted that given such competing expert testimony, the ADAAA's mandate requiring that disability "be construed broadly in favor of expansive coverage" served as a tie-breaker.   19-cv-2002, 2019 WL 7372508, at *17-18 (E.D. Pa. Dec. 31, 2019).  The district court held that it was "blatant error" for the NBME evaluators to substitute their judgment for that of those who had personally evaluated the medical student in that case.  *Id.* at *17.  The Third Circuit affirmed, noting that since "the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis," the district "could reasonably have concluded that [NBME's] experts were too demanding in what they required to prove a disability," for example, by "substituting their own opinions for those of Ramsay's healthcare providers."  968 F.3d at 260 (quoting 28 C.F.R. § 36.105(d)(1)(ii)).

145.    The record reflects that NBME, contrary to the ADA, relied upon its own consultants without deferring to the conclusions of the professionals who evaluated and treated Sampson.

146.    There is also no indication that NBME gave any weight, let alone considerable weight, to Stony Brook's approval of accommodations and to Sampson receiving 100% extended time on NBME shelf exams.[10]

147.    NBME's strict scrutiny of Sampson's requests for accommodations is precisely the sort of nit-picking that Congress sought to avoid in enacting the ADAAA, and which DOJ wished to avoid in requiring testing entities to defer to the conclusions of evaluating professionals.  In essence, NBME seeks to restore the judicially exacting standard of disability which the ADAAA was expressly enacted to reject, *see, e.g.*, Pub. L. No. 110-325, § 2(b). Further highlighting the inappropriateness of NBME's scrutiny of Sampson's requests for accommodations, one of NBME's own consultants, Kevin Murphy, testified the he requires first adherence to the DSM, which he considers a strict standard and then a second hurdle of showing one has a disability.  Tr. 430:14–431:10.  When Sampson has a lifelong history of being referred to learning specialists, tutors, and extensive neuropsychological testing documents disabilities, there is no need to go further under the ADA as amended.

148.    Further, the assertions of NBME's paid consultants are suspect for numerous reasons.  Most significant is that these paid consultants never observed or evaluated Sampson. NBME's reliance on its paid consultants who have never met Sampson is the same "blatant error" that NBME made in *Ramsay* when it second-guessed the conclusions of the evaluating professionals who actually administered individualized assessments or conducted clinical

---

[10] NBME offered no testimony from any employee at the hearing.  The only evidence concerning NBME's decision is set forth in the Declaration of Lucia McGeehan (Dkt. 21).  This declaration makes no mention concerning the weight given to Stony Brook's implementation of accommodations. In *Ramsay,* the distict court found that NBME "ran afoul of 28 C.F.R.§36.309(b)(v)" by failing to give considerable weight to prior accommodations. *Ramsay,* 2019 WL 7372508, at *17-18.

interviews.  2019 WL 7372508, at *17.  For instance, Dr. Wasserstein, along with her assistant

Dr. Miller, spent 15 hours evaluating Sampson in person and wrote a detailed evaluation

incorporating not only Sampson's psychometric scores but also describing her personal

observations of Sampson and reviewing Sampson's voluminous records describing his

substantial impairments.  *See generally* Wasserstein Report, PX. 37.  For instance, Wasserstein

observed Sampson commit errors of visual perception, mistaking the "+" character for "x".  *Id.* at

17.  In contrast, the NBME consultants, having never met or observed Sampson in person, are

unable to offer as detailed observations and conclusions.  NBME consultant Flanagan (who was

not called to testify) even twice admitted in her affidavit that she did not have adequate time to

review carefully Sampson's file.  Decl. of Dawn Flanagan (Dkt. 26) ¶¶ 7-8.  To the extent that

the NBME consultants address the personal observations of Dr. Wasserstein, Sampson's

educators, and his physician, the consultants chose to simply disbelieve those personal

observations despite having never met him in person.

149.    The NBME consultants' opinions are also rife with factual inaccuracies and

glaring omissions.  The consultants asserted in their declarations, for instance, that Sampson had

no history of accommodations prior to medical school, overlooking that even as far back as

elementary school, Sampson was referred by his teacher to a reading specialist and that Sampson

has had a lifelong need of having to work with tutors to help him learn the material orally

because he cannot not learn the material by visually reading the text.  The NBME consultants

also made no mention of or downplayed the accommodations that Sampson has received in

medical school, omitting all reference to the fact that without extended time, Sampson was

unable to read all of the questions on the shelf exams that are identical to Step 1 exams.  Nor did

the consultants mention that in medical school, Sampson had to work with a learning specialist

who reported his slow reading speed.  Significantly, none of the NBME consultants found it noteworthy enough to mention that Sampson has been prescribed medication for ADHD.

