**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ROBERT SAMPSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 2:22-CV-05120-JMA-AYS** |
| | ) |
| **NATIONAL BOARD OF MEDICAL EX-** | ) |
| **AMINERS,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**DEFENDANT NBME'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF**
**LAW DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendant National Board of Medical Examiners ("NBME") respectfully submits the following proposed findings of fact and conclusions of law.

## INTRODUCTION

Plaintiff Robert Sampson alleges that the National Board of Medical Examiners ("NBME") violated the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act by not providing him extra time and other accommodations on one of the Step exams that make up the United States Medical Licensing Examination ("USMLE").

Plaintiff filed his complaint on August 29, 2022. (Dkt. 1.) On September 6, 2022, he filed a letter request for a conference to discuss filing a motion for preliminary injunction. (Dkt. 6.) On September 8, 2022, the Court issued an order waiving the pre-motion conference requirement and setting an expedited briefing schedule in light of Mr. Sampson's related case against Stony Brook University (*Sampson v. Stony Brook University*, Case Number 2:22-cv-04490 (JMA)(AYS) (E.D.N.Y.)). During a September 12, 2022 status conference, the Court set a hearing on Mr. Sampson's motion for October 11, 2022.  (Dkt. 12.)

On September 19, 2022, Mr. Sampson filed a motion for preliminary injunction with respect to his ADA claim against NBME, asking for a mandatory injunction that would direct NBME to provide him with twice the amount of testing time that other examinees receive on the USMLE. (Dkt. 16.) NBME filed its opposition on September 29, 2022, and Mr. Sampson filed a reply on October 4, 2022. The Court held an evidentiary hearing on the motion on October 11, 12, and 13.

Mindful that a preliminary injunction is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008), to be awarded only "upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008), including a showing that the threatened irreparable harm is "actual and imminent, not remote or speculative," *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002), the Court denies Mr. Sampson's motion based on the following findings of fact and conclusions of law.

The Court notes in this regard, as the Second Circuit has noted in a similar case, that NBME's accommodation procedures "are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination." *Powell v. Nat'l Bd. of Med. Examr's*, 364 F.3d 79, 88 (2d Cir. 2004). Particularly in the context of the present proceeding—where five, well-qualified professionals have testified that Mr. Sampson does not meet the applicable diagnostic criteria for his alleged impairments and/or is not substantially limited in any relevant major life activities in all events; no discovery has occurred; there is no evidence that passing Step 1 of the USMLE will allow Mr. Sampson to remain in medical school; and he is not even registered to test and does not plan to do so several months—the requested injunction is unwarranted.

**FINDINGS OF FACT**

I. **Parties**

1.     NBME is a non-profit organization whose mission is to help protect the public health through the development and administration of high-quality examinations, including the USMLE. (Decl. of Lucia McGeehan ("McGeehan Decl.") Dkt. 21 ¶¶ 3-4.)[1]

2.     The USMLE assesses an examinee's ability to apply the knowledge and demonstrate the skills that constitute the basis of safe and effective patient care. (McGeehan Decl. ¶ 4.) Three "Step" exams make up the USMLE: Step 1, Step 2 Clinical Knowledge (Step 2 CK), and Step 3. (McGeehan Decl. ¶ 6.) Step 1, the examination currently at issue, assesses whether the examinee can understand and apply basic science concepts that are important to the practice of medicine. (*Id.*)

3.     Licensing authorities rely upon the USMLE to help evaluate the qualifications of individuals seeking an initial medical license. (McGeehan Decl. ¶ 5.)

4.     Robert Sampson ("Mr. Sampson") completed his third year of medical school at Renaissance School of Medicine at Stony Brook University ("Stony Brook") in July 2021, and he has not taken any additional medical school classes since that time. (Trans. 141:2-9.) He is currently enrolled in an MBA program at the Stony Brook College of Business. (Decl. of Robert Sampson ("R. Sampson Decl.") (Dkt. 16-3) ¶ 3 and Ex. 6.)

---

[1] Dr. McGeehan is the Manager of Examinee Accommodations in NBME's Disability Services Group. She has a Ph.D. in Educational Psychology with a focus in School Psychology. (McGeehan Decl. ¶ 2.) She is a licensed psychologist in the State of Pennsylvania. (*Id.*)

Dr. McGeehan did not testify at the hearing but submitted a declaration in support of NBME's opposition to plaintiff's motion for preliminary injunction. Plaintiff—who has the burden of proof on his motion for preliminary injunction—included Dr. McGeehan on his witness list, but ultimately did not call her as a witness. Her declaration testimony is therefore unrebutted.

5. In his Memorandum in support of his Motion for Preliminary Injunction ("Dkt. 16-1) ("Pl. Br."), Mr. Sampson argues that he "is affected by a Specific Learning Disorder with impairments in reading and written expression and Attention Deficit Hyperactivity Disorder [ADHD], which substantially impair the major life activities of reading, spelling, cognitive processing speed, attention concentration [*sic*] and taking standardized exams." (*Id.* at 3.)

## II.  Mr. Sampson's History and Status in Medical School and Business School

6. Mr. Sampson began medical school in August 2015. (R. Sampson Decl. ¶ 16.)

7. In November 2016, Stony Brook informed Mr. Sampson that he had exhibited "academic marginality" in medical school. (Pl. Addt'l Ex. 10.) He was required to take a leave of absence in December 2016. (Pl. Br. Ex. 2-B at 7.)

8. To continue in medical school, Stony Brook required Mr. Sampson to either retake his first three semesters of medical school or take and pass Step 1 of the USMLE. (Trans. 145:1-5.) Mr. Sampson chose to take the Step 1 exam, and he tested in January 2020. He did not pass. (McGeehan Decl. ¶ 30.)

9. Nevertheless, Mr. Sampson was allowed to resume his medical school studies in the fall of 2020 (Trans. 107:4-110:15; 112:11-13), and he completed his third-year clinical rotations in July 2021. (R. Sampson Decl. ¶ 2; Pl. Br. Ex. 6 (Dkt. 16-5).)

10. Mr. Sampson began taking business school classes at the same time he was completing his third year of medical school, in or around June or July of 2021. (Trans. 140:18-21.) Since fall 2021, Mr. Sampson has only been taking business school classes. (Pl. Br. Ex. 6; Trans. 141:6-9.) He has a 4.0 GPA in business school. (R. Sampson Decl. ¶ 3.)

11. On July 29, 2022, Mr. Sampson filed a complaint and motion for preliminary injunction against Stony Brook. *Sampson v. Stony Brook Univ.*, Case No. 22-4490 (E.D.N.Y.). Mr. Sampson alleged that without court intervention against Stony Brook, he would be withdrawn

from medical school on or about August 12, 2022, because he did not complete medical school in seven years, as required by the school.  (Case No. 22-4490, Dkt. 1 ¶¶ 95-97.) Mr. Sampson requested "a preliminary injunction enjoining and restraining Stony Brook from dismissing him from medical school and further ordering Stony Brook to provide the reasonable modification of permitting Sampson more than seven years to complete his medical degree." (Case No. 22-4490, Dkt. 2 at 1.)

12.     By minute order dated August 4, 2022, any action by Stony Brook on Mr. Sampson's status in medical school was stayed through October 14, 2022. On October 6, 2022, Stony Brook consented to extend the stay through December 13, 2022. (Case No. 22-4490, Dkt. 17.)

**III.    Mr. Sampson's Requests for Accommodation on Step 1 of the USMLE**

13.     Examinees take the USMLE under uniform conditions, including standard testing time. (McGeehan Decl. ¶ 7.) NBME provides accommodations, however, to individuals who have a disability within the meaning of the ADA and need accommodations. (*Id.* ¶¶ 7-8.)

14.     NBME individually reviews all accommodation requests. (McGeehan Decl. ¶ 8.) In its review, NBME is assessing whether the examinee has demonstrated that he or she is disabled within the meaning of the ADA and needs accommodations to take the examination in an accessible manner. (*Id.* ¶ 8.)

15.     To ensure that the USMLE testing program is fair to all examinees and to protect the reliability of USMLE scores, which jurisdictions rely upon to help protect the health and safety of the public, NBME denies requests for extra testing time or other accommodations that have not been shown to be warranted. (McGeehan Decl. ¶ 9.)

16.     NBME routinely seeks input from independent professionals with expertise in the relevant disability when evaluating an accommodation request. (McGeehan Decl. ¶ 10.) When it

does so, NBME asks the external professional to review all the supporting documentation submitted by the candidate and provide a written report on whether the documentation demonstrates the presence of a physical or mental impairment (as identified by the candidate); if so, whether the impairment substantially limits the candidate's ability to perform one or more major life activities that are relevant to taking the USMLE; and, if so, to make a recommendation on whether the requested accommodations are appropriate. (*Id.* ¶ 10.)

17.     Mr. Sampson first requested accommodations from NBME in April 2017, seeking 50% extra time on Step 1. (McGeehan Decl. ¶ 11 and Ex. 1.)

18.     NBME thoroughly reviewed all the documents submitted by Mr. Sampson. (McGeehan Dec. ¶ 13.) NBME also sought a recommendation from Benjamin Lovett, Ph.D. (*Id.*)

19.     Dr. Lovett is a licensed psychologist and the director of the Ph.D. program in school psychology at Teachers College, Columbia University, where he serves as an Associate Professor of Psychology and Education. (Decl. of Benjamin Lovett, Ph.D. ("Lovett Decl.") Dkt. 22 ¶ 2.) Dr. Lovett's professional expertise is in the diagnosis and management of neurodevelopmental conditions, particularly learning disorders and ADHD, and he has written and spoken extensively on these topics. (*Id.* ¶ 4.) Much of Dr. Lovett's research involves testing accommodations for students with disabilities, and he has written a book published by the American Psychological Association on the topic. (*Id.* ¶ 6 at Ex. 1 at 2)

20.     Dr. Lovett concluded that Mr. Sampson's documentation did not demonstrate that he has a mental impairment that substantially limits his ability to perform any major life activities that are relevant to taking the Step 1 examination, and he recommended that Mr. Sampson's request for extra testing time be denied. (Lovett Decl. Ex. 2)

21.    After reviewing Mr. Sampson's request and supporting documentation and considering the recommendation of Dr. Lovett, NBME denied Mr. Sampson's request by letter dated June 13, 2017. (McGeehan Decl. ¶¶ 13-14 and Exs. 2-3.)

22.    In this letter, NBME discussed the information presented in the documents submitted by Mr. Sampson, including Mr. Sampson's personal statement, the reports from his 2013 evaluators, the letter from his psychiatrist, Dr. Aronson, the letter from his former MCAT tutor, the letter from a Stony Brook University Learning Specialist, and reports of his performance on other standardized tests. (McGeehan Decl. Ex. 3 at 1-2.) NBME concluded that "[o]verall, these data do not demonstrate impaired functioning relative to most people or suggest that standard conditions are a barrier to [Mr. Sampson's] access to the USMLE." (*Id.* at 2.) It further concluded that Mr. Sampson's "documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration." (*Id.*)

23.    Mr. Sampson sought reconsideration of NBME's decision by letter dated June 22, 2017. (McGeehan Decl. ¶ 15)

24.    NBME thoroughly reviewed Mr. Sampson's request for reconsideration and also provided his supplemental documentation to Dr. Lovett for review. (McGeehan Decl. ¶ 17)

25.    Based on Dr. Lovett's recommendation (McGeehan Decl. Ex. 4) and its independent review of the file, NBME concluded that the new documentation submitted by Mr. Sampson did not provide a basis for altering NBME's original decision. (*Id.* ¶ 18.) NBME informed Mr. Sampson of its decision by letter dated August 1, 2017. (*Id.* Ex. 5)

26.    Mr. Sampson again sought reconsideration of NBME's decision, by letter received by NBME on or around November 30, 2017. (McGeehan Decl. ¶ 19.)

27.     NBME thoroughly reviewed Mr. Sampson's second request for reconsideration, and also provided his supplemental documentation to Dr. Lovett for review. (McGeehan Decl. ¶ 20.)

