UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

ROBERT SAMPSON,

**MEMORANDUM &
ORDER**

Plaintiff,   22-CV-05120 (JMA) (AYS)

-against-

NATIONAL BOARD OF MEDICAL EXAMINERS,

Defendant.

--------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Plaintiff Robert Sampson ("Sampson") claims that Defendant National Board of Medical Examiners ("NBME") has denied him testing accommodations on Step 1 of the United States Medical Licensing Examination ("USMLE") in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.[1]  Now before the Court, following a three-day evidentiary hearing, is Sampson's motion for a preliminary injunction (ECF No. 16).  Based on the following findings of fact and conclusions of law, the motion is GRANTED.

## I. FINDINGS OF FACT

### A.  **The Parties**

Sampson is a medical student at Stony Brook University's Renaissance School of Medicine ("Stony Brook").  He has wanted to become a doctor for his entire life.  (Tr.[2] 36:24–37:9.)

---

[1] Sampson also brings a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  (See Compl. ¶¶ 115–22, ECF No. 1.)  However, neither party addresses the Rehabilitation Act claim here, and therefore the Court will address Sampson's ADA claim only.

[2] Citations to "Tr." refer to the corresponding pages and lines of the transcript of the preliminary injunction hearing held from October 11 to October 13, 2022.  Citations to "PX" refer to exhibits offered by Sampson and admitted into evidence during the hearing.

Sampson is also enrolled in a Master of Business Administration ("MBA") program at the Stony Brook College of Business.  (Tr. 36:20–22, 37:22–24, 38:6–7; Decl. of Robert Sampson ("R. Sampson Decl.") ¶ 3 and Ex. 6, ECF No. 16-3.)

NBME is a non-profit organization that develops and administers examinations, including the USMLE.  (Decl. of Lucia McGeehan ("McGeehan Decl.") ¶¶ 3–4, ECF No. 21.)  The USMLE is used by medical licensing authorities to evaluate the qualifications of individuals seeking their initial medical license.  (Id. ¶ 5.)  The USMLE is comprised of three "Step" exams:  Step 1, Step 2 Clinical Knowledge ("CK"), and Step 3.  (Id. ¶ 6.)

Sampson is approximately 40 weeks away from completing his medical degree.  (Tr. 36:20–22, 37:22–24, 38:6–7.)  However, before he can begin his final 40 weeks of medical school, Stony Brook requires that he take and pass Step 1.  (Tr. 38:16–17.)

**B.  Sampson's Educational History**

Despite his evident aptitude, Sampson has struggled with learning since his early childhood.  By the time he was four years old, he had been diagnosed with severe stuttering that required intervention therapy.  As part of this intervention therapy, Sampson's speech pathologist instructed his family to slow their speech to afford him more processing time.  (Tr. 156:3–156:25, Tr. 158:14-159:5, 196:4–12.)

Sampson's early academic records from elementary school reflect difficulties with attention, focus, organization, and timely completion of assignments.  (Tr. 91:22–93:6; Decl. of Dr. Shelley Sampson ("S. Sampson Decl.") ¶ 14, ECF No. 32-1; PX 20; PX 21.)  For example, Sampson's first grade teacher noted his early struggles with focus and organization, stating, "[w]e will also be working on having Robert stay more focused on a task, so he may complete the task faster and stay more organized."  (PX 20 at 1.)  In fifth grade, Sampson's teacher highlighted that

he "appear[ed] at times to be confused with directions or questions that are presented during class."
(Id. at 2.)  And in sixth grade, Sampson's teachers commented that he was "easily distracted" and
that "distractions during work time . . . have interfered with his performance and completion of his
work."  (Id.)

Additionally, although Sampson's early academic records describe him as, among other
things, "a good independent reader," (PX 21), Sampson read slowly and had difficulty focusing
while reading.  (Tr. 159:6–18.)  Indeed, reading was "painful" for him, and while attempting to
read, he "felt like [he] was being lobotomized."  (Tr. 43:12–22.)  Sampson disliked reading aloud
in school because the material would "go[ ] in one ear and out the other," (Tr. 45:18–24), and he
could not answer his teachers' questions about the material because he "would have no idea what
[he] just read."  (Tr. 46:2–3.)  Similarly, when a "teacher would speak and she would write on the
blackboard or white board," for Sampson "there was no learning method taking place during those
lectures or classrooms."  (Tr. 39:18–24.)  As a result, he was forced to repeat entire lessons at
home with parents as tutors.  (Tr. 39:18–40:2.)  Sampson also had trouble reading outside of
school.  For example, when he struggled to read music, his cello teacher "asked [him] if [he] was
stupid on multiple occasions," and "asked [him] if [he] had dyslexia . . . [and] a learning disability."
(Tr. 50:20–51:1.)

Sampson also struggled to complete timed exams within the time allotted.  He was almost
always the last student to complete an exam, regardless of subject area.  (Tr. 41:11–17.)  He
sometimes was allowed extra time to finish timed exams during lunch or after school, while other
students finished the same exam within the allotted time in class.  (Tr. 41:18–42:2.)  Even with
additional time, however, he still was unable to finish the exams.  (Id.)

To compensate for his difficulties with speech, attention, and reading, Sampson relied on

mitigating measures and informal accommodations throughout his childhood.  In addition to working with a speech pathologist, at the urging of one of his teachers, Sampson began seeing a reading specialist in fourth or fifth grade, and he again saw a reading specialist while in high school.  (Tr. 162:7–21; S. Sampson Decl. ¶ 4.)  Because Sampson did not read material assigned in class, he instead relied on audiobooks and recordings of classroom material.  (Tr. Tr. 43:12–44:6; R. Sampson Decl. ¶ 8.)  He also made use of "an army of tutors" outside of school.  (Tr. 39:16–17; PX 19.)  In addition, his mother and other tutors read written material aloud to him and devised games designed to help him learn through repetition.  (R. Sampson Decl. ¶ 8.)  In high school, Sampson required as much as 15 hours of tutoring per week for a single class.  (Tr. 44:20–45:8.)  All told, he worked with more than twenty tutors throughout elementary school, junior high, high school, and college.  (PX 19.)

After graduating from high school, Sampson went on to attend the University of Virginia ("UVA"), where "he flourished socially and intellectually," and maintained a 3.43 GPA.  (PX 3 at 2.)  At UVA, Sampson employed strategies to mitigate his continued struggles with attention and reading.  Because he "simply did not read text books or other books," he would avoid classes with substantial reading and writing requirements.  (R. Sampson Decl. ¶ 9.)  He would also record lectures using a Livescribe pen, which synced lecture audio with his own notes, allowing him to later "refer back to what was said at that moment and repeat it many times."  (Tr. 52:3–22.)  He still was almost always the last student to complete exams and frequently failed to finish exams within the allotted time.  (Tr. 53:16–18.)  However, at least one professor granted him an informal accommodation by allowing him to take an exam in a separate area.  (Tr. 53:23–54:11.)

As a result of his hard work and use of mitigating measures, Sampson progressed through elementary school, junior high, high school, and college without being diagnosed with any learning

disorder, Attention Deficit-Hyperactivity Disorder ("ADHD"), or other mental impairment.  He had no IEP or Section 504 plan while in school.  (Tr. 126:8–10.)  He did not receive formal accommodations in elementary school, junior high school, or high school.  (McGeehan Decl. Ex. 16 at 5; PX 2.)

## C.  Sampson's Performance on Standardized Tests

Sampson worked with multiple SAT and ACT tutors over the course of years.  (Tr. 128:18–24; PX 19 at 2.)  He also developed test-taking strategies to mitigate his difficulty with reading.  For example, on the SAT and ACT sections that required answering questions about passages, Sampson would "read the question prompt and then the answer choices and attempted to answer questions without reading the material preceding the question prompt if at all possible."  (R. Sampson Decl. ¶ 11.)  Sometimes, he would read only the topic sentences of a passage.  (Tr. 130:5–1317, 133:10–15.)  As a result of those efforts, he performed well on the SAT and ACT exams taken without accommodations under standard test conditions, including standard time.  On the ACT exam, he scored in the 89th percentile overall compared to other recent high school graduates, including in the 90th percentile on English and the 74th percentile on Reading.  (PX 12.)  Sampson took the SAT three times in high school, and he received scores on the Critical Reading section in the 74th, 84th, and 93rd percentiles.  (PX 14.)

After graduating from UVA, Sampson began preparing to apply to medical school.  As part of this process, he was required to take the Medical College Admission Test ("MCAT"), a standardized entrance exam.  (Tr. 54:13–21.)  Although Sampson sought accommodations on the MCAT, his request was denied.  (Tr. 62:20–23.)  Instead, he relied on extensive tutoring by his father, a surgeon, and a classmate, Dr. Andrew Lam, among others.  (Tr. 15:23–16:2, 63:1–10; PX 19.)  Dr. Lam alone tutored Sampson for approximately 200 hours.  (Tr. 16:3–4.)  Working with

Dr. Lam, Sampson was again able to develop and implement test-taking strategies to mitigate his difficulties with attention and reading.  These strategies included writing brief notes summarizing sentences in exam questions, reading only topic sentences and specific portions of the text relevant to a particular question, and double-checking copied sentences and calculations.  (Tr. 21:15–22:16, 57:25–59:1.)  Armed with these mitigating strategies, Sampson's first MCAT score—which placed him in the 67th percentile overall—still was not high enough to earn admission to any medical school.  (Tr. 59:4–8; PX 11.)  After a second year of preparation, his score improved by only one point, placing him in the 73rd percentile overall.  (Tr. 59:9–17; PX 11.)  He subsequently applied to more than sixty medical schools, but he was admitted only to Stony Brook.  (Tr. 59:10–11, 63:25–64:1.)