150.    With respect to the actual psychometric testing that Sampson's evaluating professionals conducted, the NBME consultants do not challenge the evaluators' competency in administering or scoring the evaluations.  The NBME consultants instead single out only certain tests for misplaced criticism, lodging no objection to the rest, and ignoring numerous instances where Sampson placed below the tenth percentile, *see* PX 37, p. 16-20, Wasserstein Report. NBME's heightened focus on select tests to the exclusion of others misses the forest for the trees: the neuropsychological testing, taken as a whole, paint a comprehensive picture of Sampson as an individual with learning disabilities and ADHD.  The evaluators who personally met with Sampson did not treat any one psychometric test as dispositive—rather, it was the consistent pattern that emerged across multiple tests and personal observations of Sampson, that led these evaluators to conclude that he has disabilities.

151.    Further, NBME's consultants erroneously claim that disparity between performance on test and actual intellectual capacity cannot be used to establish disability.  In *Ramsay*, however, the Third Circuit specifically noted DOJ guidance stating that score disparities can be used to diagnose disability.  968 F.3d at 257-58.[11]  In Sampson's case, score disparities demonstrate that without accommodations, the scores reflect his disabilities rather than measuring the extent of his content knowledge.  *See* 28 C.F.R. § 36.309(b)(1)(i) (requiring accommodations when necessary to "best ensure" that test scores do not measure disability).  As

---

[11] NBME cites cases such as *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012), for the proposition that score disparity cannot be used as part of the disability determination.  *Healy*, however, overlooks DOJ regulatory guidance entitled to deference which states that such disparities are evidence of disability.  *See supra*.

Dr. Wasserstein testified, when Sampson was provided with an appropriate extension of time he
was able to read at the pace that he reads, finish the questions and answer them, "demonstrating
what he really knew."  Tr. 198:25-200:10.

152.    There is also no need for a "battle of experts" when educators, learning
specialists, and tutors who have worked closely with Sampson have all noted Sampson's
substantial impairments.

153.    Sampson's grade school records are replete with mention of difficulties with
attention, focus, organization, inability to complete assignments in a timely manner, difficulty
with comprehension, and difficulty with reading.  Decl. of Dr. Shelley Sampson (Dkt. 32-1) at
¶ 14; PX 20, Summary of Teacher Comments; PX 21, Elementary School Grade Reports.  For
instance, before fifth grade, his classroom teacher advised his parents that Sampson needed to
see a reading specialist and he did so, seeing reading specialists in elementary school and high
school.  Decl. of Dr. Shelley Sampson (Dkt. 32-1) at ¶ 4; PX 19, Drs. Sampson Letter to NBME.
Sampson has and continued to use mitigating measures from elementary school through college,
including going to more than twenty tutors who helped him learn material orally that he could
not learn through reading due to his disabilities.  Decl. of Dr. Shelley Sampson (Dkt. 32-1) at
¶ 4; PX 19, Drs. Sampson Letter to NBME.

154.    These tutors noted Sampson's substantial limitations, for instance personally
observing Sampson "reverse letters and numbers, and otherwise miswrite numbers."  Decl. of
Dr. Andrew Lam (Dkt. 32-2) at ¶ 6; Tr. 19:19-25.  A tutor also observed that when Sampson was
"trying to read passages, he would get bogged down and struggle to parse long sentences,
especially sentences with multiple clauses," and "when he would finally comprehend, he would

move on to the next sentence only to forget the previous sentence."  Decl. of Dr. Andrew Lam (Dkt. 32-2) at ¶ 5; Tr. 18:15-23.

155.    Likewise in medical school, Stony Brook's learning specialist, Linda De Motta worked with Sampson for a year and a half to develop mitigating strategies.  Dkt. 16-7, Linda DeMotta's March 29, 2017 Letter.  Notably, Ms. DeMotta reports that Sampson has a slow reading rate.  *Id*.  She further reported, "[Sampson] struggled to learn from his textbooks, so we worked on finding other resources – video, hands-on interactions, discussions, drawings- that were most appropriate and least restrictive for [his] needs as a student with a learning disability. *Id.*

156.    Sampson's experience at Stony Brook is instructive. With 50% additional time on examinations, Sampson still did not have enough time to read all of the questions.  Stony Brook later gave 100% extended time following a more current evaluation and recommendation, and it was at this point that he finally had the time to read the questions and obtain testing scores that accurately reflected his knowledge.  Tr. 114:24-115:20.  Further, Stony Brook provided testing accommodations on NBME shelf examinations which are retired questions from actual Step examinations.  *See* Dkt. 16-7, Linda DeMotta's March 29, 2017 Letter.  NBME failed to give this history of accommodations "in similar testing situations" the "considerable weight" expressly mandated by the ADA.  28 C.F.R. § 36.309(b)(1)(v).