28.     Based on Dr. Lovett's recommendation (McGeehan Decl. Ex. 6) and its independent review of the file, NBME concluded that the supplemental documentation submitted by Mr. Sampson did not provide a basis for altering NBME's prior decisions. (*Id.* ¶ 21.) NBME notified Mr. Sampson of its decision by letter dated January 12, 2018. (*Id.* Ex. 7.)

29.     On February 22, 2018, Mr. Sampson sent a letter to NBME requesting "an explanation as to why [he is] not being granted disability related accommodations on the USMLE Step 1 exam." (McGeehan Decl. ¶ 22.)

30.     NBME responded by letter dated March 6, 2018, with additional explanation for its decisions. (McGeehan Decl. Ex. 8.)

31.     On June 29, 2018, an attorney named Jo Anne Simon wrote a letter to NBME indicating that her law firm represented Mr. Sampson and sought a "reversal of the NBME's discriminatory decision." (McGeehan Decl. ¶ 24.)

32.     NBME provided a copy of this letter and additional documentation submitted on behalf of Mr. Sampson to Dr. Lovett for review. (McGeehan Decl. ¶ 25.) Dr. Lovett provided a new report addressing this additional documentation in July 2018. (*Id.* and Ex. 9.)

33.     Mr. Sampson subsequently submitted another accommodation request form to NBME, again seeking 50% additional time with testing over two days. (McGeehan Decl. ¶ 25 and Ex. 10.)

34.     NBME thoroughly reviewed all the documentation provided by Mr. Sampson in June and August 2018. (McGeehan Decl. ¶ 26.) Based on NBME's review of the file and Dr.

Lovett's July 2018 recommendation, NBME again concluded that Mr. Sampson's documentation did not demonstrate a substantial limitation in a major life activity compared to most people or that the requested accommodation was an appropriate modification of his USMLE Step 1 test administration. (*Id.*) NBME informed Mr. Sampson of its decision by letter dated September 7, 2018.  (*Id.* Ex. 11.)

35.   On November 14, 2018, NBME received another letter from Mr. Sampson's lawyer, Jo Anne Simon, requesting "a reversal of the NBME's latest discriminatory decision." (McGeehan Decl. ¶ 27.)

36.   NBME provided Ms. Simon's letter and all the documentation that had been submitted by Mr. Sampson to NBME to date to two new external, independent experts, Samuel Ortiz, Ph.D. and Kevin Murphy, Ph.D. (McGeehan Decl. ¶ 28 and Exs. 12 and 13.)

37.   Dr. Ortiz is a Professor of Psychology and Director of the Graduate Programs in School Psychology at St. John's University. (Decl. of Samuel O. Ortiz, Ph.D. ("Ortiz Decl.") Dkt. 24 ¶ 2.) He trains and consults nationally and internationally on topics ranging from nondiscriminatory assessment to contemporary evaluation of learning disabilities. (*Id.*)

38.   Dr. Murphy has over thirty-five years of professional experience in the field of psychology. (Decl. of Kevin Murphy, Ph.D. ("Murphy Decl.") Dkt. 23 ¶ 4.) Dr. Murphy has conducted approximately four thousand ADHD evaluations during his career. (*Id.* ¶ 5.) He has taught and published in the area of ADHD, including numerous books and book chapters, and he has been inducted into the ADHD Hall of Fame by the advocacy organization Children and Adults with Attention Deficit Hyperactivity Disorder ("CHADD"). (*Id.* Ex. 3 at 3-5.)

39.   Based on the recommendations of Dr. Ortiz and Dr. Murphy and NBME's own thorough review of the file, NBME concluded that Mr. Sampson's documentation did not

demonstrate a substantial limitation in a major life activity compared to most people or that additional testing time was an appropriate modification of his USMLE Step 1 test administration. (McGeehan Decl. ¶ 29.) NBME informed Mr. Sampson of its decision by letter dated January 4, 2019. (*Id.* Ex. 14.)

40.     More than three years later, in April 2022, Mr. Sampson sent a new accommodation request to NBME, this time seeking 100% additional testing time (double time) and extra breaks. (McGeehan Decl. ¶ 32 and Ex. 16.)

41.     NBME provided Mr. Sampson's new request and supporting materials to Dr. Murphy for review. (McGeehan Decl. Ex. 17.)

42.     Based on Dr. Murphy's recommendation and its own thorough review of the file, NBME denied Mr. Sampson's request. NBME informed Mr. Sampson of its decision by letter dated June 1, 2022. (McGeehan Decl. ¶ 33 and Ex. 18.)

## IV.    Mr. Sampson's Evaluations

43.     In August 2013, after he graduated from the University of Virginia and around the time he was taking or planning to take the Medical College Admission Test ("MCAT"), Mr. Sampson sought out a psychological evaluation from Suzanne Michels, Ph.D. ("Dr. Michels"). (Pl. Addt'l Ex. 3.)

44.     As part of her evaluation, Dr. Michels obtained background information from Mr. Sampson and "review[ed] … previous testing results and school records." (Pl. Addt'l Ex. 3 at 1.) Dr. Michels reviewed Mr. Sampson's performance on prior standardized tests as part of her analysis, including the SAT and ACT. (Pl. Addt'l Ex. 3 at 2.) Dr. Michels also administered a battery of assessments to Mr. Sampson. (Pl. Addt'l Ex. 3 at 3-9.)

45.     On the academic skills tests administered as part of Dr. Michel's evaluation, all of Mr. Sampson's scores as measured against age peers were in the average range or above, even on timed measures. (Pl. Addt'l Ex. 3 at 5-8; Lovett Decl. ¶ 17(a).)

46.     Dr. Michels also administered the Nelson-Denny Reading Test ("Nelson-Denny"). When Mr. Sampson's performance on the reading comprehension test was compared to graduating seniors in college, his score was in the 16th percentile. (Pl. Addt'l Ex. 3 at 6; Lovett Decl. ¶ 18.) When compared to first-year college students (who are more representative of the general adult population), his scores "would be well within the average range." (Lovett Decl. ¶ 19.)

47.     Dr. Michels diagnosed Mr. Sampson with a Learning Disorder, Not Otherwise Specified, based on a "disparity" between his measured verbal abilities and his visual/spatial reasoning abilities. (Pl. Addt'l Ex. 3 at 9.) She described Mr. Sampson as having "relative weaknesses" that he overcame with a strong drive and a conscientious approach to his studies. (Id.) Dr. Michels did not evaluate Mr. Sampson for ADHD and he did not appear to raise attention-related concerns with her. (Pl. Addt'l Ex. 3.)

48.     Dr. Michels recommended that Mr. Sampson "receive extra time on reading comprehension tasks (150%) as well as on those involving significant visual/spatial components." (Pl. Addt'l Ex. 3 at 9.) She also found he would "benefit from extended time on [more complex, applied] math tasks, as well." (Pl. Addt'l Ex. 3 at 9.)

49.     Mr. Sampson obtained a "Supplemental" evaluation from Allison Anderson, Ph.D., in December 2013, specifically seeking an evaluation for ADHD. (Pl. Addt'l Ex. 2 at 1.) Dr. Anderson reviewed the history outlined in Dr. Michel's report along with additional background information.  (Id. at 1.)

50.     As part of Dr. Anderson's evaluation, Mr. Sampson and his parents filled out Barkley Childhood Symptoms Scales addressing any symptoms of ADHD he exhibited during his childhood. Mr. Sampson's responses were significant for inattention, but his mother's and father's responses did not show significant levels of any ADHD-type symptoms. (Pl. Addt'l Ex. 2 at 9.)

51.     Mr. Sampson, his girlfriend, and a "friend/tutor" also filled out Barkley Childhood Symptoms Scale to address his current symptoms, and none of them endorsed significant levels of symptoms. (Pl. Addt'l Ex. 2 at 9.)

52.     Dr. Anderson did not diagnose Mr. Sampson with ADHD, finding that "his testing results and history supply little evidence that [his attention] problems are the result of ADHD." (Pl. Addt'l Ex. 2 at 7.) She said that he might be "slightly 'out on the continuum' in terms of distractibility, but does not appear to have the consistent and severe pattern of impulsivity, social problems, marked inattentiveness, or physical restlessness that support an ADHD diagnosis." (*Id.*)

53.     Dr. Anderson measured Mr. Sampson's timed reading comprehension skills with the Scholastic Abilities Test for Adults (SATA), and his score was in the average range under standard time limits. (Pl. Addt'l Ex. 2 at 9; Lovett Decl. ¶ 17(b).)

54.     Dr. Anderson concluded that Mr. Sampson "has a learning disorder most prominently affecting visuospatial processing, visuospatial memory, and possibly some types of 'output' (e.g., drawing, writing) related to visual information." (Pl. Addt'l Ex. 2 at 7.) She diagnosed Mr. Sampson with an Unspecified Neurodevelopmental Disorder. (*Id.*) She also assigned an "additional diagnosis" of Specific Learning Disorder with impairment in reading "[t]o account for the greater disruption in reading processes evident since elementary school." (*Id.*)

55.     A March 29, 2017 letter from Mr. Sampson's psychiatrist, Dr. Aronson, indicates that Mr. Sampson had been under Dr. Aronson's care for learning disabilities (not diagnosed by Dr. Aronson) and "mild ADD" since November 4, 2015. (Pl. Addt'l Ex. 5.) No details about Mr. Sampson's functioning was provided, no information was provided regarding how the "ADD" diagnosis was made in 2015, and no explanation was provided as to why Mr. Sampson's prior evaluators did not reach the same diagnostic conclusion regarding whether Mr. Sampson is properly diagnosed with ADHD during their 2013 assessments. (McGeehan Decl. Ex. 3.) In a September 6, 2017 letter (Pl. Addt'l Ex. 25), Dr. Aronson "listed five symptoms of ADHD and made a partial review of the criteria for the disorder. However, he did not provide the evidence showing that Mr. Sampson met those criteria, or say what evidence was used to determine that he met the criteria." (Lovett Decl. ¶ 41; *see also* Murphy Decl. ¶ 28.)

56.     Mr. Sampson sought out another evaluation in 2020, from Jeannette Wasserstein, Ph.D. (Pl. Addt'l Ex. 37.) He sought this evaluation specifically for the purpose of pursuing accommodations from NBME. (*Id.* at 1.)

57.     Dr. Wasserstein was assisted by Kim Miller, Ph.D., and Dr. Miller administered most (if not all) of the assessments to Mr. Sampson. (Trans. 185:13-14.) Dr. Wasserstein has no specific recollection of which tests she may have administered (if any). (Trans. 186:14-16.)

58.     Dr. Wasserstein interviewed Mr. Sampson, reviewed his prior evaluation reports, reviewed documentation and historical records relating to Mr. Sampson (including his standardized test scores), and reviewed the results of the assessments administered by Dr. Miller. (Pl. Addt'l Ex. 37 at 2.)

59.     On the CAADID structured interview for ADHD symptoms, Mr. Sampson "complained of broad symptoms of inattentive and hyperactive ADHD as a child and … as an adult,

albeit somewhat diminished." (Pl. Addt'l Ex. 37 at 3.) Mr. Sampson also "provided examples" of how his symptoms of inattention and hyperactivity and impulsivity impacted his day-to-day life. (Pl. Addt'l Ex. 37 at 3-4.) On the CAARS self-report questionnaire, Mr. Sampson "indicated clinically significant issues with most aspects of the scale, but especially inattention and memory." (Pl. Addt'l Ex. 37 at 22.)

60.     Dr. Wasserstein has written that it is helpful to obtain information from a collateral reporter, such as a spouse or parent, on ADHD symptom questionnaires because sometimes people are motivated to obtain a diagnosis in order to secure academic accommodations. (Trans. 244:3-20.) Dr. Wasserstein asked Mr. Sampson to provide CAARS questionnaires to his parents or other informants (similar to the Barkley scales that his parents, girlfriend, and friend/tutor filled out in 2013 for Dr. Anderson), but Mr. Sampson did not do so. (Trans. 193:5-194:1.)

61.     Dr. Wasserstein nevertheless diagnosed Mr. Sampson with ADHD, Combined presentation, in her 2020 evaluation report (Pl. Addt'l Ex. 37 at 24). During her testimony, however, she said that this was an "error," and that her diagnosis should have been limited to inattentive type. (Trans. 187:1-11.)