After observing Sampson struggle—more than any other student he had tutored—with slow reading, writing, comprehension, and recall, Dr. Lam encouraged Sampson to undergo comprehensive educational testing to evaluate whether Sampson had learning disabilities.  (Tr. 20:11–21:14, 60:19–61:14.)

**D.  2013 Evaluations for Learning Disabilities**

In August 2013, Suzanne Michels, Ph.D. performed a psychological evaluation of Sampson.  (PX 3.)  Dr. Michels personally interviewed Sampson, obtained and reviewed his relevant medical and academic history, and administered a battery of assessments.  (Id.)

In her evaluation, Dr. Michels noted that Sampson's "[r]eading and writing skills appear to be somewhat variable, and testing scores were an unusual mix." (PX 3 at 9.)  Although Sampson exhibited "very strong" verbal reasoning abilities, his visual/spatial problem solving was "significantly weaker," a difference that occurs in less than one percent of the population.  (Id.)  Based on her interview of Sampson, his medical and academic history, and the assessment results,

6

Dr. Michels diagnosed Sampson with a Learning Disorder, Not Otherwise Specified.  (Id.)  The diagnosis was based at least in part on the "disparity" between Sampson's verbal and visual/spatial reasoning abilities, which was "likely to underlie the unevenness evident in his academic profile, both in current achievement testing and his school record."  (Id.)  Dr. Michels found it "likely that [Sampson's] strong drive and very conscientious approach to his studies has allowed him to do well in school and perhaps hidden the magnitude of the relative weaknesses uncovered in this testing."  (Id.)  She did not evaluate him for ADHD.  (Id.)  Dr. Michels recommended that Sampson receive accommodations in the form of time-and-a-half on "reading comprehension tasks . . . as well as those involving significant visual/spatial components."  (Id.)  She also noted that he would "benefit from extended time on [applied] math tasks, as well."  (Id.)

In December 2013, Allison Anderson, Ph.D. conducted a supplemental evaluation of Sampson, in part for ADHD.  (PX 2.)  Based on her personal observations of Sampson, her review of Dr. Michels' report, and evaluation of the results of a battery of assessments, Dr. Anderson diagnosed Sampson with Unspecified Neurodevelopmental Disorder, visuospatial processing, and Specific Learning Disorder, with impairment in reading (dyslexia).  (Id.)  Notably, Dr. Anderson did not diagnose Sampson with ADHD.  She acknowledged that he "appear[ed] to be experiencing attention problems," but nonetheless determined that "his testing results and history supply little evidence that [his attention] problems are the result of ADHD," and that while he may be "slightly 'out on the continuum' in terms of distractibility, . . . [he] does not appear to have the consistent and severe pattern of impulsivity, social problems, marked inattentiveness, or physical restlessness that support an ADHD diagnosis."  (Id. at 7.)  However, like Dr. Michels, Dr. Anderson concluded that Sampson required accommodations on exams, including 50% additional time on the MCAT and any medical school exams.  (Id. at 8.)

### E.  **Sampson's Medical School History**

Sampson began his studies at Stony Brook in August 2015.  (R. Sampson Decl. ¶ 16.) Although Dr. Michels and Dr. Anderson had recommended that he receive accommodations due to his diagnosed learning disabilities, he did not initially request accommodations from Stony Brook.  Instead, he again turned to the stable of mitigating strategies that he had already deployed in other academic settings, such as the Livescribe pen, lecture playbacks, tutoring sessions, and supplemental supportive programs.  (Tr. 65:2–67:9; R. Sampson Decl. ¶¶ 16–19.)  Several of his professors informally permitted him extra time on some exams.  (Tr. 67:10–16.)

Although Sampson passed all his first-year classes, his grades were negatively impacted because he failed some of his end-of-course "shelf" exams.  (R. Sampson Decl. ¶ 16; PX 6, 10A; Tr. 67:17–68:14.)  Shelf exams are subject-specific exams comprised of retired USMLE questions. (Tr. 72:7–73:2.)  Under standard conditions—without extended time or other accommodations— Sampson could not complete the shelf exams within the allotted time.  (Tr. 67:10–16, 68:7–8, 73:24–74:10.)  His struggles on the shelf exams culminated in a warning of marginal performance in November 2016, during his second year of medical school.  (PX 37 at 7.)

Sampson then submitted a request for formal accommodations to Stony Brook's Disability Support Services ("DSS").  (Tr. 69:3–20; R. Sampson Decl. ¶ 22.)  DSS reviewed the results of the evaluations conducted by Dr. Michels and Dr. Anderson and personally interviewed Sampson. (Tr. 69:18–70:3; PX 6.)  Based on its review of the evaluations and its interview of Sampson, DSS granted his request for accommodations.  (PX 6.)  Specifically, DSS determined that

> [Sampson]'s Dyslexia learning disability is a mental impairment that substantially limits his reading ability and reading speed on a daily basis when he is compared to an average individual in the general population.  His learning disability is the reason he routinely runs out of time on exams and generally takes longer to think through ideas presented to him both on exams and outside the classroom.

(PX 6.)  Accordingly, DSS found that it was appropriate to permit Sampson 50% additional time

on all time-based exams—including shelf exams—as well as provide note-taking services and a separate testing area.  (Tr. 70:4–25.)  Once he was afforded 50% additional time on shelf exams, he was able to read the questions and complete the exams, with scores ranging from the 74th to 95th percentiles.  (Tr. 198:23–200:10; PX 37 at 7.)

Ultimately, Stony Brook informed Sampson that due to his purportedly marginal performance during his first year, he would have to either repeat the first three semesters of his studies or take and pass Step 1—far earlier than his peers, who did not have to take Step 1 until after their third year of medical school.  (Tr. 71:21–72:6, 145:1–5.)

**F.**  **Sampson's Requests for Accommodations on Step 1**

In response to Stony Brook's directive, Sampson decided to take Step 1 early.  (Tr. 74:16–23.)  Examinees take the USMLE under uniform conditions, including standard testing time. (McGeehan Decl. ¶ 7.)  However, NBME provides accommodations to examinees who have a disability within the meaning of the ADA and need accommodations.  (Id. ¶¶ 7–8.)  So, in April 2017, Sampson sought accommodations from NBME for Step 1.  He requested 50% additional time (time and a half) on the exam—the same accommodation that he recently received from Stony Brook for shelf exams.  (Tr. 74:24–75:6; PX 1.)  In support of his application, Sampson submitted the supporting documents required by NBME.  (Tr. 75:14–86:12; PX 1–15.)  These included, among other materials:  a personal statement describing the impact of his learning disabilities on his life; a letter from DSS attesting to Sampson's need for accommodations due to his learning disabilities; a letter from Linda DeMotta, a learning specialist at Stony Brook, who had personally observed Sampson's struggles with reading; and the evaluations conducted by Dr. Michels and Dr. Anderson.  (PX 2–4, 6–7.)  Sampson also submitted a letter from his treating psychiatrist, Dr. Thomas Aronson.  (PX 5.)  In his letter, Dr. Aronson noted that he had been treating Sampson

since November 2015 for "Learning Disabilities and mild ADD," and had prescribed him Dexedrine to treat his symptoms.  (Id.)  Dr. Aronson further explained that Sampson's diagnosed learning disorders "substantially limit major life activities in and out of the classroom," and make it "painful and agonizingly slow to read."  (Id.)

NBME sought a recommendation from an outside expert, Benjamin Lovett, Ph.D. (McGeehan Decl. ¶ 13.)  Dr. Lovett is a licensed psychologist and the director of the Ph.D. program in school psychology at Teachers College, Columbia University, where he serves as an Associate Professor of Psychology and Education.  (Decl. of Benjamin Lovett, Ph.D. ("Lovett Decl.") ¶ 2, ECF No. 22.)  After reviewing Sampson's request and supporting documentation, Dr. Lovett concluded that Sampson had not demonstrated that he has a mental impairment that substantially limits his ability to perform any major life activities that are relevant to taking the Step 1.  (Lovett Decl. Ex. 2.)  Upon considering Sampson's application and Dr. Lovett's recommendation, NBME determined that Sampson's "documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of [the] USMLE Step 1 test administration."  (McGeehan Decl. Ex. 3 at 2.)  Accordingly, NBME denied Sampson's request by letter dated June 13, 2017.  (Id. ¶¶ 13–14, Exs. 2–3.)

Undeterred, Sampson appealed NBME's decision.  On June 22, 2017, he submitted a letter from Jan Serrantino, a disability expert at the University of California-Irvine, supporting his request for accommodations; a letter from his parents describing their observations of his learning disabilities throughout his life, and providing a list of his tutors and reading specialists; and early academic records.  (Tr. 89:1–93:8; PX 17–21.)  NBME provided Sampson's appeal to Dr. Lovett, who recommended that NBME reject the appeal.  (McGeehan Decl. Ex. 4.)  Based on Dr. Lovett's

recommendation and its review of Sampson's documentation, NBME denied his appeal by letter dated August 1, 2017.  (Id. ¶ 18, Ex. 5.)

Sampson appealed again in November 2017.  He submitted new letters from Dr. Aronson, Serrantino, and Dr. Anderson.  (Tr. 93:25–96:11; PX 23–26.)  Dr. Aronson explained that Sampson met the DSM-IV criteria[3] for ADHD, based on his personal observations of Sampson over nearly two years.  (PX 25 at 1–2.)  NBME again provided Sampson's appeal file to Dr. Lovett, who again recommended that NBME reject the appeal.  (McGeehan Decl. Ex. 6.)  Based on Dr. Lovett's recommendation and its review of Sampson's documentation, NBME denied his appeal by letter dated January 12, 2018.  (Id. ¶ 21, Ex. 7.)