157.    Stony Brook has explicitly stated to the NBME that Sampson is an individual with a disability who needs testing accommodations. Dkts. 16-7 and 16-8.  If Stony Brook, along with Sampson's evaluators, has determined that Sampson is an individual with disabilities, then the disability inquiry should have ended there with the NBME granting accommodations as the ADA as amended requires.

158.    NBME errs in pointing to Sampson's history of academic success as proof that he is somehow not disabled.  The ADA regulations specifically caution against such analysis, explaining that "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve."  28 C.F.R. § 36.105(d)(3)(iii).  The regulations further state, in direct opposition to NBME's argument:

> For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population.

*Id.*; *see also* 28 C.F.R. § 36.105(d)(1)(v) ("An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.").

159.    In the context of learning disabilities and other cognitive impairments, the ADA makes clear that in the determination whether a person has a disability should be made "without regard to the ameliorative effects of mitigating measures" such as "learned behavioral or adaptive neurological modifications."  42 U.S.C. §12102(4)(E)(i)(IV).  As noted in the Congressional Record:

> Historically, certain individuals with learning disabilities seeking accommodations in higher education – including high stakes exams-have seen their access to testing accommodations severely undercut by testing companies not willing to consider and support that learning disabilities are neurologically based, lifelong disabilities that may exist in students with high academic achievement because the individual has been able to cope and mitigate the negative impact while simultaneously being substantially limited in one or more life activities.

2 Cong. Rec. 8296 (Sept. 17, 2008).  The DOJ has accordingly noted that

> Someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities including, but not limited to, reading, writing speaking, or learning because of the

additional time or effort he or she must spend to read, write, speak, or learn compared to most people.

28 C.F.R. § 36.105(d)(3)(iii); *Ramsay*, 968 F.3d at 260 (quoting 28 C.F.R. § 36.105(d)); *see also, e.g.*, *Girard v. Lincoln College of New England*, 27 F. Supp. 3d 289, 295 (D. Conn. 2014).

160.     In light of the DOJ regulations that NBME itself acknowledges preclude reliance on outcomes, it was clear error for NBME to rely on Sampson's academic achievement while ignoring the mitigating measures he used to achieve those results.  *See, e.g.*, *Ramsay*, 968 F.3d at 257 n.7 (holding that the district could "consider and discount that [plaintiff] compensated for her very weak reading and writing abilities by devoting more effort to her assignments than most students"); *see also Berger*, 2019 WL 4040576, at *23 (noting student's use of compensatory strategies). The focus is not on the results Sampson achieved, but the condition, manner, and duration that it took to perform major life activities such as reading, learning, thinking, and concentrating.  *E.g.*, 28 C.F.R. § 36.105(d)(3)(i).  As described, *supra*, Sampson has had to use mitigating measures including extensive use of tutors to learn the material orally instead of through reading.

161.     NBME also argues, contrary to DOJ guidance, that Sampson's scores on standardized exams mean that he is somehow not a person with a disability.  DOJ expressly rejected the practice of testing entities such as NBME of relying on such standardized tests as a determining factor in determining whether an individual has a disability, explaining that relying on testing performance has limited relevance and value with respect to disproving disability.  *See* Amendment of Americans with Disabilities Act Title II and Title III Regulations To Implement ADA Amendments Act of 2008, 81 Fed. Reg. 53,204, 53,237 (August 11, 2016).  As NBME's paid consultant concedes, the ACT, SAT, and MCAT were not designed to diagnose disability. Tr. 339:7–20.

38

162.     Step 1 requires Sampson to read every word of every question, and as shown by his experience on shelf exams in medical school, which are recycled Step 1 questions, Sampson needs double-time to be able to read and understand the questions.  These shelf exams, which Stony Brook found noteworthy in its determination that Sampson needs extended time, are far more probative of Sampson's need for accommodations on the identical Step 1 exam.  28 C.F.R. § 36.309(b)(1)(v) ("considerable weight" given to testing accommodations "received in similar testing situations").