62.     Mr. Sampson's academic skills were measured with the Wechsler Individual Achievement Test. All of his scores were in the average range or above. (Pl. Addt'l Ex. 37 at 16; Lovett Decl. ¶ 17(c).) He was also administered the Woodcock-Johnson Tests of Achievement, and his scores were in the high average or superior range. (Pl. Addt'l Ex. 37 at 15; Lovett Decl. ¶ 17(c).)

63.     Mr. Sampson was again administered the Nelson-Denny as part of Dr. Wasserstein's evaluation. In contrast to his performance on the Nelson-Denny reading comprehension test in 2013, where his score was in the average range compared to first-year college students, his

score on the same test in 2020 fell to a "deficient" level "typical of a child starting seventh grade." (Pl. Addt'l Ex. 37 at 16; Lovett Decl. ¶ 20.) Dr. Wasserstein did not address or explain this significant difference in Mr. Sampson's performance on this test. (Pl. Addt'l Ex. 37 at 16; Lovett Decl. ¶ 20.)

64.    Dr. Wasserstein found that, based upon his reading comprehension difficulties, Mr. Sampson "meets criteria for a DSM-5 diagnosis of Specific Learning Disorder with impairment in reading (reading fluency and reading comprehension), as well as impairment in written expression (spelling and handwriting)." (Pl. Addt'l Ex. 37 at 24.) Dr. Wasserstein assigned the diagnosis of learning disorder in reading based on his "absolutely low" Nelson-Denny test score in 2020 and his other "relatively low" scores which represented a "relative deficit." (Trans. 236:6-21.)

65.    Looking across Mr. Sampson's three evaluation reports, "[c]linical evaluation of Mr. Sampson's intellectual functioning did not indicate substantially limited cognition when compared to the general population." (Decl. of Joseph E. Bernier, Ph.D. ("Bernier Decl.") Dkt. 25 ¶ 19;[2] *see also id.* ¶¶ 20-22; Trans. 295:14:-20; Trans. 302:11-24.) Likewise, across all three of his evaluations, "[e]very time that Mr. Sampson's academic skills have been measured against age peers on diagnostic tests, his skills have been in the average range or above, including on

---

[2] Dr. Bernier is a licensed psychologist in New York State, and he has conducted hundreds of diagnostic evaluations over the course of his 46-year career. (Bernier Decl. ¶ 2). Dr. Bernier did not serve as an external reviewer at the time Mr. Sampson submitted his accommodation requests to NBME. (McGeehan Decl. ¶¶ 11-33.) Instead, he provided an expert opinion in conjunction with the expedited preliminary injunction proceedings.

measures that were timed." (Lovett Decl. ¶ 17 and ¶ 17(a)-(b); *see also* Trans. 294:4-295; 295:21-24; Trans. 299:9-17.)[3]

66.     With respect to the Nelson-Denny, the Court notes that "the version of the [Nelson-Denny] given to Mr. Sampson in 2013 and 2020 compares people to *educational* peers rather than *age* peers. Mr. Sampson was compared to graduating college seniors in the 2013 and 2020 evaluations, thus leading to scores that underestimate his actual reading skill levels under timed conditions relative to most people in the general population." (Lovett Decl. ¶ 18; McGeehan Decl. Ex. 8 at 2-3; Trans. 225:22-24.) The Court further notes that the "Reading Rate" score on the Nelson-Denny, which is based on how far a client gets in reading the test's first passage in one minute, is an unreliable measure." (Lovett Decl. ¶ 22; Trans. 292:13-293:7.)[4]

67.     As discussed above, Mr. Sampson's Nelson-Denny reading comprehension score changed significantly between 2013 and 2020, with a marked decrease in his performance in 2020. Given this dramatic and unexplained change in scores, the Court places much less weight on Mr. Sampson's performance on the Nelson-Denny. (*See* Bernier Decl. ¶ 27.)

68.     Mr. Sampson performed better on the SATA and Nelson-Denny with additional time. (Pl. Addt'l Ex. 2 at 9; Ex. 37 at 16.) But the Court credits Dr. Lovett's research-based explanation—consistent with common sense—that people with and without disabilities tend to perform better with more time on time-pressured tests. (Trans. 299:24-300:23.)

69.     In his 2020 evaluation with Dr. Wasserstein, Mr. Sampson completed only 12 out of 38 questions on the Nelson-Denny reading comprehension test in the standard 20-minute test

---

[3] Dr. Lovett explained at the hearing that, in diagnostic testing, "[e]very test may have a slightly different reference range for what constitutes average, [but] the most common one that we see is that scores between the 25th and the 74th percentile are average." (Trans. 288:18-23.)

[4] In the 2013 evaluation, Mr. Sampson's reading rate was in the average range compared to first year college students (a general population proxy group) and just one percent below the average range compared to graduating college seniors. (Trans. 293:25-294:3.)

administration time. (Pl. Addt'l Ex. 37 at 16.) As already explained, the Court is not placing sig-
nificant weight on Mr. Sampson's performance on the Nelson-Denny. Nevertheless, there are
many reasons someone might not answer all the questions on a test. For example, someone might
simply work more slowly, or have a different work style or different approach to the test.  (Trans.
382:20-383:3.) In Mr. Sampson's case, Dr. Miller observed that Mr. Sampson had a "deliberate
and slow work style" (Pl. Addt'l Ex. 37 at 14), while Dr. Michels observed that Mr. Sampson
"did not necessarily work more slowly than is typical, but his need to check his responses led to
longer than average testing times." (Pl. Addt'l Ex. 3 at 3.)

70.    Mr. Sampson's evaluators administered various neuropsychological tests. On
some of these tests, Mr. Sampson had below-average scores.

71.    For example, Mr. Sampson had some low scores on the Integrated Visual and
Auditory (IVA) Plus Continuous Performance Test (Pl. Addt'l Ex. 37 at 17-18), a "computer-
based test where the examinee has to follow certain rules about when to press a computer key,
typically." (Trans. 318:7-9; Trans. 318:9-16.) "His performance was variable, so on measures of
impulsiveness, his scores were below the average range, suggesting deficits there. On one of the
attention measures, his score was low. On the other attention measures, his scores were above
average." (Trans. 318:24-319:4.)

72.    Continuous Performance Tests like the IVA Plus "have not been shown to be par-
ticularly useful in either confirming or disconfirming an ADHD diagnosis due to their high false
positive and false negative rates." (Murphy Decl. ¶ 29 p. 12.) Dr. Wasserstein concluded that Mr.
Sampson's performance on the IVA Plus attention task "indicates that Mr. Sampson's response
control is problematic in both modalities, leading to deficits in his sustained attention, especially
visual. Given such severely impaired sustained visual attention, his reading comprehension is

likely to be impacted, especially during lengthy standardized exams." (Pl. Addt'l Ex. 37 at 18.) Dr. Lovett, however, did not "see performance on this computerized test, where you have to press a key according to different rules[,] as related to reading comprehension." (Trans. 319:16-18.) He further noted "there's not even a reason to speculate about that relationship" in Mr. Sampson's case "because there's a whole history of performance on real world comprehension measures, including some lengthy standardized exams." (Trans. 319:19-23.)

73.     On the Wisconsin Card Sorting Test, another neuropsychological exam measuring executive function, Mr. Sampson had "to sort cards according to a rule, where the cards have shapes of different colors and different numbers of shapes." (Trans. 320:23-321:9.) Mr. Sampson had variable scores on this test, generally in the average range or just below it. (Pl. Addt'l Ex. 37 at 19; Trans. 321:18-322:6.) Mr. Sampson's scores on the Delis-Kaplan Executive Function System (D-KEFs), another test of executive function, were in the average range or above. (Pl. Addt'l Ex. 37 at 18; Trans. 320:6-22.)

74.     On neuropsychological tests of auditory memory, Mr. Sampson's scores on the California Verbal Learning Test, where "he heard lists of words and had to show that he remembered the words from those lists," (Trans. 322:21-23), were variable.  "Some were below the average range.  Others were in the average range." (Trans. 323:24-26; Pl. Addt'l Ex. 37 at 20.)  Mr. Sampson scored average or above on the Wechsler Memory Scale IV, "where Mr. Sampson heard a story and had to show he remembered things from the story." (Pl. Addt'l Ex. 37 at 20; Trans. 322:18-20; 323:3-4.)

75.     On tests of visual memory, Mr. Sampson had below average scores on the Re-Osterreith Complex Figure Test, where he had to recreate a complex drawing from memory. (Pl. Addt'l Ex. 37 at 20; Lovett Decl. ¶ 30 and Ex. 6.) On the Wechsler Memory Scale IV, another

test where Mr. Sampson had to draw from memory, (Trans. 323:13-15), his scores were in the average or above average range. (Pl. Addt'l Ex. 37 at 20.)

76.     Dr. Wasserstein concluded that Mr. Sampson's variable performance on measures of visual memory "likely contribute to his reading comprehension difficulties," (Pl. Addt'l Ex. 37 at 20), but Dr. Lovett does not "necessarily see a relationship between those visual memory scores" from tests involving drawing complex figures and reading comprehension.  (Trans. 324:7-17.) He also sees no "need for speculating about whether these unusual sort of unrealistic tasks would affect reading comprehension [where] [w]e have lots of direct evidence related to [Mr. Sampson's] reading comprehension." (Trans. 324:18-22; Lovett Decl. ¶ 30.)

77.     The Court has taken Mr. Sampson's performance on the neuropsychological tests into consideration, but finds that Mr. Sampson's performance on these tests is not directly probative of his ability to access the USMLE Step 1 examination. The Court therefore puts more weight on other information in the record. (Lovett Decl. ¶ 30; *see also* Bernier Decl. ¶ 31 ("The results from neuropsychological tests must be viewed within the larger context of the other cognitive and achievement testing scores included in the assessment batteries."); Decl. of Dawn P. Flanagan, Ph.D. ("Flanagan Decl.") Dkt. 26 ¶ 6 p. 4 ("Dr. Wasserstein provided many interpretations of Mr. Sampson's performance on a variety of psychological tests that were not substantiated.  In fact, there was often an overwhelming amount of data that contradicted her interpretation.").[5])

---

[5] Dr. Flanagan is a Professor of Psychology at St. John's University, where she teaches graduate courses in cognitive assessment and the assessment, diagnoses, and remediation of learning disabilities, as well as undergraduate courses in tests and measurement. (*Id.* ¶ 2.) She has authored or co-authored numerous books, book chapters, and peer-reviewed articles relating to the diagnosis of specific learning disorders. (*Id.*) Like Dr. Bernier, Dr. Flanagan did not serve as an external review of Mr. Sampson's accommodation requests to NBME.  (McGeehan Decl. ¶¶ 11-33.)  She

## V.      Mr. Sampson's Academic Background

78.      ADHD and LD are neurodevelopmental disorders, which means "they are present early in life," even if not diagnosed until adulthood. (Trans. 285:20-286:1; 286:20-287:2; 431:16-23; Lovett Decl. ¶¶ 34, 38; Murphy Decl. ¶¶ 9-14.) The "best way" to assess childhood impairment "is with records of childhood" such as teacher narratives on report cards, grades, and scores on standardized tests. (Trans. 287:3-288:24; *see also* Trans. 334:22-335:16.)[6] Academic records beyond childhood are also highly relevant. (Lovett Decl. ¶ 13 ("[I]dentifying disorders and disabilities requires … data from real-world settings.").) Dr. Wasserstein agrees that academic performance is relevant to an analysis of disorders such as Learning Disorders and ADHD. (Trans. 246:23-247:1.)

79.      Mr. Sampson progressed through elementary school, junior high, high school, and college without being diagnosed with any learning disorder, ADHD, or other mental impairment, and without receiving any disability-related accommodations. He performed very well throughout his academic history, until he got to medical school.

80.      Mr. Sampson submitted some early school records to NBME in support of his accommodation request. Specifically, he provided report cards for first and second grade, one term of fourth grade, and portions of sixth grade. He also included typed teacher comments for fifth grade.  (Pl.'s Addt'l Ex. 21.)

81.      The comments in these reports reflect some minor issues with following directions, organization, and writing, but they also note improvement in these areas. (Pl.'s Addt'l Ex.