Sampson again appealed NBME's denial on February 22, 2018.  (PX 28.)  In support of his request for accommodations, he submitted a second letter from DeMotta, the Stony Brook learning specialist.  (Tr. 97:11–98:12; PX 29.)  In her letter, DeMotta stated that Sampson "meets the criteria, through our disabilities services office and according [to] the guidelines of the ADA, for appropriate testing accommodations."  (PX 29.)  DeMotta objected to NBME's characterization of Sampson's standardized test results as reflecting "unimpaired performances," when in fact, "[t]he records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude."  (Id.)  DeMotta further explained that NBME had erred in relying heavily on Sampson's SAT and ACT results because "[n]ot all standardized exams are equal and the USMLE Step exams in particular require reading skills, interpretation, synthesis, integration and pattern recognition well beyond any skills required on the college entrance exams."  (Id.)

---

[3]     The "DSM" is the Diagnostic and Statistical Manual of Mental Disorders.  "DSM-IV" refers to the Fourth Edition; "DSM-V" refers to the Fifth Edition.

Nevertheless, NBME denied Sampson's appeal by letter dated March 6, 2018. (Tr. 98:17–23; PX 30.)

Sampson then retained an attorney, Jo Anne Simon, to appeal NBME's latest denial of his request for accommodations. (Tr. 98:24–99:3.) Simon submitted an appeal on June 29, 2018, which included a new letter from Dr. Aronson in further support of his application. (Tr. 99:4–25; PX 31–31-A.) Dr. Aronson's letter explained that Sampson's dyslexia and ADHD "do in fact limit him (for example, reading, concentrating, writing, test taking)" when compared to "most people in the general population." (PX 31-A at 1–2.) NBME provided Sampson's latest appeal to Dr. Lovett for review, and Dr. Lovett again recommended that NBME reject Sampson's appeal. (McGeehan Decl. ¶ 25, Ex. 9.) Based on Dr. Lovett's recommendation and its review of Sampson's file, NBME denied his appeal by letter dated September 7, 2018. (Id. Ex. 11.)

Simon submitted another appeal on Sampson's behalf in November 2018. (Tr. 100:11–22; PX 33.) NBME provided Sampson's latest appeal, as well as all the materials that he had previously submitted to NBME to date, to two new external, independent consultants, Samuel Ortiz, Ph.D. and Kevin Murphy, Ph.D. (McGeehan Decl. ¶ 28, Exs. 12 and 13.) Dr. Ortiz is a Professor of Psychology and Director of the Graduate Programs in School Psychology at St. John's University. (Decl. of Samuel O. Ortiz, Ph.D. ("Ortiz Decl.") ¶ 2, ECF No. 24.) Dr. Murphy has over thirty-five years of professional experience in the field of psychology and has conducted approximately 4,000 ADHD evaluations over the course of his career. (Decl. of Kevin Murphy, Ph.D. ("Murphy Decl.") ¶¶ 4–5, ECF No. 23.) Based on the recommendations of Dr. Ortiz and Dr. Murphy and its review of Sampson's appeal, NBME denied his appeal by letter dated January 4, 2019. (McGeehan Decl. Ex. 14; Tr. 100:23–101:7.)

By this time, NBME had rejected six requests by Sampson for 50% extra time on Step 1.

Because Sampson could not proceed in his medical studies without taking Step 1, he was left with little choice but to take Step 1 without accommodations.  (Tr. 101:14–23; R. Sampson Decl. ¶ 33.) He sat for the exam in January 2020.  (R. Sampson Decl. ¶ 33.)  Despite years of preparation for Step 1, Sampson found that the test-taking strategies he previously employed on the MCAT, among other standardized tests, were ineffective on Step 1.  (Tr. 102:8–106:25.)  He was unable to read all the questions on the exam and, as a result, he failed Step 1.  (Tr. 101:22–23, 103:8–10.)

Stony Brook subsequently advised Sampson it was expelling him because he had not passed Step 1.  (Tr. 107:4–20.)  Sampson then retained new counsel and submitted an appeal to the Dean of Stony Brook, arguing that his expulsion on this basis would be discriminatory.  (Tr. 109:3–110:1.)  Stony Brook ultimately permitted Sampson to proceed to his third year of medical school.  (Tr. 110:8–15, 112:11–13.)  However, Stony Brook allowed him to continue on the condition that he re-take and pass Step 1 at the end of his third year—now at the same time as his classmates.  (Tr. 109:6–9, 110:8–14, 112:17–113:3.)

## G.  Evaluation by Drs. Wasserstein and Miller

In August 2020, Sampson obtained additional comprehensive testing from Jeanette Wasserstein, Ph.D., with the assistance of Kim Miller, Ph.D.[4]  (Tr. 113:22–114:2, 184:14–16; R. Sampson Decl. ¶ 20; Decl. of Jeanette Wasserstein ("Wasserstein Decl."), ECF No. 17; PX 37.) Sampson sought this evaluation in order to continue pursuing accommodations from NBME.  (PX 37 at 1.)  Dr. Wasserstein is a licensed psychologist and a board-certified neuropsychologist.  She has been in private practice since 1981, and she has held a faculty position at The Mount Sinai

---

[4]   Dr. Wasserstein personally interviewed Sampson to obtain a comprehensive history.  Based on this interview, she identified issues for evaluation and designed a battery of tests, which she and Dr. Miller administered to Sampson (with Dr. Miller performing "most" of the testing).  Based on her and Dr. Miller's observations of Sampson, the test scores, and relevant materials provided by Sampson, Dr. Wasserstein then prepared the evaluation report.  (Tr. 184:14–186:22; Wasserstein Decl. ¶¶ 8–13; PX 37.)

School of Medicine since 1996. (Tr. 172:2–173:2, 177:2–8; Wasserstein Decl. ¶¶ 1–2 and Ex. 2-A.) Dr. Wasserstein specializes in the diagnosis and treatment of learning disabilities in adults, including ADHD. She has evaluated thousands of individuals for learning disabilities in educational settings, including for the USMLE and other standardized exams. (Tr. 175:2–177:25.)

As part of the evaluation, Dr. Wasserstein interviewed Sampson in person and obtained a developmental, medical, and educational history. Dr. Wasserstein also reviewed the prior evaluation reports from Dr. Michels and Dr. Anderson, Sampson's educational records as far back as first grade, and other materials that Sampson had submitted to NBME in connection with his requests for accommodations. (Tr. 189:4–10, 192:9–194:1; PX 37 at 2–7.) Dr. Wasserstein noted that Sampson's difficulty discerning diction, which he experienced in high school when attempting to learn a foreign language, is common among individuals with dyslexia. (Tr. 194:2–21; PX 37 at 2.) She also highlighted that Sampson began years of speech therapy at a young age to ameliorate his severe stutter. She explained that there is a strong association between stuttering and dyslexia. (Tr. 194:22–195:8.)

Dr. Wasserstein found that Sampson had experienced difficulty with reading throughout his life. She noted that he considered reading to be a "very draining and exhausting experience" and frequently had to read the same material multiple times. (Tr. 195:4–25; PX 37 at 5.) In reviewing his early academic records, she also found it significant that his teachers reported problems with maintaining focus and organization, symptoms associated with ADHD. (Tr. 195:22–25; PX 37 p. 5.) Although Sampson earned "normal range scores" on the PSAT, SAT, and ACT, his scores reflected "relative weaknesses in his reading compared to other academic areas." (PX 37 at 6.) Because of his reading difficulties and issues with maintaining attention, Sampson had a "long history of extensive tutoring." (PX 37 at 6.) Indeed, Dr. Wasserstein could

14

not recall evaluating or treating any other individual who had received the same amount of tutoring as Sampson, which indicated that he "needed a lot of help in order to perform and function as well as he did." (Tr. 197:22–198:22; PX 37 at 6.)

Dr. Wasserstein also reviewed the evaluation reports prepared by Dr. Michels and Dr. Anderson in 2013. (Tr. 200:11–16, 208:9–17; PX 37 at 7–9.) With respect to Dr. Michels' report, Dr. Wasserstein considered it notable that on the Wechsler Adult Intelligence Scale-4th ed. ("WAIS-IV"), an IQ test, Sampson received a score in the 99.7th percentile on the Verbal Comprehension Index ("VCI"), but on the Perceptual Reasoning Index ("PRI"), he scored only in the 55th percentile. (Tr. 200:17–202:3; PX 37 at 7–8.) Although Dr. Wasserstein acknowledged that some discrepancy between these scores is normal, the degree of discrepancy that Sampson exhibited is "extraordinarily rare" and occurs in less than one percent of the general population. (Tr. 202:8–18.) Furthermore, while Sampson's scores on the WAIS-IV were considered "Average" to "Very Superior," the degree of discrepancy between his VCI and PRI scores represents "an intellectual limp which disrupts unified functioning significantly." (Tr. 202:19–203:4; PX 37 at 8.) As a result of this "limp," Sampson must "use a lot of detours" to obtain an average score. (Tr. 203:8–13.) Dr. Wasserstein also focused on Sampson's results on the Nelson-Denny Reading Test ("NDRT"), which requires reading passages of several paragraphs and answering multiple-choice questions. Under the standard 20-minute administration, Sampson scored in the bottom 16th percentile compared to college seniors. (Tr. 204:8–206:16; PX 37 at 8; Lovett Decl. ¶ 18.) With 50% additional time, he scored in the 64th percentile. (Tr. 206:9–12.) Dr. Wasserstein again noted that the wide disparity in Sampson's scores—even though most fell within normal ranges—implies a learning disability related to reading. (Tr. 206:13–21; PX 37 at 8.)

With respect to Dr. Anderson's report, Dr. Wasserstein found significant Sampson's scores on the Scholastic Abilities Test for Adults ("SATA"), which is a timed reading exam based on age norms.  (Tr. 208:18–210:3.)  Under standard time conditions, Sampson only completed half of the questions—not uncommon for persons with dyslexia—scoring in the 25th percentile.  (Tr. 210:9–25; PX 37 at 9.)  Dr. Wasserstein also noted that other assessments administered by Dr. Anderson reflected "underlying neurocognitive deficits" that cause Sampson to, among other things, read "very, very slow[ly]."  (Tr. 211:22–214:9; PX 37 at 9–10.)