163.     Like the medical student in *Ramsay*, Sampson is asking for the same accommodation on the board exams—extended testing time—that his medical school determined he needs in order to have an equal opportunity to demonstrate his knowledge of the material learned in medical school.  ADA regulations expressly provide the entities should give "considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations." 28 C.F.R. §36.309(b)(1)(v); *see also Ramsay,* 968 F.3d at 259 (noting a recent history of past accommodations critical to understanding disability and appropriateness of accommodations; *Berger,* 2019 WL 4040576, at *25-26 (giving "considerable weight" to Plaintiff's past history of accommodations).

164.     The ADA has made clear that determining whether a person has a disability should not require extensive analysis.  Congress did not contemplate fine hairsplitting when it declared that the focus of the ADA should not be on whether a person has a disability, but whether covered entities such as NBME engaged in discrimination by refusing to provide necessary accommodations for individuals with a disability.  Pub. L. No. 110-325, § 2(b)(5); *see also* 28 C.F.R. § 36.105(d)(3)(iii); *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 888 (7th Cir. 2019).  Sampson's comprehensive neuropsychological examinations, medical reports and history

of receiving extended time on medical school exams, including NBME's exams in medical school, is sufficient to demonstrate that he is an individual with a disability who needs testing accommodations for the USMLE Step 1.

165.    The testing accommodations that will "best ensure" that Sampson's Step 1 score reflects his knowledge rather than his disabilities are 100% time, a separate testing room, and extra breaks.


### B.  IRREPARABLE HARM

166.    Courts view as irreparable injury a person's psychological harm in not being able to pursue his chosen profession.  In *Enyart v. Nat'l Conf. of Bar Exam'rs*, the Ninth Circuit affirmed the grant of a preliminary injunction requiring bar exam administrators to provide accommodations for a blind test-taker, explaining that she had "demonstrated irreparable harm in the form of the loss of opportunity to pursue her chosen profession."  630 F.3d at 1165; *see also, e.g.*, *Featherstone v. Pacific Northwest Univ. of Health Scis.*, No. 1:CV-14-3084-SMJ, 2014 WL 3640803 (E.D. Wash. July 22, 2014) (holding that a medical student would suffer irreparable harm if he continued to suffer delays in his education as a result of disability discrimination).

167.    *Ramsay* is again instructive.  In that case, the Third Circuit noted that given Ramsay's disability and previous failures on the USMLE Step 1exam, "she likely would fail again and be forced to leave medical school" which "could not later be redressed by a legal or an equitable remedy."  968 F.3d at 262.  The Third Circuit concluded that "an examiner's refusal to provide accommodations can cause the exam-taker irreparable harm because doing so jeopardizes her 'opportunity to pursue her chosen profession.'"  *Id.* (quoting *Enyart*, 630 F.3d at 1166).

168.     Sampson has already been delayed in obtaining his medical degree.  He has already failed the USMLE Step 1 due to NBME's unlawful refusal to implement appropriate accommodations. NBME's repeated refusal to approve appropriate accommodations has been a barrier to Sampson progress in medical school.  If he has to take the USMLE Step 1 again without extended time, given his clear disabilities and the barriers these disabilities presented in past performance, there is a likelihood that he will fail again.  Should he fail the USMLE Step 1, he will be terminated from medical school because he has not completed the program within seven years.  Sampson's medical education, graduation, profession, and financial wellbeing—his entire future—hang in the balance of this motion.  He cannot move forward without successfully completing the medical board exams, and for that he requires appropriate accommodations.

169.     Failure to provide Sampson with accommodations for the USMLE Step 1 will effectively become the ultimate barrier to the medical profession because the resulting score will not "best ensure" that the exam results will reflect his true ability or achievement level, as required by ADA regulations, 28 C.F.R. § 36.309(b)(1)(i).  Rather, his score will reflect the substantial impact of his disability.

170.     Each day that Sampson has to defer his dream is a day that he suffers the sort of emotional and dignitary harm that the ADA was enacted to prevent.  *See Ramsay*, 968 F.3d at 262; *Enyart*, 630 F.3d at 1166.  He stands on the precipice of expulsion from medical school and losing the chance to take the USMLE Step 1 altogether, as it requires being enrolled as a medical student.  In other words, Sampson must take the exam now or his dream of becoming a doctor will be lost forever.  Since Title III of the ADA does not provide for damages, he will be left without a remedy at all.  *See* 42 U.S.C. §12188(a).  Since this is precisely the sort of injury that

courts have held to be irreparable harm, Sampson readily satisfies the requirement for irreparable harm.