---

is serving as an expert witness as part of the expedited preliminary injunction proceedings. (Flanagan Decl. ¶ 3.)

[6]   The Court notes that, as confirmed by Dr. Lovett's other testimony, there is a transcription error on page 335, line 10 of the transcript, where the word "not" is omitted between the words "did" and "see."

21.) "Although there were a few teacher comments on his early report cards relating to distracti-
bility, disorganization, listening, impulsivity, and following directions, these were few and far
between, did not appear to significantly interfere in his progress, and did not appear to have per-
sisted over time …. Moreover, there were a number of 'positive' teacher comments as well….
Overall, the trend was toward improvement and the early issues teachers commented on seemed
to resolve and not persist or cause any significant impairment as he got older…." (Murphy Decl.
¶ 33; *see also* Lovett Decl. ¶ 43; Bernier Decl. ¶ 46; Pl. Addt'l Ex. 2 at 5 ("[Mr. Sampson's] fa-
ther's responses [to behavioral questionnaires regarding childhood symptoms] were more con-
sistent with notations from Robert's school history.  In essence, his father occasionally saw Rob-
ert as showing more difficulty focusing and restraining himself compared to other students his
age (and especially more forgetful), but did not rate him as having the level of problems either at
school or home that are typical of students with ADHD.").)

82.    The reports also do not reflect any impairment in reading. To the contrary, the re-
ports reflect comments such as: "In reading, Robert enjoys reading books, has a good sight vo-
cabulary and uses a number of strategies to figure out new words" (first grade); "Robert has be-
come a good independent reader. He has improved his sight vocabulary and uses a combination
of reading strategies for new words" (second grade); and "Robert loves reading. His desire to
read the Narnia series in its entirety is indicative of his high level of commitment to his work"
(sixth grade).  (Pl. Addt'l Ex. 21.)

83.    Very few actual scores are reflected in the records, but in first grade, Mr.
Sampson's reading scores ranged from 4 (first term) to 5+ (fourth term) on a scale of 1-5 (with 5
being the highest). (Pl. Addt'l Ex. 21.) In second grade, Mr. Sampson's reading skills were
marked as 4's and 5's on a scale of 1-5 across all terms.  (*Id.*) In fourth grade, his reading scores

were 3's and 4's on a scale of 1-5. (*Id.*) Finally, Mr. Sampson's "lowered grade" in Language

Arts and Social Studies in sixth grade appears to have been a B+.  (*Id.*)

84.     Mr. Sampson reported to Dr. Wasserstein that "[w]hile in elementary school, his

mother read his assignments to him as [he] followed along." (Pl. Addt'l Ex. 37 at 5.) Mr.

Sampson's mother also reports that he worked with a reading specialist in the summer between

4th and 5th grade on a teacher's recommendation. (Trans. 162:7-15.) By all indications, howev-

er, Mr. Sampson learned to read on schedule and demonstrated this learning in school. (Pl.

Addt'l Ex. 21; Decl. of S. Ortiz, Ph.D. ¶¶ 13-18.) As his mother noted when testifying: "I don't

know what he did in the classroom.  Of course I wasn't there."  (Trans. 158:16-17.)

85.     Mr. Sampson's reading skills were also measured when he was 10 years old, and

these scores do not reflect impairment. The Woodcock Reading Mastery Test showed he was

reading at grade level, and his reading score fell in the average range at the 59th percentile on the

Terra Nova test.   (Pl. Addt'l Ex. 3 at 2; Lovett Decl. ¶ 34.)

86.     Mr. Sampson's junior high school transcript is not in the record, but he informed

Dr. Michels "that he largely did well during those years, excelling in math and science, but

worked hard to obtain B+/A- grades in language arts." (Pl. Addt'l Ex. 3 at 2.) He used a math

tutor "to keep up with the accelerated pace of his classmates," and his spelling and handwriting

"were relatively poor."  (*Id.*)

87.     Mr. Sampson's high school transcript also is not in the record, but Mr. Sampson

informed Dr. Michels that his "high school was extremely competitive, leading to widespread

use of tutoring." (Pl. Addt'l Ex. 3 at 2.) According to Dr. Michel's evaluation report, Mr.

Sampson's "high school transcript indicates that he earned A's in most classes but math, in

which he earned mostly B's. Classes were typically honors or AP level." (Pl. Addt'l. Ex. 3 at 2; *see also* Trans. 127:18-128:2.)

88.     Mr. Sampson made extensive use of tutoring, particularly during high school. (Pl. Addt'l Ex. 19 at 1.) Mr. Sampson explains that he "needed these tutors because my learning was not happening in the classroom." (R. Sampson Decl. ¶ 8.) The Court does not doubt that Mr. Sampson's use of tutors helped him to excel academically at a competitive high school.

89.     Although Mr. Sampson has suggested that he struggled academically throughout his educational career because of his impairments (Trans. 42:3-5), the available academic records and summaries as discussed above do not reference any such struggles, and he was never evaluated for a learning disability or ADHD in primary or secondary school or in college. (Trans. 126:3-10.)

90.     Mr. Sampson had no IEP or Section 504 plan while in school. (Trans. 126:8-10.) He did not receive formal accommodations in elementary school, junior high school, or high school.  (McGeehan Decl. Ex. 16 at 5.) He "had no formal interventions for academic difficulties, no special services, grade retentions, or behavior problems." (Pl. Addt'l Ex. 2 at 1.)

91.     Mr. Sampson attended the University of Virginia, "an academically competitive university," (Pl. Addt'l Ex. 2 at 1), and "he flourished socially and intellectually" with a 3.43 GPA.  (Pl. Addt'l Ex. 3 at 2.) He was a "biology student" with "an emphasis on premed."  (Pl. Addt'l Ex. 37 at 6.) He was in a fraternity (Pl. Addt'l Ex. 3 at 3), and his grades ranged from A+ to C- (Pl. Addt'l Ex. 37 at 6.)

92.     In medical school, Mr. Sampson passed all his classes, but failed some of his end-of-course "shelf" exams when he tested under standard time conditions. (Pl. Decl. ¶ 16, Pl.

Addt'l Ex. 10A.) Mr. Sampson was approved to receive testing accommodations in medical school after he had received a warning of marginal performance. (Pl. Addt'l Ex. 6.)

93.      Mr. Sampson appears to have been successful in his clinical rotations. According to various preceptor comments, Mr. Sampson:

- "[R]eadily and frequently reads up on his patients, looks up medical literature and shares new knowledge with the team;"

- "[S]howed upon on time and ... pays attention to detail...;"

- "[T]ook the initiative to look up information on interesting cases;" and

- "[U]ses scientific literature effectively to enhance his medical knowledge."

(R. Sampson Decl. Ex. 1-A (Dkt. 16-3 at 12-14).). "[I]f anything, [these reports] describe the an-tithesis of ADHD and learning disorders in reading a written expression." (Murphy Decl. ¶ 37; *see also* Lovett Decl. ¶ 44 ("Even in his clinical rotations during medical school, there is ample evidence of traits and behavior that are *the opposite of active ADHD symptoms*.") (original em-phasis); Bernier Decl. ¶ 32 ("The narrative descriptions of Mr. Sampson's performance in clini-cal settings clearly do not reflect substantially limited functioning.").)

94.      Mr. Sampson testified that he utilized various self-described and self-provided "informal accommodations" while in school, such as playing learning games with his mother (Trans. 42:19-43:8), summer reading programs at the library (Trans. 43:16-17), relying on Spark Notes or Cliff Notes (Pl. Addt'l Ex. 37 at 5), avoiding English classes in college (Trans. 47:14-49:8.), being the last student to complete tests (Trans. 51:19-20), and using a special pen for note-taking (Trans. 52:3-22). The Court notes that these "informal accommodations" appear sim-ilar to what many students use to help with learning or enrichment, or to focus on their strengths and avoid their weaknesses.

## VI.    Mr. Sampson's Performance on High-Stakes Standardized Tests

95.    National standardized tests such as the SAT or ACT "were not designed to diag-

nose disabilities, [but] they give scores that are very useful when performing an assessment, and

that is why evaluators report them as part of the history." (Trans. 336:5-10.) Dr. Wasserstein

agrees that it is appropriate to look to scores on standardized tests like the SAT or ACT as part of

an assessment. (Trans. 247:2-8.)

96.    Because high-stakes standardized tests require the use of reading, thinking, and

concentration skills, performance on such tests is directly relevant to whether someone is sub-

stantially limited in these areas or needs accommodations to test in an accessible manner. Unlike

performance on diagnostic assessments (particularly those taken for purposes of obtaining sup-

port for an accommodation request), performance on other high-stakes standardized tests pro-

vides a real-world indication of someone's skills and abilities when they have every incentive to

perform their best, and helps show the extent to which an individual is substantially limited in his

or her ability to perform the major life activities that are relevant to taking a high-stakes test such

as the USMLE Step exams. "Someone who has poor reading skills should generally be doing

poorly on real world measures of reading, such as those from the SAT, ACT, PSAT and MCAT

verbal reasoning as well." (Trans. 336:19-22; *see also* Bernier Decl. ¶¶ 12-18 (discussing Mr.

Sampson's standardized testing history and what that discloses relative to his ability to think,

read, concentrate, and efficiently process information).)

97.    Mr. Sampson did very well on SAT and ACT exams taken under standard test

conditions, including standard time. On the ACT exam, he scored in the 89th percentile com-

pared to other recent high school graduates, including in the 90th percentile on English and the

74th percentile on Reading.  (Pl. Addt'l Ex. 12.) He took the SAT three times in high school and

received scores on the Critical Reading section that were in the 74th, 84th, and 93rd percentiles,

- 25 -

meaning that, with his best performance, he "scored higher than 93% of [the prior] year's group of college bound seniors" from across the United States.  (Pl. Addt'l Ex. 14.)

98.     The ACT exam includes a Reading Test which consists of four lengthy "prose passages that are representative of the level and kinds of text commonly encountered in first-year college curricula," followed by several multiple-choice questions relating to each passage. (Mandelsburg Decl. Ex. D at 8: *id*. at 34-41.) To do well on that section of the exam, ACT advises students that, "[b]efore you begin answering a question, read the entire passage thoroughly. It is important that you read every sentence rather than skim the text."  (*Id*. Ex D. at 8.)

99.     Mr. Sampson worked with multiple SAT and ACT tutors over the course of years. (Trans. 128:18-24.) Whether because of the assistance of those tutors or otherwise, Mr. Sampson was not substantially limited in his ability to read, think, or concentrate as compared to most people in the general population when he took the SAT and ACT exams, as shown by his excellent scores on those tests.  (Trans. 340:17-341:22.)

100.     Mr. Sampson took the Medical College Admission Test ("MCAT") twice. He requested accommodations on the MCAT, but his request was denied. (Trans. 62:20-23.) Testing under standard conditions, he achieved total scores in the 67th and 73rd percentiles and a Verbal Reasoning score in the 84th percentile—meaning that his Verbal Reasoning performance was in the top 16% percent of all the extremely capable individuals who took the MCAT when he did. (Pl. Addt'l Ex. 11.) His performance on the MCAT is "average and high average as compared to *medical school* applicants, a much more capable group than the general population or the average college graduate." (Decl. of J. Bernier, Ph.D. ¶ 15; Trans. 340:2-16.)

101.     The average word count for questions on the Step 1 exam is 132 words. (McGeehan Decl. ¶ 37.) By contrast, at the time he tested, the Verbal Reasoning section of the

MCAT contained seven passages with an average word count of 600 words per passage. (Mandelsberg Decl. Ex. A at 7.) The MCAT Verbal Reasoning passages were thus longer than the typical passage found on Step 1.

102.    The MCAT tests students "on the skills and knowledge medical educators and physicians have identified as key perquisites for success in medical school and the practice of medicine." (Mandelsburg Decl. Ex. A at 5.) Verbal reasoning skills are tested, as are a student's knowledge of "biology, general chemistry, organic chemistry, and physics." (*Id*.) To do well on the Verbal Reasoning section (as Mr. Sampson did), students are advised to "read attentively and make reasonable inferences based on the information provided [in the passages]." (Mandelsburg Decl. Ex. B at 309 (ECF p. 18 of 291).)