Dr. Wasserstein also reviewed letters submitted in support of Sampson's requests for accommodations, as well as NBME's letters denying his requests.  (PX 37 at 10–15.)

In addition to interviewing Sampson and reviewing relevant materials, Dr. Wasserstein and Dr. Miller administered a battery of assessments.[5]  (Tr. 184:14–186:22, 189:4–190:17; PX 37 at 13.)  Dr. Wasserstein administered the WAIS-IV and obtained a near-identical result to Dr. Michels' 2013 WAIS-IV administration.  (Tr. 219:20–221:10; PX 37 at 14–15.)  Dr. Wasserstein also administered the NDRT.  Under standard time, Sampson was only able to attempt 12 of 38 questions.  Although he answered those 12 questions correctly, he scored in the 1st percentile compared to college seniors.[6]  (Tr. 225:8–24.)  Dr. Wasserstein testified that this result "scream[s] dyslexia" and reflects an impairment of Sampson's reading ability.  (Tr. 225:11–19.)  Sampson performed remarkably better when allowed as much time as he needed, answering 37 of 38

---

[5]    As part of Sampson's evaluation, Dr. Wasserstein administered symptom validity tests to ensure data reliability.  (Tr. 218:2–219:6; PX 37 at 13.)  Sampson's results on these tests were valid on all measures, which confirmed that he was "trying hard" and exercising his "best efforts" during the evaluation.  (Tr. 219:7–19; PX 37 at 13–14.)

[6]    This represented a significant decrease from Sampson's 2013 NDRT score, which placed him in the 16th percentile.  (PX 37 at 8.)  Dr. Wasserstein did not address this disparity in her evaluation report.  (PX 37; Lovett Decl. ¶ 20.)  However, in light of the results of Sampson's symptom validity testing, (Tr. 225:14–19), the Court has credited his 2020 NDRT score.  In any event, the 2013 score alone suggests a substantial impairment of Sampson's reading ability.

16

questions correctly and scoring in the 99th percentile.  (Tr. 226:12–227:2; PX 37 at 16.)

Dr. Wasserstein also administered a series of neuropsychological assessments.  (Tr. 227:11–18.)  On the Wisconsin Card Sort Test ("WCST"), a neuropsychological exam measuring visual processing and executive functioning, Sampson's scores varied on different portions of the test, ranging from average to as low as the 21st percentile.  (Tr. 228:10–21; PX 37 at 19.)  Dr. Wasserstein testified this score reflects an impairment in his ability to use visual information rapidly and correctly.  (Tr. 228:22–229:7.)  Dr. Wasserstein also noted that the WCST is "considered a good, performance-based measure of ADD."  (Tr. 229:2–3.)  Dr. Wasserstein administered the California Verbal Learning Test ("CVLT").  (Tr. 229:8–24.)  Again, his scores varied on different components of the test, with some as low as the 7th percentile.  (PX 37 at 20.)  Dr. Wasserstein stated that the CVLT results indicate that Sampson "has both visual memory and learning problems."  (Tr. 229:20–21.)  These problems act as a "roadblock in his ability to retrieve information," which in turn causes him "to do things more slowly," which would impact his performance on the USMLE.  (Tr. 230:8–17.)  Dr. Wasserstein also administered the Rey-Osterreith Complex Figure Test ("RCFT").  (Tr. 230:18–22; PX 37 at 20–21.)  Sampson's scores were below average on each component of the RCFT, reflecting consistent impairment of skills required to retrieve complex information.  (Tr. 230:23–24; PX 37 at 20.)

Dr. Wasserstein also evaluated Sampson for ADHD.  She administered the Conners Adult ADHD Rating Scale ("CAARS"), which indicated clinically significant problems with inattention, memory, and hyperactivity.  (Tr. 232:8–233:15; PX 37 at 22.)  She also considered the prior evaluation reports prepared by Dr. Michels and Dr. Anderson, neither of whom diagnosed Sampson with ADHD; Dr. Aronson's diagnosis of ADHD; Sampson's academic records, including comments from his teachers; Sampson's academic performance; and her own and Dr.

Miller's observations of Sampson.  (Tr. 234:4–235:5; PX 37 at 22–25.)

Based on the totality of this data, Dr. Wasserstein found that there was "more than sufficient evidence" that Sampson met the criteria for a DSM-V diagnosis of Specific Learning Disorder with impairment in reading (reading fluency and reading comprehension) and written expression (spelling and handwriting).  (Tr. 187:1–25, 236:6–10; PX 37 at 24.)  Dr. Wasserstein also diagnosed Sampson with ADHD in accordance with the DSM-V criteria.  (Tr. 233:16–234:3.)  She testified that Sampson has substantial impairments in reading, reflected in the "absurdly" slow rate at which he reads compared to most people.  And because of his ADHD, he does not function efficiently compared to others.  These impairments operate in concert with one another.  (Tr. 236:22–237:25.)

Dr. Wasserstein recommended the following accommodations:  double time on in-class and standardized exams, including Step 1; a separate testing room; and longer breaks.[7]  (Tr. 238:1–16; PX 37 at 25.)  After Stony Brook reviewed Dr. Wasserstein's report, it granted Sampson double time on examinations, a separate testing area, and extra breaks.  It also provided note-taking services.  (Tr. 114:24-115:20.)

With Dr. Wasserstein's evaluation in hand, Sampson submitted a seventh request for accommodations to NBME on April 13, 2022, seeking 100% additional time (double time) and additional breaks.  (Tr. 117:3–5; PX 35–37; McGeehan Decl. ¶ 32 and Ex. 16.)  NBME provided Sampson's appeal to Dr. Murphy for review.  Based on Dr. Murphy's recommendation and its review of the file, NBME denied Sampson's request by letter dated June 1, 2022.  (Tr. 119:14–15; McGeehan Decl. ¶ 33 and Ex. 18; Murphy Decl. ¶ 25 and Ex. 2.)

---

[7]      Shortly after evaluating Sampson, Dr. Wasserstein became seriously ill with COVID-19.  (Tr. 118:7–18; 241:12–25.)  Dr. Wasserstein's report was written in December 2020, but Sampson did not receive the final report until January 2022.  (Tr. 116:17–18, 118:8–119:13, PX 37.)  Some of this delay may have been attributable to Sampson, but his and Dr. Wasserstein's testimony on this point was inconclusive.  (Tr. 118:13–119:4, 241:19–243:14.)

During Sampson's attempts to obtain accommodations for Step 1, NBME's consultants never met, interviewed, or evaluated him in person.  (Tr. 356:2–357:5, 423:21–424:13.)

## H.  **Sampson's Current Academic Status at Stony Brook**

Sampson began his third year of medical school in August 2020, ending a three-and-a-half year leave of absence.  (Tr. 112:11–16.)  He received strong performance reviews during his third-year clinical rotations, which he completed in July 2021.  (R. Sampson Decl. ¶ 2 and Ex. 1-A at 12–14.)  Sampson also began taking business school classes at the same time he was completing his third year of medical school, in or around June or July of 2021.  (Tr. 139:3–6, 140:18–141:5.)  Since he finished his third-year clinical rotations, he has taken only business school classes.  (Tr. 141:6–9.)  He has maintained a 4.0 GPA in business school.  (R. Sampson Decl. ¶ 3.)

On July 29, 2022, Sampson filed a complaint and motion for preliminary injunction against Stony Brook.  See Sampson v. Stony Brook Univ., et al., No. 22-CV-4490 (E.D.N.Y.).  He alleged that Stony Brook planned to dismiss him from medical school by August 12, 2022, because he did not complete his degree within seven years as required by school policy.  (See Compl. ¶¶ 95–97, ECF No 1.)  He sought injunctive relief prohibiting Stony Brook from dismissing him from medical school and requiring Stony Brook to allow him more than seven years to complete his degree. (ECF No. 2.)  Action on Sampson's status is currently stayed.  (ECF Nos. 7, 17–18.)

## I.  **The Preliminary Injunction Hearing**

Sampson commenced this action on August 29, 2022.  The Court held a three-day evidentiary hearing on Sampson's motion for a preliminary injunction from October 11 to October 13, 2022.  Testifying as part of Sampson's case were Dr. Lam; Dr. Shelley Sampson, his mother; Dr. Wasserstein; and Sampson himself.  Testifying on behalf of NBME were Marc Kroopnick, Ph.D., Director of MCAT Development and Psychometrics with the Association of American

Medical Colleges (Tr. 249:20–22); Dr. Lovett; and Dr. Murphy.

## II.   CONCLUSIONS OF LAW

### A.  Preliminary Injunction Standard

A party seeking a preliminary injunction must show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  Raia v. Pompeo, 455 F. Supp. 3d 7, 11–12 (E.D.N.Y. 2020) (quoting N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018) (internal citation omitted)).  However, a more exacting standard applies to a party seeking mandatory relief:

> where the movant is seeking to modify the status quo by virtue of a mandatory preliminary injunction (as opposed to seeking a prohibitory preliminary injunction to maintain the status quo), or where the injunction being sought will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits, the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits.

Yang v. Kosinski, 960 F.3d 119, 127–28 (2d Cir. 2020) (internal quotation marks and citations omitted); Raia, 455 F. Supp. 3d at 12 (citing N. Am. Soccer League, 883 F.3d at 37).

Here, Sampson must meet this heightened standard.  He seeks an injunction that would require NBME to reverse its current position and provide him accommodations on Step 1.  This would constitute mandatory relief because, if granted, the injunction would alter "the parties' pre-controversy position vis-à-vis the other."  N. Am. Soccer League, 883 F.3d at 38.  Sampson also must meet this heightened standard because the injunction he seeks would "provide the [him] with substantially all the relief sought" prior to a trial on the merits.  Yang, 960 F.3d at 128.