171.     Courts have granted preliminary injunctive relief against testing agencies under similar circumstances.  *See e.g.*, *Enyart*, 630 F.3d at 1165 (finding irreparable harm in the form of loss of pursuing chosen profession); *Jones v. Nat'l Conf. of Bar Exam'rs,* 801 F. Supp. 2d 270, 286-288 (D. Vt. 2011) (finding irreparable harm if Plaintiff is required to take a "high stakes" exam in discriminatory circumstances); *Bonnette v. D.C. Court of Appeals*, 796 F. Supp. 2d 164, 186-187 (D.D.C. 2011) (irreparable harm found for delay in practicing profession); *Rush v. Nat'l Bd. of Med. Exam'rs,* 268 F. Supp. 2d 673, 678 (N.D. Tex. 2003); *Agranoff*, 97 F. Supp. 2d at 88.

## C.  BALANCE OF HARDSHIPS

172.     The balance of hardships strongly weighs in favor of granting a preliminary injunction requiring NBME to grant Sampson the same testing accommodations he has had in medical school. The NBME's denials of Sampson's accommodation request denies him the opportunity to take the USMLE Step 1 in a non-discriminatory manner and on equal footing with non-disabled test-takers.

173.     NBME will not be harmed.  Extended testing time is not logistically difficult to provide in general and even less so in this specific case.  In the *Ramsay* case, the Third Circuit affirmed the grant of a preliminary injunction requiring the testing entity to grant double time. 968 F.3d at 263; *see also Berger,* 2019 WL 4040576, at *30 (granting preliminary injunction requiring testing entity to provide double extended time)  Testing entities such as the NBME grant extended time as an accommodation, and it will cost NBME nothing to grant this

accommodation to Sampson so that he has a fair opportunity to demonstrate his knowledge of medicine.[12]  *See Ramsay*, 968 F.3d at 263.


### D.  PUBLIC INTEREST

174.    The enforcement of the ADA is in the public interest.  In the context of testing accommodations, Congress explained that it enacted 42 U.S.C. § 12189 "to assure that persons with disabilities are not foreclosed from educational, professional or trade opportunities because an examination or course is conducted in an inaccessible site or without an accommodation." *Rawdin v. American Bd. of Pediatrics*, 582 F. App'x 114, 118 (quoting H.R. Rep. No. 101-485(III), at 68-69 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 491-92).  For these reasons, granting a preliminary injunction would further the public interest in eradicating discrimination against individuals with a disability.[13]  Accordingly, granting the injunctive relief requested is consistent with the anti-discrimination mandate of the ADA and therefore serves the public interest.

---

[12] NBME has presented no evidence that providing extended time creates an unfair advantage. Dr. Lovett vaguely testified that people tend to do better on tests with more time. Tr. 299: 24 – 300: 17. However, there has been no evidence that Dr. Lovett's research involved the USMLE Step exams or any medical exam for that matter. Therefore, his testimony has no relevance to this matter.

[13] Many areas of the United States are under-served by physicians, and so increasing the number of physicians is in the public interest.  *Ramsay*, 968 F.3d at 263.  It is also in the interest of people with disabilities – estimated to number almost 13 percent of the total population of the United States– to have the opportunity to be treated by people with life experiences that are more similar to their own experiences, *i.e.,* by people with disabilities.  *See generally* L. Meeks and N. Jain, *Accessibility, Inclusion and Action in Medical Education* (Association of American Medical Colleges 2018) at 8, *available at* https://store.aamc.org/accessibility-inclusion-and-action-in-medical-education-lived-experiences-of-learners-and-physicians-with-disabilities.html.

## CONCLUSION

For these reasons, Sampson respectfully requests that the Court issue a preliminary injunction requiring the NBME to comply with federal law and to provide Sampson, after a reasonable, dedicated study period, with 100% extended time, a separate testing room, and extended breaks on Step 1 of the USMLE so that he may have an opportunity equal to that of individuals without disabilities to prove that he has mastered the medical knowledge learned in medical school.

Respectfully submitted,

s/Mary C. Vargas
Mary C. Vargas
Michael Steven Stein
STEIN & VARGAS LLP
10 G Street NE, Suite 600
Washington, DC  20002
Tel. (240) 793-3185
Fax (888) 778-4620
mary.vargas@steinvargas.com
michael.stein@steinvargas.com

s/Charles Weiner
Charles Weiner
LAW OFFICE OF CHARLES WEINER
Cambria Corporate Center
501 Cambria Avenue
Bensalem, PA 19020
Tel. (267) 685-6311
Fax (215) 604-1507
charles@charlesweinerlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned served a true and correct copy of the foregoing by CM/ECF on the following counsel for NBME:

Adam Mandelsberg
Caroline Mew
Perkins Coie LLP
1155 Avenue of the Americas
22nd Floor
New York, NY 10036

s/Mary C. Vargas
Mary C. Vargas