103.    Mr. Sampson's friend and MCAT tutor, Dr. Andrew Lam, provided a letter to NBME in support of Mr. Sampson's request for testing accommodations and also testified at the hearing. In his letter, Dr. Lam explained that "the average sentence on the MCAT, constructed of multiple interrelating clauses, was challenging for [Mr. Sampson] to parse and understand in the short time he was allowed." (Pl. Addt'l Ex. 9.) Dr. Lam further explained that, after Mr. Sampson and he tried out various strategies, they found one that worked, where Dr. Lam "allowed [Mr. Sampson] just a little extra time to carefully read and record notes about the content of each paragraph." (Pl. Addt'l Ex. 9; Trans. 30:17-20.) At the hearing, however, and in contrast to his letter, Dr. Lam testified that Mr. Sampson used a different strategy, where Mr. Sampson "would read the whole question, but not the whole passage." (Trans. 31:15-16.) The Court does not credit Dr. Lam's inconsistent testimony.[7]

---

[7] Dr. Lam is friends with Mr. Sampson. (Trans. 33:24-34:1.)

104.     Mr. Sampson also testified to utilizing test-taking strategies where he "read the question prompt and then the answer choices and attempted to answer questions without reading the material preceding the question prompt if at all possible." (R. Sampson Decl. ¶ 11.)

105.     Dr. Marc Kroopnick, Director of MCAT Development and Psychometrics with the Association of American Medical Colleges ("AAMC") testified, however, that it is unlikely that a successful test-taker would be able to answer MCAT Verbal Reasoning questions without reading and understanding the passage to which the questions relate. (Trans. 258:20-260:7; 262:23-263:7.)

106.     Mr. Sampson also testified to his extensive studying and use of tutors to prepare for the MCAT (Trans. 56:17-58:2), but as Dr. Kroopnick explained, "I would think any study mechanism … could help you achieve a higher score." (Trans. 271:18-20.) Dr. Kroopnick also "would not necessarily be surprised" to hear that a student prepared for two years to take the MCAT (Trans. 267:13-15), and he expects that "[a]ttending an MCAT prep course" could help improve any student's scores. (Trans. 267:24-268:1.)

107.     The Court notes that, regardless of the strategy that Mr. Sampson used on the MCAT, his excellent results on that challenging and reading-intensive examination show that he is not substantially limited in his ability to read, think, concentrate, or otherwise perform any major life activities that are relevant when taking a high-stakes standardized exam.

## CONCLUSIONS OF LAW

### I.     Preliminary Injunction Standard

108.     Mr. Sampson, as the moving party, bears the burden of proof and persuasion on his motion for preliminary injunction. *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007). Preliminary injunctive relief "'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of per-

suasion.'" *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22 (2008).

109.    If a requested injunction is prohibitory and intended to preserve the status quo, the movant "must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League v. U.S. Soccer Fed'n,* 883 F.3d 32, 37 (2d Cir. 2018) (internal citation omitted).A more demanding standard applies, however, when a party seeks *mandatory* relief. "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits[.]" *Id.* (internal quotation marks and citation omitted); *Raia v. Pompeo*, 455 F. Supp. 3d 7, 11-12 (E.D.N.Y. 2020).

110.    A heightened burden also applies if the injunction would give the plaintiff the "final relief he seeks without requiring him to prove the merits of his case at trial," because this "is not the appropriate purpose of a preliminary injunction." *Demirayak v. City of New York*, No. 17-5205, 2017 WL 6729355, *2 (E.D.N.Y. Oct. 31, 2017), *aff'd*, 746 F. App'x 49 (2d Cir. 2018); *WarnerVision Entm't v. Empire of Carolina, Inc.*, 101 F.3d 259, 261-62 (2d Cir. 1996).

111.    In either case, the movant must meet "the higher standard of substantial, or clear showing of likelihood of success to obtain preliminary relief." *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34-35 (2d Cir. 1995). The movant must also make a "strong showing" of irreparable harm and demonstrate that "the preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).

112.    The heightened standards for a mandatory preliminary injunction apply here under both of these tests. First, Mr. Sampson seeks to alter the status quo (*i.e.*, testing under standard conditions). Second, Mr. Sampson is seeking the very same injunctive relief he seeks on the merits. It makes no difference that Mr. Sampson is seeking preliminary relief only with respect to Step 1, leaving Step 2 CK and Step 3 for another day, because he intends to take the Step 1 exam now and is seeking the identical substantive relief by way of a preliminary injunction that he would otherwise be entitled to only if he prevails on the merits of his trial, following fact and expert witness discovery.

## II.    Mr. Sampson Has Not Satisfied His Burden of Making a Clear and Strong Showing of Imminent and Non-Speculative Irreparable Harm

113.    "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citations omitted). "In the absence of evidentiary support of irreparable harm," there is no basis to enter a preliminary injunction. *Id.* at 120.

114.    Mr. Sampson "must demonstrate that absent a preliminary injunction [he] will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Grand River Enterprise Six Nations, Ltd.*, 481 F.3d at 66 (citations omitted); *see also Kamerling*, 295 F.3d at 214 (threatened harm must be "actual and imminent, not remote or speculative").

115.    Mr. Sampson has not met his burden of showing actual and imminent irreparable harm relative to his request for testing accommodations on Step 1 of the USMLE.

116.    The basis for Mr. Sampson's motion for a preliminary injunction "requiring the NBME to provide double testing time over two days and extended breaks on Step 1 of the US-

MLE" is his contention that "[a]bsent such relief, [he] will be dismissed from medical school and his medical career will be over." (Dkt. 16 at 1.) The record does not support this assertion.

117.    Mr. Sampson is currently facing dismissal from medical school because he failed to complete his medical degree within seven years. According to Stony Brook, he was required to complete all the requirements for his MD degree by August 12, 2022. *Sampson v. Stony Brook Univ.*, Case No. 22-4490, Dkt. 13 at 10; *see also id.* Dkt. 1 ¶¶ 95-97. Taking and passing the Step 1 exam at this point is not going to change the fact that Mr. Sampson did not complete his medical school requirements in seven years, and Stony Brook has not agreed to allow Mr. Sampson to remain in medical school to pursue accommodations on the USMLE. (Def. Addt'l Ex. 7; Trans. 153:5-12.)

118.    Likewise, while Mr. Sampson's threat of dismissal from medical school may be imminent, any alleged harm related to taking the Step 1 exam is not. Mr. Sampson has not even registered to take the test. (McGeehan Decl. ¶ 36.) Indeed, the Court learned at the conclusion of the preliminary injunction hearing through Mr. Sampson's counsel that Mr. Sampson would need a "dedicated study period" of twelve to sixteen weeks to prepare to take the Step 1 examination, and he would not be in a position to engage in this "dedicated study period" until after he completes business school classes at the end of December 2022. (Trans. 435:22-436:14.) In other words, Mr. Sampson is not seeking to take the Step 1 exam until late April 2023 at the earliest, which is more than six months from the date of the hearing on his preliminary injunction motion. There is thus no "imminent" harm that would justify mandatory preliminary injunction relief to Mr. Sampson, particularly relief ordered on an expedited briefing and hearing schedule and without any discovery. *Cf. Baer v. Nat'l Bd. of Med. Examr's*, 392 F. Supp. 2d 42, 49 (D. Mass

2005) (denying preliminary injunction and noting that "a full adjudication on the merits could be completed with the period of [plaintiff's] eligibility for the Step 1 exam").

119.    It is also entirely speculative that Mr. Sampson would not pass the Step 1 examination if he takes it under standard time conditions. Although he did not pass when he tested in January 2020, he chose the option provided by his medical school of testing earlier than his classmates, who were not required to take Step 1 until after they completed their third year of medical school, and he tested after being on a leave of absence from medical school for over three years. (Trans. 145:9-146:17.) Any assumption that Mr. Sampson would fail if he tested again under standard conditions—particularly given that he has now completed his third year of medical school—is entirely speculative. *See Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp. 2d at 49 ("[I]t is not certain that she will suffer the predicted harm; she may pass the test.").

120.    Mr. Sampson's extensive delay in pursuing relief against NBME also "defeats any possible showing of irreparable harm." *Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-8028, 2018 WL 2089342, *2 (S.D.N.Y. May 3, 2018); *see also Tom Doherty Assocs., Inc.*, 60 F.3d at 39. NBME first denied Mr. Sampson's request for accommodations in 2017—more than five years ago. (McGeehan Decl. Ex. 3.) Mr. Sampson made numerous requests for reconsideration in 2017 and 2018, and each time NBME unequivocally denied his requests. (*Id.* ¶¶ 15-30 and Exs. 5, 7, 8, 11, 14.) As early as 2018, he was represented by counsel who accused NBME of discriminatory conduct. (*Id.* ¶¶ 24, 28.) At that time, Mr. Sampson knew he would have to take and pass Step 1 to proceed in medical school,[8] believed that he could not pass without accommodations, knew that NBME had repeatedly denied his accommodation requests, and was represented by

---

[8] Although Stony Brook allowed Mr. Sampson to return to medical school in June 2020 without having passed Step 1, he knew that he would have to take the test at the end of his third-year clerkship as part of his medical school requirements.

counsel, yet he did not seek court relief. Those facts weigh strongly against a finding of irreparable harm. *See Wright v. Nat' Bd. of Med. Exam'rs*, 2021 WL 5028463, *9 (D. Colo. 2021) ("Another problem is that the emergency nature of this litigation is at least in part due to Mr. Wright's own choices. He has taken the USMLE Step 3 three times since 2017 and requested accommodations twice but did not bring this case until August 27, 2021."); *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp. 2d at 49 ("If Baer believed her lifelong dream of becoming a doctor was about to come to an end, as she alleges in her verified complaint, then perhaps her pursuit of a judicial remedy should have been more expeditious. Her slowness in filing this action after receiving the NBME's denial letter is unexplained, and any consequent time binds she faces are self-inflicted.") (citations omitted); *Pazer v. N.Y. State Bd. of Law Exam'rs*, 849 F. Supp. 284, 287 (S.D.N.Y. 1994) ("[A]ny so-called irreparable injury here is largely the result of Pazer's decision not to seek judicial relief sooner.").[9]

121.    Mr. Sampson has explained that he wanted to avoid the expense, disruption, and exposure of litigation (Trans. 122:6-123:5), but while understandable, these issues are common to many litigants. The Court further notes that Mr. Sampson did not seek to file this case or his case against Stony Brook under seal, which his counsel has done in a similar case.  *See T.W. v. N.Y. State Bd. of Law Exam'rs*, No. 16-3029, 2017 WL 4296731 (E.D.N.Y. Sept. 26, 2017). The Court also cannot credit Mr. Sampson's testimony that he did not know earlier that "a lawsuit

---

[9] Mr. Sampson obtained another professional evaluation in 2020 purportedly to comply with NBME guidelines requiring reports within three years of the request (Trans. 113:5-21), but NBME did not deny any of his six prior requests on the basis that his 2013 evaluation reports were outdated. (McGeehan Decl. Exs. 3, 5, 7, 8, 11, 14.) There appears to have been additional delay in pursuing this additional diagnostic report, attributable in whole or in part to Mr. Sampson. (Trans. 118:13-119:4; 149:12-15.) The hearing testimony was vague on this point (*e.g.*, Trans. 241:19-243:14).

would have brought relief," (Trans. 122:16-18), when he was represented by counsel in 2018 and again in 2020.

122.    Mr. Sampson has claimed irreparable harm based on psychological injury from not being able to pursue his chosen profession, but he is not in the same position as the plaintiffs in the cases he relies upon (*Enyart v. NCBE*, *Jones v. NCBE*, and *Bonnette v. D.C. Ct. of Appeals*), who had either graduated from school or were on track to graduate and the only remaining step was passing the licensure exam. There also was no dispute that they were disabled (they were all legally blind); the only issue was appropriate accommodations on the bar exam. In contrast, Mr. Sampson's medical school is ready to dismiss him, the Step 1 exam is not the only remaining requirement for him to complete medical school, and his disability status is a vigorously disputed issue.