### B.  Irreparable Harm

First, Sampson must establish "[t]he single most important prerequisite for the issuance of a preliminary injunction," that he would suffer irreparable harm in the absence of preliminary

20

injunctive relief.  Yang, 960 F.3d at 128 (quoting Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)).  "To satisfy the irreparable harm requirement, [Sampson] must demonstrate that absent a preliminary injunction [he] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (quoting Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005)). Because he seeks mandatory relief, Sampson must "make a strong showing of irreparable harm." Yang, 960 F.3d at 128.  The Court finds that he has made this showing.

In Ramsay v. National Board of Medical Examiners, the Third Circuit concluded that the plaintiff had demonstrated that she faced irreparable harm where evidence of her disability, together with her previous failures to pass Step 1 without accommodations, indicated that "she likely would fail again and be forced to leave medical school" which "could not later be redressed by a legal or an equitable remedy."  968 F.3d 251, 262 (3d Cir. 2020).  Like the plaintiff in Ramsay, Sampson cannot continue his medical training until he passes Step 1.  He faces injury that is neither remote nor speculative.  Although he has not yet registered to take Step 1 following NBME's latest denial of his request for accommodations, (Tr. 435:22–436:14), he has already taken Step 1 without accommodations.  He failed despite extensive preparation and use of the test-taking strategies that he had employed successfully on the MCAT, as he was unable to read all the questions on the exam.  In light of his substantial impairments, it is likely that he will again fail Step 1 if he takes the exam without accommodations.  Accordingly, he will not be able to progress to his final year of medical school unless he receives accommodations on Step 1.

Moreover, Stony Brook has informed Sampson that he faces termination because he has

not completed his studies within seven years.[8]  If Sampson is dismissed from medical school, he will be ineligible to take Step 1, as NBME requires examinees to be currently enrolled as medical students.  (McGeehan Decl. ¶ 34.)  Based on Sampson's MCAT scores and previous attempts to gain admission to medical school—which resulted in only one offer of admission—it is unlikely that he would win admission to other medical schools that, for example, do not condition graduation on passing Step 1.  Cf. Baer v. Nat'l Bd. of Med. Exam'rs, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (plaintiff failed to establish irreparable harm because "[t]he record indicates that she may plausibly seek admission to other medical schools that, unlike [her current medical school], do not condition matriculation on passing the Step 1 exam").  Thus, it is clear that unless Sampson is able to take Step 1 with accommodations, his "medical career will effectively end." Ramsay v. Nat'l Bd. of Med. Exam'rs, No. 19-CV-2002, 2019 WL 7372508, at *18 (E.D. Pa. Dec. 31, 2019), aff'd, 968 F.3d 251 (3d Cir. 2020).[9]

In addition, courts have repeatedly determined that "an examiner's refusal to provide accommodations can cause the exam-taker irreparable harm because doing so jeopardizes her 'opportunity to pursue her chosen profession.'"  Ramsay, 968 F.3d at 262–63 (quoting Enyart v. Nat'l Conf. of Bar Exam'rs, 630 F.3d 1153, 1166 (9th Cir. 2011)).  Because Sampson cannot proceed to his final year of medical school until he passes Step 1, any further delay pending a trial on the merits would continue to deprive Sampson of his opportunity to pursue his medical training.

---

[8]     NBME argues that Sampson has not shown irreparable harm because "taking the Step 1 exam will not alter the fact that he is subject to dismissal by Stony Brook because he failed to complete his medical degree within seven years."  (NBME Opp'n at 7.)  However, even if Sampson were to prevail in his lawsuit against Stony Brook, he still could not proceed with his medical studies without taking and passing Step 1.

[9]     Moreover, Title III of the ADA does not provide for damages, so absent injunctive relief Sampson will be left without any remedy.  See 42 U.S.C. § 12188(a).  Even if damages were available, however, "[t]he lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation."  Berger v. Nat'l Bd. of Med. Exam'rs, No. 19-CV-99, 2019 WL 4040576, at *28 (S.D. Ohio Aug. 27, 2019) (quoting Bonnette v. District of Columbia Court of Appeals, 796 F. Supp. 2d 164, 186 (D.D.C. 2011)).

See Berger v. Nat'l Bd. of Med. Exam'rs, No. 19-CV-99, 2019 WL 4040576, at *28 (S.D. Ohio Aug. 27, 2019) (finding that "a delay in taking the Step 2 CK exam pending the resolution of this lawsuit would deprive [plaintiff] of the opportunity to practice his chosen profession of medicine"); Doe v. Samuel Merritt Univ., 921 F. Supp. 2d 958, 964 (N.D. Cal. 2013) (medical student was likely to suffer irreparable harm by inability to participate in clinical rotations and earn medical degree while lawsuit was pending, delaying her professional career); Bonnette v. D.C. Ct. of Appeals, 796 F. Supp. 2d 164, 186–87 (D.D.C. 2011) ("Because [plaintiff] cannot practice law until she successfully passes the D.C. Bar Examination, any delay in taking the MBE deprives her of time to practice her chosen profession."); Jones v. Nat'l Conf. of Bar Exam'rs, 801 F. Supp. 2d 270, 286–87 (D. Vt. 2011) ("[W]hile Plaintiff is losing opportunities to take the MPRE, there is no countervailing benefit she obtains through the passage of time.  Indeed, the passage of time is likely to exacerbate her harm as it may delay completion of her law school education and may delay her entry into her chosen professional field.").

It is true, as NBME argues, (NBME Opp'n at 8–9, ECF No. 20), that Sampson's delay in seeking preliminary injunctive relief through this lawsuit weighs against finding irreparable harm. In particular, NBME points to the fact that it first denied Sampson's request for accommodations in 2017.  (McGeehan Decl. ¶ 14.)  However, NBME ignores that in 2020, Stony Brook allowed Sampson to proceed to his third year of medical school without first passing Step 1.  (Tr. 109:3–110:14.)  This obviated Sampson's immediate need to obtain accommodations from NBME.  (Tr. 112:19–113:21.)  As a result, the correct point of reference is not NBME's first denial in 2017, but rather NBME's denial of Sampson's most recent request for accommodations, which occurred only in June 2022.  This slight delay does not defeat Sampson's showing of irreparable harm.

Accordingly, the Court concludes that Sampson has made a "strong showing," Yang, 960

23

F.3d at 128, that he will suffer irreparable harm absent preliminary injunctive relief.

## C.  **Clear or Substantial Likelihood of Success on the Merits**

### 1.  **ADA Framework**

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation[.]" 42 U.S.C. § 12182(a).  NBME does not dispute that it is subject to the ADA's antidiscrimination provisions.  Indeed, the ADA specifically requires that testing entities like NBME "that offer[] examinations . . . related to applications, licensing, certification, or credentialing for . . . professional . . . purposes shall offer such . . . in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." Id. § 12189.  United States Department of Justice ("DOJ") regulations implementing this provision of the ADA require that

> [t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

28 C.F.R. § 36.309(b)(1)(i).[10]  Accordingly, an entity offering such an examination, like NBME, must provide "appropriate auxiliary aids" for those with disabilities, such as additional time or an

---

[10]     The ADA authorizes DOJ to promulgate regulations implementing the ADA's public accommodation provisions.  See 42 U.S.C. §§ 12186(b), 12205a; see also Reed v. 1-800-Flowers.com, Inc., 327 F. Supp. 3d 539, 544 (E.D.N.Y. 2018) ("When enacting the ADA, Congress charged [DOJ] with issuing regulations under Title III, 42 U.S.C. § 12186(b), rendering technical assistance, id. § 12206(c), and enforcing Title III in court, id. § 12188(b)."). Such regulations, issued following notice-and-comment rulemaking, have "the force and effect of law." Ramsay, 968 F.3d at 257 (quoting PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055 (2019)).  See also Hill v. Delaware N. Companies Sportservice, Inc., 838 F.3d 281, 290 (2d Cir. 2016) ("In general, there are two types of rules: legislative rules, which have the force of law, and interpretive rules, which inform the public of the agency's construction of the statutes it administers. . . .  Interpretive rules lack the force of law because they need not undergo notice-and-comment rulemaking as legislative rules do. . . .  For this reason, we defer to interpretive rules only to the extent that we find them persuasive.") (internal quotation marks and citations omitted).

24

alteration in "the manner in which the examination is given," unless the modification would "fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden." 28 C.F.R. §§ 36.309(b)(2), (3).

A person has a "disability" under the ADA if they have "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). DOJ regulations provide that a "physical or mental impairment" includes ADHD and "dyslexia and other specific learning disabilities." 28 C.F.R. § 36.105(b)(2). "Major life activities" include, as relevant to Sampson's claim, reading and concentrating.[11] 42 U.S.C. § 12102(2)(A); 28 C.F.R. § 36.105(c)(1). Whether an impairment "substantially limits" a major life activity should be measured "as compared to most people in the general population." 28 C.F.R. § 36.105(d)(1)(v). As a result, "not every impairment will constitute a disability." Ramsay, 968 F.3d 251, 257 (quoting J.D. by Doherty v. Colonial Williamsburg Found., 925 F.3d 663, 670 (4th Cir. 2019)). See also B.C. v. Mount Vernon Sch. Dist., 837 F.3d 152, 160 (2d Cir. 2016) (explaining that "[n]ot every impairment that affects an individual's major life activities is a substantially limiting impairment") (citation omitted).