123.    Mr. Sampson is also differently situated than plaintiffs in other cases where irreparable harm was found relating to a plaintiff's ability to pursue his or her chosen profession because he is enrolled in both medical school and business school (where he has a 4.0 GPA), and has pursued other professional interests as well (Trans. 141:13-142:15). He may well choose to pursue a business-related profession instead of continuing to pursue a profession as a licensed physician.

124.    Mr. Sampson has failed to satisfy his burden of making a clear and strong showing that he is likely to suffer imminent, non-speculative irreparable harm relative to NBME and the Step 1 exam in the absence of preliminary injunctive relief.

III.     **Mr. Sampson Has Not Satisfied His Burden of Making a Clear and Strong Showing of Likelihood of Success on the Merits**

A.      **Statutory and regulatory criteria for determining disability**

125.     To be disabled under the ADA, a person must have "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1). More specifically, a person must have an impairment that substantially limits his or her ability to perform a major life activity "*as compared to most people in the general population*." 29 C.F.R. § 36.105(d)(1)(v) (emphasis added).

126.     Having a diagnosed impairment is not the same as being disabled within the meaning of the ADA. "[N]ot every impairment will constitute a disability[.]" 28 C.F.R. § 36.105(d)(1)(v).

127.     Under the ADA Amendments Act, the definition of disability should be construed in favor of broad coverage. This broadened coverage, however, does not extend beyond the terms of the statute. *See* 42 U.S.C. § 12102(4)(A) ("The definition of disability … shall be construed in favor of broad coverage of individuals …, to the maximum extent permitted by the terms of [the ADA]."). And the terms of the statute require a showing of substantial limitation, even after enactment of the ADA Amendments Act ("ADAAA"):

> By retaining the essential elements of the definition of disability including **the key term 'substantially limits'** we reaffirm that not every individual with a physical or mental impairment is covered by the … definition of disability in the ADA.  An impairment that does not substantially limit a major life activity is not a disability[.] That will not change after enactment of the ADA Amendments Act[.]

Statement of the Managers, 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008) (emphasis added); *see* 42 U.S.C. § 12102(1)(A).

128.     DOJ regulations provide that "[t]he primary object of attention in cases … should be whether public accommodations have complied with their obligations and whether discrimi-

nation has occurred, not the extent to which an individual's impairment substantially limits a major life activity." 28 C.F.R. § 36.105(d)(1)(ii). There is no obligation under the ADA, however, to provide accommodations to someone whose alleged impairment does not substantially limit a major activity, which therefore makes it essential for a court to evaluate the "extent to which an individual's impairment substantially limits a major activity" in any case in which a defendant has been accused of violating the ADA. Therefore, the Court must determine whether Mr. Sampson is substantially limited in a major life activity before deciding whether NBME owed him any obligations under the ADA and before deciding whether he is entitled to his requested relief. Eliding the cornerstone statutory requirement of determining "disability" would be inconsistent with the plain terms of the statute. *See, e.g., Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013) ("Although the text of the ADAAA expresses Congress's intention to broaden the definition and coverage of the term 'disability,' it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination.").

129.    To be disabled within the meaning of the ADA, Mr. Sampson must have an impairment that substantially limits his ability to perform a major life activity ***as compared to most people in the general population***. 28 C.F.R. § 36.105(d)(1)(v) (emphasis added). Although "[a]n impairment does not need to prevent, or significantly or severely restrict [Mr. Sampson] from performing a major life activity in order to be considered substantially limiting[,]" *id.*, "not every impairment will constitute a disability within the meaning of [the ADA]," *id.*

130.    The disability determination requires an "individualized assessment." 28 C.F.R. § 36.105(d)(vi).

131.     Scientific, medical, or statistical evidence may be considered in determining whether an individual is substantially limited in a major life activity compared to most people in the general population. *See* 28 C.F.R. § 36.105(d)(vii).

132.     The determination of whether an impairment substantially limits a major life activity must be made without regard to the ameliorative effects of mitigating measures, including "learned behavioral or adaptive neurological modifications." 28 C.F.R. § 36.105(d)(1)(viii); 36.105(d)(4)(iv).

133.     The "conditions under which [Mr. Sampson] performs the major life activity; the manner in which [he] performs the major life activity; or the duration of time it takes [him] to perform the major life activity" may be considered. 28 C.F.R. § 36.105(d)(3)(i).

134.     In determining whether someone is "substantially limited," DOJ regulations provide that the "focus is on how a major life activity is substantially limited" compared to most people in the general population, not simply the outcomes that can be achieved. 28 C.F.R. § 36.105(d)(3)(iii). This does not, however, "preclude the consideration of grades and outcomes; rather, they simply cannot be the only determining factor." *Wright v. Nat'l Bd. of Med. Exam'rs*, 2021 WL 5028463, at *4. And even when considering any "additional effort" someone must spend "to read, write, speak, or learn," that analysis must be made "compared to most people in the general population." 28 C.F.R. § 36.105(d)(3)(iii).

135.     Mr. Sampson relies on DOJ guidance to argue that NBME is required as a matter of law to defer to the conclusions of his evaluating professionals. (Pl. Reply Br. (Dkt. 32) at 1-3.) He points in particular to language in the preamble to DOJ's updated rule implementing Title III of the ADA (*i.e.*, not the DOJ rule implementing the ADA definition of disability) stating that "[r]eports from experts who have personal familiarity with the candidate should take precedence

over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment," and that "when testing entities receive documentation provided by a qualified professional who has made an individualized assessment that supports the need for the modification, or aid requested, they shall generally accept such documentation and provide the accommodation." (Pl. Reply Br. at 2 (citing 75 Fed. Reg. 56,236, 56,297 (Sept. 15, 2010)).) He also relies on technical assistance published by DOJ in 2015 relating to these 2010 regulations, which states that testing entities "should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodation." (Pl. Reply Br. at 2-3 (citing https://www.ada.gov/regs2014/testing_accommodations.html.)

136.    The DOJ technical assistance document relied on by Mr. Sampson, however, makes clear that its guidance—and any informal agency guidance—is not legally binding:

> This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws.  The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

https://www.ada.gov/regs2014/testing_accommodations.pdf, at 10; *see also Perez v. Mortgage Bankers Ass'n*, 572 U.S. 93, 97 (2012).

137.    Nothing in the ADA or its implementing regulations requires NBME (or the Court) to simply "defer" to the conclusions of an examinee's evaluating professional in determining whether Mr. Sampson is disabled, without independently determining whether he has an impairment that substantially limits him in a major life activity compared to most people in the general population. Applying the DOJ guidance to require *de facto* disability findings would conflict with the explicit terms of the statute and DOJ's own regulations. *See D.S. by and through M.S. v. Trumball Bd. of Educ.*, 975 F.3d 152, 167 (2d Cir. 2020) ("The Department of Educa-

- 38 -

tion's interpretation ignores the plain language of the statute and regulations, and therefore we owe it no deference.") (citations omitted); *cf. Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (holding that, in the absence of a statutory directive, ERISA plan administrators are not required to accord special deference to a claimant's treating physician, as compared to experts consulted by the plan, in determining whether the claimant has a disability).

138.   Applying the agency guidance relied on by Mr. Sampson to replace a substantial limitation analysis also would impose a different definition of and approach to disability determinations solely on entities that administer certain standardized tests, and not on the myriad other entities that are also subject to the ADA. This conflicts with the single definition of disability under the ADA, Congress's desire to provide "clear, strong, *consistent*, [and] enforceable standards" under the statute, 42 U.S.C. § 12101(b)(2) (emphasis added), and DOJ's own recognition that there should be consistency in the definition of disability across all regulated entities, 81 Fed. Reg. 53,204,  53,208 (Aug. 11, 2016).

139.   Indeed, DOJ's guidance directed solely to standardized testing entities conflicts with guidance it has provided to all entities subject to Titles II and III of the ADA. For example, the DOJ has advised:

> [I]ndividuals seeking coverage under the first or second prong of the definition of 'disability' should not be constrained from offering evidence needed to establish that their impairment is substantially limiting…. Such evidence may comprise facts related to condition, manner, or duration.  ***And, covered entities may defeat a showing of substantial limitation by refuting whatever evidence the individual seeking coverage has offered, or by offering evidence that shows that an impairment does not impose a substantial limitation on a major life activity***.

81 Fed. Reg. at 53,237 (emphasis added). If NBME—like all covered entities—has the right to refute "whatever evidence the individual seeking coverage has offered" (and surely it does)— then it is not required to blindly defer to the conclusions or recommendations of an examinee's professional.

140.    The Court further notes that, even if the non-binding DOJ guidance applied here, the guidance only requires deference when the documentation of a qualified professional "supports the need for the requested testing accommodation." DOJ, Testing Accommodations, https://www.ada.gov/regs2014/testing_accommodations.pdf at 7. If the report of a qualified professional does not demonstrate that an individual has an impairment that substantially limits a major life activity and/or that the requested accommodations are necessary and appropriate under applicable statutory and regulatory standards, then even DOJ's guidance, by its terms, would not require deference to such documentation.

**B.    Mr. Sampson has not shown a clear likelihood of success on the merits because he has not demonstrated he is disabled within the meaning of the ADA.**

141.    To establish a disability within the meaning of the ADA, Mr. Sampson must show that (1) he has an impairment (2) that substantially limits (3) a major life activity as compared to most people in the general population. 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105(d)(1)(v).

142.    In his preliminary injunction brief, Mr. Sampson argues that he is "affected by a Specific Learning Disorder with impairments in reading and written expression and [ADHD]." (Pl. Br. at 3.) These are the diagnoses made by Dr. Wasserstein in her December 2020 report. (Pl. Addt'l Ex. 37 at 24.) Mr. Sampson is not relying on the other diagnoses assigned to him by Dr. Michels (Learning Disorder, Not Otherwise Specified) or Dr. Anderson (Unspecified Neurodevelopmental Disorder).

143.    Mr. Sampson claims to be "substantially impair[ed]" in "the major life activities of reading, spelling, cognitive processing speed, attention [*sic*] concentration and taking standardized exams." (Pl. Br. at 3.)[10]

---

[10] Mr. Sampson makes a somewhat different argument in his Complaint, claiming to be substantially impaired by a Specific Learning Disorder with impairment in reading and ADHD. He ar-

144.    The Court is not considering whether Mr. Sampson is substantially limited in spelling (or whether this is a major life activity), because the Step 1 examination is a multiple-choice test and does not require Mr. Sampson to spell.[11]

145.    Reading and concentration are major life activities. 42 U.S.C. § 12102(2)(A); 28 C.F.R. § 36.105(c)(1). It is not clear to the Court whether "attention" is a major life activity and, if so, how that differs from "concentration." The Court is treating "attention" as synonymous with "concentration." "Cognitive processing *speed*" is not an *activity*, but the Court assumes that Mr. Sampson is referring to the major life activity of "thinking," which he references in his complaint.[12]  The Court assumes for the present analysis, without deciding, that "taking standardized exams" is a major life activity. *But see Hentze v. CSX Transportation, Inc.*, 477 F. Supp. 3d 644, 660-667 (S.D. Ohio 2020) ("While test taking, or more accurately, struggles with test taking, may in some circumstances have major consequences, it is simply not a major activity, at least not in the same sense as the enumerated activities [in the ADA]").

146.    Mr. Sampson claims in his complaint to be substantially limited in the major life activity of learning, although he does not make this argument in his preliminary injunction motion. The Step 1 exam is not itself a learning activity. To the contrary, it is a test that measures learning during medical school and the application of this knowledge to principles of patient care. (McGeehan Decl. ¶¶ 4-6.) Any alleged impairment relating to learning, therefore, precedes

---

gues that these conditions substantially limit the major life activities of reading, thinking, learning, cognitive processing, and taking timed examinations.  Complaint ¶ 19.

[11] The Court notes, however, that there is insufficient evidence to support any argument that Mr. Sampson is substantially limited in his ability to spell.  (Lovett Decl. ¶ 31; Pl. Addt'l Ex. 37 at 17.)