In determining whether Sampson has a disability, the Court must consider the ADA's legislative history. "The definition of 'disability' under the ADA was previously interpreted narrowly." Hamilton v. Westchester Cty., 3 F.4th 86, 92 (2d Cir. 2021) (citing Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197–98 (2002)). However, in 2008, Congress enacted the ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, with the "principal purpose" of "overrul[ing] the Supreme Court's arguably narrow interpretation of what constitutes an ADA-

---

[11]    Sampson claims to be "substantially impair[ed]" in "the major life activities of reading, spelling, cognitive processing speed, attention [sic] concentration and taking standardized exams." (Sampson Mem. at 3, ECF No. 16-1.) However, for the purposes of this motion, the Court has considered only reading and concentration, which the Court finds are the only "major life activities" relevant to the USMLE Step 1.

qualifying disability . . . and to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." Hamilton, 3 F.4th at 92 (citation omitted). Accordingly, the ADAAA commands that "disability" should be "construed in favor of broad coverage[.]" 42 U.S.C. § 12102(4)(A). See also Hamilton, 3 F.4th at 92 (explaining that the ADAAA "broadened the definition of 'disability' under the ADA"); Ramsay, 968 F.3d at 257 ("We construe the term 'disability' broadly.") (citation omitted).

Likewise, DOJ regulations interpreting the ADAAA explain that

[t]he primary object of attention in cases brought under title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

28 C.F.R. § 36.105(d)(1)(ii). The regulations also state that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA," and "is not meant to be a demanding standard." 28 C.F.R. § 36.105(d)(1)(i). Therefore, "the 'substantially limits' inquiry 'should not demand extensive analysis,'" and "'[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.'" Ramsay, 968 F.3d at 258–59 (quoting 28 C.F.R. §§ 36.105(d)(1)(ii), (vii)). Additionally, in determining whether an individual has a disability, "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." 28 C.F.R. § 36.105(d)(3)(iii). As a result, DOJ's regulations caution against placing undue emphasis on scholastic achievement, as "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities . . . because of the additional time or effort he or she must spend to

26

read, write, speak, or learn compared to most people in the general population." Id.  Nevertheless, the Court notes that DOJ regulations and guidance "do[ ] not preclude the consideration of grades and outcomes; rather, they simply cannot be the only determining factor."  Wright v. Nat'l Bd. of Med. Examiners, No. 21-CV-02319, 2021 WL 5028463, at *4 (D. Colo. Oct. 15, 2021).

Finally, DOJ regulations require that "[w]hen considering requests for modifications, accommodations, or auxiliary aids or services, the [testing] entity gives considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations . . ." 28 C.F.R. § 36.309(b)(1)(v).  This is because "a recent history of past accommodations is critical to an understanding of the applicant's disability and the appropriateness of testing accommodations."  Ramsay, 968 F.3d at 259 (quoting Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56,236, 56,298 (Sept. 15, 2010)).

### 2.  Sampson's Entitlement to Accommodations Under the ADA

Sampson has provided ample evidence that his learning disabilities and ADHD substantially limit his reading and concentration compared to most people in the general population.

As set forth in the Court's findings of fact, Sampson's parents, teachers, tutors, and psychological evaluators have all noted that, as a result of his impairments, he experiences more difficulty with reading and concentration as compared to most people in the general population.

In elementary school, Sampson's teacher recognized that he needed to work with a reading specialist.  (S. Sampson Decl. ¶ 4; PX 19 at 2; Tr. 162:7–21.)  Dr. Lam, Sampson's MCAT tutor, also recognized Sampson's substantial limitations in reading.  For example, he observed Sampson "reverse letters and numbers, and otherwise miswrite numbers," and struggle with sentences with

multiple clauses, only to forget the previous sentence as soon as he moved onto the next sentence. (Decl. of Dr. Andrew Lam ¶ 6, ECF No. 32-2.)  Dr. Lam tutored hundreds of students in elementary school, middle school, high school, college, and medical school.  (Tr. 16:3–4, 16:10–14.)  Out of all the students with whom he worked, Dr. Lam stated that Sampson "by far . . . had the most difficulty . . . when it came to processing written text and reading."  (Tr. 20:11–20.)  Linda DeMotta, who also observed Sampson's struggles with reading firsthand, noted that Sampson "has a slow reading rate and poor visuospatial processing such that he will avoid reading because the reading process is both exhausting and painful."  (PX 7 at 1.)  Based on her observations of Sampson, DeMotta concluded that Sampson's "dyslexia substantially impairs his reading skills, test taking skills, time management skills, and memory."  (Id. at 2.)

Sampson's use of strategies designed to mitigate the effects of his impairments is also well documented.  He has relied on more than 20 tutors from elementary school through college, who have helped him learn material that he could not learn through reading.  He has used a Livescribe pen to record lectures and sync the audio with his notes and has steered clear of classes with substantial reading components or timed exams.  (Tr. 51:14–53:12.)  On the SAT and ACT, he employed measures that allowed him to minimize the amount of reading required to answer questions.  (R. Sampson Decl. ¶ 11; Tr. 130:5–1317, 133:10–15.)  Similarly, in preparing for the MCAT, Dr. Lam helped him develop test-taking strategies that included writing brief notes summarizing sentences in exam questions, reading only topic sentences and specific portions of the text relevant to a particular question, and double-checking copied sentences and calculations. (Tr. 19:6–11, 21:15–22:16, 58:3–59:1.)  Despite his impairments, by using these mitigating measures, Sampson generally has performed well in school and on standardized exams.

Sampson also has received formal and informal accommodations throughout his life.  He

testified that when taking tests in school, he "was pretty much basically the very last person taking the test every single time . . . [a]nd this was in pretty much every subject area, whether it was Social Studies or Math or English, I would always need the most amount of time to finish answering the questions or writing an essay." (Tr. 41:11–17.)  As a result, some of his teachers granted him extra time to complete exams during lunch or after school—though even with extra time, Sampson was sometimes still unable to complete the exams.  (Tr. 41:23–42:2.)  Even before he sought formal accommodations as a medical student, several of Sampson's professors allowed him extra time for exams, though not for shelf exams.  (Tr. 66:4–67:16.)  In his second year of medical school, Stony Brook granted him formal accommodations, including 50% additional time on exams.  (PX 6.)  Once he received these accommodations, his shelf exam scores improved dramatically, climbing from a failing average of 66% on unaccommodated exams to a passing average of 83% on accommodated exams.  (PX 7.)  He later applied for additional accommodations after receiving ADHD diagnoses from Dr. Aronson and Dr. Wasserstein.  (PX 5, 37; Tr. 114:24–115:20.)  Stony Brook approved his request and allowed him 100% additional time on exams—including shelf exams comprised of retired USMLE questions.  (Tr. 115:11–15.)

Finally, Sampson's evaluation conducted by Dr. Wasserstein demonstrates that his reading abilities are substantially impaired compared to most individuals in the general population.  Dr. Wasserstein, with the assistance of Dr. Miller, spent 15 hours evaluating Sampson in person and prepared an exhaustive evaluation analyzing his psychometric scores, accounting for her and Dr. Miller's personal observations of Sampson, and reviewing his academic and medical records describing his substantial impairments.  (PX 37.)  Based on this entire body of evidence, Dr. Wasserstein found that Sampson met the criteria for a DSM-V diagnosis of Specific Learning Disorder with impairment in reading (reading fluency and reading comprehension) and written

expression (spelling and handwriting).  (Tr. 187:1–25, 236:6–10; PX 37 at 24.)  Dr. Wasserstein

concluded that, when compared to the general population, Sampson has a substantial impairment

in reading in that he reads at a slow rate.  (Tr. 236:22–237:10.)  Likewise, his treating psychiatrist,

Dr. Aronson, as well as Dr. Wasserstein, concluded based on clinical evaluations that his ADHD

substantially impairs his concentration ability.  (PX 5, 25, 31-A, 37.)  These evaluators based their

conclusions on "exactly the type of data DOJ contemplates as showing a learning disability that

substantially limits an individual as compared to others in the general population."  Ramsay, 968

F.3d at 258 (affirming district court's finding that plaintiff was disabled based on diagnostic

assessments showing substantial limitation).

      Nevertheless, NBME and its consultants argue that Sampson has failed to demonstrate that

he is disabled.  (See NBME Opp'n at 14–23; Lovett Decl. ¶¶ 3, 45–49; Murphy Decl. ¶ 43; Ortiz

Decl.; Decl. of Joseph E. Bernier, Ph.D. ("Bernier Decl.") ¶¶ 8–34, 37, ECF No. 25; Declaration

of Dawn P. Flanagan, Ph.D. ("Flanagan Decl.") ¶ 5, ECF No. 26.)[12]

      NBME and its consultants attack Dr. Wasserstein's analysis of the psychometric testing

that she conducted with Dr. Miller, as well as her interpretation of the evaluations prepared by Dr.

Michels and Dr. Anderson.[13]  For example, in reviewing Sampson's evaluations, Dr. Lovett found

that "[e]very time that Mr. Sampson's academic skills have been measured against age peers on

diagnostic tests, his skills have been in the average range or above, including on measures that

were timed."  (Lovett Decl. ¶ 17.)  Dr. Lovett pointed to Sampson's scores on the Wechsler

Individual Achievement Test and the Woodcock-Johnson Tests of Achievement, which were in

---

[12]     Dr. Bernier is a licensed psychologist in New York State.  (Bernier Decl. ¶ 2.)  Dr. Flanagan is a Professor of Psychology at St. John's University.  (Flanagan Decl. ¶ 2.)  Dr. Bernier and Dr. Flanagan did not serve as external reviewers for NBME at the time Sampson submitted his accommodation requests.  (McGeehan Decl. ¶¶ 11–33.)  They have provided expert opinions solely in connection with the preliminary injunction proceedings, although neither testified at the hearing.