[12] Mr. Sampson's cognitive processing speed is also decidedly unimpaired. (Pl. Addt'l Ex. 37 at 14 (showing a Processing Speed Index score in the "Superior" range); Bernier Decl. ¶ 20; Murphy Decl. ¶ 29).

and is not relevant to Mr. Sampson's ability to access the Step 1 exam, and any accommodation directed to a substantial limitation in learning would be improper because it would fundamentally alter what the exam is intended to measure. *See generally* 28 C.F.R. § 36.309(b)(3).

147. There is significant reason to question whether Mr. Sampson meets the diagnostic criteria for either a learning disability or ADHD. The three well-qualified professionals who reviewed Mr. Sampson's file at NBME's request as part of the accommodation review process have stated that he does not. (Lovett Decl.; Ortiz Decl.; Murphy Decl.)[13]

148. However, the Court need not decide that issue in ruling on Mr. Sampson's request for a preliminary injunction. Even if the Court assumes for present purposes that Mr. Sampson was properly diagnosed with a Specific Learning Disorder in reading or ADHD, he has not shown that he is substantially limited in any major life activity relevant to taking Step 1 as compared to most people in the general population, and he therefore does not qualify as disabled within the meaning of the ADA. On this issue, four external, well-qualified professionals have testified that Mr. Sampson is ***not*** substantially limited in any major life activity that is relevant to taking the USMLE Step 1 exam, when compared (as he must be) to most people in the general population. (Lovett Decl. ¶¶ 3, 45-49; Murphy Decl. ¶ 43; Bernier Decl. ¶¶ 8-34, 37; Flanagan Decl. ¶ 5.)

149. Stated differently, the fact that Mr. Sampson has been diagnosed by certain professionals as having ADHD and/or learning disorders does not mean that he is disabled within

---

[13] Dr. Bernier and Dr. Flanagan, who reviewed records for Mr. Sampson solely in connection with this litigation, focused their analysis on the "substantial limitation" question. *See* Bernier Decl. ¶ 7; Flanagan Decl. ¶¶ 5-6. Dr. Bernier nevertheless also concluded that the documentation did not show that Mr. Sampson met diagnostic criteria for a learning disorder in reading and writing or ADHD. Bernier Decl. ¶¶ 35-46. Dr. Flanagan has "significant doubt" whether all of Mr. Sampson's diagnoses are warranted, but at the time of her declaration, she had not had adequate time to fully study the evaluations relative to his diagnoses. Flanagan Decl. ¶¶ 7-8.

the meaning of the ADA. *See Valles v. ACT,* 2022 WL 2789900, *3-4 (E.D. Tex. 2022) ("Even accepting the diagnoses and evaluations from his physicians as true, Valles has not demonstrated that he will likely succeed in proving he has a disability for which he is entitled to receive accommodations under the ADA."); *see also, e.g., Glueck v. Nat'l Conf. of Bar Exam'rs*, No. 17-451, 2018 WL 3977891, *4-6 (W.D. Tex. 2018) (finding law school graduate with ADHD and LD diagnoses was not disabled under the ADA); *Black v. NBME*, 281 F. Supp. 3d 1247, 1249-50 (S.D. Fla. 2017) (finding that medical school student with ADHD was not disabled under the ADA).

150.    Across all three of his evaluations, "[e]very time that Mr. Sampson's academic skills have been measured against age peers on diagnostic tests, his skills have been in the average range or above, including on measures that were timed." (Decl. of B. Lovett, Ph.D., ¶ 17; *see also* Decl. of J. Bernier, Ph.D. ¶ 23.)

151.    On the Scholastic Abilities Test for Adults (SATA) administered by Dr. Anderson, a timed reading comprehension test, Mr. Sampson scored in the average range without any additional time. (Lovett Decl. ¶ 17(b); Bernier Decl. ¶ 23.)

152.    On the Nelson-Denny reading comprehension test in 2020, Mr. Sampson scored in the 1st percentile, placing his score at a 7th grade level. When Mr. Sampson took this same test in 2013 with Dr. Anderson, however, he scored at the 16th percentile compared to college seniors, and in the average range when compared to first-year college freshmen (who are more representative of the general population). (Lovett Decl. ¶¶ 19-20; Bernier Decl. ¶ 27.) Dr. Wasserstein did not offer any explanation for this change in scores, and the Court finds, on this preliminary record, that it cannot place significant weight on Mr. Sampson's 2020 Nelson-Denny test results. Other courts have cautioned against use of Nelson-Denny results generally when

making a disability determination. *See Glueck v. Nat'l Conf. of Bar Exam'rs*, No. 17-451, 2018
WL 3977891, at *5 & n.4 (holding that the plaintiff was not disabled as a matter of law, despite
scoring in the fourth percentile on the Nelson-Denny, because "this comparison was made 'using
end of college norms'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, No. 15-4987, 2016
WL 1404157, at *8 (E.D. Pa. 2016) ("[T]he Nelson-Denny compared Bibber to other four-year
college graduates, which is assuredly not representative of the general population when over half
of the people in the country lack a bachelor's degree.").

153.    Mr. Sampson performed better on the SATA and the Nelson-Denny with addi-
tional time, but "research consistently shows that on … timed pressured tests, people tend to do
better with more time; whether or not they have a disability." (Trans. 300:10-12.) Likewise,
"[c]ourts have found individuals are not disabled under the ADA even when there are significant
score increases under extended-time conditions." *Wright v. Nat'l Bd. of Med. Examr's*, 2021 WL
5028463, at *7 (citation omitted).

154.    Mr. Sampson does have some low diagnostic assessment scores on some neuro-
psychological measures, such as an assessment of figure-drawing from memory and a card-
sorting task.  As set forth above, however, these are not direct measures of reading skills.[14]

155.    The Court notes that Mr. Sampson had uneven performance within and across
some tests. Dr. Wasserstein finds these discrepancies significant, equivalent to a 6'4" person who
has one leg that is six inches shorter and a club foot.  (Pl. Addt'l Ex. 37 at 15; Trans. 202:8-
203:13.) Dr. Lovett has testified, however, that variability across test scores is not indicative of

---

[14] By way of comparison, in *Ramsay v. NBME*, the Court emphasized that the plaintiff had scores
in less than the fifth percentile on tests of reading skills. 968 F.3d 251, 258 (3d Cir. 2020); *see id.*
at 255 ("testing reveals that Ramsay, as compared to others in her age group, was in the fourth
percentile in reading comprehension and fluency, second percentile in word reading speed, and
first percentile in oral reading fluency").

an impairment or a disability. It is "the type of profile of performance that virtually everyone has (at least in some domains)." (Lovett Decl. ¶ 47; Trans. 328:4-23; *see also* Flanagan Decl. ¶ 6 at pp. 5-6 (explaining that "[d]iscrepancies are misinterpreted as evidence of impairment throughout Dr. Wasserstein's report," and stating that "[r]ather than interpreting a statistically significant and unusual difference between Average and Very Superior performance as evidence of impairment, it ought to be interpreted as reflecting a cognitive area of strength that is rarely found in the general population. [M]ost people have at least two statistically significantly differences in their cognitive ability profiles, yet most people are not disabled."); Murphy Decl. ¶ 29 at p. 12 ("Real-world evidence of impairment is critical in the context of an ADHD diagnosis and disability determination; not merely diagnostic test scores or statistical discrepancies in individual areas of ability.")).[15]

156.    Courts have also recognized that, while someone may exhibit "statistically significant variation in test scores sufficient to support a clinical diagnosis" that is based on "an internal referent," when compared "to an external referent as the ADA requires—that is, the general population—that person may nevertheless exhibit average abilities." *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012); *see also Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp. 2d at 46.  As the Second Circuit has explained, "'[n]ot every impairment that affects an individual's major life activities is a *substantially* limiting impairment,'"

---

[15] Dr. Bernier made a similar point, noting that "[w]hile there are some disparities shown in [Mr. Sampson's] ability to perform the various tasks that make up the WAIS-IV, *having disparate abilities is not itself evidence of substantially limited functions. Virtually everyone has disparate abilities.*" (Bernier Decl. ¶ 20.) (original emphasis). And Dr. Flanagan explained:  "[S]tatistically significant and unusual differences between scores, when the lower of the two scores in the comparison is at least Average, simply means that the higher score represents much stronger than Average ability (e.g., Superior, Very Superior).  Moreover, scores in the Superior to Very Superior range are rare in the general population, as most people rarely score at the >99th percentile.  Thus, what makes a difference between Average and Very Superior performance unusual is the fact that most people do not score in the Very Superior range in any cognitive domain.").)

and a court must be "careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 160 (2d Cir. 2016) (citations omitted).

157.    Determining whether Mr. Sampson has a disability within the meaning of the ADA does not come down to a "battle of the experts," as Mr. Sampson has urged. The Court must examine all relevant information in the record to determine whether Mr. Sampson has met his burden of showing a clear likelihood of success in demonstrating a *substantial limitation* compared to *most people in the general population*.

158.    In Mr. Sampson's case, while he may have some weaknesses relative to his own high IQ or compared to other high-achieving students, the record evidence does not demonstrate that he is substantially limited compared to most people. "[A] relative impairment is not enough to qualify [Mr. Sampson] as disabled because the Court must compare his test scores and test-taking ability against the general population and not against his own expected capabilities." *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 651 (E.D. Pa. 2013), *aff'd on other grounds*, 582 Fed. Appx. 114 (3d Cir. 2014).

159.    As shown above, Mr. Sampson's known academic history through college—without school-based accommodations, interventions, or remediations—also is inconsistent with any argument that he is substantially limited compared to most people.

160.    Mr. Sampson's standardized testing history also undermines any argument that he is substantially limited compared to most people in any major life activity relevant to accessing the Step 1 exam.[16] Mr. Sampson's performance on standardized tests has been stellar: average to

---

[16] Courts routinely consider a plaintiff's standardized testing history and other academic history—including their history of performance with or without accommodations—in evaluating whether someone is disabled within the meaning of the ADA. *See, e.g., Black v. Nat'l Bd. of*

well above average scores on the ACT, SAT, and MCAT, all taken under standard, non-accommodated testing conditions.  His scores on the MCAT are particularly notable, given his performance in comparison to the highly selective group of individuals taking that test—college students or college graduates interested in applying to medical school. "Of course, average (or above-average) performance presumptively establishes the absence of a substantial limitation." *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d at 1249-50; *see also Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d at 620 (same).

161.    Mr. Sampson suggests that the MCAT, SAT and ACT contain much shorter passages than Step 1, and that he answered questions on those exams without actually having to read the passages or the prompts found in independent questions. (R. Sampson Decl. ¶ 11; Trans. 130:5-131:11.) Based on a review of the sample test questions and guides submitted by NBME (Mandelsburg Decl. Exs. A-E) and the testimony of Dr. Kroopnick (Trans. 262:10-263:20), however, the Court finds that Mr. Sampson had to read, think and concentrate to perform at the level he did on these standardized tests.

162.    Mr. Sampson insists that his performance on standardized tests and other "outcomes" also should be disregarded. This begs the question of what information the Court should

---

*Med. Exam'rs,* 281 F. Supp. 3d at 1251 (relying, among other evidence, on plaintiff's average or above-average performance on the MCAT and other standardized exams in holding that plaintiff was not disabled within the meaning of the ADA despite being diagnosed with ADHD by a qualified professional, and stating that "average (or above-average) performance presumptively establishes the absence of substantial limitation" when evaluating a person's ability to perform "in comparison to 'most people in the general population'"); *Glueck v. Nat'l Conf. of Bar Exam'rs*, 2018 WL 3977891, at *6 ("The conclusion that Plaintiff is not disabled under the ADA is supported by the fact that he succeeded academically in primary and secondary school and college without requesting or receiving accommodations, took the SAT and ACT without requesting or receiving accommodations, and took the LSAT without accommodations and scored in the average range."); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157 (individual who scored in the 71st percentile on the GRE and in the "average" range on the reading section of the MCAT without accommodations was not substantially limited compared to most people in reading).

draw upon to assess his performance as compared to most people (particularly in the alleged major life activity of taking standardized tests). Mr. Sampson may feel like he has worked harder than most people (at his competitive high school while taking honors and AP classes, at the University of Virginia, and in preparing for and attending medical school), but these are rarefied environments, and his perception of what he is doing compared to others, while offered in good faith, may not accurately reflect his effort and performance relative to most people in the general population.[17]   (Trans. 342:23-344:24.) Testimony about extraordinary efforts, moreover, cannot be considered without also noting that such efforts did not just allow Mr. Sampson to get by, but allowed him to perform well in competitive environments. The Court is therefore considering all the information—Mr. Sampson's effort and strategies, as well as his outcomes and grades—in context.  *See Wright v. Nat'l Bd. of Med. Exam'rs*, 2021 WL 5028463, at *4 (explaining that consideration of grades and outcomes is not precluded, "they simply cannot be the only determining factor"); *see also, e.g.*, *Schimkewitsch v. New York Inst. of Tech.*, No. CV 19-5199-GRB-AYS, 2020 WL 3000483, *5 (E.D.N.Y. June 4, 2020) (holding that plaintiff student had not shown he was substantially limited because of his diagnosed anxiety disorder and noting he had "maintained a 3.5 GPA").