[13]     They do not, however, challenge the evaluators' administration or scoring of the evaluations.

the average range or above. (Id. ¶ 17(c); PX 37 at 15–16.) Similarly, Dr. Bernier reviewed Sampson's three evaluation reports for NBME and concluded that "[c]linical evaluation of Mr. Sampson's intellectual functioning did not indicate substantially limited cognition when compared to the general population." (Bernier Decl. ¶ 19.)

NBME and its consultants highlight specific diagnostic tests that purportedly undermine—or at least do not support—Sampson's claim. (NBME Opp'n at 14–16.) For example, Dr. Bernier asserts that Sampson's evaluators "overemphasize the NDRT findings and feature the results as a cornerstone of their conclusions that Mr. Sampson is an impaired reader who is consequently unable to access standardized examinations under normal time conditions," when in fact the NDRT "is not an appropriate measure of reading impairment because the test scores were compared to an inappropriate reference group, specifically to college graduates, not the general population using age norms." (Bernier Decl. ¶¶ 26–28.) Dr. Lovett similarly discounted Sampson's reliance on the NDRT. (Lovett Decl. ¶¶ 18–22.) NBME and its experts also argue that Sampson's scores on neuropsychological assessments are not probative of his reading or concentration skills. For example, Dr. Lovett critiqued Dr. Wasserstein's conclusion that Sampson's variable performance on measures of visual memory "likely contribute to his reading comprehension difficulties." (PX 37 at 20.) Specifically, Dr. Lovett testified that he does not "necessarily see a relationship between those visual memory scores" from tests involving drawing complex figures and reading comprehension. (Tr. 324:7–17; see also Lovett Decl. ¶ 30; Bernier Decl. ¶ 31; Murphy Decl. ¶ 29.)

NBME and its consultants also take issue with Dr. Wasserstein's conclusion, (Tr. 202:19–203:4, 206:13–21; PX 37 at 8), that extreme variability across some of Sampson's diagnostic test scores is evidence of a substantial impairment. Dr. Lovett testified that variability across test

scores is not indicative of an impairment or a disability, as it is "the type of profile of performance that virtually everyone has (at least in some domains)." (Lovett Decl. ¶ 47; Tr. 328:4–23; see also Flanagan Decl. ¶ 6; Bernier Decl. ¶ 20.)

Ultimately, however, the Court finds Dr. Wasserstein's conclusions—as supported by the factual record—more persuasive and finds NBME's experts less persuasive.

First, NBME and its experts apply too exacting a standard in concluding that Sampson is not disabled. DOJ regulations implementing the ADAAA caution that "the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis," and "is not meant to be a demanding standard." 28 C.F.R. § 36.105(d)(1)(i), (ii). As set forth above and in the Court's findings of fact, Sampson has provided extensive evidence that his learning disabilities and ADHD substantially limit his reading and concentration abilities compared to most people in the general population.

NBME and its experts single out the results of specific psychometric tests for criticism, but Dr. Wasserstein relied on multiple measures in concluding that Sampson's reading and concentration abilities are substantially limited compared to most people in the general population. Aside from Sampson's NDRT scores, on the SATA he scored in only the 25th percentile, falling "in the below average range compared to same age peers." (PX 37 at 8–9, 12; Tr. 208:18–210:3, 210:9–25, 211:22–214:9.) Sampson also scored poorly on several neuropsychological assessments, including the WCST—a "good, performance-based measure of ADD" (Tr. 229:2–3)—the CVLT, and the RCFT. (PX 37 at 17–20.) Dr. Wasserstein noted that his low scores on these assessments reflect "impaired neuropsychological functions [that] greatly impact his ability to perform under rapid processing demands, especially where there is reading[.]" (PX 37 at 24.) She further testified that this would affect his performance on written examinations like Step 1.

32

(Tr. 227:11–229:7, 229:8–231–7.)  Additionally, Dr. Wasserstein explained that the discrepancy between his VCI and PRI scores represents "an intellectual limp which disrupts unified functioning significantly," implying a learning disability relating to reading.[14]  (Tr. 202:19–203:4, 206:13–21; PX 37 at 8.)

Moreover, Sampson's evaluators—most notably, Dr. Wasserstein, but also Dr. Michels, Dr. Anderson, and his treating psychiatrist, Dr. Aronson—made their findings following hours of in-person observation of Sampson's behavior and symptoms.  On the other hand, NBME's experts have never met, interviewed, or evaluated Sampson in person.  DOJ's regulations "mandate that the determination of whether an impairment substantially limits a major life activity requires an individualized assessment.  Such assessments benefit from the reports of professionals who know or have personally examined the individual."  Ramsay, 968 F.3d at 260 (citing 28 C.F.R. § 36.105(d)(1)(vi)).  In-person assessments allow evaluating professionals to closely observe an individual's behavior and effort.  The preamble to DOJ's updated rule implementing the ADA explains that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment."  Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56,236, 56,297 (Sept. 15, 2010).[15]  Accordingly, "when testing entities receive documentation provided by a qualified professional who has made an individualized

---

[14]      NBME and its experts contend that "variability across test scores is not indicative of an impairment or a disability."  (NBME Opp'n at 16; see also Lovett Decl. ¶ 47; Murphy Decl. ¶ 30; Bernier Decl. ¶ 20.)  However, the Court finds persuasive DOJ regulatory guidance, cited in Ramsay, explaining that disparities between an individual's aptitude and actual achievement can be used—in part—to diagnose disability.  968 F.3d at 257–58.

[15]      In interpreting and applying an agency's regulation, courts may properly consider "the regulation's preamble . . . as well as the purpose of the regulation's authorizing statute."  Fernandez v. Zoni Language Centers, Inc., 858 F.3d 45, 50 (2d Cir. 2017) (quoting Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ., 819 F.3d 42, 52 (2d Cir. 2016)).  See also Ramsay, 968 F.3d at 258 n.8.

assessment of an applicant that supports the need for the modification, accommodation, or aid requested, they shall generally accept such documentation and provide the accommodation." Id.

It is certainly true, as NBME argues (NBME Opp'n at 22–23), that NBME was not required to conduct an in-person interview or evaluation of Sampson. Notably, however, other courts—having considered DOJ regulations and guidance—have decided to credit the testimony and findings of experts who have personally observed a plaintiff over the testimony and findings of experts who have not. See Ramsay, 968 F.3d at 260 (holding that district court's decision to weigh the plaintiff's experts more favorably than the NBME's experts, who had not personally observed the plaintiff, "was consistent with DOJ regulations"); Berger, 2019 WL 4040576, at *25–26 ("[T]he Court finds the strong weight of the evidence supports the findings and conclusions of [the plaintiff's expert], who personally administered multiple assessments to [the plaintiff] and clinically observed his performance and efforts on those assessments"). Here, after considering the DOJ regulations and guidance and all the evidence in the record, the Court finds that the weight of the evidence supports the conclusions of Dr. Wasserstein. Accordingly, the Court credits Dr. Wasserstein—whose evaluation and diagnoses of Sampson also benefited from in-person observation of his behavior and symptoms—over NBME's experts.

Second, NBME's arguments and its experts' opinions fail to adequately account for the evidence of accommodations—both formal and informal—that Sampson has received throughout his life. DOJ regulations require that "[w]hen considering requests for modifications, accommodations, or auxiliary aids or services" testing entities must "give[ ] considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations . . ." 28 C.F.R. § 36.309(b)(1)(v).

Sampson has provided ample evidence of accommodations from childhood through the

present day, including his extensive use of tutors and learning specialists, as well as teachers who

informally allowed him extra time to finish exams.  Most importantly, however, Stony Brook has

determined that as a result of his impairments, he should receive double time on shelf exams.

NBME cannot seriously dispute that these exams—comprised of retired USMLE questions—

represent a "similar testing situation," 28 C.F.R. § 36.309(b)(1)(v), as compared to Step 1.  NBME

offers no testimony or other evidence demonstrating that it gave "considerable weight" to this

evidence in rejecting Sampson's requests for accommodations.  In fact, NBME contends that it

need not give any weight to Stony Brook's determination that Sampson is entitled to

accommodations.[16]  (NBME Opp'n at 23.)  The Court disagrees and assigns "considerable weight"

to Sampson's history of accommodations, especially Stony Brook's determination that he should

receive double time on shelf exams.  See Ramsay, 968 F.3d at 259 (holding that district court did

not err in giving "considerable weight" to plaintiff's past accommodations in determining that

plaintiff was disabled).

Third, NBME and its experts place too much emphasis on Sampson's academic and test-

taking outcomes, without accounting for the mitigating measures he employed to achieve those

outcomes.  The ADA requires that the determination of whether a person has a disability should

be made "without regard to the ameliorative effects of mitigating measures" such as "learned

behavioral or adaptive neurological modifications."  42 U.S.C. § 12102(4)(E)(i)(IV).  See also 28

---

[16]         For this proposition, NBME cites Doherty v. National Board of Medical Examiners, in which the Fifth Circuit
held that testing entities like NBME need only consider past accommodations "after a person establishes that they are
disabled under the ADA." 791 F. App'x 462, 466 (5th Cir. 2019).  The Third Circuit rejected this approach in Ramsay,
968 F.3d at 259 (citing 28 C.F.R. § 36.309(b)(1)(v)), consistent with other courts that have considered an applicant's
history of accommodations in determining whether they are disabled.  See, e.g., Bibber v. Nat'l Bd. of Osteopathic
Med. Exam'r, Inc., No. 15-CV-4987, 2016 WL 1404157, at *7 (E.D. Pa. Apr. 11, 2016) (explaining that "[c]ourts
across the country have considered," among other factors, "whether the individual has been afforded testing
accommodations in the past").  Doherty is also factually distinguishable.  There, the Fifth Circuit explained that "the
record does not provide evidence of whether [plaintiff's medical school] gave [her] accommodations because it found
that she met the definition of disability under the ADA[.]"  791 F. App'x at 466.  Here, by contrast, Stony Brook
explicitly told NBME that it had granted Sampson accommodations because it had determined that he met the
definition of disability under the ADA and explained the bases for its decision.  (See, e.g., PX 6–7, 29.)