163.    Thus, in reviewing Mr. Sampson's performance on other high-stakes standardized tests, the Court is not simply looking to the scores he received. Mr. Sampson took those tests un-

---

[17] Anecdotal reports and isolated data are difficult to evaluate. For example, Mr. Sampson testified to struggles with reading and avoiding reading as much as possible, but he also described using "libraries of books" to prepare for the MCAT.  (Trans. 55:4-56:2.) Dr. Wasserstein's evaluation report showed that Mr. Sampson had issues with manual dexterity (Pl. Addt'l Ex. 37 at 22), but Mr. Sampson testified that he is leaning towards practicing in the field of orthopedics or plastic surgery, in part because he "like[s] using his hands." (Trans. 37:10-17.) These inconsistencies illustrate the risks of relying only on anecdotal self-reports or isolated assessment data when evaluating whether someone is disabled within the meaning of the ADA.

der the same conditions—including the same time conditions—as other non-accommodated test takers.  He had to read, think, and concentrate under the same conditions as other test takers. And under those standardized conditions, his performance not only met, but exceeded, that of other test takers, even groups of test-takers (*i.e.*, other MCAT test-takers) who exceed the abilities of most people in the general population. *See Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d at 621 ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, . . . stand as testament to his ability to read, learn, think, and concentrate just as well as, if not better, than the general population.").

164.    Mr. Sampson had difficulty with some exams taken under standard time conditions in medical school, and he did not pass the Step 1 exam on his first attempt.  However, the determination of whether Mr. Sampson is substantially limited must be made in comparison to most people, not compared to other medical school students or his own high expectations. *See Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157, at *6 ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population"); *see also, e.g., Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x 462, 465 (5th Cir. 2019); *Singh v. George Wash. Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007); *Black v. NBME*, 281 F. Supp. 3d at 1249-50; *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011).[18]  Any reported struggles by Mr. Sampson with respect to his medical school exams or the Step 1 exam, therefore, do not reflect a substantial limitation compared to most people.

---

[18] Although some of these cases pre-date the ADA Amendments Act, the requirement that substantial limitation be measure against most people in the general population remains in place after enactment of the ADAAA.

165.     There was a good deal of testimony at the hearing regarding the amount of tutor-ing Mr. Sampson received in school, but any tutoring focused on enhancing the learning process is not directly relevant to his ability to take a standardized test in an accessible manner. There is evidence, moreover, that this tutoring was focused on keeping up with an accelerated curriculum and competitive school environment, and Mr. Sampson did indeed perform very well academi-cally, even if he was not, for example, able to remain enrolled in AP Physics.  (Pl. Addt'l Ex. 3 at 2; Trans. 44:11-45:8.)

166.     Mr. Sampson was tutored in preparation for the SAT, ACT, and MCAT, but it is not clear whether such advanced preparation can be considered a "mitigating measure" for his actual performance on those tests. He began preparing for the ACT and SAT in junior high, for example, so presumably much of that preparation was directed to learning the material covered on a test frequently taken by high school seniors. In any event, we do not know how Mr. Sampson would have performed without his test preparation efforts as compared to most people. *See Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157, at *9 ("[I]t is im-portant to note that Bibber has not presented sufficient evidence to show how the reading strate-gies she has utilized for years improve her reading so significantly that without them she would be substantially limited when compared to the general population.").[19] What we do know, how-ever, from the available school records and other information is that Mr. Sampson demonstrated at least average performance before significant tutoring was in place.

_____

[19] Moreover, while "ameliorative effects of mitigating measures" are not considered in determin-ing whether someone is substantially limited compared to most people, the DOJ interpretive guidance document relied on by Mr. Sampson makes clear that the ADAAA's "prohibition on assessing the ameliorative effects of mitigating measures applies only to the determination of whether an individual meets the definition of 'disability.'" 81 Fed. Reg. at 53,232. It does not apply "to the requirements to provide … testing accommodations under § 36.309 in the title III regulations." *Id.*

167.    Mr. Sampson has testified that he did not read entire passages on the ACT, SAT, and MCAT before responding to questions as a "mitigating measure." Sample test materials from these other exams are part of the record. Although it does appear that some SAT passages refer test-takers to specific lines in the passage (*see, e.g.,* Mandelsberg Decl. Ex. E at ECF 221-222), it does not appear that an examinee could answer those questions without having read the entire passage. The ACT and MCAT, moreover, do not regularly point to specific lines in the passage, and when they do, they often point to many lines or a paragraph, and those discrete parts generally must be analyzed within the context of the passage as a whole. (Mandelsberg Decl. Ex. C at ECF 61-74; Ex. D at ECF 139-146; *see also* Trans. 256:16-260:7.) The Court agrees with Dr. Kroopnick that someone scoring at the 84th percentile on the Verbal Reasoning section of the MCAT would have to read and comprehend the content in a limited amount of time and focus and concentrate while testing.  (Trans. 263:12-20.)

168.    And once again, even if Mr. Sampson used this test-taking strategy extensively, we do not know how Mr. Sampson would have performed without using such strategy, as compared to most people.

169.    The Court has taken into consideration the fact that Mr. Sampson received accommodations in medical school. The DOJ Title III regulations (not the regulations implementing the ADA definition of disability) require testing entities to give "considerable weight" to "documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations."  28 C.F.R. § 36.309(b)(1)(v). This "requirement applies only after a person establishes that they are disabled under the ADA." *Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x 462, 466 (5th Cir. 2019). Furthermore, as the *Doherty* court reasoned, a medical school might provide accommodations even if they are not warranted under the ADA, and its

decision in that regard does not bind other entities. *Id.* Nevertheless, the evidence shows that NBME took all information submitted by Mr. Sampson into account in reviewing his file. And while prior accommodations are of course relevant, so is their absence. Mr. Sampson's history of strong performance in school and on standardized tests without accommodations, and the fact that he only began receiving accommodations in medical school, weighs *against* a finding of disability or the need for accommodations on the Step 1 exam. *See Wright v. Nat'l Bd. of Med. Exam'rs*, 2021 WL 5028463, at *6; *cf. Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d at 1252 (recounting strong performance from kindergarten through college without requesting or receiving an accommodation from a school or standardized test administrator).

170.    Although Mr. Sampson has complained that NBME did not personally evaluate or meet with him, NBME and its external professionals did not need to meet in person with Mr. Sampson to analyze the data presented in his evaluators' reports and other objective evidence in the record. "The practice of reviewing supporting documentation and providing an opinion based upon that documentation is well established and professionally sound, especially in the case of ADHD and learning disorders, where so much of the diagnosis relies on historical information, not just behavior in a clinician's office." (Murphy Decl. ¶ 7.) Nothing in the ADA or its implementing regulations requires a testing entity to conduct an in-person meeting or independent testing. The Court further notes that Dr. Wasserstein did not administer most of Mr. Sampson's diagnostic evaluations, and she could not identify any that she actually administered  personally. (Trans. 185-18:186:16). She nevertheless formed her opinions by relying largely upon the assessment results and behavioral observations that were made available to her, the same as NBME and its external professionals did and, ultimately, the same as the Court must do.

171.    Mr. Sampson was not diagnosed with any impairment until after he completed college. He has a background of strong academic and standardized test performance with no IEPs, Section 504 plans, or other school interventions. His first evaluator did not diagnose him with ADHD or a reading disorder; his second evaluator diagnosed him with a reading disorder but not ADHD; his treating psychiatrist apparently diagnosed him with "mild ADD" after his first two evaluators did not; and Dr. Wasserstein administered a "lengthy battery of tests and scales" (Lovett Decl. ¶ 46) before reaching her diagnostic conclusions. Mr. Sampson has complained that the process in his case does not meet the general regulatory expectation that "the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis," 28 C.F.R. § 36.105(d)(1)(ii), but the Court finds that any complexity here was largely the result of NBME's thorough consideration of the material and information that Mr. Sampson submitted in support of his request for testing accommodations.

172.    Mr. Sampson has failed to show a clear likelihood of success on the merits because the current record does not demonstrate that Mr. Sampson is substantially limited in any major life activity relevant to accessing Step 1 of the USMLE compared to most people in the general population.

**IV.    NBME and Other Examinees Would Be Harmed by the Preliminary Injunction**

173.    The Court also finds that a preliminary injunction is not warranted because of the significant harm to NBME and other examinees if unwarranted accommodations are provided, particularly on this preliminary record. *See, e.g., Rothberg v. Law Sch. Admission Council,* 102 F. App'x 122, 126-27 (10th Cir. 2004) (vacating preliminary injunction that allowed plaintiff to take the LSAT with extra time and noting LSAC would be irreparably harmed if the accommodated score were released prior to a decision on the merits). As the Second Circuit noted in *Powell v. Nat'l Bd. of Med. Exam'rs*, "[a]s administrator of the national exam used by a number of

states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it." 364 F.3d at 88-89.

174.    The balance of harms favors NBME, not Mr. Sampson—all the more so because he waited years before coming to court, yet now requests expedited judicial relief. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("In considering the balance of equities…, we think that plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request.").

## V.    The Public Interest Does Not Support Mr. Sampson's Motion

175.    The Court also finds that the public interest does not support granting a preliminary injunction to Mr. Sampson.

176.    Mr. Sampson has argued that "[m]any areas of the United States are under-served by physicians, ... so increasing the number of physicians is in the public interest." *Id*. He has not testified, however, that he intends to practice in any under-served areas. All he testified was that he is "leaning towards orthopedics or plastic surgery." (Trans. 37:10-14.)

177.    "The public certainly has an interest in ensuring that those with disabilities are provided adequate accommodations, as required under the law. However, the public also has an interest in ensuring that the ADA is enforced according to its requirements." *See Valles v. ACT*, 2022 WL 2789900, at *5. The public also "has an interest in the fair administration of standardized tests." *Bach v. LSAC*, No. 13-888, 2014 U.S. Dist. LEXIS 124632, at *8 (M.D.N.C. Feb. 4, 2014).

178.    That interest is particularly strong where, as here, medical licensing authorities rely on the test to assess the competency of potential doctors.  Moreover, if medical schools, residency programs or other third parties rely on USMLE scores earned with unwarranted accommodations, it will "alter[] the substance of the product because the resulting scores [will] not be

guaranteed to reflect each examinee's abilities accurately." *Powell v. NBME*, 364 F.3d at 89. That would unfairly advantage Mr. Sampson to the detriment of such third parties, including examinees who meet the ADA's definition of disabled. The injunction would thus harm the very population the ADA is meant to protect.

**<u>CONCLUSION</u>**

Mr. Sampson has not shown that he is entitled to the drastic and extraordinary remedy of a preliminary injunction. His motion for preliminary injunctive relief is DENIED.

Dated:  October 31, 2022                                  Respectfully submitted,

 */s/ Caroline M. Mew*
Caroline M. Mew (*pro hac vice*)
Perkins Coie LLP
700 13th St. NW, Suite 800
Washington, DC 20005
Telephone:  +1.202.654.1767
Facsimile:  +1.202.654.6211
CMew@perkinscoie.com

Adam R. Mandelsberg, Bar No. 065532013
Perkins Coie LLP
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone: +1.212.261.6867
Facsimile: +1.212.399.8067
AMandelsberg@perkinscoie.com