C.F.R. § 36.105(d)(3)(iii) ("[T]he focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve.").

NBME argues that Sampson's success on standardized tests, set forth in the Court's findings of fact, "undermines any argument that he is substantially limited compared to most people in any major life activity relevant to taking the Step 1 exam." (NBME Opp'n at 17.) To be sure, the ADA nor DOJ regulations "preclude the consideration of grades and outcomes," Wright, 2021 WL 5028463, at *4, and the Court has considered them here. Likewise, it is true that some courts—including those cited in NBME's brief, (NBME Opp'n at 17–19)—have concluded that prior success in the classroom or on standardized exams does not support a finding of disability. However, those courts also relied on other factors beyond high test scores—factors that are absent here—in concluding that the plaintiffs were not disabled. See, e.g., Wright, 2021 WL 5028463, at *5–6 (plaintiff seeking accommodations on USMLE Step 3 had never received test-taking accommodations and had already taken and passed Step 1 and Step 2 CK without accommodations); Black v. Nat'l Bd. of Med. Exam'rs, 281 F. Supp. 3d 1247, 1249–52 (M.D. Fla. 2017) (plaintiff submitted "diagnoses" obtained from professionals who either did not opine on whether she was "substantially limited," or concluded that she was not "substantially limited"); Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, 870 F. Supp. 2d 607, 620–22 (S.D. Ind. 2012) (plaintiff's evaluating psychologist testified that his reading skills were average, and plaintiff provided "no evidence of coping mechanisms undertaken to account for a substantially-limiting disorder").

As other courts have recognized, a "'definition of disability based on outcomes alone, particularly in the context of learning disabilities, would prevent a court from finding a disability in the case of any individual . . . who is extremely bright and hardworking, and who uses alternative

routes to achieve academic success,' a result that would be inconsistent with the goals of the ADA." Berger, 2019 WL 4040576, at *23 (quoting Bartlett v. New York State Bd. of Law Exam'rs, No. 93-CV-4986, 2001 WL 930792, at *37 (S.D.N.Y. Aug. 15, 2001) (Sotomayor, J.)). See also Peters v. Univ. of Cincinnati Coll. of Med., No. 10-CV-906, 2012 WL 3878601, at *6 (S.D. Ohio Sept. 6, 2012) ("Defendant's rationale—that anyone who has had some modicum of academic success cannot be found to have a disability that affects learning—flies in the face of Congress' directives and the relevant implementing regulations.").

Indeed, this view is consistent with DOJ regulations, which explain that "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities . . . because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population."  28 C.F.R. § 36.105(d)(3)(iii).  See also Amendment of Americans With Disabilities Act Title II and Title III Regulations To Implement ADA Amendments Act of 2008, 81 Fed. Reg. 53,204, 53,230 (Aug. 11, 2016) ("concur[ring]" with Equal Employment Opportunity Commission's "view" that "[i]ndividuals diagnosed with dyslexia or other learning disabilities will typically be substantially limited in performing activities such as learning, reading, and thinking when compared to most people in the general population, particularly when the ameliorative effects of mitigating measures, including therapies, learned behavioral or adaptive neurological modifications, . . . studying longer, or receiving more time to take a test, are disregarded as required under the ADA Amendments Act.") (citing Regulations To Implement the Equal Employment Provisions of the Americans With Disabilities Act, as Amended, 76 Fed. Reg. 16978, 17,009 (Mar. 25, 2011)); Ramsay, 968 F.3d at 257–58.

Here, Sampson provided extensive evidence documenting the mitigating measures that he

developed and applied in taking standardized tests such as the SAT, ACT, and MCAT, as well as in other academic settings throughout his life.  Nevertheless, NBME contends that it is doubtful that, given the format of these exams, Sampson could have actually utilized these test-taking strategies to perform as well as he did.  (NBME Opp'n 17–19.)  At the hearing, Dr. Kroopnick testified that a successful MCAT examinee could not answer MCAT Verbal Reasoning questions without fully reading and understanding the passage to which the questions relate.  (Tr. 258:20– 260:7, 262:23–263:20.)  Ultimately, however, the Court credits Sampson's testimony, which was corroborated by Dr. Lam's description of the test-taking strategies that he helped Sampson develop and deploy.  (Tr. 21:15–22:16, 57:25–59:1.)

That Sampson was able to use these mitigating measures with some success does not, as NBME argues, undermine his claim that he is substantially limited in his ability to read and concentrate.  Rather, his past success on standardized tests and in the classroom reflects that he compensated for his impaired reading and concentration abilities through learned behavioral modifications, such as test-taking strategies, and by studying longer than his peers.  See Ramsay, 968 F.3d at 258 n.7 ("[I]n deciding whether [the plaintiff] was disabled, the Court could appropriately consider and discount that she compensated for her very weak reading and writing abilities by devoting more effort to her assignments than most students.") (citing 28 C.F.R. § 36.105(d)(3)(iii)); Berger, 2019 WL 4040576, at *23 (discussing the plaintiff's "compensatory strategies to speed up his reading for standardized examinations like the MCAT").

In sum, considering the entire factual record in this case, the Court concludes that Sampson has established that he is disabled within the meaning of the ADA, by virtue of his diagnosed Specific Learning Disorder with impairments in reading (reading fluency and reading comprehension) and written expression (spelling and handwriting), and ADHD.  These

impairments substantially limit his ability to read and concentrate as compared to most people in the general population.  Accordingly, he has demonstrated a substantial likelihood of success on the merits of his ADA claim.

## D.  **Balance of Harms and Public Interest**

Under the final injunction factor, the Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." Yang, 960 F.3d at 135–36 (internal quotations marks and citations omitted).

Sampson argues that the balance of harms weighs in his favor, as "NBME's denials of Sampson's accommodation request denies him the opportunity to take the USMLE Step 1 in a non-discriminatory manner and on equal footing with nondisabled test-takers," while "[e]xtended testing time is not logistically difficult to provide," and "it will cost NBME nothing to grant [his requested] accommodation[s]."  (Sampson Mem. at 22.)  NBME contends that Sampson's reasoning "misses the mark," as "[t]he harm here has nothing to do with logistics or cost, and everything to do with ensuring fairness to other examinees, preserving the integrity of the USMLE, and protecting the public welfare."  (NBME Opp'n at 24.)

This factor favors Sampson.  The Court recognizes that NBME's "procedures are designed to ensure that individuals with bona fide disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination." Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 88 (2d Cir. 2004).  Nevertheless, it is equally true that, "[a]s administrator of the national exam used by a number of states for licensing medical doctors, [NBME] has a duty to ensure that its examination is fairly administered to all those taking

39

it." Id. at 88–89 (emphasis added).  See also 28 C.F.R. § 36.309(b)(1)(i) (requiring testing entities to select and administer exams "so as to best ensure that, when the examination is administered to an individual with a disability . . . the examination results accurately reflect the individual's aptitude or achievement level . . . rather than reflecting the individual's impaired sensory, manual, or speaking skills").   As discussed above, Sampson has demonstrated that his requested accommodations are necessary to ensure that when he takes Step 1, he will be tested on his aptitude and knowledge of the subject matter—not on whether he can overcome his disability.  Without his requested accommodations, Sampson risks failing Step 1 and losing the opportunity to progress in his medical training.  Accordingly, the balance of harms weighs in favor of granting an injunction.

Next, Sampson argues that the public interest favors enforcing the ADA, increasing the number of physicians in the United States, and allowing qualified candidates with disabilities to pursue medical careers.  (Sampson Mem. at 23.)  NBME, on the other hand, contends that Sampson's position "is based on the mistaken premise that [he] has shown he is disabled under the ADA and has a clear likelihood of succeeding on the merits of his claim."  (NBME Opp'n at 24–25.)  Moreover, according to NBME, the public interest weighs against granting a preliminary injunction where accommodations may be unwarranted because "medical licensing authorities rely on the [USMLE] to assess the competency of potential doctors." [17]  (Id. at 25.)

This factor also favors Sampson.  It is NBME's position—not Sampson's—that is based on a mistaken premise.  "In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities." Ramsay, 968

---

[17]     NBME also notes that even if, as Sampson says, "[m]any areas of the United States are under-served by physicians," (Sampson Mem. at 23), Sampson has not provided any evidence that he intends to practice medicine in an underserved area, and there is a "significant question whether he will ever be licensed to practice medicine anywhere . . . given his status in medical school and the fact that he is also pursuing a business degree."  (NBME Opp'n at 25.)  Although it is correct that Sampson has offered scant support for this line of argument, the Court finds—on other grounds—that this factor weighs in his favor.

F.3d at 263 (quoting Enyart, 630 F.3d at 1167).   Sampson has shown a substantial likelihood that he is entitled to accommodations under the ADA.   Accordingly, "[g]ranting injunctive relief would further the public interest by prohibiting discrimination by testing agencies, such as the NBME, on the basis of disability."   Berger, 2019 WL 4040576, at *29 (collecting cases).   And because Sampson has shown a substantial likelihood that he is entitled to accommodations, there is no reason that providing him the requested accommodations will "alter[ ] the substance of" Step 1.   Powell, 364 F.3d at 89.   Rather, the resulting scores will simply "reflect each examinee's abilities accurately."   Id.   Thus, the public interest weighs in favor of granting preliminary injunctive relief.

### III.   CONCLUSION

For the reasons stated above, Sampson's motion for a preliminary injunction is GRANTED.   NBME is ORDERED to provide the following accommodations to Sampson on the USMLE Step 1 exam:   100% additional testing time (double time), a separate testing room, and extended breaks.

**SO ORDERED.**

Dated:  December 2, 2022
Central Islip, New York

_____/s/_____(JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE